WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Brian S. Rosen, Esq. (BR 0571)

Attorneys for The New York
  Racing Association, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------x
                                                       :
**In re:**                                             :          **Chapter 9**
                                                       :
**NEW YORK CITY OFF-TRACK BETTING**                    :          **Case No. 09-17121 (MG)**
**CORPORATION,**                                       :
                                                       :
                                **Debtor.**            :
                                                       :
-----------------------------------------------------------------------x

**OBJECTION OF THE NEW YORK RACING ASSOCIATION, INC.**
**TO DEBTOR'S BANKRUPTCY PETITION AND**
**STATEMENT OF QUALIFICATIONS UNDER SECTION 109(C)**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

          The New York Racing Association, Inc. ("*NYRA*"), pursuant to sections 109(c)

and 921(c) of chapters 1 and 9 of title 11 of the United States Code (the "*Bankruptcy Code*"),

and this Court's Order, entered December 9, 2009, hereby objects (the "*Objection*") to the

voluntary petition (the "*Petition*") under chapter 9 of the Bankruptcy Code of New York City

Off-Track Betting Corporation ("*NYC OTB*") and the entry of an order for relief in connection

therewith, and respectfully represents as follows:

## INTRODUCTION

1.     The Petition must be dismissed because NYC OTB cannot satisfy the debtor-eligibility requirements under section 109(c) of the Bankruptcy Code and did not meet the good faith requirement of section 921(c) of the Bankruptcy Code.  Pursuant to section 109(c), NYC OTB bears the burden of demonstrating that (a) the Petition was filed in good faith, (b) it was specifically authorized to be a debtor under chapter 9 of the Bankruptcy Code, and (c) prior to filing its Petition (i) negotiations with its creditors were "impracticable" or (ii) it reasonably believed a creditor would attempt to obtain a preferential transfer, rendering negotiations improper.

2.     NYC OTB's contentions in its Statement of Qualifications under Section 109(c) of the Bankruptcy Code (the "*Statement*") are belied by the most compelling facts, including the plain language pursuant to which NYC OTB was organized and permitted to operate, which compel dismissal of the Petition.  First, NYC OTB was not specifically authorized by state law to file the Petition.  Second, NYC OTB has failed to demonstrate that it was unable to negotiate in good faith over a plan of adjustment with its creditors – in particular, NYRA, which NYC OTB lists as its second largest creditor –  because such negotiations were impracticable, or because it was reasonably concerned that, during such negotiations, a creditor would attempt to obtain a preference.  Third, NYC OTB's petition was not filed in good faith, as it (a) is using these proceedings to avoid making statutorily mandated distributions to NYRA and other similar creditors, (b) has no reasonable prospects for reorganization, (c) failed to give adequate consideration to alternatives to a chapter 9 filing, and (d) filed for purposes inconsistent with the policy behind chapter 9.

3.     As more fully discussed below, NYC OTB is ineligible to be a chapter 9 debtor and did not file the Petition in good faith.  Accordingly, this Court should dismiss the Petition.

## FACTUAL BACKGROUND

4.     On December 3, 2009 (the "**Petition Date**"), NYC OTB filed the Petition [Docket No. 1] and Statement [Docket No. 6], along with the Declaration of Robert J. Garry in Support of the Chapter 9 Petition and the Statement of Qualifications (the "**Garry Declaration**") [Docket No. 2] and the Declaration of Raymond Casey in Support of the Chapter 9 Petition and the Statement of Qualifications (the "**Casey Declaration**") [Docket No. 3].

5.     In the Statement, NYC OTB claims to be qualified to be a chapter 9 debtor under the requirements of section 109(c) of the Bankruptcy Code.  (Statement at 1.)  In support thereof, NYC OTB contended that "[it] is specifically authorized by name to be a chapter 9 debtor through Executive order No. 27 . . . issued by New York Governor David A. Paterson on September 1, 2009" (the "**Executive Order**") and that, "[o]n December 3, 2009, the board of directors of NYC OTB voted to pass resolutions authorizing the commencement and prosecution of this case."  (Id. ¶ 2.)  In addition, NYC OTB asserted in a perfunctory manner that it "is (a) unable to negotiate with creditors because such negotiation is impracticable; and (b) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 [of the Bankruptcy Code]."  (Id. ¶ 5.)

6.     Concurrently with the Petition and Statement, NYC OTB filed its List of Creditors Holding 20 Largest Unsecured Claims (the "**Unsecured Creditors List**"), which lists NYRA as NYC OTB's second largest unsecured creditor [Docket No. 4].  Strangely, upon information and belief, NYC OTB failed to include on the Unsecured Creditors List other post-

employment benefits obligations, non-current, which, according to the audited financial statements of NYC OTB, aggregate claims in excess of $200 million.

