Richard Levin (RL 1651)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone:     (212) 474-1000
Facsimile:     (212) 474-3700

*Attorneys for the New York City Off-Track
Betting Corporation*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 9 |
| NEW YORK CITY OFF-TRACK BETTING CORPORATION, | Case No. 09-17121 (MG) |
| Debtor.[1] | |

**RESPONSE OF NEW YORK CITY OFF-TRACK BETTING CORPORATION
TO OBJECTION OF THE NEW YORK RACING ASSOCIATION, INC. TO THE
DEBTOR'S BANKRUPTCY PETITION AND STATEMENT OF
QUALIFICATIONS UNDER SECTION 109(c)**

The Debtor, New York City Off-Track Betting Corporation

("NYC OTB"), files this Response to the "Objection Of The New York Racing

Association, Inc. To Debtor's Bankruptcy Petition And Statement Of Qualifications

Under Section 109(c)" [Docket No. 33] (the "Objection").[2]

---

[1] NYC OTB's address is 1501 Broadway, New York, NY 10036.  The Debtor's tax identification number is 13-2664509.

[2] Two additional objections were filed after the court-ordered deadline for objections.  *See* Joinder of New York Thoroughbred Horsemen's Association, Inc. in the Objection of the New York Racing Association, Inc. to Debtor's Bankruptcy Petition and Statement of Qualifications Under Section 109(c), [Docket No. 34]; Joinder of  New York Thoroughbred Breeders, Inc. in Objection of the New York Racing Association, Inc. to Debtor's Bankruptcy Petition and Statement of Qualifications Under Section 109(c)

The Objection argues that NYC OTB is not eligible under section 109(c) of the Bankruptcy Code[3] to be a debtor in a chapter 9 case and did not file its petition in good faith, as required by section 921(c). This Response and the evidence to be introduced at the hearing on the Objection will show that NYC OTB meets all the eligibility requirements and filed its petition in good faith. NYC OTB has been specifically authorized to be a debtor under chapter 9. It has negotiated with creditors over a plan, though such negotiations turned out to be impracticable, and was therefore unable to reach agreement on a plan. It filed its petition in good faith to protect its assets and to bring all parties in interest to the same negotiating table while it seeks a legislative solution to its financial distress that will allow it to develop a viable business and confirm and implement a chapter 9 plan.

## FACTS

The facts are set forth in the Declaration of Raymond Casey in Support of the Chapter 9 Petition and the Statement of Qualifications [Docket No. 3], the Declaration of Robert J. Garry in Support of the Chapter 9 Petition and the Statement of Qualifications [Docket No. 2] and the Statement of Qualifications Under Chapter 9 of Title 11 U.S.C. §109 et seq. [Docket No. 6] and will be supplemented by additional testimonial and documentary evidence, which NYC OTB intends to present at the hearing on the Objection scheduled for January 20, 2010.

---

[Docket No. 37]. However, because those objections merely joined in NYRA's Objection and advanced no separate objections of their own, this Response to NYRA's Objection addresses those objections as well.

[3] All section and chapter references in this Response are to sections and chapters of the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

# ARGUMENT

## I.  NYC OTB Has Been Specifically Authorized To Be a Chapter 9 Debtor

### A.  The Governor Specifically Authorized NYC OTB To Be a Chapter 9 Debtor

To be eligible to be a chapter 9 debtor, section 109(c)(2) requires that a municipality be "specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter". NYC OTB received such authorization in Executive Order No. 27, issued by New York Governor David A. Paterson on September 1, 2009, a certified copy of which is attached to the Statement of Qualifications [Docket No. 6] ("Executive Order No. 27"):

> "The New York City Off-Track Betting Corporation, as reconstituted and continued in existence pursuant to Section 27 of Chapter 115 of the Laws of 2008, is hereby authorized to and may file any petition with any United States district court or court of bankruptcy under any provision of the laws of the United States, now or hereafter in effect, for the composition or adjustment of municipal indebtedness."

Executive Order No. 27, at 2.  The Objection challenges this specific authorization as not satisfying the requirements of section 109(c)(2).  However, based on New York law empowering the Governor to oversee NYC OTB and carry out the legislative policies of the Racing, Pari-Mutuel Wagering and Breeding Law, the Governor's specific authorization in Executive Order No. 27 for NYC OTB to be a chapter 9 debtor meets the requirements of section 109(c)(2).

