**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re:

NEW YORK CITY OFF-TRACK BETTING
CORPORATION,

                        Debtor.

---------------------------------------------------------------x

FOR PUBLICATION

Chapter 9

Case No. 09-17121 (MG)

## OPINION AND ORDER OVERRULING OBJECTIONS OF NEW YORK RACING ASSOCIATION, INC., NEW YORK THOROUGHBRED HORSEMEN'S ASSOCIATION, INC., AND NEW YORK THOROUGHBRED BREEDERS, INC. TO DEBTOR'S BANKRUPTCY PETITION AND STATEMENT OF QUALIFICATIONS UNDER SECTION 109(C)

*A P P E A R A N C E S:*

CRAVATH, SWAINE & MOORE LLP
*Attorneys for Debtor*
825 Eighth Avenue
New York, NY 10019
By:    Richard Levin, Esq.
          Antony L. Ryan, Esq.
          Paul E. Rosenthal, Esq.

WEIL, GOTSHAL & MANGES LLP
*Attorneys for New York Racing Association, Inc.*
767 Fifth Avenue
New York, NY 10153
By:    Brian S. Rosen, Esq.
          Bruce A. Colbath, Esq.

WEIL, GOTSHAL & MANGES LLP
*Attorneys for New York Racing Association, Inc.*
100 Federal Street, Floor 34
Boston, MA 02110
By:    Ardith Bronson, Esq.

OLSHAN GRUNDMAN FROME ROSENZWEIG & WOLOSKY LLP
*Attorneys for Monticello Raceway Management*
Park Avenue Tower
65 East 55th Street
New York, NY 10022
By:     Jordanna L. Nadritch, Esq.

WYATT TARRANT & COMBS, LLP
*Attorneys for Churchill Downs*
Lexington Financial Center
Suite 1600
Lexington, KY 40507
By:     Robert J. Brown, Esq.

STROOCK & STROOCK & LAVAN LLP
*Attorneys for DC 37, Local 2021, DC 37 Benefits Fund Trust, and DC 37 Med-Team*
180 Maiden Lane
New York, NY 10038
By:     Sherry Millman, Esq.
        Abigail M. Beal, Esq.

WHITE & CASE LLP
*Attorneys for Yonkers Raceway*
1155 Avenue of the Americas
New York, NY 10036
By:     Phillip John Nichols, Esq.
        Gerard Uzzi, Esq.

NEW YORK CITY LAW DEPARTMENT
*Attorneys for the City of New York and the New York City Employee Retirement System*
10 Church Street
New York, NY 10007
By:     Andrew G. Lipkin, Esq.

DIANA G. ADAMS
*United States Trustee for Region 2*
33 Whitehall Street, 21st Floor
New York, NY 10004
By:     Brian S. Masumoto, Esq.
        Andrew D. Velez-Rivera, Esq.

**MARTIN GLENN**
**United States Bankruptcy Judge**

New York City Off-Track Betting Corporation ("NYC OTB") filed a voluntary petition (the "Petition") for the adjustment of debt under chapter 9 of the Bankruptcy Code on December 3, 2009. In support of the Petition, NYC OTB filed declarations from Raymond Casey, President and Chief Executive Officer of NYC OTB and Robert J. Garry, Executive Vice President and Chief Financial Officer of NYC OTB. Pursuant to 11 U.S.C. § 921(b), the Honorable Dennis Jacobs, Chief Judge of the United States Court of Appeals for the Second Circuit assigned the Petition to this Court on December 4, 2009. (ECF # 10.) The Court held a hearing on NYC OTB's requests for interim relief on December 7, 2009. Following the hearing, the Court entered an order setting January 4, 2010 as the deadline for filing objections. (ECF # 19.)

New York Racing Association, Inc. ("NYRA") objects to the Petition. NYRA argues that NYC OTB cannot satisfy the requirements to be a debtor under chapter 9 of the Bankruptcy Code. NYRA further claims that NYC OTB did not file the Petition in good faith. (*See* NYRA Obj. 2–3.) The New York Thoroughbred Horsemen's Association, Inc. ("NYTHA") and the New York Thoroughbred Breeders, Inc. ("NYTB") join in NYRA's objections (collectively, the "Objectors"). The Court held an evidentiary hearing to resolve these objections on February 22, 2010. This Opinion sets forth the Court's findings of fact and conclusions of law pursuant to FED. R. BANKR. P. 7052. For the following reasons the objections are overruled.

## BACKGROUND

NYC OTB is a public benefit corporation which operates a pari-mutuel betting system. (Decl. of Raymond Casey ¶ 4, NYRA Ex. P.) Pari-mutuel betting is a "system

of gambling in which bets placed on a race are pooled and then paid (less a management fee and taxes) to those holding winning tickets." BLACK'S LAW DICTIONARY (8th ed. 2004). The New York State Legislature created NYC OTB on April 22, 1970. Goals for NYC OTB included raising revenues for the state and certain municipalities as well as fighting the role of organized crime in horse-race gambling. (Decl. of Robert J. Garry ¶ 5, NYRA Ex. T.) As of November 30, 2009, NYC OTB had 66 different locations and employed 1,343 people. (*Id.* ¶¶ 6, 12.) Over its existence, NYC OTB has contributed approximately $2 billion to New York State's racing industry, $1.4 billion to New York City, and almost $600 million to New York State. (*Id.* ¶ 9.)

NYC OTB's financial troubles did not recently materialize. For the past nine years, NYC OTB has been caught in a downward spiral, based in large part on its statutory business model. Nearly all of NYC OTB's revenue is earned from its gambling operations. The total dollar amount wagered through NYC OTB is called the "Handle." (Decl. of Robert J. Garry ¶¶ 7, 9, NYRA Ex. T.) NYC OTB receives a percentage of the Handle while winning betters receive approximately 80% of all amounts wagered on each race. (*Id.* ¶ 7.) Pursuant to section 527 of the Racing, Pari-Mutuel Wagering and Breeding Law, NYC OTB must make payments to New York State's horse racing industry, including different tracks and breeding funds, plus certain distributions to the state and local governments, based on NYC OTB's total Handle (the "mandatory statutory distributions" or "required statutory payments"), not on NYC OTB's net revenues. (Decl. of Raymond Casey ¶ 14, NYRA Ex. P; Decl. of Robert J. Garry ¶ 7, NYRA Ex. T); *see also* N.Y. RAC. PARI-MUT. WAG & BREED. LAW § 527(1)(a)–(c) (delineating mandatory statutory distributions). The result is that mandatory statutory

distributions frequently outpace NYC OTB's earnings after paying operating expenses. (Decl. of Raymond Casey ¶ 17, NYRA Ex. P.)

Increased operating costs, plus the legislature's changes to required statutory payments have further stressed NYC OTB's financial situation. For example, between 2003 and 2005 the New York State Legislature increased NYC OTB's mandatory statutory distributions by, on average, $7.8 million each year. (*Id.* ¶ 20.) As a result, NYC OTB has run annual deficits of tens of millions of dollar since 2006. (Decl. of Robert J. Garry ¶ 10, NYRA Ex. T.) As of September 30, 2009, NYC OTB's total Handle for fiscal year 2010 was $441.4 million. Total revenue after paying pari-mutuel bets was $108.7 million. Operating expenses, including financing the operations of each branch, administrative fees, and advertising costs totaled $68 million. After covering all operating expenses and adding other payments, NYC OTB earned $42.4 million before making its mandatory statutory distributions. The total required statutory payments to New York State's horse racing industry and state and local governments, however, were $51.1 million, leaving NYC OTB with an $8.7 million shortfall for the current fiscal year. (*See* NYC OTB Unaudited Financial statements for the Six Months Ended Sept. 30, 2009, NYC OTB Ex. 6.)

NYC OTB has cut costs in an attempt to remain viable. Since February 2004, NYC OTB has reduced personnel, closed branches, cut overtime, and reduced energy expenditures. These efforts resulted in an aggregate cost savings of approximately $45 million through 2008. (Decl. of Robert J. Garry ¶ 12, NYRA Ex. T.) In addition to typical cost cutting efforts, NYC OTB also repeatedly asked the New York State Legislature, in 2005 and again in 2007, to change the mandatory statutory distributions to

assist it in returning to profitability. (Decl. of Raymond Casey ¶¶ 23, 25, NYRA Ex. P.)

NYC OTB also commissioned Boston Consulting Group to complete a study analyzing

ways to bring NYC OTB back to fiscal health. A key conclusion of the study was the

need for the State Legislature to change the mandatory statutory distributions. (*Id.* ¶ 24.)