7.      As set forth in the Garry Declaration, NYC OTB acknowledges that it is statutorily required to distribute a certain percentage of the total dollars wagered through its services on a race to the New York State (the "***State***") horse racing industry, including NYRA. (Garry Decl. ¶ 7.)  Notably, NYC OTB is required "to pay [mandatory distributions to] its statutory beneficiaries before making allowance for its own operating expenses."  (Casey Decl. ¶ 17.)  In addition, NYC OTB acknowledges its obligation to make payments to NYRA pursuant to negotiated simulcast contracts between the parties.  (Garry Decl. ¶ 7.)  NYC OTB has not made timely payment to NYRA of distributions mandated by either the Racing Law or by contract.  (See Unsecured Creditors List.)  As of the Petition Date, by NYC OTB's own acknowledgment, NYRA is entitled to payments of at least $14,695,315.07.  (See id.)  This amount is slightly less than the amount owed NYC OTB's top unsecured creditor, and is over twice as much as the amount owed to NYC OTB's third largest unsecured creditor.  (See id.)

8.      According to the Casey Declaration, the primary purpose of NYC OTB's bankruptcy filing is to pursue a "legislative restructuring of NYC OTB's mandatory distribution payments."  (Casey Decl. ¶ 37.)  But, NYC OTB's parochial lobbying agenda is hardly a concrete "business plan," and NYC OTB is hinging the success of this case on the State Legislature's "swift and decisive" action to modify the legislative distribution scheme – a subject that NYC OTB has "repeatedly petitioned" the State legislature to address, *to no avail*.  (Id. ¶¶ 23, 57.)  NYC OTB confesses that all "other aspects of NYC OTB's business plan are still under consideration." (Id. ¶ 37.)  For example, NYC OTB contemplates debt financing of $250 million,

the source of which will depend on "the condition of financial markets at the time NYC OTB plans to obtain such financing."  (<u>Id.</u> ¶ 64.)

9.     On December 9, 2009, this Court entered an Order (A) Dispensing With Any Requirement to File a List of Customers or Employees, (B) Fixing (I) a Deadline for Filing Objections to the Chapter 9 Petition, (II) a Deadline for Any Response, and (III) a Hearing Date on Any Such Objection, and (C) Approving Form of and Directing Notice [Docket No. 19] (the "***Order***").  Pursuant to the Order, this Court set January 4, 2010 at 4:00 p.m. as the deadline to object under section 921(c) of the Bankruptcy Code to the Petition and the entry of an order for relief.

### NYC OTB FAILS TO SATISFY SECTION 921(c) OF THE BANKRUPTCY CODE AND THE PETITION MUST BE DISMISSED

**A.     NYC OTB Has Not Satisfied Its Burden of Demonstrating Its Eligibility Under Section 109(c)**

10.     Section 921(c) of the Bankruptcy Code states that, "[a]fter any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title." 11 U.S.C. § 921(c).  Although the statutory language of section 921(c) is permissive, courts have interpreted it as requiring dismissal of a petition filed by a debtor not eligible for relief under chapter 9.  <u>In re City of Vallejo</u>, 408 B.R. 280, 289 (B.A.P. 9th Cir. 2009) ("Despite the permissive statutory language, courts have construed § 921(c) to require the mandatory dismissal of a petition filed by a debtor who fails to meet the eligibility requirements under § 109(c)." (citation omitted)); <u>In re Valley Health Sys.</u>, 383 B.R. 156, 160 (Bankr. C.D. Cal. 2008) (citing <u>In re County of Orange</u>, 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995) ("Although the language of § 921(c) is permissive, the case law indicates that § 921(c) 'must be given a mandatory effect if

the defect in the filing is in the debtor's eligibility to file chapter 9.'" (quoted reference

omitted))).  An entity is eligible for relief under chapter 9 only if it:

>(1) is a municipality;
>
>(2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by state law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;
>
>(3) is insolvent;
>
>(4) desires to effect a plan to adjust such debts; and
>
>(5)(A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
>
>(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
>
>(C) is unable to negotiate with creditors because such negotiation is impracticable; or
>
>(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c).

11.     The chapter 9 petitioner bears the burden of demonstrating that it has met

the mandatory provisions of section 109(c)(1)-(4) and one of the requirements under section

109(c)(5).  In re City of Vallejo, 408 B.R. at 289 (citing In re Valley Health, 383 B.R. at 161); In

re County of Orange, 183 B.R. at 599 (citing In re City of Bridgeport, 129 B.R. 332, 339 (Bankr.

D. Conn. 1991)).  When determining whether a chapter 9 petitioner is eligible for an order for

relief, a bankruptcy court "should . . . exercise [its jurisdiction] lightly . . . .  Considering the

bankruptcy court's severely limited control over the debtor, once the petition is approved, access

to Chapter 9 relief has been designed to be an intentionally difficult task." In re Sullivan County Reg'l Refuse Disposal Dist., 165 B.R. 60 (Bankr. D.N.H. 1994); see In re Cottonwood Water and Sanitation Dist., Douglas County, Colo., 138 B.R. 973, 979 (Bankr. D. Colo. 1992) (explaining that, although the Bankruptcy Code, as remedial legislation, is generally broadly construed, "municipal bankruptcies involve significant problems . . . not encountered in the private sector" and raise important constitutional issues, so that "Congress consciously sought to limit accessibility to the bankruptcy court by municipalities" (internal quotation marks and citation omitted)).