### B.  Section 109(c)(2) Does Not Require Specific Legislative Authorization

In construing a statute, the court must give effect to the plain meaning if the meaning is clear and unambiguous. *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).  Where the language is clear, "the sole function of the courts is to enforce it according to its

terms." *Id*. (internal quotes and citation omitted).  In determining the plain meaning, the statute's grammatical structure may mandate a particular interpretation. *Id*.

The statute here requires that the municipality be "specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor" under chapter 9. 11 U.S.C. § 109(c)(2).  Giving the sentence its natural and grammatical reading, it is the municipality that must be "specifically authorized", not "State law" or "a governmental officer or organization".  There are two permissible sources of authorization for the municipality to be a chapter 9 debtor: "by State law" and "by a governmental officer or organization empowered by State law".

No State statute "specifically authorize[d NYC OTB], in its capacity as a municipality or by name," to be a debtor under chapter 9. *Id*.  NYC OTB does not contend otherwise.  Thus, the Objection misreads section 109(c)(2) and the Statement of Qualifications in relying on the lack of "statutory language that meets the Bankruptcy Code's specific authority requirement".  (Objection ¶ 15.)

Rather, NYC OTB has been "specifically authorized, … by name, … by a governmental officer [the Governor] … empowered by State law". *Id*.  Executive Order No. 27 specifically authorizes NYC OTB, by name, to be a debtor under chapter 9. Therefore, the only issue is whether the Governor is "empowered by State law" to grant the authorization.  That issue is a question of state, not federal, law. *Price v. Gurney*, 324 U.S. 100, 107 (1945); *In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 73 (Bankr. D.N.H. 1994).

C.    The Governor Is Empowered by New York State Law To Authorize NYC
OTB To Be a Chapter 9 Debtor

1.    *The New York Legislature May Delegate to the Governor the
Power To Implement and Execute the Law*

The New York State Constitution allocates and assigns governmental powers among the legislative, the executive and judicial branches. *Nicholas v. Kahn*, 47 N.Y.2d 24, 30-31 (1979).  The constitutional principle of separation of powers is "implied by the separate grants of power to each of the coordinate branches of government". *Clark v. Cuomo*, 66 N.Y. 2d 185, 189 (1985); *Bourquin v. Cuomo*, 85 N.Y.2d 781, 784 (1995).  The separation of powers doctrine "requires that the Legislature make the critical policy decisions, while the executive branch's responsibility is to implement those policies". *Id*.  Therefore, the Legislature may "declare its policy in general terms by statute, endow administrative agencies with the power and flexibility to fill in details and interstices and to make subsidiary policy choices consistent with the enabling legislation". *Citizens for an Orderly Energy Policy, Inc. v. Cuomo*, 78 N.Y.2d 398, 410 (1991).

Under the New York State Constitution, the Governor has a duty to "take care that the laws are faithfully executed". N.Y. CONST. art. IV, § 3.  "The executive power of the State, vested in the Governor, is broad" and includes oversight of any department, board, bureau, or commission of the State. *Rapp v. Carey*, 44 N.Y.2d 157, 162 (1978); N.Y. EXEC. LAW § 31 (2009).  The Governor "has the power to enforce legislation and is accorded great flexibility in determining the methods of enforcement". *Clark v. Cuomo*, 66 N.Y.2d at 189, quoting *Rapp v. Carey*, 44 N.Y.2d 157, 163 (1978).