NYC OTB also requested assistance from the New York City Council to convince the

New York State Legislature to make the required changes. (*Id.* ¶ 26.) By December

2007, no legislative fix had materialized. New York City, to which NYC OTB reported

at the time, was unwilling to use taxpayer funds to ensure its continued existence. Thus,

NYC OTB enacted a plan to cease operations in 2008 (the "2008 Closure Plan"). (*Id.*)

The 2008 Closure Plan contemplated ending all NYC OTB operations on June 15,

2008. This included the layoff of all employees, closing all locations, and ceasing all

operations. (Decl. of Robert J. Garry ¶ 13, NYRA Ex. T.) On June 16, 2008, while

shutdown efforts commenced, Governor David Patterson announced that New York State

was taking over NYC OTB from New York City, and instructed employees to report to

work as scheduled. The next day, the State Legislature passed Chapter 115 of the Laws

of 2008, codifying New York State's takeover of NYC OTB and increasing certain

revenue streams, such as the amounts retained from the Handle, in an effort to sustain

NYC OTB. (Decl. of Raymond Casey ¶ 30–31, NYRA Ex. P.) This amendment,

however, did not change NYC OTB's mandatory statutory distributions. *Compare* NY

RAC PARI-M § 527(1)(a)–(c) (effective June 17, 2008) *with* NY RAC PARI-M §

527(1)(a)–(c) (effective Feb. 19, 2008 to June 16, 2008).

Following the state takeover, NYC OTB's operations limped along for another 17

months. NYC OTB was still hampered by the required statutory payments and had no

funds to invest in capital improvements.  Prior to filing for chapter 9 protection on

December 3, 2009, NYC OTB estimated that it would run out of cash by the end of 2009.

(Tr. 93:7–11.)[1]  Filing its Petition enabled NYC OTB to further delay certain payments,

stretching its available cash and enabling operations to continue at least to the end of

March 2010.  (Tr. 79:13–16, 93:16–19.)  NYC OTB maintains that it needed to file for

chapter 9 protection to delay shutdown so the New York State Legislature could enact the

legislative changes required, including changes to mandatory statutory distributions, to

ensure the health and continued operation of NYC OTB.  (Decl. of Raymond Casey ¶ 35–

36, NYRA Ex. P.)

## DISCUSSION

Objectors argue that NYC OTB is (i) not eligible to be a debtor under chapter 9 of

the Bankruptcy Code; and (ii) the Petition was not filed in good faith.

### A.  NYC OTB's Eligibility to File a Bankruptcy Petition Under Chapter 9

Bankruptcy Code § 109(c) sets forth the requirements to file for protection under

chapter 9 of the Bankruptcy Code.  6 COLLIER ON BANKRUPTCY 900.02 ¶ [2] (16th ed.

2009) ("Section 109(c) of the Bankruptcy Code sets forth the statutory criteria for

eligibility as a chapter 9 debtor.").  The statute requires that a chapter 9 debtor must:

> (1) be a municipality;
>
> (2) be "specifically authorized, in its capacity as a municipality or by
> name, to be a debtor under such chapter by State law, or by a
> governmental officer or organization empowered by State law to
> authorize such entity to be a debtor under such chapter";
>
> (3) be insolvent;
>
> (4) "desire[] to effect a plan to adjust such debts; and"

---

[1]    References in this Opinion to the transcript of the Court proceedings on February 22, 2010 are
identified as "Tr. [page:line numbers]."

(5) have

    A.   "obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

    B.   has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

    C.   is unable to negotiate with creditors because such negotiation is impracticable; or

    D.   reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title."

11 U.S.C. § 109(c). Courts must dismiss the petitions of debtors filing under chapter 9 who fail to satisfy these requirements. *Int'l Ass'n. of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280, 289 (9th Cir. B.A.P. 2009) (observing that courts require the dismissal of chapter 9 petitions filed by debtors "who fail[] to meet the eligibility requirements under § 109(c)"); *In re Valley Health Sys.*, 383 B.R. 156, 160 (Bankr. C.D. Cal. 2008) (same). The burden of proving eligibility lies with the entity filing the petition. *See, e.g.*, *In re County of Orange*, 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995) (citing *In re City of Bridgeport*, 129 B.R. 332, 339 (Bankr. D. Conn. 1991)).

Bankruptcy courts should review chapter 9 petitions with a jaded eye. Principles of dual sovereignty, deeply embedded in the fabric of this nation and commemorated in the Tenth Amendment of the United States Constitution, severely curtail the power of bankruptcy courts to compel municipalities to act once a petition is approved. 6 COLLIER ON BANKRUPTCY 900.01 ¶ [2][c] (observing bankruptcy courts' limited power over municipalities due to the Tenth Amendment). *See also New York v. United States*, 505 U.S. 144, 155–66 (1992) (reviewing development of Tenth Amendment jurisprudence,

recognizing dual sovereignty and observing that "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions"). This fundamental constitutional principle halts bankruptcy courts from regulating or otherwise controlling expenditures or activities of municipalities. 5 WILLIAM J. NORTON, JR. & WILLIAM L. NORTON III, NORTON BANKRUPTCY LAW AND PRACTICE § 90:4 (3d ed. 2009) ("Without the consent of the municipality, the court may not interfere with any of the political or governmental powers of the debtor, any property or revenues of the debtor, or the debtor's use or enjoyment of any income-producing property."); H.R. REP. NO. 95-595, at 263 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6221 ("[T]he powers of the court are subject to a strict limitation – that no order or decree may in any way interfere with the political or governmental powers of the petitioner, the property or revenue of the petitioner, or any income-producing powers."). Congress deemed this principle so important it explicitly recognized the limits of bankruptcy courts' powers in section 904.[2]

In light of these concerns, bankruptcy courts scrutinize petitions for relief under chapter 9. *See In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 82 (Bankr. D.N.H. 1994) (observing that the jurisdiction of bankruptcy courts "should not be exercised lightly in chapter 9 cases, in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment"); *In re Cottonwood Water and Sanitation Dist.*, 138 B.R. 973, 979 (Bankr. D. Colo. 1992)

---

[2]      Section 904 titled "Limitation on jurisdiction and powers of court" states:
"Notwithstanding any power of the court, unless the debtor consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with–
           (1) any of the political or governmental powers of the debtor;
           (2) any of the property or revenues of the debtor; or
           (3) the debtor's use or enjoyment of any income-producing property."

(noting that constitutional issues in chapter 9 cases caused Congress "to limit accessibility to the bankruptcy court by municipalities.") (quoting H.R. REP. NO. 94-938, at 10 (1976)) (internal quotation marks omitted). Despite the scrutiny required due to federalism issues, bankruptcy courts must balance constitutional concerns with congressional intent. *Hamilton Creek Metro. Dist. v. Bondholders Colo. Bondshares (In re Hamilton Creek Metro. Dist.)*, 143 F.3d 1381, 1384 (10th Cir. 1998) ("To be eligible for chapter 9 relief, a petitioner must meet several criteria, which are to be construed broadly to provide access to relief in furtherance of the Code's underlying policies."); *In re Pierce County Housing Auth.*, 414 B.R. 702, 710 (Bankr. W.D. Wash. 2009) ("The eligibility requirements of 109(c) are to be broadly construed to provide access to relief in furtherance of the Code's underlying policies.") (quoting *In re Valley Health Sys.*, 383 B.R. at 163) (internal quotation marks omitted). In its revisions to the statute, Congress has clearly intended to expand "the applicability of chapter IX as much as possible." H.R. REP. NO. 94-686, at 19–20, 94th Cong. 2nd Sess. (1975) (noting that certain changes to the eligibility requirements to chapter 9 debtors were intended to broaden the applicability of chapter 9); S. REP. NO. 94-458, at 13, 94th Cong. 1st Sess. (1975) ("The provisions of [chapter 9] should provide ready access to the bankruptcy courts.").

### 1. NYC OTB is a municipality

Section 101(40) of the Bankruptcy Code defines "municipality" as a political subdivision, public agency, or instrumentality of a State. Legislative history, however, does not offer any assistance in determining the scope of these terms. *In re County of Orange*, 183 B.R. at 601 (observing that "legislative history of § 101(40), although helpful, does not set the limits for inclusion in these broad categories"). Courts have

looked to previous iterations of the Bankruptcy Code for guidance on what is a municipality for purposes of chapter 9. *Id.* at 602 ("Because neither the plain language of the statute nor its legislative history answers the question with sufficient clarity, the next step is to examine the bankruptcy practice that existed prior to the addition of § 101(40)."). Section 81(6) of the Bankruptcy Act, predating the Code, granted jurisdiction to bankruptcy courts to adjust the debts of "incorporated authorities, commissions, or similar public agencies organized for the purpose of constructing, maintaining, and operating revenue producing enterprises." H.R. REP. NO. 94-686, at 37, 94th Cong. 2nd Sess. (1975).

Here, NYC OTB is a public benefit corporation. N.Y. RAC. PARI-MUT. WAG & BREED. LAW § 603(1). In New York, public benefit corporations are "created by the State for the general purpose of performing functions essentially governmental in nature." *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 386–87 (1987) (internal quotation marks and citation omitted). While these entities are not the same as the State of New York or its subdivisions, they may be treated as such in certain circumstances. *People v. Miller*, 70 N.Y.2d 903, 906 (1987) ("We have repeatedly held that public benefit corporations are not identical to the State or one of its political subdivisions, but only may be treated as such for certain purposes."). This Court need not explore whether this is such a situation. NYC OTB is a creation of the state, made for the purpose of operating a "revenue producing enterprise." As Congress previously directed jurisdiction over this type of entity, *see* H.R. REP. NO. 94-686, at 37, 94th Cong. 2nd Sess. (1975), this Court concludes that NYC OTB is a "municipality" as defined by the current Bankruptcy Code. This conclusion is buttressed by Congress's desire to broaden the

application of chapter 9 in the last revision. *See, e.g.*, H.R. REP. NO. 94-686, at 19–20, 94th Cong. 2nd Sess. (1975). Moreover, Objectors concede that NYC OTB is a "municipality" under the Bankruptcy Code. (NYRA Obj. 7; Tr. at 6:20–24.)