While NYRA accepts that NYC OTB is a public benefit corporation in accordance with Section 603(1) of the Racing Law, and thus would constitute a "municipality" as per section 101(40) of the Bankruptcy Code, NYC OTB fails to satisfy each of the other required precepts for chapter 9 protection.

1. **NYC OTB's Petition Must Be Dismissed Because NYC OTB Was Not Specifically Authorized To Be A Chapter 9 Debtor**

12.     Section 109(c)(2) makes clear that a municipality is not eligible to be a debtor unless it is specifically authorized by state law, or by a governmental officer or organization empowered by state law, to file for bankruptcy. Such authorization must be "exact, plain, and direct with well-defined limits so that nothing is left to inference or implication." In re County of Orange, 183 B.R. at 604 (finding investment fund formed by county was not specifically authorized by California statute to file its chapter 9 petition); accord In re Slocum Lake Drainage Dist. of Lake County, 336 B.R. 387, 390 (Bankr. N.D. Ill. 2006) (citations omitted) (dismissing chapter 9 petition filed by drainage district because it was not specifically authorized, in its capacity as a municipality or by name, to be a debtor under any Illinois statute, and was not authorized by a governmental officer or organization empowered by Illinois law).

13.     Section 109(c)(2), enacted as part of the 1994 Amendments to the Bankruptcy Code, changed the language in section 109(c) from "generally authorized" to file a chapter 9 proceeding to the "specifically authorized" language currently found in the statute.  In re Alleghany-Highlands Econ. Dev. Auth., 270 B.R. 647, 648 (Bankr. W.D. Va. 2001).  The legislative history of the 1994 Amendments indicates that the subsection was enacted to remedy a split in the courts as to whether states had to provide express statutory authorization for a municipality's chapter 9 filing.  In re Timberon Water & Sanitation Dist., No. 9-07-12142, 2008 WL 5170581, at *1 n.3 (Bankr. D.N.M. June 18, 2008); see In re Slocum Lake, 336 B.R. at 390 (quoting H.R. Rep. No. 103-835, at 59 (1994) ("This section clarifies the eligibility requirements applicable to municipal bankruptcy filings by requiring that municipalities be specifically authorized by the State in order to be eligible to file for bankruptcy.")); In re County of Orange, 183 B.R. at 604 ("The [1994] amendment requires that the state give the municipality express authority to file.").

14.     Therefore, it is clear that, in this case, no authority to file the Petition exists absent legislative authorization and subsequent gubernatorial agreement specifically (i) authorizing NYC OTB to file a bankruptcy petition, or (ii) empowering a governmental officer or organization to authorize NYC OTB's bankruptcy filing.

15.     The Statement fails to point to statutory language that meets the Bankruptcy Code's specific authority requirement.  This is because no such language exists.  The State has passed legislation enabling a municipality or its emergency financial control board, or the city of New York or the New York state financial control board, to file for bankruptcy under chapter 9.  N.Y. Local Fin. Law § 85.80.  But, that State legislation defines "municipality" as a

"county, city, town, or village," id. § 2.00, and does not include a public benefit corporation such as NYC OTB.  Accordingly, *express authorization was required.*

16.     NYC OTB contends in its Statement that the Executive Order specifically authorized NYC OTB by name to be a debtor under chapter 9.  Critically, however, there was and is no statute that empowered Governor Paterson to authorize — pursuant to Executive Order or otherwise — NYC OTB to file for bankruptcy protection under chapter 9.  Therefore, the Executive Order could not provide the express written authority required for NYC OTB's chapter 9 filing.

17.     The historical background of NYC OTB is instructive and confirms the foregoing.  Nearly forty years after NYC OTB's inception, the State legislature enacted Chapter 115 of the Laws of 2008, effective as of June 17, 2008, which transferred control of NYC OTB from New York City to the State and provided for a major overhaul of the statutory framework pursuant to which NYC OTB exists and operates.  Yet, despite the State legislature's finding that NYC OTB was insolvent, the State legislature did not specifically authorize NYC OTB to file for bankruptcy protection and did not empower the Governor to authorize NYC OTB to restructure under chapter 9 in the event the State's takeover and reorganization efforts failed to improve NYC OTB's economic prospects.

18.     Clearly, the State legislature intended for the executive branch to assume certain responsibility for NYC OTB from New York City.  See, e.g., Racing Law, § 603 (McKinney 2009) (providing governor with power to appoint and remove for cause directors on NYC OTB's board, and to designate chairman of board).  Had the legislature intended to authorize the executive branch to utilize chapter 9 in restructuring NYC OTB, the legislature "could have easily drafted appropriate legislation . . . ."  In re Slocum Lake, 336 B.R. at 391.

The fact that the legislature has not done so leads to only one conclusion: that if, and when, bankruptcy became a necessity for NYC OTB, the State legislature intended for the Governor to return to the legislature to obtain the specific statutory authority required for NYC OTB's bankruptcy filing. Because the Governor did not seek passage of appropriate enabling legislation, or obtain express statutory authority to issue the Executive Order, NYC OTB is not eligible to be a debtor under section 109(c)(2) of the Bankruptcy Code.