The principle is firmly rooted that the Legislature may declare a policy of the State and leave the implementation and details to the Executive.  Thus, the Court of

Appeals of New York held that the Legislature's declared policy to encourage the broadest possible citizen participation in elections empowered the Governor's Executive Order to create a Voter Registration Task Force and to require state agencies to make voter registration materials available to citizens. *Clark v. Cuomo*, 66 N.Y.2d 185 (1985). Similarly, the Court of Appeals determined that the Legislature had empowered the Governor to establish, by Executive Order, a Citizens Utility Board, even though the Board was different from the one contemplated by the Legislature, where the Legislature had enacted the basic policy that utility customers be adequately represented before the Public Service Commission. *Bourquin v. Cuomo*, 85 N.Y.2d 781 (1995). The Court of Appeals upheld the Governor's agreement to acquire a nuclear power plant as within the power granted by the Legislature, based on legislation that made clear the Legislature's policy that the plant be closed. *Citizens for an Orderly Energy Policy, Inc. v. Cuomo*, 78 N.Y.2d 398 (1991). In each of these cases, the Legislature had stated a broad policy but had not specifically authorized the Governor's Executive Order or action. In each case, the Court of Appeals determined that the Legislature had empowered the Governor to issue the Executive Order or take the action because it was within the powers that the New York State Constitution and the Legislature had properly delegated to the Governor.

Cases addressing the validity of administrative regulations rely on the same line of case law and similarly support cases in which the Court of Appeals has addressed action by the Governor. The Court of Appeals has ruled that the Legislature authorizes administrative action when the action is consistent with legislative policy. Thus, the Chairman of the Public Service Commission (the "PSC") properly promulgated rules limiting personal investments by PSC employees in utility companies where the

Legislature had established a code of ethics in broad terms and declared a public policy of the State to prevent the appearance of taint or impropriety in state agencies. *Nicholas v. Kahn*, 47 N.Y.2d 24 (1979). The rules were within the authority that the Legislature, by stating the general policy, had delegated to the PSC Chairman.

The corollary, of course, is that the Governor may not contravene the Legislature's stated policy. Where the Legislature had determined that the existence of conflicts of interest in the Executive Branch should be determined on a case-by-case basis, the Court of Appeals has held that the Legislature did not empower the Governor to issue an Executive Order requiring Executive Branch employees' financial disclosure and broadly prohibiting their political activity. *Rapp v. Carey*, 44 N.Y.2d 157 (1978). The Executive Branch also may not implement a policy on which the Legislature has not spoken, because the Legislature has not empowered the Executive to do so. Thus, where the Legislature had never stated a policy regarding public smoking, the Public Health Council overstepped the line between rule making and policy making when it issued detailed regulations on smoking in indoor public spaces. *Boreali v. Axelrod*, 71 N.Y.2d 1 (1987).

However, the Legislature's failure to adopt a bill with specific measures may not be taken as a rejection of the Governor's authority to implement those measures when they are consistent with the Legislature's policy. In *Clark v. Cuomo*, the Legislature failed to act on a bill establishing a Voters Registration Task Force, and in *Borquin v. Cuomo*, the Legislature failed to act on a bill creating a Citizens Utility Board. Yet Executive actions to the same effect were upheld as within the legislative grant of power because they were consistent with the Legislature's general policy. As the New

York Court of Appeals made clear, the fact that legislation "was not passed does not indicate legislative disapproval of the programs contemplated by the order. Legislative inaction, because of its inherent ambiguity, affords the most dubious foundation for drawing positive inferences." *Clark v. Cuomo*, 66 N.Y.2d 185, 190-91 (1985) (citations and internal quotes omitted).

The Legislature's authority to delegate and empower executive action is not unlimited. It must limit the field in which the delegated powers operate and provide "reasonable safeguards and standards". *Levine v. Whalen*, 39 N.Y.2d 510, 515 (1976). But a specific formula is not required. *Id*. Thus, in *Levine v. Whalen*, the New York Court of Appeals held that the language "to provide for the protection and promotion of the health of the inhabitants of the state" stated a sufficiently clear standard. *Id*. at 516. New York courts have routinely upheld, as providing a sufficiently clear standard, similar language, such as "public interest", *N.Y. Cent. Secs. Corp. v. U.S.*, 287 U.S. 12, 24-25 (1932); "public interest, convenience, or necessity", *Sullivan County Harness Racing Assn. v. Glasser*, 30 N.Y.2d 269, 277 (1972); "public convenience and advantage", *Martin v. State Liq. Auth.*, 15 N.Y.2d 707 (1965); "public peace, safety and good order", *People ex rel. Doscher v. Sisson*, 222 N.Y. 387, 396-7 (1918); "public health, safety and general welfare", *Aloe v. Dassler*, 278 App. Div. 975, *aff'd* 303 N.Y. 878 (1952); and "public interest", *Int'l Ry. Co. v. Public Serv. Comm.*, 264 App. Div. 506, *aff'd* 289 N.Y. 830 (1943). *See Levine v. Whalen*, *supra*, at 517.