   2.   *NYC OTB has sufficient authorization to file for chapter 9 protection*

Section 109(c)(2) of the Bankruptcy Code requires municipalities to be "specifically authorized . . . by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor" under chapter 9. The Bankruptcy Code, however, did not always require specific authorization for a municipality to file for bankruptcy protection. *See generally* Nicholas B. Malito, *Municipal Bankruptcy: An Overview of Chapter 9 and a Critique of the "Specifically Authorized" and "Insolvent" Eligibility Requirements of 11 U.S.C.A. § 109(c)*, 17 J. BANKR. L. & PRAC. 4, Art. 2 at 517 (2008).

The initial version of the Bankruptcy Code only required general authorization for a municipality to file for chapter 9 protection. *In re City of Bridgeport*, 128 B.R. 688, 694 (Bankr. D. Conn. 1991). The *City of Bridgeport* court, assaying the legislative history, determined that the requirement of general authorization was a compromise between the House of Representatives and the Senate. The House advocated a version of the bill that would permit municipalities to file under chapter 9 so long as the act was not prohibited by state law. The draft bill pending in the Senate, however, included language requiring specific authorization. *Id.* at 695 (citing H.R. CONF. REP. NO. 938, 94th Cong. 2d Sess. 16-17 (1976), U.S. CODE CONG. & ADMIN. NEWS 1976, p. 539; H.R. 10624, 94th Cong., 1st Sess. (1975); S. 2597, 94th Cong., 1st Sess. (1975)). The court intimated that Congress settled on this construction because some type of state authorization was

required to avoid violating principles of dual sovereignty. *Id.* Specifically, the *City of Bridgeport* court reasoned that because an earlier Supreme Court case, *Ashton v. Cameron County Water Improvement Dist.*, 298 U.S. 513, 531 (1936), stated that Congress cannot increase the power municipalities have under state law without violating the Tenth Amendment, some type of general authorization from the state was required for a municipality to seek bankruptcy protection in federal court to avoid violating principles of federalism. *Id.*

The Bankruptcy Reform Act of 1994 changed the language of section 109(c)(2) to require specific authorization. 6 COLLIER ON BANKRUPTCY ¶ 900.02 [2][b] ("The 1994 Act modified the pre-existing law which only required general authorization."). The legislative history indicates that this change was required to remedy a split where some courts required express State law authorization, while others only required general authorization, to file a chapter 9 petition. H.R. REP. NO. 103-835, at 59 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3368 ("This section clarifies the eligibility requirements applicable to municipal bankruptcy filings by requiring that municipalities be specifically authorized by the State in order to be eligible to file for bankruptcy."). The few courts that have analyzed this revised language consistently hold that the plain language of the statute must be satisfied: specific authorization from a state is required for a municipality to file for bankruptcy. *In re Timberon Water and Sanitation Dist.*, No. 9-07-12142 ML, 2008 WL 5170581, at *2 (Bankr. D.N.M. June 18, 2008) (concluding that "the statute was amended to require that a municipality be 'specifically authorized' to file for bankruptcy"); *In re Slocum Lake Drainage Dist. of Lake County*, 336 B.R. 387, 390 (Bankr. N.D. Ill. 2006) (observing that "specific authorization by a state is necessary in

order for a municipality to be eligible to file for bankruptcy"); *In re Alleghany-Highlands Econ. Dev. Auth.*, 270 B.R. 647, 648–49 (Bankr. W.D. Va. 2001) (same) (quoting *In re County of Orange*, 183 B.R. 603–05). These courts further hold that the explicit authorization must be written, "exact, plain, and direct with well-defined limits so that nothing is left to inference or implication." *In re Timberon*, 2008 WL 5180581, at *2 (quoting *In re Slocum*, 336 B.R. at 390); *In re Alleghany-Highlands*, 270 B.R. at 648–49 (same); *In re County of Orange*, 183 B.R. at 604 (same).

Taking a crabbed reading of section 109(c), Objectors argue that because the New York Legislature has not passed a statute explicitly granting NYC OTB the power to file for chapter 9 protection, this specific authorization requirement cannot be met. The Objectors overreach. The Governor of New York State issued an executive order specifically authorizing NYC OTB to file for bankruptcy protection in this Court.

> a. *The Executive Order No. 27 satisfies the specific authorization requirement of section 109(c)(2)*

On September 1, 2009, Governor David Patterson issued Executive Order No. 27. Executive Order No. 27 authorizes NYC OTB to "file any petition with any United States district court or court of bankruptcy under any provision of the laws of the United States, now or hereafter in effect, for the composition or adjustment of municipal indebtedness." Despite this explicit authorization, Objectors maintain that Executive Order No. 27, standing alone, does not satisfy the specific authorization requirement of section 109(c)(2). Objectors rely on limited case law in support of their position. These cases, however, all address instances where municipalities filed chapter 9 petitions pursuant to general grants of power in a state statute. For example, the *Timberon Water* court addressed an effort to use a statute granting the municipality the general power "to sue

and be sued" and to "exercise all rights and powers necessary or incidental to or implied from . . . specific powers" as specific authorization to file for chapter 9 protection.  *In re Timberon Water*, 2008 WL 5180581, at *1–2 (quoting N.M. STAT. ANN. § 73-21-16(C) (1978) and N.M. STAT. ANN. § 73-21-16(N) (1978)).  Similarly, the *Slocum* court analyzed a municipality's effort to use statutorily granted powers in the Illinois Public Water District Act to "do and perform all acts and things, whether express or implied, that may be reasonably required in order to accomplish the purposes of this Act" as sufficient authorization to file for bankruptcy.  *In re Slocum*, 336 B.R. at 389 (quoting 70 ILL. COMP. STAT. 605/4-14 (2002) and 70 ILL. COMP. STAT. 3705/5 (2002)).  None of the cases addresses an analogous situation where the chief executive of a state issued a direct and unambiguous order specifically authorizing a municipality to file for bankruptcy.

"In the usual case, if the words of a statute are unambiguous, judicial inquiry should end, and the law is interpreted according to the plain meaning of its words."  *Devine v. U.S.*, 202 F.3d 547, 551 (2d Cir. 2000).  *See also* 2A NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 46:1 (7th ed. 2009) (stating that "when the language of the statute is clear and not unreasonable or illogical in its operation, the court may not go outside the statute to give it a different meaning").  Here, section 109(c)(2) plainly states that "a governmental officer . . . empowered by State law" may specifically authorize a municipality to file for chapter 9 protection.  Executive Order No. 27 follows Congress's instructions precisely, granting NYC OTB specific authorization to file for protection under chapter 9 of the Bankruptcy Code.  Nothing in this reading of the statute frustrates Congress's apparent intent to require specific authorization for a municipality to file for chapter 9 protection.  If

Congress intended to circumscribe the power of government officials to specifically authorize the entry of municipalities into bankruptcy, it was capable of revising section 109(c)(2) to those ends. *Cf. Lorillard v. Pons*, 434 U.S. 575, 580–81 (1978) (observing that when "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute").

b.  *The Governor has sufficient power under New York state law to authorize NYC OTB to file for bankruptcy*

In addition to satisfying the "specific authorization" requirement, the Governor must also have had sufficient power under state law to authorize NYC OTB's bankruptcy filing. Section 109(c)(2) requires that the Governor be "empowered by State law to authorize" NYC OTB to file for bankruptcy. This requires the Court to analyze New York law. *In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. at 73 (observing that courts "must look to *state* law" when determining whether a municipality has power to file a chapter 9 petition).

The New York Constitution, similar to our Federal Constitution, provides for separation of powers. *Clark v. Cuomo*, 66 N.Y.2d 185, 189 (1985) ("The doctrine of separation of powers is implied by the separate grants of power to each of the coordinate branches of government."). The legislative power resides in the senate and assembly, N.Y. CONST. art. III, § 1, and the executive power lies with the governor. *Id.* art. IV, § 1. In New York, this construct "requires that the Legislature make the critical policy decisions, while the executive . . . implement those policies." *Bourquin v. Cuomo*, 85 N.Y.2d 781, 784 (1995). This does not mean that each branch of government must operate in a vacuum, wholly sealed off from the other. The New York Court of Appeals

has consistently recognized that limited overlap in responsibilities between branches does not run afoul of the New York Constitution. *Id.* (observing that "this Court has always understood that the duties and powers of the legislative and executive branches cannot be neatly divided into isolated pockets"); *Clark*, 66 N.Y.2d at 189 (stating that "some overlap between the three separate branches does not violate the constitutional principle of separation of powers").