19.     Moreover, the resolutions passed by NYC OTB's board of directors authorizing NYC OTB's chapter 9 filing are insufficient to meet the statutory requirement of section 109(c)(2). Notwithstanding the general corporate power to sue and be sued that is vested in and exercised by NYC OTB's board of directors, see Racing Law, §§ 603, 604, the resolutions passed by NYC OTB's board did not confer the specific authorization required for NYC OTB to file for relief under chapter 9 of the Bankruptcy Code, and are without force or effect. Courts hold that generalized powers under state law, such as the power to sue and be sued, do not create a specific authorization to seek the protection afforded under chapter 9 of the Bankruptcy Code. See In re Timberon, 2008 WL 5170581, at *2-3; In re Allegheny-Highlands, 270 B.R. at 649. Such generalized statutes are not the "exact, plain, and direct [authorization]" contemplated by section 109(c)(2) of the Bankruptcy Code. See In re County of Orange, 183 B.R. at 604. To hold that generalized corporate powers provide sufficient authority for a municipality's bankruptcy filing, such courts explain, would run counter to the 1994 Amendments to the eligibility requirements for chapter 9 proceedings. See In re Timberon, 2008 WL 5170581, at *3; In re Allegheny-Highlands, 270 B.R. at 649. Accordingly, the failure to meet this eligibility requirement mandates dismissal of the Petition.

**2. Alternatively, NYC OTB's Petition Must Be Dismissed Because NYC OTB Does Not Meet Any Exceptions To The Statutory Requirement For Negotiating With Creditors Prior To Filing For Bankruptcy**

20.     NYC OTB's Statement and Declarations fail to demonstrate that NYC OTB was unable to engage in good faith negotiations over a plan of adjustment with its creditors – in particular, NYRA, which NYC OTB lists as its second largest creditor – because such negotiations were impracticable, or because it was reasonably concerned that a creditor would attempt to obtain a preference.

21.     Congress enacted the "negotiation" requirement of section 109(c) to prevent capricious filings of chapter 9 petitions. See In re Town of Westlake, Tex., 211 B.R. 860, 867-68 (Bankr. N.D. Tex. 1997) (suggesting that section 109(c)(5) requires that a municipality have an intent to negotiate with creditors it intends to impair). Pursuant to section 109(c)(5), the proposed chapter 9 debtor must establish that it has taken certain steps prior to filing for bankruptcy to address its debts outside of bankruptcy. Such requirement supplements the requirement in 109(c)(4) that a debtor "desire to effect a plan to adjust [its] debts."

22.     As the court in In re Cottonwood Water and Sanitation District explained the negotiation requirement:

> Congress consciously sought to limit accessibility to the bankruptcy court by municipalities [by requiring] . . . the municipal entity, before rushing to . . . Court, to first seek to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan to be filed under section 941 of the [Bankruptcy] Code. . . . The 'creditor protection' provided by section 109(c)(5) . . . insures that the creditors have an opportunity to negotiate concerning a plan on a level playing field with the debtor before their rights are further impaired by the provisions of section 362 of the [Bankruptcy] Code.

138 B.R. at 979. Accordingly, to be entitled to an order for relief, a potential chapter 9 debtor "must be prepared to show that it engaged in good faith negotiations with its creditors concerning the possible terms of a plan to be effected pursuant to section 941 of the Bankruptcy

Code," id., or demonstrate why the potential debtor was unable to engage in such negotiations. Courts do not "view lightly the negotiation requirements of 11 U.S.C. ¶ 109(c)(5)." In re Villages at Castle Rock Metro. Dist. No. 4, 145 B.R. 76, 85 (Bankr. D. Colo. 1990).

      **a.**      **NYC OTB Failed To Provide Any Evidence**
                      **That It Was Incapable Of Engaging In**
                      **Pre-filing Negotiations With Its Creditors**

      23.      NYC OTB certifies that it did not negotiate with creditors prior to filing because such negotiations were impracticable. The burden of proving impracticability, as with other eligibility requirements, rests with NYC OTB. See In re City of Vallejo, 408 B.R. at 289 (citing In re Valley Health, 383 B.R. at 161); In re County of Orange, 183 B.R. at 599 (citing In re City of Bridgeport, 129 B.R. at 339). "As the legislative history indicates, [the impracticability requirement] was enacted in 1976[1] during the time of an impending municipal bankruptcy filing by the City of New York and was intended to cover situations in which a very large body of creditors would render prefiling negotiations impractical." In re Sullivan County Reg'l Refuse Disposal Dist., 165 B.R. 60, 79 n.55 9 (Bankr. D.N.H. 1994) (citation omitted); accord 2 King, Collier on Bankruptcy, ¶ 109.04[3][e][iii] (16th ed. 2009) ("[Section 109(c)(5)(C)] was inserted in the 1976 Act as a means of dealing with the difficult problems created by major municipalities such as New York City, whose bonds are exceedingly numerous and are frequently in bearer form. Under these circumstances, negotiation is difficult at best, because of the extreme difficulty in identifying the creditors with whom the municipality must negotiate."). Courts considering section 109(c)(5)(C) define the ordinary meaning of "impracticable" as "not practicable; incapable of being performed or accomplished by the means