In determining whether a particular executive act comes within the legislative standard, the court must "examine the purpose of the enabling legislation, its factual background and history to ascertain whether [the executive has] been delegated

the power to promulgate [the] rules." *Nicholas v. Kahn*, 47 N.Y.2d at 32 (1979). Here, the

history of Chapter 115 of the Laws of 2008 ("Chapter 115"), its factual background, the

pervasive overall supervision and regulatory control over off-track pari-mutuel wagering

on horse races that the Legislature has assigned to the Executive Branch and the

responsibility for management and administration of NYC OTB specifically conferred

upon the Governor by Chapter 115, as well as the Governor's Constitutional and

Executive Law authority to "take care that the laws are faithfully executed", N.Y. CONST.

art. IV, § 3, all support the conclusion that the Legislature has empowered the Governor

to issue Executive Order No. 27 and specifically authorize NYC OTB to be a debtor

under chapter 9.

2. *The Legislature Empowered the Governor To Implement Chapter 115, Including the Power To Authorize NYC OTB To Be a Chapter 9 Debtor*

The Legislature enacted Chapter 115 to confirm a State takeover of NYC

OTB from the City of New York.  In enacting Chapter 115, the Legislature expressly

found:

> "[T]he New York city off-track betting corporation (NYC OTB) is
> insolvent and facing closure.  The legislature further finds that nearly 1.1
> billion dollars, almost half of all money wagered on horse racing in New
> York state, is wagered through NYC OTB.  The revenue distributed to the
> racing industry, which is derived from wagering through NYC OTB, plays
> an integral role in sustaining the viability of the entire horse racing
> industry in New York state, and NYC OTB employs almost 1,500 people
> in New York.  The legislature therefore determines that the continued
> operation of NYC OTB corporation is of paramount importance to the
> public interest."

2008 N.Y. SESS. LAWS 661 (McKinney).  The legislative policy of Chapter 115 is clear:

it is "of paramount importance to the public interest" to maintain "the continued

operation of NYC OTB".

Through Chapter 115, the Legislature gave the Governor increased powers over NYC OTB. The Legislature removed from the Mayor of New York City and granted to the Governor the power to appoint NYC OTB's Board, designate the Chairman and remove board members for cause. Racing, Pari-Mutuel Wagering and Breeding Law, §§ 603(1), (3) and (5). NYC OTB's former obligation to report to the Mayor of New York City was shifted to the Governor, among other state bodies. *Id*., § 621. In short, the Legislature gave the Governor the authority to supervise NYC OTB, to address its fiscal challenges and to authorize actions to preserve its continued operation.

The Legislature's statement of policy that it is of paramount importance that NYC OTB continue operations, coupled with the Governor's broad powers of oversight of State agencies (*Rapp v. Carey*) and the great flexibility accorded the Governor in determining methods of enforcement of legislation (*Clark v. Cuomo*), empowered the Governor to authorize NYC OTB to be a chapter 9 debtor. The empowerment parallels the determination of the Court or Appeals that the Legislature authorized the Governor to establish a Citizens Utility Board to carry out the policy to provide adequate representation to utility customers (*Bourquin v. Cuomo*), to establish a Voter Registration Task Force and make voter registration forms available at state agencies to carry out the policy to promote voting (*Clark v. Cuomo*) or even to purchase a nuclear power plant to carry out the policy that the plant be shut down (*Citizens for an Orderly Energy Policy, Inc. v. Cuomo*). The Legislature did not restrict the means the Governor might use to achieve the overarching goal of continued operation of NYC OTB, as it did in *Rapp v. Carey*, where the legislative policy that ethics issues be

addressed on a case-by-case basis did not permit a blanket executive order requiring financial disclosure of all employees and prohibiting political activities.