The Governor's executive power is broad. He is granted "the power to enforce legislation" and "is accorded great flexibility in determining the methods of enforcement." *Rapp v. Carey*, 44 N.Y.2d 157, 163 (1978). This power, combined with permissible overlap with the legislative branch, enables the Governor to act in certain circumstances, without a "specific and detailed legislative expression authorizing a particular executive act." *Bourquin*, 85 N.Y.2d at 785 (concluding that "the exigencies of government have made it necessary to relax a merely doctrinaire adherence to a principle so flexible and practical, so largely a matter of sensible approximation, as that of the separation of powers") (quoting *In re Richardson*, 247 N.Y. 401, 410 (1928) (Cardozo, J.)).

Thus, the Governor only lacks the power to act when he oversteps his constitutional role. *Cf. Johnson v. Pataki*, 91 N.Y.2d 214, 223 (1997) (observing that courts are limited to examining whether the actions of the Governor, taken pursuant to an executive order, are constitutional); *Doe v. Rosa*, 606 N.Y.S.2d 522, 525 (N.Y. Sup. Ct. 1993) ("Short of a [constitutional] challenge to [an] Executive Order . . . it is proper to treat an Executive Order as operating 'with full force of law'") (quoting *Clark*, 66 N.Y.2d at 193 (Jasen, J., dissenting in part) (internal citations omitted)). This only occurs when

the Governor "acts inconsistently with the Legislature, or usurps its prerogatives . . . ." *Bourquin*, 85 N.Y. at 785 (quoting *Clark*, 66 N.Y.2d at 189).  In other words, so long as the Governor stays within the policies stated by the legislature and does not seize its legislative role, his acts are constitutional.  *Rapp*, 44 N.Y.2d at 163 (observing that the Governor may not "go beyond stated legislative policy and prescribe a remedial device not embraced by the policy") (quoting *Broidrick v. Lindsay*, 39 N.Y.2d 641, 645–46 (1976)).

The legislature expressed its preferred policy with regards to NYC OTB when it transferred control of the entity from New York City to the State of New York, finding that NYC OTB was "insolvent and facing closure" and stating that "the continued operation of NYC OTB corporation is of paramount importance to the public interest." 2008 N.Y. SESS. LAWS 661 (McKinney) (NYRA Ex. H).  Indeed, the statement in support of the bill that transferred control of NYC OTB from New York City to New York State indicated that the "cost of a closure [of NYC OTB was] too great" to risk.  Legislative History of Chapter 115 of the Laws of 2008, *reprinted in* New York Legislative Service, Inc. (NYRA Ex. Q at 10).  Moreover, in these revisions, the legislature granted the governor wide power to appoint NYC OTB's board members.  N.Y. RAC. PARI-MUT. WAG. & BREED. LAW § 603(1).  Thus, it seems clear that Executive Order No. 27 is a valid exercise of gubernatorial power.  The Executive Order merely implements a valid stated policy objective of the New York Legislature.  It does not go beyond legislative policy nor does it constitute the governor usurping the legislature's role in crafting detailed statutes.  This conclusion is consistent with the New York Court of Appeals' decisions regarding the power of the Governor to issue executive orders.

In *Bourquin v. Cuomo*, former Chief Judge Kaye examined the constitutionality of Executive Order No. 141. *Bourquin*, 85 N.Y.2d at 783. Executive Order No. 141 permitted the creation of a private corporation ("Citizens' Utility Board") to act as a representative for certain citizens in utility regulatory hearings. Executive Order No. 141 also granted the Citizens' Utility Board access to annual state agency mailings. *Id.* The Governor argued that a general state statute permitting the creation of a single state consumer protection board authorized the creation of the more specific Citizens' Utility Board. *See id.* at 785. Looking to the text of the statute, Chief Judge Kaye reasoned that a general policy declaration that the general state consumer protection board should "promote and encourage the protection of the legitimate interests of consumers within the state" was sufficient to warrant the Governor's actions. *Id.* at 785–86 (quoting N.Y. EXEC. LAW § 553(2)(b)). Chief Judge Kaye further opined that the Executive Order did not usurp the legislature's functions as it did not give any substantive directions regarding the purpose of the Citizens' Utility Board. The Executive Order simply created the Citizens' Utility Board without directing policy decisions. *Id.* at 787.

The New York Court of Appeals analyzed a similar situation almost a decade earlier in *Clark v. Cuomo*. There, the court analyzed Executive Order No. 43, which established a voter registration program (the "Registration Program") and an entity called the "Voter Registration Task Force." *Clark*, 66 N.Y.2d at 187. The Registration Program was implemented through various state agencies and commanded all participants to maintain political party neutrality. *Id.* The Voter Registration Task Force was charged with implementing the Registration Program. *Id.* Under the Registration Program, voter registration forms were distributed to numerous different state agencies.

Signs were posted at these locations, reminding citizens of the requirement to register prior to voting. *Id.* The court determined that this was a valid exercise of gubernatorial power, relying upon a general statute announcing the broad policy of the state board of elections. *Id.* at 190. Specifically, the statute called for the state board of elections to "encourage the broadest possible voter participation in elections." *Id.* (quoting N.Y. ELEC. LAW § 3-103 [13]). The court further reasoned that the Executive Order was acceptable because it did not create or contradict the legislature's stated policies. *Id.* at 189–90.

The facts at bar compel the same result. Similar to what occurred in *Bourquin* and *Clark*, the Governor enacted Executive Order No. 27 pursuant to a general legislative policy. Specifically, the legislature has found that "the continued operation of NYC OTB corporation is of paramount importance to the public interest." Executive Order No. 27; 2008 N.Y. SESS. LAWS 661 (McKinney) (NYRA Ex. H). Moreover, Executive Order No. 27 is not inconsistent with legislative policies or a usurpation of the legislative power. *See Bourquin*, 85 N.Y.2d at 787 (reasoning that executive order was constitutional because it did not serve a legislative function); *Clark*, 66 N.Y.2d at 189–90 (observing constitutionality of executive order consistently implementing stated legislative purpose). Indeed, Executive Order No. 27 is a model of executive restraint compared to the executive orders at issue in *Bourquin* and *Clark*. Here, the Governor merely granted specific authorization to file a petition under chapter 9 of the Bankruptcy Code after the legislature specifically found that the NYC OTB "is insolvent and facing closure" and declared that its continued operation was of the utmost importance to the State. Executive Order No. 27; 2008 N.Y. SESS. LAWS 661 (McKinney) (NYRA Ex. H). The

executive orders at issue in *Bourquin* and *Clark*, however, created entirely new administrative bodies.  Moreover, the executive order in *Clark* commandeered certain state employees, adding substantive tasks to their pre-existing workload.  *See Clark*, 66 N.Y.2d at 187 (noting that the executive order required State agencies to make voter registration forms available through their staffs and provide assistance in completing the forms).

To the extent Objectors argue that the legislature's failure to specifically authorize the Governor to file for chapter 9 protection somehow invalidates Executive Order No. 27, the Court disagrees.  (NYRA Obj. 9.)  As observed by the *Clark* and *Bourquin* courts, the failure to legislate a specific action does not bar the governor from taking that action pursuant to executive order.  In each of those cases the legislature considered, but failed to pass, statutes that would have had the same effect as the executive orders in question. *Bourquin*, 85 N.Y.2d at 787; *Clark*, 66 N.Y.2d at 190–91.

The Court further holds that the Objector's remaining contention, that "the resolutions passed by NYC OTB's board of directors authorizing NYC OTB's chapter 9 filing are insufficient to meet the statutory requirement of section 109(c)(2)" (NYRA Obj. 10), is not sufficient grounds to invalidate the Petition.  Objectors correctly maintain that a municipality cannot rely upon generalized statutory powers to issue specific resolutions permitting it to file a bankruptcy petition.  (*Id.* (citing *In re Timberon*, 2008 WL 5170581, at *3).)  Here, however, the NYC OTB board did not rely solely upon a general grant of statutory power to file for bankruptcy.  Executive Order No. 27 gave it the explicit authorization to file for bankruptcy.

The Governor had adequate power to issue Executive Order No. 27, specifically permitting NYC OTB to file for bankruptcy. It is clear that NYC OTB had sufficient authorization to seek the protection of chapter 9.

### 3. NYC OTB is insolvent

Section 101(32) of the Bankruptcy Code defines the term "insolvent." A municipality is considered insolvent when it is "(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due." 11 U.S.C. § 101(32)(C)(i)–(ii). "While the test under [section] 101(32)(c)(i) looks to current, general nonpayment, the test under 101(32)(c)(ii) is an equitable, prospective test looking to future inability to pay." *In re McCurtain Mun. Auth.*, No. 07-80363, 2007 WL 4287604, at *3 (Bankr. E.D. Okla. Dec. 4, 2007) (quoting *In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. at 80) (internal quotation marks omitted). Insolvency is analyzed from the date of the petition. *Id.*

Here, NYC OTB was clearly insolvent when it filed for chapter 9 protection. Meyer S. Frucher, chairman of NYC OTB, testified that NYC OTB could not pay its debts as they came due without closing its doors. (Tr. at 93:12–95:23.) ("Q. Right. So the – I guess what you mean is that you're delaying the payment to your creditors and using that money to operate NYC OTB? A. That's correct . . . . We could either file Chapter 9 and suspend prepetition payments pursuant to law, or we could shut down."). While NYC OTB may have been able to continue operating for a few more weeks before filing its chapter 9 Petition, the evidence clearly demonstrates that it could no longer meet its payment obligations. (Tr. 79:13–21, 93:7–15) (indicating (i) if it had not filed for chapter 9 protection, NYC OTB would have run out of cash by the end of December 2009; (ii) NYC OTB will run out of funds to continue operations in March 2010; and (iii)

only filing for chapter 9 has enabled NYC OTB to continue operations past December 2009).