---

[1] On April 8, 1976, an amendment to Chapter IX of the Bankruptcy Act was enacted into law and replaced sections 81-84 of the Act that Congress enacted in 1937. See Pub. L. No. 94-260, 90 Stat. 315 (Apr. 8, 1976).

employed or at command; infeasible." <u>See, e.g.,</u> <u>In re Valley Health</u>, 383 B.R. at 163 (internal quotation marks and citation omitted).

24.     Courts have commonly found the exception in section 109(c)(5)(C) satisfied where the sheer number of creditors involved renders prefiling negotiations impracticable. <u>In re County of Orange</u>, 183 B.R. at 607-08 (finding negotiations "impracticable" where potential municipal debtor was unable to meet lenders' demands for additional collateral or satisfy claims of hundreds of participants in its investment pool involving hundreds of accounts with "complex accountings" (citation omitted)); <u>see</u> <u>In re Pierce County Hous. Auth.</u>, 414 B.R. 702, 713-14 (Bankr. W.D. Wa. 2009) (finding it would have been impracticable for debtor to negotiate with approximately 7,000 potential litigants, which number excluded potential unknown plaintiffs, especially given debtor's unsuccessful attempts to settle with existing plaintiffs pre- and post-petition); <u>In re Villages at Castle Rock</u>, 145 B.R. at 85 (finding negotiations impracticable for debtor with several hundred bondholders). In addition, the impracticability requirement may be satisfied when "a municipality must act to preserve its assets and a delay in filing to negotiate with creditors risks a significant loss of those assets," <u>In re Valley Health</u>, 383 B.R. at 163 (citing <u>In re County of Orange</u>, 183 B.R. at 607-08); <u>In re City of Desert Hot Springs</u>, 81 F. App'x 123, 124 (9th Cir. 2003) ("Negotiation with Silver Sage was impracticable in light of Silver Sage's past history of freezing the City's assets and its unwillingness to agree not to do so again."), or "by [the petitioner's] need to protect the public from harm." <u>In re City of Vallejo</u>, 408 B.R. at 298.

25.     Here, the number of creditors does not render negotiations impracticable. First, NYC OTB, which has not issued public debt, does not face the same difficulty a large municipal debtor would face in identifying and negotiating with numerous bondholders. Second,

NYC OTB has not had difficulty identifying its creditors due to their sheer number, as evidenced by NYC OTB's filing of its Unsecured Creditors List, albeit incomplete, on the Petition Date.  In fact, the entities that NYC OTB considers its principal creditors are statutory distributees, like NYRA, which were well known to NYC OTB prior to the filing of the Petition.  Third, while section 109(c)(5)(C) may not necessarily require a debtor to negotiate with creditors to an impasse or satisfy a numerosity requirement before determining that such negotiation is impracticable, see In re Valley Health, 383 B.R. at 163, NYC OTB concedes that *it made no attempt whatsoever* to engage in good faith plan negotiations with creditors – even those creditors NYC OTB considers its principal creditors, like NYRA – prior to filing the Petition, *without explaining why it was incapable of doing so*.  (See Statement ¶ 5.)  Cf. In re Valley Health, 383 B.R. at 163 (finding negotiations impracticable where, even though municipality admitted that it did not engage in negotiations with its 5,000 creditors holding claims in excess of $100 million regarding a plan of adjustment prior to filing its petition, municipality communicated with its major creditors to assure them it would negotiate a plan of adjustment consistent with the requirements of chapter 9, and directors only approved the chapter 9 filing after a public meeting, held on notice, where the filing was discussed).  NYC OTB clearly failed to satisfy its burden of proof.

26.     Moreover, in NYC OTB's case, negotiating with creditors posed no risk of significant loss of NYC OTB's assets.  This case is unlike In re Orange County, where the bankruptcy court found that the chapter 9 petitioner had no time to enter into negotiations with the participants in its investment fund before it was required to file to protect its portfolio assets from liquidation by its lenders, see 183 B.R. at 608, or In re City of Desert Hot Springs, where it was likely a creditor would freeze the debtor's assets, as it had in the past, 81 F. App'x at 124.

Here, NYC OTB did not assert that it faced a similar need to file quickly to preserve its assets from creditors.  In fact, NYC OTB claims it has only a single secured creditor that is owed a *de minimus* amount.[2]  (Casey Decl. ¶ 16.)  Nor did NYC OTB assert it filed to avert public harm.  In sum, negotiations with creditors, even if difficult, would not have been impracticable prior to filing, and certainly could have been entered into with the principal creditors NYC OTB listed on its Unsecured Creditors List.