Executive Order No. 27 is entirely consistent with the foregoing legislative statement of policy. It recognizes the continued deterioration in NYC OTB's finances and gives effect to the legislative policy that "continued operation of NYC OTB is of paramount importance to the public interest". 2008 N.Y. SESS. LAWS 661 (McKinney). It acknowledges the efforts of the NYC OTB Board of Directors "to restore fiscal equilibrium to NYCOTB" and determines that "it is in the public interest to afford maximum flexibility to the NYCOTB Board of Directors as it charts a course to return NYCOTB to fiscal solvency". Executive Order No. 27, at 2. Based on these considerations, Executive Order No. 27 specifically authorized NYC OTB to be a chapter 9 debtor.

Finally, although the Objection suggests otherwise, this is not a case of "self-authorization" as was attempted in *In re Timberon Water & Sanitation Dist.*, 2008 WL 5170581 (Bankr. D.N.M. June 18, 2008), where the municipality argued that its own general powers conferred on it by state law made it the "governmental organization empowered by state law to authorize" its own filing and that its own Board's resolution provided the necessary specific authorization. *See also In re Alleghany-Highlands Eco. Devel. Auth.*, 270 B.R. 647 (Bankr. W.D. Va. 2001). Here, the NYC OTB Board acted only after specific authorization by the supreme executive authority of the State, who considered the fiscal distress confronting NYC OTB and the potential adverse effect on the State and the racing industry and made the independent decision to authorize NYC OTB to be a chapter 9 debtor. *See generally* Executive Order No. 27.

## II.    NYC OTB Satisfies at Least One of the "Negotiation" Requirements of Section 109(c)(5)

Section 109(c)(5) requires that a municipality meet one of four negotiation-related requirements to be eligible to be a chapter 9 debtor.  Briefly stated, they are:  (A) negotiation of an agreement with creditors, (B) good faith negotiation and failure to reach an agreement, (C) negotiation is impracticable and (D) reasonable belief that a creditor may attempt to obtain an avoidable preference.  NYC OTB has not reached an agreement with its creditors.  The following therefore addresses only section 109(c)(5)'s second, third and fourth alternatives.

Section 109(c)(5) should be liberally construed to foster the remedial purposes for which the statute was enacted.  As stated in the Senate Judiciary Committee Report accompanying the bill that enacted the Bankruptcy Code and section 109(c)(5):

> "The purpose of the provision is to limit accessibility to the bankruptcy court somewhat, as does current law, without making the accessibility requirement so stringent as to preclude relief in a situation in which the petitioner is confronted with stubborn or aggressive creditors, or creditors whose identities are unknown because of the existence of a large number of bonds in bearer form."

S. Rep. 95-989, 95th Cong., 2d Sess. 111 (1978).

### A.    NYC OTB Negotiated in Good Faith with Its Creditors

The second alternative basis on which a municipality may meet the negotiation-related eligibility requirement is that the municipality "has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that [the municipality] intends to impair under a plan".  11 U.S.C. § 109(c)(5)(B).  Some cases have held that this alternative requires that the municipality present some sort of "comprehensive workout plan dealing with all of [its] liabilities and all of [its] assets" as part of the negotiations (*In re Sullivan*

*County Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 78 (Bankr. D.N.H. 1994)), "the

possible terms of a plan to be effected pursuant to section 941" (*In re Cottonwood Water*

*& Sanitation Dist.*, 138 B.R. 973, 979 (Bankr. D. Colo. 1992)), or an "outline or term

sheet of a plan which designates classes of creditors and their treatment" (*In re City of*

*Vallejo*, 408 B.R. 280, 297 (9th Cir. B.A.P. 2009)).  However, the plain meaning of the

statute does not so require, nor does the case law uniformly require a plan; *see In re*

*Villages at Castle Rock Metropolitan Dist. No. 4*, 145 B.R. 76, 85 (Bankr. D. Colo. 1990)

(negotiation "to develop a financial model … to reach conceptual agreement with the

largest bondholders" meets this alternative).  The leading treatise suggests that requiring

negotiation over the terms of a chapter 9 plan "is an overly restrictive view of the

requirement".  2 Alan N. Resnick & Henry J. Sommer, COLLIER ON BANKRUPTCY ¶

109.04[3][e][ii] (16th ed. 2009).