The New York State Legislature concurs with this conclusion, stating when revising the statute governing NYC OTB in June 2008, that NYC OTB "is insolvent and facing closure." 2008 N.Y. SESS. LAWS 661 (McKinney) (NYRA Ex. H). The legislative history of the bill mirrors these findings. Legislative History of Chapter 115 of the Laws of 2008, *reprinted in* New York Legislative Service, Inc. ("NYC OTB is insolvent and facing imminent closure . . . . NYC OTB has been avoiding bankruptcy by spending cash reserves and *deferring payments* on its obligations.") (emphasis added) (NYRA Ex. Q). Lastly, counsel for NYRA conceded on the record that NYC OTB is insolvent for purposes of section 109(c). (Tr. at 7:8–11 ("Do you, for purposes of this hearing, do you concede that OTB is insolvent within the meaning of 109? Mr. Rosen: We do concede that, Your Honor.")).

### 4. NYC OTB wishes to establish a plan of reorganization to adjust its debts

Section 109(c)(4) requires that a municipality desire to effect a plan to adjust its debts. There is no specific test to determine when a municipality satisfies this requirement. *In re City of Vallejo*, 408 B.R. at 295 (concluding that "no bright-line test exists for determining whether a debtor desires to effect a plan . . . under § 109(c)(4)"). In *City of Vallejo*, the Bankruptcy Appellate Panel reasoned that no strict rule exists because of the "highly subjective nature of the inquiry." *Id.* The evidence must demonstrate that "the purpose of the filing of the chapter 9 petition [was] not simply . . . to buy time or evade creditors." *Id.* (quoting 2 COLLIER ON BANKRUPTCY ¶ 109.04[3][d] (internal quotation marks omitted). Courts examining this requirement have determined

that a filed statement indicating intent to affect a plan of reorganization, combined with efforts made towards negotiating and drafting a plan, fulfill this requirement. *In re Pierce County Housing Auth.*, 414 B.R. at 710 (observing that municipal debtor satisfied section 109(c)(4) by "stating its intent to effect a plan to adjust its debts . . . [and] drafting and negotiating a Plan and Amended Plan").

NYC OTB satisfies these requirements. First, it has submitted a Statement of Qualifications stating that NYC OTB "desires to effect a plan to adjust its debts." (Statement of Qualifications under Chapter 9 of Title 11 U.S.C. § 109 *et seq.*, ECF # 6.) Second, as indicated in testimony and supporting documents, NYC OTB is diligently negotiating and drafting a plan of reorganization. (Tr. 75:17–21.) Indeed, since OTB came under control of current management, it has been developing a plan to fix its shortcomings. This plan includes eliminating debt, reducing expenses, and reducing and modernizing facilities. (Tr. 37:13–38:16, 41:8–42:8.) The plan also calls for asking the New York Legislature to replace the mandatory statutory distributions with negotiated contractual payments. (Tr. 42:9–44:3.) These contracts would pay for services that the required statutory payments currently cover, including the rights to rebroadcast races. Any surplus held by NYC OTB after these payments would then be distributed in whatever manner the State Racing Board requested. (Tr. 43:21–44:22.) NYC OTB has also created, and presented to industry participants, financial summaries of different possible restructuring approaches. (NYRA Ex. O; Tr. 88:14–21, 108:24–109:8.) Moreover, NYC OTB has further lobbied the New York State Legislature for the statutory changes it believes are necessary for a successful reorganization. (NYC OTB Ex. 7; Tr. 76:1–25, 89:15–92:14.) NYC OTB has been working with J.P. Morgan

Securities for the past seven months on a plan for the issuance of municipal bonds. (Tr. 13:19–25.) J.P. Morgan has submitted a formal proposal to NYC OTB to underwrite the bond issuance. (NYRA Ex. EE.) Finally, as evidenced by its absence in the briefing and during oral argument, NYRA does not seriously contest that NYC OTB meets this requirement. (*See* Tr. 138:13–16.)

### 5. *NYC OTB satisfies the negotiation requirements of section 109(c)(5)*

NYC OTB argues that it satisfies the requirements of section 109(c)(5) in three different ways. First, they maintain that they have met the requirements of subsection B by negotiating in "good faith with creditors." 11 U.S.C. § 109(c)(5)(B). Second, NYC OTB argues that it was unable to conduct these negotiations because they were impracticable. 11 U.S.C. § 109(c)(5)(c). Third, NYC OTB states that it reasonably believed that "a creditor may attempt to obtain a transfer that is avoidable under section 547." 11 U.S.C. § 109(c)(5)(d).

### a. *NYC OTB has fulfilled the requirement to negotiate with its creditors in good faith pursuant to section 109(c)(5)(B)*

Section 109(c)(5)(B) requires a debtor to have "negotiated in good faith with creditors and ha[ve] failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter." Courts examining this statute require that these negotiations include discussions regarding a proposed plan. *See, e.g.*, *In re City of Vallejo*, 408 B.R. at 297 ("[W]e conclude that the plain language of § 109(c)(5)(B) requires negotiations with creditors revolving around a proposed plan, at least in concept."); *In re Pierce County*, 414 B.R. at 713 (following *In re City of Vallejo* by requiring prepetition negotiations with creditors regarding a possible plan or reorganization); *In re Sullivan*

*County Reg'l Refuse Disposal Dist.*, 165 B.R. at 78 (observing that "the [debtors] were also required to negotiate regarding a 'plan' to deal with their financial problems").

While the text of the statute does not specifically mandate negotiations regarding the terms of a plan, some courts have read in this requirement from the context of the statute. For example, the *City of Vallejo* court examined the statutory language and observed that the second portion of the statute contemplates a showing by a debtor that it has been unable to obtain the agreement of creditors that the debtor intends to impair under a plan of reorganization. *In re City of Vallejo*, 408 B.R. at 296–97. The *City of Vallejo* court reasoned that "it would be difficult for a municipality to prove that it negotiated in good faith with creditors it intends to impair unless the municipality had a plan of adjustment drawn or at least outlined when it negotiated with the creditors." *Id.* at 297. Other courts have looked to legislative intent when requiring a municipal debtor to have engaged in negotiations regarding a plan. For example, in *In re Cottonwood*, 138 B.R. at 975–79, the court canvassed the legislative history regarding the current version of section 109(c)(5). The *Cottonwood* court determined that, while changes to the statute were contemplated to remove the requirement that a debtor have attempted to work out a plan with creditors before filing for bankruptcy, Congress rejected those proposed alterations in the final bill. *Id.* In support of its position, the court identified language from the Senate Report on the final version of the bill stating that the "creditor protection provision, requiring a municipality to attempt a good faith negotiation with its creditors before a petition is filed, is retained." *Id.* at 977–78 (quoting S. REP. NO. 95-989, at 9 (1978)) (internal quotation marks omitted).[3]

---

[3]     The leading bankruptcy treatise argues that the requirement to have discussions regarding a plan of reorganization "is an overly restrictive view of the requirement of section 109(c)(5)(B)." 2 COLLIER ON

Courts agree, however, that no formal complete plan is required for negotiations. An "outline or a term sheet of a plan which designates classes of creditors and their treatment" will suffice. *In re City of Vallejo*, 408 B.R. at 297. *See also In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. at 78 (observing that no formal plan is required to be negotiated pursuant to section 109(c)(5)(B)).

Here, it is clear that NYC OTB engaged in negotiations with creditors regarding the possible terms of a reorganization plan prior to filing its chapter 9 Petition. The testimony of Meyer S. Frucher clearly indicates that NYC OTB discussed a plan of reorganization with NYRA. (Tr. 60:22–61:14.) Frucher further testified that he had between seven and ten meetings with NYRA personnel to discuss a possible plan of reorganization. (*See* Tr. 62:1–3.) According to Frucher, these meetings can be broken into three phases. The initial phase, which occurred between June and August of 2009, focused on assessing the challenges involved with revitalizing NYC OTB. These talks started before Frucher became an NYC OTB employee. He engaged in these discussions to ensure that the task he was taking on was not impossible. After deciding to take the job, discussions switched to include the work that needed to be done to save NYC OTB including "cutting staff, seeking outside financing, [and] the need for a change in business model." During this process NYRA shared suggestions with NYC OTB, some of which NYC OTB contends have been incorporated into their business plan. (Tr. 63:8–

BANKRUPTCY ¶ 109.04[3][e][ii]. Collier's reading would essentially remove the second prong of the statute, which requires a showing by a debtor that it has "failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that [the debtor] intends to impair under a plan in a case under such chapter." 11 U.S.C. § 109(c)(5)(B). As stated by the *City of Vallejo* court, "it would be difficult for a municipality to prove that it negotiated in good faith with creditors it intends to impair unless the municipality had a plan of adjustment drawn or at least outlined when it negotiated with the creditors." *In re City of Vallejo*, 408 B.R. at 297. The Court need not resolve this legal issue because the Court finds that the evidence establishes that NYC OTB had an outline of a plan of adjustment that it negotiated in good faith with its creditors.