> **b.**  **NYC OTB Failed To Provide Any Evidence That It Did Not Negotiate Pre-filing Because It Reasonably Believed A Creditor Would Seek To Obtain A Preference**

27.  If NYC OTB could not demonstrate the impracticability of negotiating with its creditors prior to its chapter 9 filing, NYC OTB was obligated to demonstrate that it reasonably believed a creditor would attempt to obtain a preference, rendering negotiation improper.  See 11 U.S.C. § 109(c)(5)(D).  NYC OTB has failed to do so.  There is no information in the Statement or Declarations regarding any aggressive creditor action.[3]

Accordingly, NYC OTB has not met its burden of establishing that it has satisfied the prefiling

---

[2] As noted above, NYRA is entitled to distributions from NYC OTB pursuant to the provisions of the Racing Law and by contract.  NYRA submits that any monies attributable to statutory distributions are held in trust by NYC OTB for the benefit of, among other parties, NYRA, and NYRA reserves its right to demand turnover of such monies.

[3] NYC OTB represented at its first-day hearing held on December 7, 2009, that pending litigation with Monticello Raceway ("***Monticello***") was a factor precipitating its bankruptcy filing.  See Monticello Raceway Mgmt., Inc. v. New York City Off-Track Betting Corp., Index No. 104624/09 (N.Y. Sup. Ct. 2009).  In that action, Monticello seeks to compel an accounting of all handle commissions and other revenues necessary for computing amounts Monticello claims are due from NYC OTB, and for a judgment declaring the amount owed to Monticello by NYC OTB.  (See id. Compl. ¶¶ 19, 20-21.)  However, NYC OTB's concern that Monticello may have obtained summary judgment in the pending action within 30-45 days of the Petition Date would not constitute concern that a creditor was seeking to obtain an avoidable transfer under section 547 of the Bankruptcy Code.  Moreover, the potential liability in the state court action is *only* approximately $1.7 million, according to Monticello's complaint.  For the 2009-10 fiscal year, NYC OTB projected mandatory distributions of $97.4 million and total operating expenses of $138.3 million.  (Garry Decl. ¶ 19.)

negotiation requirement of section 109(c)(5) of the Bankruptcy Code, and it is therefore ineligible for relief under chapter 9.

**B.    NYC OTB Did Not File Its Petition In Good Faith**

28.    Even if NYC OTB could establish, by the requisite standard of proof, that it is an entity eligible for chapter 9 relief, the Petition is nonetheless subject to dismissal pursuant to section 921(c) of the Bankruptcy Code because the Petition was not filed in good faith.  "Good faith is not defined in the Bankruptcy Code."  In re McCurtain Mun. Auth., No. 07-80363, 2007 WL 4287604, at *4 (Bankr. E.D. Okla. Dec. 4, 2007).  Courts have determined, however, that the primary function of the good faith requirement in section 921(c) is to "ensure the integrity of the reorganization process by limiting access to its protection to those situations for which it was intended."  In re Sullivan County, 165 B.R. at 80 (citation omitted); accord In re McCurtain, 2007 WL 4287604, at *4 (citation omitted); see In re Villages at Castle Rock, 145 B.R. at 81 (describing good faith as requirement that "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes" (internal quotation marks and citation omitted)).

29.    To determine whether a petition is filed in good faith, courts may evaluate "(i) the debtor's subjective beliefs; (ii) whether the debtor's financial problems fall within the situations contemplated by chapter 9; (iii) whether the debtor filed its chapter 9 petition for reasons consistent with the purposes of chapter 9; (iv) the extent of the debtor's prepetition negotiations, if practicable; (v) the extent that alternatives to chapter 9 were considered; and (vi) the scope and nature of the debtor's financial problems."  In re Pierce County, 414 B.R. at 714 (citation omitted); see In re Valley Health, 383 B.R. at 161 n.8 ("[T]he absence of good faith prepetition negotiations is a factor that may be considered in determining whether a chapter 9 petition was filed in good faith." (citation omitted)); In re Villages at Castle Rock, 145 B.R. at 81

(stating debtor's "financial condition, motives, and the local financial realities" are relevant considerations for a court's good faith analysis (internal quotation marks and citation omitted)); see also In re Sullivan County, 165 B.R. at 81 (examining evolution of case law on good faith in chapter 11 filings as persuasive guidance in construing good faith filings under chapter 9 and concluding that bad faith dismissals usually result where (i) "there were no reasonable prospects for reorganization and the petition served only to hinder or delay creditors," or (ii) for other reasons, the filing was deemed "at odds with the legislatively intended scope of the chapter involved").

### 1. The Filing Was Merely A Tactic To Delay Further Payments To Creditors

30.     NYC OTB's petition was not filed in good faith because NYC OTB seeks to use these proceedings to avoid paying mandatory statutory distributions to NYRA and other creditors within the horse racing industry.[4]  The good faith requirement of section 921(c) requires that a municipality's purpose for seeking relief under chapter 9 may not be "simply to buy time or evade creditors."  6 King, Collier on Bankruptcy, ¶ 900.02[2][d] (15th ed. 2008); see In re Sullivan County, 165 B.R. at 82 (finding municipality lacked good faith where municipality filed to delay obligations under contract and force counterparty to compromise, and therefore "had no sincere intention of debt adjustment in an overall plan sense"); cf. In re Villages at Castle Rock, 145 B.R. at 81 (finding that debtor sought protection under chapter 9 in good faith, and not merely to delay payments to bondholders, where chapter 9 proceeding would provide time for residential development to proceed so that the tax base could be enhanced and further development fees realized, which would permit repayment to bondholders pursuant to a feasible plan of debt adjustment).