   NYC OTB intends to show, through the documentary and testimonial

evidence to be introduced at the hearing, that it negotiated in good faith with creditors.

  B.  <u>Negotiation Was Impracticable</u>

   Section 109(c)(5)(C) provides the third alternative basis for meeting the

negotiation-related eligibility requirement:  "that such negotiation is impracticable".  The

recent decision in *In re Valley Health System*, 383 B.R. 156 (Bankr. C.D. Cal. 2008),

provides a complete, accurate analysis of the proper interpretation of this provision.  It

reads "impracticable" according to its ordinary meaning of "incapable of being

performed or accomplished by the means employed or at command; infeasible". *Id.*, at

163, quoting WEBSTER'S NEW INTERNATIONAL DICTIONARY 1136 (3d ed. 2002).  Based

on the statute's plain meaning, the court rejects as inconsistent with the statute's plain

language any notion that the legislative history permits the impracticability requirement

to apply only where the municipality has reached impasse after extensive prepetition negotiations or where creditors are too numerous for negotiations. *Id*. at 162.  The court similarly rejects any notion that the case law supports such a narrow interpretation.  It recognizes that negotiations also may be impracticable where a filing delay to negotiate risks asset preservation. *In re Valley Health Sys.*, 383 B.R. at 63, citing *In re County of Orange*, 183 B.R. 594, 607-08; *accord* 2 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 109.04[3][e][iii] (15th ed. rev. 2008).

  Other cases have reached a similar conclusion. Negotiation may be impracticable with one group of creditors where negotiations with another key group have hit an impasse. *In re Villages at Castle Rock Metropolitan Dist. No. 4*, 145 B.R. 76, 85 (Bankr. D. Colo. 1990); *In re Pierce County Housing Auth.*, 414 B.R. 702, 714 (Bankr. W.D. Wash. 2009).  Negotiations are equally impracticable where another part of the financial equation—a viable long-term financial plan based on revenues or expenses—cannot be determined.  Thus, where a city was unable, despite extended negotiations, to reach agreement with its labor unions over labor costs, which constituted the largest portion of the city's budget, "it would have been futile to negotiate with other creditors". *In re City of Vallejo*, 408 B.R. 280, 298 (9th Cir. B.A.P. 2009).

  Here, NYC OTB is heavily regulated by statute.  The wagers it receives from its customers are subject to statutory distributions before its revenue is available to fund its operating expenses.  Given the increase in statutory demands on its handle over the past eight years and the steep recession-driven decline in handle over the past two years, and despite its self-imposed reduction in operating expenses, NYC OTB cannot develop a viable financial or business plan until the Legislature decides how much NYC

OTB must pay to support the New York racing industry. Until the Legislature sets that key financial determinant, any negotiation with creditors over a repayment plan is impracticable.

  C. <u>NYC OTB Reasonably Believed That a Creditor Was Attempting To Obtain a Voidable Preference</u>

   The fourth alternative basis on which a municipality may meet section 109(c)(5)'s eligibility requirement is that the municipality "reasonably believes that a creditor may attempt to obtain" an avoidable preference. 11 U.S.C. § 109(c)(5)(D). This alternative replaces a provision in former law under which the municipality could seek a stay of litigation while it negotiated a debt adjustment plan. Rather than requiring the municipality to seek piecemeal stays, this provision permits a municipality to file its chapter 9 petition and obtain the protection of the automatic stay. 2 Alan N. Resnick & Henry J. Sommer, COLLIER ON BANKRUPTCY ¶ 109.04[3][e][iv] (16th ed. 2009). Obtaining a judicial lien may be an avoidable preference. *See* 5 Alan N. Resnick & Henry J. Sommer, COLLIER ON BANKRUPTCY ¶ 547.03[1][a] (15th ed. rev. 2009) (judicial lien avoidable if other preference elements are present). Thus, if a creditor is pursuing litigation against the municipality and is likely to obtain a judgment in the near future, with the risk that the creditor could then execute and obtain a judicial lien, the municipality meets this fourth alternative basis.

   NYC OTB intends to show its compliance with this requirement through the documentary and testimonial evidence to be introduced at the hearing.