11, 98:10–99:9.)  The second stage of talks, occurring between September and November

2009, involved gathering information and sharing advice.  The parties also discussed

possible required statutory changes and a possible bankruptcy filing during this phase.

(Tr. 64:1–2, 99:16–100:14.)  Later in this phase NYC OTB presented a business plan to

NYRA.  The business plan initially focused on structural changes, like creating a utility

to aggregate back-office activities to cut costs, and then morphed into discussions

regarding NYC OTB's ability to pay monies owed to NYRA and the need for bankruptcy

protection.  (Tr. 64:18–66:8.)  Indeed, NYC OTB and NYRA entered into a

confidentiality agreement on October 23, 2009 to share financial information in an effort

to mitigate the damage a restructuring would cause both parties.  (NYC OTB Ex. 2; Tr.

67:17–68:8.)  The third and final phase involved discussions occurring after the petition.

Frucher characterizes these conversations as "less than cordial" and "less than

constructive."  (Tr. 101:3–8.)

  The testimony of Charles Hayward, President and Chief Executive Officer of

NYRA, corroborates Frucher's testimony.  Hayward testified that he personally had a

number of meetings with Frucher and other NYC OTB officials from June 2009 through

December 2009 where they discussed possible ideas for restructuring NYC OTB.  (Tr.

125:14–24) ("Q.  Is it correct, sir, that you've met with Sandy Frucher and others from

the New York City OTB in the June to December 2009 time frame?  A.  Yes. . . .  Q.

And did [discussed] topics include ideas for a restructuring of the New York City OTB?

A.  Absolutely.").  Hayward further stated that during these conversations NYRA shared

its views regarding staff reductions, shop closures, and consolidation of services with

NYC OTB.  (Tr. 126:8–16.)  Frucher further testified that NYRA "had a number of

meetings" where it "put forth a number of ideas" regarding NYC OTB's reorganization, "some of which were listened to and some of which were dismissed." (Tr. 126:24–127:12.)

NYC OTB also had discussions with other New York State racetracks about a possible reorganization before filing for chapter 9 protection. NYC OTB discussed a possible reorganization with at least one breeding association. (Tr. 69:1–70:6.) NYC OTB also talked about a possible reorganization with its unions. These discussions were to ensure that the unions understood the issues facing OTB and to come to an agreement regarding how to address labor issues in the restructuring of NYC OTB. (Tr. 71:1–15.) These efforts resulted in agreements with NYC OTB's two largest unions to reduce the number of employees. (Tr. 71:16–72:2.) These unions filed joinders urging the Court to approve NYC OTB's chapter 9 Petition. (*See* ECF #s 38, 41.)

At oral argument, counsel for NYRA argued that these talks did not satisfy the requirements of section 109(c)(5)(B) because they were mere "musings" as they did not focus upon a concrete plan of reorganization. (Tr. 165:13–166:7.) But, as indicated above, talks need not involve a formal plan to satisfy section 109(c)(5)(B)'s negotiation requirement. *In re City of Vallejo*, 408 B.R. at 297; *In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. at 78. Nor is there any indication—and the Objectors do not argue—that NYC OTB engaged in these talks in bad faith. *See* 11 U.S.C. § 109(c)(5)(B) (requiring good faith negotiations to satisfy the statute). Frucher's testimony, corroborated with Hayward's admissions that NYRA and NYC OTB were discussing ideas for a possible restructuring, plus the successful negotiations with the unions,

persuade the Court that NYC OTB engaged in good faith negotiations of an informal plan of reorganization with its creditors.

But NYC OTB does not satisfy the requirements of section 109(c)(5)(B) merely by demonstrating that they have negotiated in good faith with creditors regarding the terms of a plan. NYC OTB has the burden to demonstrate that they have met the requirements of the statute. 2 COLLIER ON BANKRUPTCY ¶ 109.04[2] ("The burden of establishing eligibility for relief under chapter 9 lies with the debtor seeking relief."). The second prong of section 109(c)(5)(B) requires a showing that the debtor "has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that [the debtor] intends to impair under a plan . . . ." 11 U.S.C. § 109(c)(5)(B). The *City of Vallejo* court, foreseeing that this section of the statute must be satisfied to comply with section 109(c)(5)(B), stated that any negotiations regarding a plan of reorganization would require "some outline or term sheet of plan which designates classes of creditors and their treatment . . . ." *In re City of Vallejo*, 408 B.R. at 297.

While the record is not entirely clear, Frucher testified that he outlined a plan to creditors where no one would be impaired due to the reorganization. Frucher stated that the plan would pay all prepetition creditors' arrears in full, over time, from the proceeds of new bank and bond financing, and anticipated increases in revenue. (Tr. 50:7–51:17, 101:14–21, 102:17–103:20, 106:20–108:23.) If successfully implemented, no creditors would be impaired with respect to prepetition arrears under the plan. (Tr. 51:14–17 ("Q. And if you obtained the bond financing, how many cents on the dollar are you planning to pay on OTB's prepetition liabilities? A. Hundred percent.").) As NYC OTB has

negotiated with its creditors in good faith, but did not intend to impair its creditors, the Court concludes that NYC OTB has met the elements of section 109(c)(5)(B).

Moreover, the Objectors' main complaint deals with prospective impairment, not the impairment of prepetition arrears. Objectors argue that NYC OTB's restructuring proposal would adversely impact their revenues if the State Legislature changes the statutory formula for mandatory distributions. (*See, e.g.*, Tr. 64:2–4 (relating that Objectors "could not support a gross to net unless they were made whole, or some version thereof, because they themselves were suffering from a revenue diminution").) But NYC OTB cannot unilaterally (or even with agreement of its creditors) impose such changes; the applicable statute needs to be amended through the political process. Further, as this prospective impairment does not give rise to any claim that may be impaired under a plan, negotiations regarding future statutory changes are not required by the statute. *Cf. In re City of Vallejo*, 408 B.R. at 296 (observing that the context of the section 109(c)(5)(B) may be used to interpret its requirements).

### b. *Negotiations with NYC OTB's creditors were impracticable*

In addition to satisfying the requirements of section 109(c)(5)(B) , the Court concludes that NYC OTB has likewise satisfied the requirements of section 109(c)(5)(C). A debtor may be excused from negotiating with creditors if those negotiations would be impracticable. 11 U.S.C. § 109(c)(5)(C). Congress added this mechanism to satisfy section 109's negotiation requirement in response to possible large municipality bankruptcy cases that could involve vast numbers of creditors. 2 COLLIER ON BANKRUPTCY ¶ 109.04[3][e][iii] (citing *In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. at 79 n.54). Courts frequently find that negotiations are impracticable

where debtors have large numbers of creditors. *See, e.g.*, *In re Pierce County*, 414 B.R. at 713 ("Petitioners may demonstrate impracticability by the sheer number of their creditors . . . .") (quoting *In re City of Vallejo*, 408 B.R. at 298) (internal quotation marks omitted); *In re County of Orange*, 183 B.R. at 607 ("The impracticality requirement may be satisfied based on the sheer number of creditors involved."); *In re Villages at Castle Rock Metro. Dist. No. 4*, 145 B.R. 76, 85 (Bankr. D. Colo. 1990) (observing that holding negotiations with hundreds of bondholders was impracticable). Courts also frequently find that negotiations are impracticable where pausing to negotiate before filing for chapter 9 protection would put the debtor's assets at risk. *See, e.g.*, *In re Valley Health Sys.*, 383 B.R. at 163 ("Negotiations may also be impracticable when a municipality must act to preserve its assets and a delay in filing to negotiate with creditors risks a significant loss of those assets."); 2 COLLIER ON BANKRUPTCY ¶ 109.04[3][e][iii] ("[W]here it is necessary to file a chapter 9 case to preserve the assets of a municipality, delaying the filing to negotiate with creditors and risking, in the process, the assets of the municipality makes such negotiations impracticable.").