---

[4] See supra note 2.

31.     NYC OTB acknowledges that it is statutorily required to make certain distributions, along with contractual payments, to NYRA and other entities within the State horse racing industry, and that, under the applicable statutory scheme, distributions must be made to creditors such as NYRA before NYC OTB pays its own expenses.  (Garry Decl. ¶ 7; Casey Decl. ¶ 17.)  In addition, prior to filing, NYC OTB failed to negotiate in good faith with those parties within the State horse racing industry, including NYRA, to which NYC OTB owed statutorily mandated payments, and to which NYC OTB was already delaying payment at increasingly longer intervals.[5]  Like the municipality in <u>In re Sullivan County</u> that merely sought to hold off an inevitable payment to a contract counterparty, NYC OTB is required to pay distributions to NYRA in full under the racing laws,[6] and its chapter 9 filing – ostensibly to lobby for modification of the legislative distribution scheme – is simply an attempt to delay, or avoid altogether, its obligations to NYRA and similar creditors.  Such an attempt to unreasonably delay payment to its creditors indicates NYC OTB has not filed the Petition in good faith.

**2.      No Reasonable Prospects For NYC OTB's Reorganization
Exist At Present, And None Existed On The Petition Date**

32.     NYC OTB's lack of good faith in filing for bankruptcy is also evidenced by the fact that its business plan is rife with contingencies that render the prospect of a successful reorganization remote.  First, NYC OTB's business plan hinges on the State legislature's "swift

_____

[5] Upon information and belief, prior to filing, NYC OTB had already unilaterally extended payment terms of distributions to in-state racing tracks, such as NYRA, while making timely payments to out-of-state racing tracks.  Singling out in-state tracks for adverse treatment also indicates NYC OTB's lack of good faith in seeking bankruptcy protection.

[6] The statutory payment scheme mandated by the Racing Law directs NYC OTB to make certain distributions to NYRA on each dollar wagered through NYC OTB's services on races held by NYRA, as well as out-of-state thoroughbred races, _before_ any such funds may be used by NYC OTB for its own expenses – a fact asserted in NYC OTB's first-day pleadings.  NYRA submits that NYC OTB is required to distribute such payments in full to NYRA, and presently holds in trust amounts that NYRA is entitled to be paid pursuant to statute.  Accordingly, such funds are not property of the debtor and may not be distributed to creditors in a plan of adjustment.

and decisive" action to modify the legislative distribution scheme – a change that NYC OTB's President, Raymond Casey, declares he has repeatedly, and unsuccessfully, petitioned the legislature to enact since 2005. (Casey Decl. ¶¶ 23, 57.) <u>See</u> <u>also</u> 11 U.S.C. § 943(b)(6) (requiring that where any regulatory or electoral approval is necessary under applicable nonbankruptcy law in order to carry out any provision of a Chapter 9 plan, such approval either has been obtained or the plan is expressly conditioned on such approval). Given this critical element of NYC OTB's business plan, it is unclear when NYC OTB could propose a plan of adjustment, and therefore, how long creditors must wait to be paid. This is a particularly significant consideration in a chapter 9 case, where creditors are not able to propose their own plans, as they can in a chapter 11 case.

33. Second, the most critical of the legislative changes NYC OTB seeks is modification of the legislative distribution scheme to allow NYC OTB to pay its operating expenses before it calculates its mandatory distribution to the State horse racing industry, as well as State and local governments (<u>i.e.</u>, payment on the "net" rather than the "gross"). However, it is likely that, if distributions are made based on percentages of revenue *after* NYC OTB satisfies its hefty overhead costs, there will be insufficient funds to distribute to the State horse racing industry. Ironically, this could put the State horse racing industry out of business, which would, in turn, put NYC OTB out of business. This result casts doubt on NYC OTB's ability to "effect a speedy, efficient reorganization on a feasible basis." <u>In re County of Orange</u>, 183 B.R. at 608 (describing Ninth Circuit test for good faith in a chapter 11 case and applying to chapter 9 context).[7] Moreover, any modification of the legislative distribution scheme to pay on the "net"

---

[7] Such a result is contrary to NYC OTB's enabling legislation, which states that the legislature's intent was "to ensure that off-track betting is conducted in a manner compatible with the well-being of the horse racing and breeding industries in this state, which industries are and should continue to be major sources

would only affect future operations and shortfalls – such legislation cannot apply retroactively to achieve less than full payment of mandatory statutory distributions NYC OTB incurred prior to the Petition Date and during the pendency of this case.