**III.     NYC OTB Filed Its Petition in Good Faith**

      A.      <u>Good Faith Requires a Proper Purpose and a Desire To Effect a</u>
                 <u>Reorganization</u>

Section 921(c) permits the court to dismiss a chapter 9 petition "if the debtor did not file the petition in good faith".  Chapter 9 does not define "good faith".  However, courts have developed the meaning of "good faith" in chapter 9 cases based on good faith case law from chapter 11 cases.

Although the Court of Appeals for the Second Circuit has not set forth a general definition of "good faith" in chapter 11 cases, it has upheld a bankruptcy court's dismissal on good faith grounds of a non-operating, dissolved, single-asset real estate debtor, where the debtor had no reasonable probability of emerging from chapter 11 and no realistic chance of reorganizing. *C-TC 9th Ave. Pshp. v. Norton Co. (In re C-TC 9th Ave. Pshp.),* 113 F.3d 1304, 1310-1312 (2d Cir. 1997).  And in that case, it cited with approval the Fifth Circuit's *In re Little Creek Devel. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986), which noted, "[G]ood faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes."  The "test…is whether the debtor is attempting to unreasonably deter and harass its creditors or attempting to effect a speedy, efficient reorganization on a feasible basis [and] to achieve objectives within the legitimate scope of the bankruptcy laws".  *In re County of Orange*, 183 B.R. 594, 608 (Bankr. C.D. Cal. 1995) (citations omitted).  *In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 81 (Bankr. D.N.H. 1994) synthesized the "two complimentary lines of authority:  (1) dismissals because there were no reasonable prospects for reorganization and the petition served only to hinder and delay creditors; and (2) dismissals because for other reasons the

filing is deemed to be inappropriate, as being at odds with the legislatively intended scope of the chapter involved". Thus, where the debtor files to preserve its assets and effect a reorganization, the petition is filed in good faith.

A petition may be in good faith even though the petition delays creditors. For example, in *Orange County*, the objecting creditor argued that the debtor's filing was an effort to put assets out of creditors' reach, gain control over loss allocations and gain negotiating leverage and therefore was not in good faith. The court rejected the challenge, ruling that where the debtor had suffered severe investment losses, was subjected to collateral calls that it could not meet and faced the prospect of the liquidation of its investment portfolio, asset protection and claims resolution were valid reasons for filing. 183 B.R. at 608.

Nor must a debtor have solved the underlying causes of its financial difficulties to meet the "good faith" condition to filing a chapter 9 petition. Thus, where a debtor's financial difficulties resulted from economic decline and a lack of development, the petition was filed in good faith, even though the economy had not yet recovered. *In re Villages at Castle Rock Metropolitan Dist. No. 4*, 145 B.R. 76, 81 (Bankr. D. Colo. 1990). Where a debtor faced "the shadow of frozen funds, multiple litigation, and disannexation of a substantial portion of its tax base", the court found the petition to have been filed in good faith, though the debtor had not yet resolved its claim to set aside the disannexation and the freezing of its funds. *In re Town of Westlake, Tex.*, 211 B.R. 860, 868 (Bankr. N.D. Tex. 1997). In the chapter 11 context, courts have not dismissed cases as filed in bad faith where the debtor required regulatory changes to enable it to reorganize. *See, e.g., FCC v. NextWave Pers. Communs. Inc.,* 537 U.S. 293;

123 S. Ct. 832; 154 L. Ed. 2d 863 (2003) (invalidating regulatory action for violation of section 525's anti-discrimination provision); *In re Public Serv. Co.*, 88 B.R. 521 (Bankr. D.N.H. 1988) (describing history of legislative and regulatory challenges and granting seven-month exclusivity extension).

Nor does good faith require that the debtor borrow to meet existing obligations where its cash flow is insufficient to secure a new lender. *In re McCurtain Mun. Auth.*, 2007 WL 4287604, *6 (Bankr. E.D. Okla. Dec. 4, 2007). Such a borrowing would only substitute one debt for another.