Courts may find negotiations impracticable in more than these limited circumstances. Courts have looked to the plain meaning of the words of section 109(c)(5)(C) to avoid a crabbed interpretation of the statute. *See In re Valley Health Sys.*, 383 B.R. at 162–63 (citing *United States v. LaBonte*, 520 U.S. 751, 757 (1997) ("Congressional intent can be divined by giving the words used their ordinary meaning.")). The plain meaning of the word "impracticable" is "not practicable; incapable of being performed or accomplished by the means employed or at command; infeasible." *Id.* at 163 (quoting WEBSTER'S NEW INTERNATIONAL DICTIONARY 1136 (3d

ed. 2002)) (internal quotation marks omitted). Likewise, legal dictionaries define impracticable as "not feasible" and impracticability as "[a] fact or circumstance that excuses a party from performing an act . . . because (though possible) it would cause extreme and unreasonable difficulty." BALLENTINE'S LAW DICTIONARY (2010); BLACK'S LAW DICTIONARY (8th ed. 2004). Courts have applied this reasoning to conclude that impracticability of negotiations is a fact-sensitive inquiry that "depends upon the circumstances of the case." *In re City of Vallejo*, 408 B.R. at 298; *In re Valley Health Sys.*, 383 B.R. at 161–63 (examining plain language of statute and rejecting constrained reading of impracticability requirement). *See also In re Pierce County*, 414 B.R. at 713 ("Whether negotiations with creditors is impracticable depends on the circumstances of the case.") (quoting *In re City of Vallejo*, 408 B.R. at 298) (internal quotation marks omitted).

Here, it is clear that negotiations with creditors were impracticable, even though NYC OTB was able to resolve outstanding issues with certain creditors before filing its Petition. As indicated in Frucher's testimony, NYC OTB's tentative reorganization plan includes recapitalization and payment of past debts. (Tr. 37:13–38:16.) Without these items, Frucher stated that no reorganization of NYC OTB could be successful. (Tr. 52:17–55:25.) Yet, Kent Hiteshew, managing director at J.P. Morgan Securities, testified that NYC OTB's mandatory statutory distributions currently prevent the issuance of municipal bonds necessary to pay the past debts and recapitalize the company, as required by NYC OTB's current reorganization plan. (Tr. 19:1–3; 25:15–17.) Thus, without a statutory change, NYC OTB cannot present a plan of reorganization to its creditors and negotiations are not feasible. *In re Valley Health Sys.*, 383 B.R. at 165

("Meaningful negotiation is infeasible, if not impossible, absent a plan of adjustment predicated upon a comprehensive business plan to return to profitability.").

Moreover, Frucher characterized NYC OTB's situation as a "zero-sum game" where the New York State Legislature either changes the mandatory statutory distributions, or NYC OTB closes its doors at the end of March. This is similar to the situation the Ninth Circuit Bankruptcy Appellate Panel analyzed in *City of Vallejo*. There, the debtor attempted to renegotiate interest rates on municipal bonds with its largest creditor, Union Bank. 408 B.R. at 287. Union Bank, however, refused to adjust interest rates without reviewing a multi-year cash flow projection. *Id.* The debtor could not, however, provide a cash flow without long-term agreement from its unions, whose contracts accounted for the majority of the debtor's future obligations. No agreement was reached. *Id.* The *City of Vallejo* court determined that because "labor costs comprised the largest slice of [the debtor's] budget, it would have been futile to negotiate with other creditors without an agreement with the Unions." Here, as in *City of Vallejo*, there is little reason for many creditors to negotiate, as they are currently ensured by statute certain statutory distributions from NYC OTB. While some of these creditors may yield, acknowledging that they must accept some reduction to ensure the continued operation of NYC OTB, others, as the Objectors have so far demonstrated, may not. Other courts have interpreted negotiations breaking down with large creditors as a factor that demonstrates the impracticability of negotiations. For example, the court in *In re Villages at Castle Rock Metropolitan Dist. No. 4*, 145 B.R. at 85, determined that when the debtor unsuccessfully negotiated for numerous months with a single large creditor, further talks with creditors were impracticable.

The Court concludes that the mandatory statutory distributions made negotiations with creditors impracticable. While some creditors have supported NYC OTB's Petition, others have not. Protected by statute, there is less reason for these entities to accept lower payments, save to ensure the continued operation of NYC OTB. This case involves sophisticated parties—many with strong legislative ties—represented by able counsel and professional advisors. Ultimately, if NYC OTB is going to survive (and prosper), providing important financial support to the racing industry, employees, municipalities and the State, hard bargaining (inside and outside of Albany) will be required.

> c. *NYC OTB has not demonstrated that it reasonably believes that "a creditor may attempt to obtain a transfer that is avoidable under section 547"*

Section 109(c)(5)(D) permits a debtor to avoid negotiations with its creditors if it can demonstrate that it "reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 . . . ." Here, NYC OTB has proffered little more than passing testimony regarding a lawsuit brought by Monticello Raceway. (Tr. 74:15–75:1.) Based on the scant evidence in the record, the Court cannot determine that NYC OTB reasonably believed that Monticello Raceway may attempt to obtain a preference. While Monticello Raceway may very well have intended to obtain a judgment and post-judgment attachment of assets, NYC OTB has failed to meet its evidentiary burden on this prong.

**B. NYC OTB Filed For Chapter 9 Protection in Good Faith**

Courts may dismiss chapter 9 petitions if they are not filed in good faith. *See* 6 COLLIER ON BANKRUPTCY 921.04 ¶ [2]–[4]. The power to dismiss for not filing a petition in good faith "is permissive, not mandatory." *In re In re Pierce County*, 414 B.R. at 714 (citing 6 COLLIER ON BANKRUPTCY 921.04 ¶ [4]). "Good faith in the chapter 9 context is

not defined in the Code and the legislative history of [section] 921(c) sheds no light on Congress' intent behind the requirement." *In re County of Orange*, 183 B.R. at 608 (citing *In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. at 80). As a result, courts have looked to discussions of good faith in the chapter 11 context to determine whether a chapter 9 petition has been filed in good faith. *In re McCurtain Mun. Auth.*, 2007 WL 4287604, at *4 (referencing chapter 11 good faith standards to determine whether chapter 9 petition was filed in good faith) (quoting *In re Villages at Castle Rock Met. Dist. No. 4*, 145 B.R. at 81); *In re County of Orange*, 183 B.R. at 608 (observing that "courts have . . . applied to chapter 9 cases the judicial reasoning that developed in chapter 11 cases" regarding good faith); *In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. at 82 (examining and applying chapter 11 good faith requirements to chapter 9 petition).

The leading treatise lists six different factors that courts may examine when determining whether a petition under chapter 9 was filed in good faith:

> (i) the debtor's subjective beliefs; (ii) whether the debtor's financial problems fall within the situations contemplated by chapter 9; (iii) whether the debtor filed its chapter 9 petition for reasons consistent with the purposes of chapter 9; (iv) the extent of the debtor's prepetition negotiations, if practical; (v) the extent that alternatives to chapter 9 were considered ; and (vi) the scope and nature of the debtor's financial problems.

6 COLLIER ON BANKRUPTCY ¶ 921.04 [2]. And the Second Circuit has identified eight different factors that are "indicative of a bad faith filing" in the chapter 11 context:

> (1) the debtor has only one asset;

> (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

(3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

(4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

(5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

(6) the debtor has little or no cash flow;

(7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and

(8) the debtor has no employees.

*C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1311 (2d Cir. 1997). Objectors argue that NYC OTB's Petition was not filed in good faith because (i) it was filed only to avoid making further payments to creditors; (ii) no reasonable prospects exist for NYC OTB's reorganization; (iii) NYC OTB's Petition contravenes the policy behind chapter 9; and (iv) NYC OTB did not adequately explore alternatives to bankruptcy. None of these arguments withstands scrutiny.

### 1. *Mere delay of payments to creditors does not warrant dismissal of NYC OTB's petition*

Objectors maintain that NYC OTB's chapter 9 Petition was filed in bad faith because the automatic stay will permit it to avoid making its mandatory statutory distributions. (NYRA Obj. 17.) Objectors are correct that chapter 9 may not be used "simply to buy time or to avoid creditors." (*Id.* (quoting 6 COLLIER ON BANKRUPTCY 900.02 ¶ [2][d]).) But the delay of mandatory payments to creditors is a fundamental component of bankruptcy protection. "[T]he automatic stay provides the debtor with a breathing spell from his creditors." *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d

Cir. 1990) (internal quotation marks and citation omitted). This delay permits a debtor "to attempt a repayment or reorganization plan to satisfy existing debt." *Kadesh v. United Air Lines, Inc.*, No. 02 Civ. 9058(SHS), 2003 WL 435632, at *1 (S.D.N.Y. Feb. 24, 2003) (quoting *Eastern Refractories Co. v. Forty Eight Insulations Inc.*, 157 F.3d 169, 172 (2d Cir. 1998)) (internal quotation marks omitted). The very "purpose of chapter 9 is to temporarily protect a debtor from collection actions so that it may establish a repayment plan with its creditors." *In re Hamilton Creek Metro. Dist.*, 143 F.3d at 1386.