34. Third, to finance its business plan, NYC OTB contemplates debt financing of $250 million, the source of which will depend on "the condition of financial markets at the time NYC OTB plans to obtain such financing." (Casey Decl. ¶ 64.) Such a commitment to debt financing is equivocal, at best, and may even require that NYC OTB obtain a guarantee from the State as a condition to such financing. However, NYC OTB's business plan fails to account for any legislative process that may be a condition precedent to such financing.

35. Fourth, any plan of adjustment must "be in the best interests of creditors." 11 U.S.C. § 943(b)(7). The "best interests test," as applied in chapter 9 cases, is "generally regarded as requiring that a proposed plan provide a better alternative for creditors than what they already have." In re Mount Carbon Metro. Dist., 242 B.R. 18, 34 (Bankr. D. Colo. 1999) (citation omitted); accord In re Sanitary & Improvement Dist., No. 7, 98 B.R. 970, 974 (Bankr. D. Neb. 1989) ("Section 943(b)(7) . . . simply requires the Court to make a determination of whether or not the plan as proposed is better than the alternatives."). Here, NYRA and other statutory distributees are entitled to be paid before any of NYC OTB's other obligations may be paid.[8] (Garry Decl. ¶ 7; Casey Decl. ¶ 17.) Any plan of adjustment must provide for payment in full of such obligations, which constitute the majority of the outstanding amounts listed on NYC OTB's Unsecured Creditors List, in order to satisfy the best interests test. The amount of such

---

of revenue to state and local government and sources of employment for thousands of state residents." Racing Law § 518.

[8] It should be further noted that Section 624 of the Racing Law requires that all obligations of NYC OTB must be satisfied in full prior to termination, and thus liquidation, of NYC OTB.

obligations that remain outstanding casts doubt on NYC OTB's ability to propose a plan of adjustment that is feasible and in the best interests of creditors, as required by section 943(b)(7) of the Bankruptcy Code.

**3.     NYC OTB's Filing Is At Odds
With The Policy Behind Chapter 9**

36.     In addition, NYC OTB's filing was not in good faith because NYC OTB appears to have sought bankruptcy protection primarily as leverage to further its previously unsuccessful legislative agenda.  "The general policy of chapter 9 is to give a debtor a breathing spell from debt collection efforts so that it can work out a repayment plan with creditors."  In re County of Orange, 183 B.R. at 608.  Because the purpose of chapter 9 is the adjustment of existing debts, NYRA submits that Chapter 9 is not the proper platform from which to pursue legislative change that affects *future* operations or to resolve political disputes.  See also In re Town of Westlake, 211 B.R. at 865 (dismissing alleged municipal debtor's petition where filing was the product of a temporary dispute over authority to sign checks).  This Court may – and should – dismiss the Petition, as its filing was at odds with the policy behind chapter 9, and, therefore, not in good faith.

**4.     NYC OTB Failed To Consider
Adequately Its Alternatives To Chapter 9**

37.     Finally, NYC OTB's decision to file for bankruptcy without making reasonable efforts to seek other revenue sources to meet its obligations prior to filing demonstrates a lack of good faith.  "The legislative history indicates that the strict hurdles to filing Chapter 9 were implemented to ensure that it was considered by a municipality only as a last resort."  In re Pierce County, 414 B.R. at 714 (citation omitted) (noting debtor decided to file a chapter 9 petition only after several years of failed negotiations and attempts at mediation); see also In re Sullivan County, 165 B.R. at 78, 82 (finding municipality's failure to use its powers to

raise discretionary revenue through its assessment and taxing powers prior to coming into bankruptcy court was evidence of lack of good faith filing); cf. In re McCurtain, 2007 WL 4287604, at *6 (denying objection to good faith filing, where creditor argued debtor public trust that provided water and sewer services could have generated revenues by assessing citizens or borrowing funds, because evidence showed the small community consisting of low-income citizens could not afford higher utility rates, and because state water agency representative testified debtor would not have been eligible for a loan from that agency).

   38. For example, NYC OTB intends to incur $250 million of debt to finance its reorganization.  However, it is unclear why, *prior to* coming into bankruptcy court, NYC OTB did not use its authority to issue bonds to raise revenue to pay its obligations, fund operations, and grow its business.  NYC OTB's failure to make such an effort to raise revenue *before* filing points to its lack of good faith in this proceeding, see In re Sullivan County, 165 B.R. at 78, 82, and, when considered in conjunction with the other indications that that this Petition was not filed in good faith, warrants dismissal of the Petition and this chapter 9 proceeding.

## CONCLUSION

NYC OTB has failed to establish the Congressionally-mandated criteria for bankruptcy intervention. WHEREFORE NYRA respectfully requests that the Court (i) decline to enter an order for relief, (ii) dismiss NYC OTB's Petition, (iii) dismiss this case, and (iv) grant NYRA such other relief as the Court deems just and proper.

Dated: New York, New York
      January 4, 2010

/s/ Brian S. Rosen
Brian S. Rosen, Esq. (BR 0571)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for The New York
  Racing Association, Inc.