*In re Sullivan County Reg'l Refuse Disposal Dist.* is the only reported case that our research identified in which the court dismissed a chapter 9 petition as not having been filed in good faith. As the court explained there, dismissal was required because "the decision to file bankruptcy was not the end result of a considered debate. It was not a final alternative chosen as a last resort…. The debtors' immediate post-filing actions tend to confirm that the bankruptcy option … appears to be a late hour litigation tactic to hold off [the single creditor's] threatened shut-out and an attempt to position the Districts to force some compromises." *In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. at 82. The court found that the "debtors created their own problem of a massive debt by signing a contract and then refusing to face up to their obligations". *Id.* Thus, *Sullivan* fits squarely within the mainstream of chapter 11 cases dismissing petitions for bad faith where the debtor used the petition as a litigation tactic or solely to delay creditors without any intent to reorganize. *See In re C-TC 9th Ave. P'shp*, *supra*; *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999).

B.      <u>NYC OTB Filed Its Petition for a Proper Purpose To Effect a Reorganization</u>

This case differs markedly from *Sullivan*. NYC OTB has been saddled with increasing legislative demands for the past eight years and experienced a severe recession that reduced its handle and revenue by 10% per year. It responded by slashing expenses and making repeated but unsuccessful attempts to obtain legislative relief. NYC OTB filed chapter 9 only as it was on the verge of running out of cash. It has continued to pursue a legislative solution since the filing. As noted above, good faith does not require that the debtor have obtained needed legislative relief before it may file its petition to protect its assets. Nor do NYC OTB's prior unsuccessful efforts to obtain legislative relief compel this Court to conclude that none will be forthcoming.

It is a common pattern that debtors seek chapter 11 relief when unable to reach agreement with their creditors, who often later adjust their position based on the debtor's financial failure and the need to develop a solution. The same is true in the regulatory or legislative arena. Public Service Co. of New Hampshire ("<u>PSNH</u>") unsuccessfully sought legislative and regulatory relief for years before it filed its chapter 11 petition. After the filing, the New Hampshire Legislature finally provided the necessary relief, and PSNH emerged from reorganization. *See generally Rochman v. Northeast Util. Serv. Group (In re Public Serv. Co.)*, 963 F.2d 469, 270 (1st Cir. 1992) (describing legislative approval required for agreement underlying reorganization plan); *In re Public Serv. Co.*, 88 B.R. 521 (Bankr. D.N.H. 1988). Similarly, the courts have permitted chapter 11 cases for debtors who could reorganize only with regulatory relief. *See generally In re F.C.C.*, 217 F.3d 125 (2d Cir. 2000) (application of automatic stay to prevent cancelation of radio spectrum licenses vacated; bankruptcy court has no

jurisdiction to review FCC regulatory actions); *Calif. Dep't of Water Res. v. Calpine Corp. (In re Calpine Corp.)*, 337 B.R. 27 (S.D.N.Y. 2006) (bankruptcy court does not have jurisdiction to authorize rejection of federally regulated power purchase agreements).

There has not been and there cannot be a showing that the New York Legislature will not act here to address NYC OTB's financial distress. Legislative inaction to date "does not indicate legislative disapproval [and] affords the most dubious foundation for drawing positive inferences". *Clark v. Cuomo*, 66 N.Y.2d 185, 190-91 (1985) (internal quotes and citations omitted). To the contrary, only last week, on January 8, 2010, the Senate and Assembly Standing Committees on Racing and Wagering and the Senate and Assembly Standing Committees on Corporations, Authorities and Commissions held an unprecedented joint hearing on NYC OTB's financial troubles in the wake of the chapter 9 petition. Paul Post, New York Breeders Make Statement at OTB Hearing, Throughbred Times, Jan. 8, 2010, http://www.thoroughbredtimes.com/national-news/2010/January/08/New-York-breeders-make-statement-at-OTB-hearing.aspx. Thus, although there can be no assurance that there will be a legislative solution to NYC OTB's financial distress, there can be no doubt that NYC OTB's chapter 9 petition was filed in good faith.

## <u>CONCLUSION</u>

For the foregoing reasons, the Objection should be overruled, and this

Court should issue an order for relief in this chapter 9 case.

Dated:  January 13, 2010

CRAVATH, SWAINE & MOORE LLP

By :     s/ Richard Levin
RICHARD LEVIN (RL 1651)
A member of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for the New York City Off-Track Betting Corporation*