Courts do not dismiss bankruptcy petitions merely because they delay payments to creditors. Petitions are only dismissed where the delay is an attempt "to deter and harass creditors in their bona fide efforts" to enforce their rights. *In re Thirtieth Place, Inc.*, 30 B.R. 503, 505 (9th Cir. B.A.P. 1983); *see also In re C-TC 9th Ave. P'ship*, 113 F.3d at 1311 (listing only "an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights," not an intent to generally delay creditors, as grounds for dismissing a petition for bad faith). This was the situation faced by the court in *In re Sullivan County Reg'l Refuse Disposal District*, 165 B.R. at 82. There, the court determined that the chapter 9 petition was filed merely as a litigation tactic, with "no real thought or sincere intention of debt adjustment in an overall plan sense." The court dismissed the chapter 9 petition as being filed in bad faith. *Id.* But mere delay, combined with efforts to move forward with a plan of reorganization, does not warrant a dismissal for bad faith. *In re County of Orange*, 183 B.R. at 608 (observing that the "general policy of chapter 9 is to give a debtor a breathing spell from debt

collection efforts so it can work out a repayment plan with creditors") (citing H.R. Rep. No. 95-595 (1977)).

Here, the evidence demonstrates that NYC OTB has not filed merely to delay payments to its creditors or as a litigation tactic. NYC OTB has been working with J.P. Morgan Securities for the past seven months, assessing the possibility of a public debt issuance, essential to recapitalization and payment of creditors. (Tr. 13:19–14:10.) Moreover, NYC OTB has entered into good faith negotiations with a number of creditors, frequently discussing elements of a plan of reorganization. *See supra* Part A.5.a. NYC OTB is still working towards a plan of reorganization, presenting financial projections to racing industry officials on February 4, 2010. (Tr. 88:14–25; NYRA Ex. O.) NYC OTB is still lobbying the New York State Legislature for the statutory changes required to effect a plan of reorganization. (Tr. 76:1–77:3; NYC OTB Ex. 7.) NYC OTB has worked for years to avoid bankruptcy, cutting costs and lobbying the legislature for statutory changes. (*See supra* Background; Tr. 83:11–14.) The Objectors have likewise been exercising their considerable legislative clout, lobbying and testifying at legislative committee hearings. (Tr. 76:17–77:3.) The Court finds that NYC OTB actively pursued viable alternatives to chapter 9 bankruptcy. The chapter 9 Petition was filed only when NYC OTB was faced with imminent financial collapse that would have required shutting its doors, laying off all of its employees, and ceasing payments to all of its constituencies that look to NYC OTB for financial support.

Thus, this is not a situation like the one presented in *In re Sullivan County Reg'l Refuse Disposal District*, 165 B.R. 60, where the chapter 9 petition was filed without any intent to adjust its debt or as a mere litigation tactic. Here, NYC OTB was, and still is,

working toward a plan of reorganization. Its chapter 9 Petition, and the accompanying delay of payments to creditors, at best has given NYC OTB an additional few months to resolve its long-term financial problems. (Tr. 79:13:–21, 93:7–15) (noting that if NYC OTB had not filed for chapter 9 protection it would have run out of cash by the end of December 2009).

### 2. *NYC OTB need not have had a feasible plan of reorganization when filing for chapter 9 protection*

Objectors argue that because NYC OTB's reorganization plan is contingent upon the New York State Legislature taking action and NYC OTB completing a bond offering, the case was filed in bad faith and the Court should dismiss the Petition. The Objectors apparent position is that unless a chapter 9 debtor can present, simultaneously with its filing, a comprehensive plan of reorganization, the petition was filed in bad faith. The Court rejects this position. There simply is no requirement, in the chapter 9 or chapter 11 context, for a debtor to have solved the riddles of its business woes prior to filing for bankruptcy protection. Neither the Second Circuit, nor the leading treatise, contemplates dismissing petitions for bad faith for failure to have a ready exit from bankruptcy. *See supra* Part B. Indeed, imposing this type of prerequisite could drastically reduce debtors' access to bankruptcy protection, resulting in the disorderly liquidation of estates.

Objectors fail to point to a single chapter 9 case where a petition was dismissed for these reasons. In *In re Town of Westlake*, 211 B.R. at 868, for example, the court found that a hastily filed petition—without an accompanying plan to exit bankruptcy— passed the good faith test of chapter 9. Similarly, in *In re Villages at Castle Rock Metropolitan District No. 4*, 145 B.R. at 81, the court found that a chapter 9 petition was filed in good faith where the debtor's exit from bankruptcy was dependent upon the

contingent development of a tax base.  *Id.* ("Continued development . . . suggests that the tax base may be enhanced and that further development fees may be realized, which might well permit the repayment of the bondholders pursuant to a feasible debt adjustment plan.").

Moreover, Objectors have failed to adequately address the Court's question, posed at the February 22, 2010 hearing, observing that chapter 11 cases often persist for long periods of time while awaiting exit financing, and inquiring why the circumstances here require a different result.  Counsel for NYRA argued that a chapter 9 case requires a different result because the requirements for entering chapter 11 are different than those of chapter 9.  (Tr. 168:7–24.)  This reasoning ignores the multitude of cases that have looked to chapter 11 cases when examining good faith in the chapter 9 context.  *See supra* Part B.  Thus, the Court concludes that this case does not require a different result.[4]

### 3.  *NYC OTB's Petition is consistent with chapter 9 policy*

Objectors maintain that because NYC OTB's eventual exit from bankruptcy is dependent upon action by the New York State Legislature, its Petition is somehow an improper attempt to leverage the political process.  (NYRA Obj. 21; Tr. 176:9–19.)  The Court rejects this argument.  It is unclear how NYC OTB's filing for chapter 9 protection while searching for a viable way to exit bankruptcy is an improper attempt to "leverage" the political process.  The New York State Legislature is well aware of the financial troubles facing NYC OTB, having deemed NYC OTB "insolvent" since 2008.  2008 N.Y. SESS. LAWS 661 (McKinney) (NYRA Ex. H).  NYC OTB has been lobbying for

---

[4]      In certain compelling factual circumstances, the utter infeasibility of reorganization may be a factor demonstrating a bad faith filing.  *See, e.g.*, *In re AdBrite Corp.*, 290 B.R. 209, 218 (Bankr. S.D.N.Y. 2003) (observing that the *C-TC* bad faith "factors are illustrative only and should not be substituted for the court's sound discretion.").

years to achieve the statutory changes it believes are necessary for its successful reorganization. NYC OTB does not ask this Court to rewrite New York State statutes; nor could this Court do so. The New York State legislative and executive branches hold the power to make the statutory changes needed for NYC OTB to survive—nothing in the Bankruptcy Code changes this fact.

Chapter 9 bankruptcy protection provides NYC OTB with the breathing spell needed to restore its financial viability, through financial restructuring and statutory changes. This is precisely the purpose of chapter 9, "to temporarily protect a debtor from collection actions so that it may establish a repayment plan with its creditors." *In re Hamilton Creek Metro. Dist.*, 143 F.3d at 1386. Chapter 9 "affords a municipality temporary protection from debt collection efforts so that it may establish a plan of adjustment with its creditors." *In re Valley Health Sys.*, 383 B.R. at 163; *In re County of Orange*, 183 B.R. at 608 (finding no bad faith where a municipal debtor filed for chapter 9 "to protect its assets and allow it the opportunity to work out an adjustment of its debts in an orderly way"). Objectors have not offered any compelling arguments why NYC OTB's chapter 9 filing is inconsistent with these policies.

> ### 4.  NYC OTB adequately explored bankruptcy alternatives before filing its petition

Finally, Objectors maintain that NYC OTB did not seek sufficient alternatives before filing for bankruptcy. This argument has no merit. As demonstrated at the hearing, NYC OTB has gone to great lengths to avoid bankruptcy. Since 2004 it has made efforts to cut costs in an effort to remain viable. *See supra* Background. NYC OTB has also consistently lobbied the legislature for the statutory changes it believes are required to restore its financial viability. (Tr. 76:1–25, 89:15–92:14.) The record clearly

establishes that NYC OTB is unable to issue debt to finance its reorganization without legislative action. (Tr. 54:22–25.)

Even assuming NYC OTB could have theoretically done more to avoid bankruptcy, courts do not require chapter 9 debtors to exhaust every possible option before filing for chapter 9 protection. For example in *In re McCurtain Municipal Authority*, 2007 WL 4287604, at *6, the court analyzed an argument that the petition was filed in bad faith because the municipality could have assessed citizens to pay its debts. The court observed that such an effort was unlikely to be successful and held that "failure to do so d[id] not necessarily indicate that [the] bankruptcy was filed in bad faith. *Id.* (citing *In re Chilhowee R-IV Sch. Dist.*, 145 B.R. 981, 983 (Bankr. W.D. Mo. 1992)). Thus, the Court concludes that NYC OTB examined sufficient alternatives to filing its chapter 9 Petition to demonstrate that the filing was made in good faith.

## CONCLUSION

For the above stated reasons the objections to NYC OTB's Petition are **OVERRULED**. The practical implications of this decision are limited. Protected for now by chapter 9 of the Bankruptcy Code, NYC OTB will either reorganize or liquidate under the watch of this Court, depending on the actions of the New York State Legislature and NYC OTB's further negotiations with each of its important constituencies.

**IT IS SO ORDERED.**

DATED:      March 22, 2010
            New York, New York

                        _____/s/Martin Glenn_____
                            MARTIN GLENN
                    United States Bankruptcy Judge