Richard Levin (RL 1651)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone:     (212) 474-1000
Facsimile:     (212) 474-3700

*Attorneys for the New York City Off-Track
Betting Corporation*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 9 |
| NEW YORK CITY OFF-TRACK BETTING CORPORATION, | Case No. 09-17121 (MG) |
| Debtor.[1] | |

<u>**NOTICE OF PRESENTMENT OF STIPULATION, AGREEMENT AND ORDER
BETWEEN THE METROPOLITAN TRANSPORTATION AUTHORITY AND
NEW YORK CITY OFF-TRACK BETTING CORPORATION**</u>

**PLEASE TAKE NOTICE**  that, on April 13, 2010, at 12:00 PM. (Eastern Time)

the undersigned will present the attached Stipulation and Order between New York City

Off-Track Betting Corporation ("**NYC OTB**") and the Metropolitan Transportation

Authority to the Honorable Martin Glenn, United States Bankruptcy Judge, for signature.

**PLEASE TAKE FURTHER NOTICE**  that, objections, if any, to the proposed

Stipulation and Order must be made in writing and received in the Bankruptcy Judge's

chambers and by the undersigned no later than April 13, 2010 at 11:00 AM. (Eastern

---

[1] NYC OTB's address is 1501 Broadway, New York, NY 10036.  NYC OTB's tax identification number is 13-2664509.

Time).  Unless objections are received by that time, the proposed Stipulation and Order

may be signed without a hearing.

      Dated:  March 26, 2010

                              CRAVATH, SWAINE & MOORE LLP

           By :    s/ Richard Levin
                      RICHARD LEVIN (RL 1651)
                      A member of the Firm

                      Worldwide Plaza
                      825 Eighth Avenue
                      New York, NY 10019
                      (212) 474-1000

                      *Attorneys for the New York City Off-*
*Track Betting Corporation*

Richard Levin (RL 1651)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone:     (212) 474-1000
Facsimile:     (212) 474-3700

*Attorneys for the New York City Off-Track
Betting Corporation*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 9 |
| NEW YORK CITY OFF-TRACK BETTING CORPORATION, | Case No. 09-17121 (MG) |
| Debtor.[1] | |

**STIPULATION, AGREEMENT AND ORDER BETWEEN THE
METROPOLITAN TRANSPORTATION AUTHORITY AND NEW YORK CITY
OFF-TRACK BETTING CORPORATION PROVIDING FOR RELIEF FROM
THE AUTOMATIC STAY**

New York City Off-Track Betting Corporation, the Debtor in the above-
captioned case ("**NYC OTB**"), and the Metropolitan Transportation Authority ("**MTA**"
and together with NYC OTB, the "**Parties**"), enter into this Stipulation and Agreed Order
(the "**Stipulation**") and represent and agree as follows:

---

[1] NYC OTB's address is 1501 Broadway, New York, NY 10036.  NYC OTB's tax identification
number is 13-2664509.

## RECITALS

  A.  On February 10, 2003, NYC OTB entered into a ten year lease of real property with MacArthur Properties LLC for use of 2135 square feet (the "**Premises**") of a commercial condominium unit located at 1318 Second Avenue, New York a/k/a 301 East 69th Street, New York, New York (the "**Property**"). A copy of the lease agreement is attached hereto as Annex A.

  B.  During the term of the lease, NYC OTB made various improvements to the Premises that remain attached as trade fixtures (the "**Fixtures**"). Under the lease, NYC OTB maintains a leasehold interest in the Premises (the "**Leasehold Interest**") and the Fixtures (the Leasehold Interest and the Fixtures are collectively the "**NYC OTB Property Interests**").

  C.  On December 3, 2009, (the "**Petition Date**") NYC OTB filed a voluntary petition [Docket No. 1] for relief under chapter 9 of Title 11 of the United States Code.

  D.  The Metropolitan Transportation Authority of the State of New York ("MTA") is a public authority and public benefit corporation of the State of New York that is organized under New York Public Authorities Law §1260 *et seq.* for the purpose of operating a unified public transportation system serving New York City and nearby metropolitan counties in the State of New York. In accordance with New York Public Authorities Law §1267 and the New York State Eminent Domain Procedure Law ("EDPL"), MTA is in the process of

acquiring properties needed to construct and operate the Second Avenue Subway, a new subway line that will serve the East Side of Manhattan.

E.      MTA is acquiring such properties, as provided under the EDPL, by filing applications to condemn in the Supreme Court of the State of New York, New York County.  Among the property interests that MTA requires for the Second Avenue Subway is a permanent easement in a portion of the Property (the "**Easement**") for a new subway entrance.  MTA will acquire the Easement with funds procured from a federal grant subject to the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (the "**Uniform Act**").  MTA's acquisition of the Easement, and its construction and operation of the new subway entrance, will have the effect of permanently displacing NYC OTB from the Property.

F.      Under the Fifth Amendment to the United States Constitution and Article I, §7 of the New York State Constitution, MTA must provide just compensation to NYC OTB associated with MTA's acquisition of the Easement, namely, for NYC OTB's right, title and interest in the Fixtures. Under the Uniform Act, MTA also will provide relocation assistance to NYC OTB if required.

G.      MTA has negotiated a stipulation agreement (the "**Stipulation Agreement**"), attached hereto as Annex B with NYC OTB to provide compensation to NYC OTB in the amount of $183,732 (the "**Award**") for the value of the Fixtures.  NYC OTB and MTA have also negotiated an assignment of

condemnation award agreement (the **"Assignment of Condemnation Award Agreement"** and together with the Stipulation Agreement, the **"Agreements"**) attached hereto as Annex C, which provides that NYC OTB will vacate and surrender possession of the Premises within thirty (30) days of receipt of the Award, subject to any liens or encumbrances, if any, but in no event will NYC OTB be compelled to vacate the Premises sooner than ten (10) business days following the running of the Belmont Stakes scheduled for Saturday, June 5, 2010.

H.      MTA's proposed acquisition or termination of the NYC OTB Property Interests is not excepted from the automatic stay provision of Section 362 and 922 of the Bankruptcy Code.  Therefore, in order to acquire or terminate the NYC OTB Property Interests, either through an eminent domain proceeding commenced in the Supreme Court of the State of New York or a voluntary transaction in lieu thereof, MTA requires relief from the automatic stay.

I.      In an effort to effectuate the terms of the Agreements, the Parties have agreed that it is in their best interest to enter into this Stipulation upon the terms and conditions contained herein and in the Agreements.

**NOW, THEREFORE, UPON THE FOREGOING RECITALS, WHICH ARE INCORPORATED AS THOUGH FULLY SET FORTH HEREIN, IT IS HEREBY STIPULATED AND AGREED, BY AND BETWEEN THE PARTIES, THROUGH THEIR RESPECTIVE UNDERSIGNED COUNSEL, AND SUBJECT TO OBTAINING COURT APPROVAL HEREOF, IT SHALL BE ORDERED THAT:**

1.      This Stipulation shall be of no force and effect unless and until approved by the Court (the "**Effective Date**").  This Stipulation shall be immediately effective on the Effective Date and shall not be stayed pursuant to Bankruptcy Rule 4001(a)(3).

2.      On the Effective Date, the automatic stay extant in NYC OTB's chapter 9 case in accordance with section 362 and 922 of the Bankruptcy Code (the "**Automatic Stay**") shall be modified solely to the extent necessary to permit MTA to exercise its rights under the Agreements and applicable law solely with respect to the NYC OTB Property Interests, including acquiring or terminating the NYC OTB Property Interests by eminent domain in accordance with the terms of the Agreements.  The Automatic Stay shall be further modified such that all notices provided to NYC OTB by MTA and all actions taken by MTA to acquire the NYC OTB Property Interests prior to the Effective date are deemed to have been permitted and effective.

3.      NYC OTB is authorized to make, execute, file and deliver such statements, instruments, and other documents and take all other or further actions that may be required or necessary for the performance by NYC OTB of the terms of the Agreements, and each of the Parties are hereby authorized to file, register and otherwise record a copy of the Agreements.

4.      Other than as set forth in Paragraph 2 above, the Automatic Stay shall remain in full force and effect.

5.      This Stipulation shall be binding upon and shall govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, records of deeds, registrars of deeds, administrative agencies, governmental units, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, contract, or the duties of their office to accept, acknowledge, assent or consent to, file, register, record or release any documents or instruments with respect to the NYC OTB Property Interests and the transaction effectuated in connection therewith under this Stipulation.

6.      Each person who executes this Stipulation on behalf of a Party represents that he or she is duly authorized to execute this Stipulation on behalf of such Party.

7.      This Stipulation may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

8.      This Stipulation may be amended or otherwise modified only by a signed writing executed by the Parties.

9.      This Court shall retain jurisdiction to resolve any disputes or controversies arising from or related to this Stipulation.

Dated:  March 26, 2010

CRAVATH, SWAINE & MOORE LLP

By :     s/ Richard Levin
RICHARD LEVIN (RL 1651)
A member of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for the New York City Off-Track Betting Corporation*

BERGER & WEBB, LLP

By :     s/ Kenneth J. Applebaum
KENNETH J. APPLEBAUM

1633 Broadway, 46th Floor
New York, NY 10019
(212) 319-1900

*Attorneys for the Metropolitan Transportation Authority*

**SO ORDERED:**

Dated: New York, New York
April ___, 2010

_____
HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

# ANNEX A

## LEASE AGREEMENT

BR 110

**LEASE**

By and Between

**MACARTHUR PROPERTIES LLC**

Owner

and

**THE NEW YORK CITY OFF-TRACK BETTING CORPORATION**

Tenant

<u>Premises</u>

1318 Second Avenue
New York, New York

This Agreement of Lease (hereinafter the "Lease") dated as of February 10, 2003, by and between MacArthur Properties LLC (the "Owner") having an office at 140 East 56th Street, New York, NY 10022 and the **New York City Off-Track Betting Corporation**, a public benefit corporation established under the laws of the State of New York (CH 144 L. 1970) with offices at 1501 Broadway, New York, New York 10036 (the "Tenant").

**WHEREAS**, Owner is the fee title owner of a commercial condominium unit located in the Building located and known as 1318 Second Avenue, New York a/k/a 301 East 69th Street, New York, New York (the "Building"); and

**WHEREAS**, the Owner desires to lease to Tenant and Tenant desires to lease from Owner a portion of the Building consisting of a ground floor store thereof comprising approximately 2135 square feet (the "Premises").

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, Owner and Tenant agree as follows:

1. **Term** (a) The term of this Lease shall commence as of April 1, 2003 (the "Commencement Day") and shall continue for ten (10) consecutive years until March 31, 2013 (the "Initial Term") notwithstanding any other termination provisions as set forth herein.

2. **Base Rent** Tenant covenants and agrees to pay Owner, in twelve (12) equal monthly installments in advance on the first day of each month, the said annual rents during each of said years as follows:

> April 1, 2003 to March 31, 2004 - $275,200.00 Per Annum
> April 1, 2004 to March 31, 2005 - $283,456.00 Per Annum
> April 1, 2005 to March 31, 2006 - $291,959.68 Per Annum
> April 1, 2006 to March 31, 2007 - $300,718.47 Per Annum
> April 1, 2007 to March 31, 2008 - $300,718.47 Per Annum
> April 1, 2008 to March 31, 2009 - $300,718.47 Per Annum
> April 1, 2009 to March 31, 2010 - $300,718.47 Per Annum
> April 1, 2010 to March 31, 2011 - $318,761.57 Per Annum
> April 1, 2011 to March 31, 2012 - $328,324.41 Per Annum
> April 1, 2012 to March 31, 2013 - $338,174.14 Per Annum

3. **Use and Occupancy** Tenant shall use and occupy the Premises as an off-track betting parlor and for no other business.

4. **Alterations** Except as otherwise provided herein, Tenant shall make no changes in or to the Premises of any nature without Owner's prior written consent. Subject to the prior written consent of Owner, which consent shall not be unreasonably withheld, conditioned or delayed, and to the provisions of this Article, Tenant, at Tenant's expense, may make interior alterations, installations, additions or improvements which are nonstructural and which do not affect utility services or plumbing and electrical lines, in or to the interior of the Premises by using contractors

1

or mechanics first approved in each instance by Owner, such approval not to be unreasonably withheld, conditioned or delayed, provided that Tenant may make cosmetic or decorative alterations within the Premises without obtaining Owner's consent. Tenant shall, before making any alterations, additions, installations, or improvements, at its expense, obtain all permits, approvals and certificates required by any governmental or quasi-governmental bodies and (upon completion) certificates of final approval thereof, and shall deliver promptly duplicates of all such permits, approvals and certificates to Owner, and Tenant agrees to carry and will cause Tenant's contractors and sub-contractors to carry such workmen 's compensation, general liability, personal and property damage insurance as Owner may reasonably require. If any mechanic's lien is filed against the Premises, or the Building of which the same forms a part, for work claimed to have been done for, or materials furnished to, Tenant, whether or not done pursuant to this Article, the same shall be discharged by Tenant within thirty (30) days thereafter, at Tenant's expense, by payment or filing the bond required by law or otherwise permitted by law. All fixtures and all paneling, partitions, railings and like installations, installed in the Premises at any time, either by Tenant or by Owner in Tenant's behalf, shall upon installation, become the property of Owner and shall remain upon and be surrendered with the Premises unless Owner, by notice to Tenant no later than ninety days (90) prior to the date fixed as the termination of the Lease, elects to relinquish Owner's rights thereto and to have them removed by Tenant, in which event, the same shall be removed from the Premises by Tenant, at Tenant's expense, prior to the expiration of the Lease. Nothing in this Article shall be construed to give Owner title to or to prevent Tenant's removal of Tenant's trade fixtures, moveable office furniture and equipment, but upon removal of any such from the Premises or upon removal of any other installation as may be required by Owner, Tenant shall immediately and at its expense, repair and restore the Premises to the condition existing prior to installation, reasonable wear and tear excepted, and repair any damage to the Premises or the Building due to such removal. All property permitted or required to be removed by Tenant at the end of the term remaining in the Premises after Tenant's removal shall be deemed abandoned and may, at the election of Owner, be retained as Owner's property.

5. **Repairs** (a) Owner shall maintain and repair the public portions of the commercial condominium unit, both exterior and interior, but only as it effect Tenant's possession and use of the Premises. If Owner allows Tenant to erect on the outside of the Building a sign or signs, or a hoist, lift or sidewalk elevator for the exclusive use of Tenant, Tenant shall maintain such exterior installations in good appearance and shall cause the same to be operated in a good and workmanlike manner and shall make all reasonable repairs thereto necessary to keep same in good order and condition, at Tenant's own cost and expense, and shall cause the same to be covered by the insurance provided for hereafter in Article 9. Tenant shall, throughout the term of this Lease, take good care of the Premises and the fixtures and appurtenances therein and, at its sole cost and expense, make all nonstructural repairs thereto as and when needed to preserve them in good working order and condition, reasonable wear and tear, obsolescence and damage from the elements, fire or other casualty excepted; provided that, Tenant shall no longer be obligated to do so if Tenant shall not be able to use the Premises substantially as contemplated by the terms of this Lease. If the Premises become infested with vermin, Tenant at its expense shall cause the same to be exterminated from time to time to the reasonable satisfaction of Owner.

(b) Tenant shall give prompt notice of any defective condition in the Premises for which Owner may be responsible hereunder. Notwithstanding anything herein to the contrary, Tenant shall not be required to make any repairs (whether structural or nonstructural) to the extent the

2

same are necessitated by the gross and affirmative negligence or willful misconduct of the Owner, its agents, employees, contractors, invitees or licensees. The provisions of this Article 5 with respect to the making of repairs shall not apply in the case of fire or other casualty which are dealt with in Article 10 hereof.

6. **Window Cleaning** Tenant will not clean nor require, permit, suffer or allow any window in the Premises to be cleaned from the outside in violation of Section 202 of the New York State Labor Law, any other applicable law or of the Rules of the Board of Standards and Appeals, or of any other Board or body having or asserting jurisdiction.

7. **Requirements of Law, Fire Insurance** (a) Owner warrants and represents that any latent conditions within the Premises or the Building that first become apparent during the Initial and/or Renewal Term of the Lease and that are not due to Tenant's actions shall be cured by Owner within thirty (30) days of notification thereof by Tenant or any governmental department, agency or bureau having jurisdiction.

(b) Except as may be the responsibility of Owner in accordance with (a) above subsequent to the commencement of the term, Tenant, at Tenant's sole cost and expense, shall promptly comply with all present and future laws, orders and regulations of all state, federal, municipal and local governments, departments, commissions and boards and any direction of any public officer pursuant to law, and all orders, rules and regulations of the New York Board of Fire Underwriters or the Insurance Services Office, or any similar body which shall impose any violation, order or duty upon Tenant with respect to the Premises (collectively the "Legal Requirements"), or with respect to the Building if arising out of Tenant's particular manner of use of the Premises. Except as provided in Article 30 hereof, nothing herein shall require Tenant to make structural repairs or alterations unless Tenant has by its manner of use of the Premises or method of operation therein, violated any such laws, ordinances, orders, rules, regulations or requirements with respect thereto. Tenant shall not do or permit any act or thing to be done in or to the Premises which is contrary to law, or which will invalidate or be in conflict with public liability, fire or other policies of insurance at any time carried by or for the benefit of Owner with respect to the Premises or the Building, or which shall or might subject Owner to any liability or responsibility to any person or for property damage. Owner shall promptly and diligently comply with all Laws and/or Legal Requirements with respect to the Premises and the Building that Tenant is not obligated to perform hereunder.

(c) Tenant shall pay all costs, expenses, fines, penalties or damages which may be imposed upon Owner by reason of Tenant's failure to comply with the provisions of this Article. With regard to any asbestos containing materials found, contained, located or otherwise present within, in or on the Premises at the term commencement date, Owner will, at its expense, abate or use its best efforts within Owner's control to cure any problem within forty-five (45) days of notification by Tenant or any government agency that such materials do not comply with applicable law or regulation or otherwise pose a hazard to the health or well being of Tenant's agents, contractors, employees, invitees or licensees unless such asbestos containing material was introduced into the Premises by the Tenant or its presence disturbed by the use of the Premises by Tenant as further subject to the provisions contained in sub-paragraph 44(b) herein.

8. **Subordination** This Lease is subject and subordinate to all ground or underlying leases and to all mortgages which may now or hereafter affect such leases or the real property of which the Premises are a part, and to all renewals, modifications, consolidations, replacements and extensions of any such underlying leases and mortgages. This clause shall be self-operative and no further instrument of subordination shall be required by any ground or underlying lessor or by any mortgagee, affecting any lease or the real property of which the Premises are a part. In confirmation of such subordination, Tenant shall from time to time execute promptly any certificate that Owner may request.

Owner agrees that it shall use its best efforts to obtain and deliver to Tenant, as to the mortgages now or hereafter covering the Premises, nondisturbance agreements from the holder of any such mortgage, providing in substance that if Tenant shall have entered into possession and occupancy of the Premises and commenced payment of fixed rent and additional rent hereunder, and so long as Tenant is not in default in its obligations for the payment of fixed rent and additional rent and in the performance of the other terms, covenants and conditions to be performed on its part under this Lease, notwithstanding the foreclosure of any such mortgage, its possession of the Premises will not be disturbed during the term hereof. Tenant will not be named as a party defendant in any foreclosure proceedings brought for the recovery of possession. Tenant agrees to execute and deliver to such mortgagee a nondisturbance and attornment agreement in form and substance reasonably satisfactory to Tenant and Tenant's counsel.

9. **Tenant's Liability Insurance, Property Loss, Damage Indemnity** (a) Owner or its agents shall not be liable for any damage to property of Tenant or of others entrusted to employees of the Building, nor for loss of or damage to any property of Tenant by theft or otherwise, nor for any injury or damage to persons or property resulting from any cause of whatsoever nature, unless caused by or due to the gross and affirmative negligence or misconduct of Owner, its agents, servants or employees. Owner or its agents will not be liable for any such damage caused by other tenants or persons in, upon or about the Building or caused by operations in construction of any private, public or quasi-public work.

(b) Tenant agrees, at Tenant's sole cost and expense, to maintain and keep in force throughout the term of this Lease commercial general liability insurance against claims arising out of or connected with the possession, use, operation or condition of the Premises on an occurrence basis with a minimum limit of liability of $1,000,000 combined single limit per occurrence and $3,000,000 in the aggregate, including bodily injury, death and property damage. Tenant shall deliver to Owner within sixty (60) days from date hereof a certificate evidencing such insurance, containing an endorsement that it may not be canceled except upon thirty (30) days notice to the Owner. In the event that Tenant fails to provide such evidence, the Owner may obtain such coverage and change the premiums to the Tenant as additional rent hereunder, which additional rent shall be paid on the first day of the month following the expenditure by the Owner to obtain said coverage.

(c) Tenant shall indemnify and save harmless Owner against and from all liabilities, obligations, damages, penalties, claims, costs and expenses for which Owner shall not be reimbursed by insurance under the preceding paragraph (b), (but excluding attorneys fees subject to paragraph (d), paid, suffered or incurred as a result of any breach by Tenant, Tenant's agents,

4

contractors, employees, invitees, or licensees, of any covenant or condition of this Lease to be performed or observed by Tenant, or the carelessness, negligence or improper conduct of the Tenant, Tenant's agents, contractors, employees, invitees or licensees. Tenant's liability under this Lease extends to the acts and omissions of any subtenant, and any agent, contractor, employee, invitee or licensee of any subtenant.

(d) In case any action or proceeding is brought against Owner by reason of the claims and/or any circumstances enumerated above, upon written notice from Owner, Tenant will at Tenant's expense, resist or defend such action or proceeding by counsel which shall be chosen by Tenant's insurance carrier and/or the New York City Corporation Counsel.

(e) Each party shall include in each of its insurance policies covering loss, damage or destruction by fire or other casualty a waiver of the insurer's right of subrogation against the other party or, if such waiver should be unobtainable or unenforceable, (i) an express agreement that such policy shall not be invalidated if the insured waives before the casualty the right of recovery against any party responsible for a casualty covered by such policies, or (ii) any other form of permission for the release of the other party. If such waiver, agreement or permission shall cease to be obtainable without additional charge, then if the other party shall so elect and shall pay the insurer's additional charge therefor, such waiver, agreement or permission shall be included in the policy, or the other party shall be named as an additional insured in the policy, provided, however, that Owner or Tenant shall at no time be named a loss payee under any of the other's insurance policies.

10. **Destruction, Fire and Other Casualty** (a) If the Premises or any part thereof shall be damaged by fire or other casualty, Tenant shall give immediate notice thereof to Owner and this Lease shall continue in full force and effect except as hereinafter set forth.

(b) If the Premises are partially damaged or rendered partially unusable by fire or other casualty, the damages shall be repaired by and at the expense of Owner and the rent and all additional rent and other charges, until such repair shall be substantially completed, shall be apportioned from the day following the casualty according to the part of the Premises which is untenantable.

(c) Notwithstanding any other provisions within this Lease, if the Premises are damaged in whole or in part by fire or other casualty and if the Premises are not substantially repaired prior to the date that is ninety (90) days after the date of such casualty (the "Substantial Completion Date"), Tenant may upon thirty (30) days prior notice to Owner given within thirty (30) days after the Substantial Completion Date elect to (a) complete the restoration of the Premises (in such an event Owner shall reimburse Tenant for cost of repair and restoration and/or Tenant shall reduce rent by the cost to repair) or (b) terminate this Lease thirty (30) days after giving of such notice if the Premises are not substantially repaired within such thirty (30) day notice period.

(d) Notwithstanding the foregoing, including Owner's obligation to restore under paragraphs (b) and (c) above, each party shall look first to any insurance in its favor before making any claim against the other party for recovery for loss or damage resulting from fire or other casualty, and to the extent that such insurance is in force and collectible and to the extent

5

permitted by law, Owner and Tenant each hereby releases and waives all rights of recovery with respect to paragraphs (b) and (c) above against the other or any one claiming through or under each of them by way of subrogation or otherwise. The release and waiver herein referred to shall be deemed to include any loss or damage to the Premises and/or to any personal property, equipment, trade fixtures, goods and merchandise located therein. The foregoing release and waiver shall be in force only if both releasors' insurance policies contain a clause providing that such a release or waiver shall not invalidate the insurance. Tenant acknowledges that Owner will not carry insurance on Tenant's furniture and/or furnishings or any fixtures or equipment, improvements or appurtenances removable by Tenant, and agrees that Owner will not be obligated to repair any damage thereto or replace the same. Tenant hereby waives the provisions of Section 227 of the Real Property Law and agrees that the provisions of this Article shall govern and control in lieu thereof.

11. **Eminent Domain** If the whole or any part of the Premises shall be acquired or condemned by Eminent Domain for any public or quasi-public use or purpose, then and in that event, the term of this Lease shall cease and terminate from the date of title vesting in such proceeding and Tenant shall have no claim for the value of any unexpired term of said Lease. Tenant shall have the right to make an independent claim to the condemning authority for the value of Tenant's moving expenses and personal property, trade fixtures and equipment.

12. **Assignment, Subletting, Etc.** (a) Tenant, for itself, its heirs, distributees, legal representatives, executors, administrators, successors and assigns expressly covenants that it shall not assign, mortgage or encumber this Agreement, nor underlet, or suffer or permit the Premises or any part thereof to be used by others, without the prior written consent of Owner in each instance, which consent shall not be unreasonably withheld, conditioned or delayed. This Article supplements all other provisions of this Lease related to assignment and subletting. Owner agrees it will not unreasonably withhold, condition or unduly delay its consent to Tenant's request(s) to assign this Lease or sublet the entire Premises provided that at the time of such request Tenant is not in default under any of the terms, covenants or conditions of this Lease. If this Lease be assigned, or if the Premises or any part thereof be underlet or occupied by anybody other than Tenant, Owner may, after default by Tenant, collect rent from the assignee, under-tenant or occupant, and apply the net amount collected to the rent herein reserved; but no such assignment, underletting, occupancy or collection shall be deemed a waiver of the covenant, or the acceptance of the assignee, under-tenant or occupant as tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained. The consent by Owner to an assignment or underletting shall not in any way be construed to relieve Tenant from obtaining the express consent in writing of Owner to any further assignment or underletting, such consent not to be unreasonably withheld, conditioned or delayed.

(b) The said Assignee and/or Sublessee, shall be a reputable party who is fiscally responsible and of good moral character of which Tenant shall provide evidence to Owner, satisfactory to Owner, and of which Owner shall be the sole judge. Notwithstanding any other provision to the contrary in the case of an assignment of the Lease, if such Assignee and/or Sublessee shall be of equal or greater credit-worthiness than Tenant, Owner shall release Tenant from further performance by Tenant of the covenants on the part of Tenant contained in this Agreement.

6

(c) Notwithstanding anything contained herein to the contrary, the Premises shall be used by such Assignee or Sublessee of the entire premises only for the purposes permitted under this Lease, or for another lawful retail purpose which, in Owner's opinion, is in keeping with the character of the Building and will not have a negative influence on the Building, and further provided that the Premises shall not be used for (i) any use that may be competitive with any use then permitted at any portion of the building of which the premises are a part, (ii) for the sale of food or beverage, (iii) bank, (iv) messenger or courier services, (v) travel agency, (vi) post office, (vii) school or day care center, (viii) professional, insurance, political, or any service or other type of office use, (ix) real estate or securities, (x) any service business, (xi) night club, (xii) any use which provides music, or permits dancing or any entertainment whatsoever, (xiii) pool or billiard parlor, (xiv) health or exercise purpose, (xv) will not in Owner's reasonable opinion interfere with or cease a nuisance to another tenant or to Owner's proper operation of the Building or (xvi) any use prohibited or precluded by the condominium or Condominium documents.

(d) Said Assignee and/or Sublessee shall be a reputable party and financially responsible with respect to the responsibilities involved and that the principals of such Assignee or Sublessee be of good moral character.

(e) That the proposed Assigness or Sublessee, as the case may be, is not then a Tenant or sublessee of the Owner or an occupant of any part of the building.

(f) The Tenant shall not, without written consent of the Owner, collect rent or additional rent in advance for more than one month from any Assignee or Sublessee unless all such rent is turned over immediately to Owner.

(g) Tenant shall furnish with its request for approval the following information:

(i) Name and address of the proposed assignee or sublessee;

(ii) Names and business addresses of all principals of the proposed assignee or sublessee if a corporation, the names and business addresses of all stockholders directors and officers thereof; if a partnership or joint venture, the names and business of all partners (general and limited) and joint venturers thereof;

(iii) One (1) commercial bank references and two (2) business references for the proposed assignee or sublessee and principals;

(iv) If available, an up-to-date pro forma financial statement (not more than six (6) months old) for the proposed assignee or sublessee certified by the entity preparing same.

(h) If there is an assignment and/or a sublease then and in such event, the Assignee or Sublessee shall deposit a sum equal to three months rent as in for a security deposit with Owner and shall comply with all of the terms of Article 31 of the Standard Real Estate Board form Store Lease dated May 5, 1980 are by reference deemed incorporated herein in full and upon the deposit of security as described herein, Owner shall hold same in accordance with the terms

thereof. In addition, each of the shareholders, jointly and severally, of the subtenant shall execute a limited personal guaranty as set forth in Exhibit A annexed hereto and made a part hereof.

(i) In the event Owner shall consent to an assignment of this Lease or subletting of the Premises, it is hereby agreed and understood by the parties hereto that Tenant shall assign and deliver to Owner upon receipt thereof any amount it shall receive from the Subtenant or Assignee as rent or additional rent, in excess of those amounts set forth under the terms of lease for same. In addition, Tenant shall pay to Owner all amounts paid by said assignee or sublessee as consideration pursuant to the transaction related to the assignment or sublease. Further, Tenant agrees to assign to the Owner by a separate instrument of assignment all of its interest, and right, to any security deposited by the prospective sublessee or assignee.

(j ) No Assignment of Lease or Sublease of the premises as provided in this Article shall be valid unless performed in strict accordance with the provisions of this Lease pertaining to assigning and the Assignee or Sublessee within ten (10) days from the execution of the Assignment or Sublease executes, acknowledges and delivers to Owner a copy of the Assignment or Sublease and an assumption agreement, in writing and in recordable form, whereby the Assignee or Sublessee assumes and agrees to perform all the covenants, conditions, agreements and terms contained in this Lease on the part of Tenant to be performed, including, but not limited to, the payment of the rent and additional rent reserved hereunder.

13. **Utilities** Tenant covenants and agrees that Tenant will be responsible for the payment of all utilities used by Tenant including but not limited to electricity, water and sewer usage and water and sewer lines, telephone, gas, heat, steam, and air conditioning and Tenant agrees not to use any equipment which will overload such installations or interfere with the use thereof by other Tenants in the commercial condominium unit. If additional electric power or installation of additional equipment is necessary to run Tenant's equipment, Tenant shall obtain, install and maintain same at its own cost and expense.

14. **Access to Premises** (a) Owner or Owner's agents shall have the right (but shall not be obligated) to enter the Premises in any emergency at any time, and, at other reasonable times upon reasonable prior notice, to examine the same and to make such repairs, replacements and improvements as Owner may deem reasonably necessary and desirable to any portion of the Building or which Owner may elect to perform.

(b) Except in the case of any bona-fide emergency, Owner shall give Tenant forty-eight (48) hours advance written notice of an intended entry to the Premises in order to enable Tenant to have a representative present on all such occasions, if Tenant so desires. Owner shall use reasonable efforts to perform all work or other business in the Premises in a manner designed to minimize interference with Tenant's normal business operations. Upon the completion of such work, the usable area of any floor of the Premises shall not have been materially reduced and Owner shall restore the portions of the Premises affected by such work to the conditions they were in immediately prior to the performance of such work. Owner shall not make any additions, alterations or improvements to the Premises that are not necessary but merely desirable, unless the same are desired by Owner in order to improve the functioning of the Building and/or its mechanical systems or as are required by municipal code, municipal authorities, mortgages and insurance companies. Tenant shall permit Owner to use and maintain and replace existing pipes and conduits in and through the Premises and to erect new pipes and

8

conduits therein, provided they are concealed within the walls, floors or ceilings wherever practicable, and provided that Owner shall use reasonable efforts to perform such work or other business in the Premises in a manner designed to minimize interference with Tenant's normal business operations. During the progress of any work in the Premises, Owner may take all necessary materials and equipment into said Premises without the same constituting an eviction.

15. **Vaults** No vaults, vault space or area, whether or not enclosed or covered, not within the property line of the Building is leased hereunder, anything contained in or indicated on any sketch, blueprint or plan, or anything contained elsewhere in this Lease to the contrary notwithstanding. Owner makes no representation as to the location of the property line of the Building. All vaults and vault space and all such areas not within the property line of the Building which Tenant may be permitted to use and/or occupy, is to be used and/or occupied under a revocable license, and if any such license be revoked, or if the amount of such space or area be diminished or required by any federal, state or municipal authority or public utility, Owner shall not be subject to any liability nor shall Tenant be entitled to any compensation or diminution or abatement of rent, nor shall such revocation, diminution or requisition be deemed constructive or actual eviction.

16. **Occupancy** Annexed hereto and made a part hereof is the Certificate of Occupancy for the Building which permits the use of the Premises set forth in Article 3 hereof. Tenant will not at any time use or occupy the Premises in violation of Article 3 hereof, or of the Certificate of Occupancy issued for the Building of which the Premises are a part. Tenant has inspected the Premises and accepts them as is, subject to the riders annexed hereto with respect to Owner's work, if any. In any event, Owner makes no representation except as provided herein as to the condition of the Premises. In fact, Tenant acknowledges that it has been occupying the Premises under a prior lease or leases and/or extensions since January of 1973. Tenant hereby certifies that, as of the date hereof, (a) there is no offset, abatement, counterclaim or defense to the enforcement of this and or prior lease against Tenant and (b) to the best of Tenant's knowledge, Owner is not in default of any of the covenants, agreements or obligations under this and the prior lease between the parties and their predecessors, if any.

17. **Bankruptcy** (a) Anything elsewhere in this Lease to the contrary notwithstanding, this Lease may be canceled by Owner by the sending of a written notice to Tenant within a reasonable time after the happening of any one or more of the following events: (1) the commencement of a case in bankruptcy or under the laws of any state naming Tenant as the debtor, which is not stayed within one hundred and twenty (120) days, or (2) the making by Tenant of an assignment or any other arrangement for the benefit of creditors under any state statute. Neither Tenant nor any person claiming through or under Tenant, or by reason of any statute or order of court, shall thereafter be entitled to possession of the Premises but shall forthwith quit and surrender the Premises. If this Lease shall be assigned in accordance with its terms, the provisions of this Article 17 shall be applicable only to the party then owning Tenant's interest in this Lease.

(b) It is stipulated and agreed that in the event of the termination of this Lease pursuant to (a) hereof, Owner shall forthwith, notwithstanding any other provisions of this Lease to the contrary, be entitled to recover from Tenant as and for liquidated damages an amount equal to the difference between the rent received hereunder for the unexpired portion of the term demised

9

and the fair and reasonable rental value of the Premises for the same period. In the computation of such damages the difference between any installment of rent becoming due hereunder after the date of termination and the fair and reasonable rental value of the Premises for the period for which such installment was payable shall be discounted to the date of termination at the rate of ten per cent (10%) per annum.

18. **Default** (a) If Tenant defaults in fulfilling any of the covenants of this Lease; or if the Premises become vacant or deserted; or if any execution or attachment shall be issued against Tenant or any of Tenant's property whereupon the Premises shall be taken or occupied by someone other than Tenant and is not stayed within one hundred and twenty (120) days; or if this Lease be rejected under Section 365 of Title 11 of the U.S. Code (Bankruptcy Code); then, in any one or more of such events, upon Owner serving a written thirty (30) days notice upon Tenant specifying the nature of said default and upon the expiration of said thirty (30) days, if Tenant shall have failed to comply with or remedy such default, or if the said default or omission complained of shall be of such nature that the same cannot be completely cured or remedied within said thirty (30) day period, and if Tenant shall not have diligently commenced curing such default within such thirty (30) day period, and shall not thereafter with reasonable diligence and in good faith proceed to remedy or cure such default, then Owner may serve a written ten (10) days notice of cancellation of this Lease upon Tenant, and upon the expiration of said ten (10) days this Lease and the term thereunder shall end and expire fully and completely as if the expiration of such ten (10) day period were the day herein definitely fixed for the end and expiration of this Lease and the term thereof, and Tenant shall then quit and surrender the Premises to Owner but Tenant shall remain liable as hereinafter provided.

19. **Owner and Waiver of Redemption** In case of any such default, re-entry, expiration and/or dispossess by summary proceedings or otherwise, (a) the rent, and additional rent, shall become due thereupon and be paid up to the time of such re-entry, dispossess and/or expiration, (b) Owner may re-let the Premises or any part or parts thereof, either in the name of Owner or otherwise, for a term or terms, which may at Owner's option be less than or exceed the period which would otherwise have constituted the balance of the term of this Lease and may grant concessions or free rent or charge a higher rental than that in this Lease, and/or (c) Tenant or the legal representatives of Tenant shall also pay Owner as liquidated damages for the failure of Tenant to observe and perform said Tenant's covenants herein contained, any deficiency between the rent hereby reserved and/or covenanted to be paid and the net amount, if any, of the rents collected on account of the subsequent lease or leases of the Premises for each month of the period which would otherwise have constituted the balance of the term of this Lease. The failure of Owner to re-let the premises or any part or parts thereof shall not release or affect Tenant's liability for damages. In computing such liquidated damages there shall be added to the said deficiency such expenses as Owner may reasonably and necessarily incur in connection with re-letting. Any such liquidated damages shall be paid in monthly installments by Tenant on the rent day specified in this Lease. In putting the Premises in good order or preparing the same for re-rental Owner may, at Owner's option, make such alterations, repairs, replacements, and/or decorations in the Premises as Owner, in Owner's reasonable judgment, considers advisable and necessary for the purpose of re-letting the Premises, and the making of such alterations, repairs, replacements and/or decorations shall not operate or be construed to release Tenant from liability. Owner shall exercise its best efforts in the mitigation of any damages to Owner due to any failure by Tenant to perform the covenants herein contained. In no event shall Tenant be

entitled to receive any excess, if any, of such net rent collected over the sums payable by Tenant to Owner hereunder. In the event of a breach or threatened breach by Tenant of any of the covenants or provisions hereof, Owner shall have the right of injunction and the right to invoke any remedy available at law or in equity as if re-entry, summary proceedings and other remedies were not herein provided for.

20. **Fees and Expenses** If Tenant shall default in the observance or performance of any term or covenant on Tenant's part to be observed or performed under or by virtue of any of the terms or provisions in any article of this Lease, after notice (if required) and upon expiration of any applicable grace period, if any (except in case of a bona-fide emergency), then, unless otherwise provided elsewhere in this Lease, Owner may at any time thereafter and without notice perform the obligation of Tenant thereunder, and if Owner, in connection therewith or in connection with any default by Tenant in the covenant to pay rent hereunder, makes any expenditures or incurs any obligations for the payment of money including , but not limited to reasonable attorney's fees, in instituting, prosecuting or defending any actions or proceedings, including appellate proceedings in connection therewith, and prevails in any such actions or proceedings, such sums so paid or obligations incurred with interest and costs shall be deemed to be additional rent hereunder and shall be paid by Tenant to Owner within ten (10) days of rendition of any bill or statement to Tenant therefor, and if Tenant's lease term shall have expired at the time of making of such expenditures or incurring of such obligations, such sums shall be recoverable by Owner as damages. In the event Tenant is the prevailing party in any such actions or proceedings, including appellate proceedings in connection therewith, Tenant shall be entitled to recover from Owner Tenant's reasonable attorney's fees and ancillary out-of-pocket expenses incurred in defending or resisting same.

21. **Representation by Owner** Neither Owner nor Owner's agents have made any representations or promises with respect to the physical condition of the Building, the land upon which it is erected or the Premises, or any other matter or thing affecting or related to the Premises except as herein expressly set forth, and no rights, easements or licenses are acquired by Tenant by implication or otherwise except as expressly set forth in the provisions of this Lease. Tenant has inspected the Premises and is thoroughly acquainted with their condition, and agrees to take the same "as is" and acknowledges that the taking of possession of the Premises by Tenant shall be conclusive evidence that the said Premises and the Building of which the same forms a part were in good and satisfactory condition at the time such possession was so taken, except for latent defects, if any, which may exist on the Premises. All understandings and agreements heretofore made between the parties hereto are merged in this contract, which alone fully and completely expresses the agreement between Owner and Tenant and any executory agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of such agreement in whole or in part, unless such executory agreement is in writing and signed by the party against whom enforcement of the change, modification, discharge or abandonment is sought.

22. **End of Term; Surrender of Premises** (a) Upon the expiration or other termination of the term of this Lease, Tenant shall quit and surrender to Owner the Premises broom clean and in good order and condition, ordinary wear and tear excepted, and Tenant shall remove all of its personal property therefrom. If the last day of the Initial Term or any subsequent Renewal Term thereof falls on Sunday, this Lease shall expire at noon on the preceding Saturday unless it be a

11

legal holiday in which case it shall expire at noon on the preceding business day. Tenant's obligation to observe and perform the provisions of this paragraph shall survive the expiration or earlier termination of this Lease.

(b) If Tenant remains in possession of the Premises after the expiration of the Initial Term or the Renewal Term of this Lease without the execution of a new lease, such holding over, in the absence of a written agreement to the contrary, shall be deemed to have created and be construed to be a tenancy from month-to-month at the same rental rate as that of the last month of the demised Initial or Renewal Term. In addition, Tenant shall not under any circumstances be held liable for any consequential damages as a result of such holding over.

23. **Quiet Enjoyment** Owner covenants and agrees with Tenant that upon Tenant paying the rent and additional rent and observing and performing all the terms, covenants and conditions, on Tenant's part to be observed and performed, Tenant may peaceably and quietly enjoy the Premises hereby demised, subject, nevertheless, to the terms and conditions of this Lease including, but not limited to the ground leases, underlying leases and mortgages hereinbefore mentioned.

24. **Cancellation** Tenant shall have the option to cancel this Lease on March 31, 2010, subject to written notice to Owner no later than April 1, 2009 ("Cancellation Notice"). In order for said Cancellation Notice to be effective, Tenant shall not have defaulted under the terms of this Lease, and not be in default as of the date of the Cancellation Notice and as of the date set forth in the Cancellation Notice as the cancellation date ("Cancellation Date"). Further, and as additional conditions to the effectiveness of the Cancellation Notice, Tenant shall be required to vacate the Premises in the condition require at the expiration of the term of the Lease and deliver to Owner a written surrender of this lease and any other document reasonably required by Owner.

25. **No Waiver** (a) The failure of Owner to seek redress for violation of, or to insist upon the strict performance of any covenant or condition of this Lease or of any of the Rules or Regulations set forth or hereafter adopted by Owner, shall not prevent a subsequent act which would have originally constituted a violation from having all the force and effect of an original violation. The receipt by Owner of rent and/or additional rent with knowledge of the breach of any covenant of this Lease shall not be deemed a waiver of such breach and no provision of this Lease shall be deemed to have been waived by Owner unless such waiver be in writing signed by Owner.

(b) The failure of Tenant to seek redress for violation of, or to insist upon the strict performance of any covenant or condition of this Lease shall not prevent a subsequent act which would have originally constituted a violation from having all the force and effect of an original violation. The payment by Tenant of rent with knowledge of the breach of any covenant of this Lease shall not be deemed a waiver of such breach, and no provision of this Lease shall be deemed to have been waived by Tenant unless such waiver be in writing signed by Tenant.

26. **Waiver of Trial by Jury** It is mutually agreed by and between Owner and Tenant that the respective parties hereto shall and they each hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of

12

Owner and Tenant, Tenant's use of or occupancy of said Premises, and any emergency statutory or any other statutory remedy.

27. **Inability to Perform** This Lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on the part of Tenant to be performed shall in no way be affected, impaired or excused because Owner is unable to fulfill any of its obligations under this Lease or to supply or is delayed in supplying any service expressly or impliedly to be supplied or is unable to make, or is delayed in making any repairs, additions, alterations or decorations or is unable to supply or is delayed in supplying any equipment, fixtures or other materials if Owner is prevented or delayed from doing so by reason of strike or labor troubles, including but not limited to government preemption in connection with a National or Local Emergency or by reason of any rule, order or regulation of any department or subdivision thereof of any government agency, or by reason of the conditions of supply and demand which have been or are affected by war or other emergency, but excluding lack of funds, or when, in the reasonable and prudent judgment of Owner, temporary interruption of such services is necessary by reason of accident, mechanical breakdown, or to make repairs, alterations or improvements.

28. **Bills and Notices** Except as otherwise in this Lease provided, a notice or communication which Owner may desire or be required to give to Tenant, shall be deemed sufficiently given or rendered if, in writing, delivered to Tenant by registered or certified mail addressed to Tenant's Legal and Real Estate Departments at the corporate offices located at 1501 Broadway, New York, NY 10036 (the "Corporate Office") and the time of the giving of such notice or communication shall be deemed to be the time when the same is delivered, registered or certified mail, to Tenant at the Corporate Office. Any notice, as opposed to other communication, by either party to the other must be served by registered or certified mail and, if to Owner, addressed to Owner at the address first hereinabove given or at such other address as Owner shall designate by written notice satisfying the requirements of this Article 28.

29. **Water and Sewer Charges** If necessary, Owner shall install a water meter and thereby measure Tenant's water consumption for all purposes. Tenant shall pay Owner for the cost of the meter and the cost of the installation thereof; throughout the duration of Tenant's occupancy Tenant shall keep said meter and installation equipment in good working order and repair at Tenant's own cost and expense. Tenant agrees to pay for water consumed, as shown on said meter as and when bills are rendered. Tenant covenants and agrees to pay the sewer rent, charge or any other tax, rent, levy or charge which now or hereafter is assessed, imposed or constitutes a lien upon the Premises or the realty of which they are part pursuant to law, order or regulation made or issued in connection with the use, consumption, maintenance or supply of water, water system or sewage or a sewage connection or system. The bill rendered by Owner shall be payable by Tenant as additional rent within twenty (20) business days of receipt from Owner.

30. **Sprinklers** Tenant shall not be required to install, change, modify or add to any existing sprinkler system, including installation of additional sprinkler heads or other equipment in response to any recommendation or requirement of the New York Board of Fire Underwriters or the New York Fire Insurance Exchange or any bureau, department or official of the Federal, City or State Government or in order to prevent the imposition of a penalty or charge against the

full allowance for a sprinkler system in the fire insurance rate, if such recommendation, requirement or imposition is applicable as a requirement on a building-wide basis as opposed to that arising out of Tenant's business, location of partitions, trade fixtures, or other contents of the Premises, Tenant's act, omission, breach or negligence.

31. **Rubbish Removal etc.** (a) Tenant shall at Tenant's expense, keep the Premises clean and in order, to the reasonable satisfaction of Owner, and if Premises are situated on the street floor, Tenant shall, at Tenant's own expense keep said sidewalks and curbs free from snow, ice, dirt and rubbish. Tenant shall pay to Owner the cost of removal of Tenant's refuse and rubbish from the Building. Bills for the same shall be rendered by Owner to Tenant at such time as Owner may elect and shall be due and payable within ten (10) days of receipt by Tenant. The amount of such bills shall be paid as additional rent. Tenant shall, however, have the option of independently contracting for the removal of such rubbish and refuse in the event that Tenant does not wish to have same done by employees of Owner. Under such circumstances, however, the removal of such refuse and rubbish by others shall be subject to such rules and regulations as, in the reasonable judgment of Owner, are necessary for the proper operation of the Building.

(b) Notwithstanding anything herein to the contrary, if essential services such as electrical and water supplied by Owner are interrupted and such services are in the sole control of Owner and the interruption does not result from either the negligence or willful misconduct of Tenant, its employees, invitees, or agents, then Tenant shall be entitled to an abatement of rent. Such abatement shall begin on the business day of the interruption or when Tenant ceases using the Premises because of the interruption, whichever is later. The abatement shall end when the services are fully restored and Tenant is able to resume its normal business operations. Tenant shall have the option to cancel said Lease if the interruption unreasonably and materially interferes with Tenant's use of or access to the Premises for at least thirty (30) consecutive days and Owner is not diligently exercising its best efforts to restore the services; provided that, Tenant must give Owner notice of the cancellation within ten (10) days from the end of the thirty (30) day period.

32. **Taxes** (a) Tenant shall pay, as Additional Rent, 27% of the amount by which the New York City Real Estate Taxes "Real Estate Taxes" (including but not limited to all equivalent, and/or use and/or supplemental taxes or any taxes assessed as a substitute for such Real Estate Taxes), assessed or imposed against the entire commercial unit and land of which the Premises forms a part and any improvements thereon or added thereto from time to time, and air rights and underground rights, are increased, for any reason whatsoever (including, but not limited to, increases, in assessed value or tax rate), over the sum of $21,562.96 (Base Taxes). Tenant shall pay said Additional Rent within ten (10) days after rendition of bills therefor by Owner. Owner shall have the same rights and remedies for non-payment of said Additional Rent as if same were a non-payment of rent under this Lease.

(b) There shall be excluded from Real Estates Taxes throughout the initial and any subsequent renewal term of this Lease any interest or penalties incurred thereon or imposed against Owner, except for those incurred as a result of Tenant's actions, of any taxes resulting from an increase of the assessed value of the building attributable to capital improvements (other than building improvements or replacements) made by Owner to the building unless such capital improvement was made in whole or in part for the benefit of the building. There shall also be

14

excluded from such Real Estate Taxes throughout the initial and any subsequent Renewal Term of this Lease any taxes, levies, imposition, or charges attributable to special assessments unless rising out of Tenant or this tenancy directly or indirectly or that which is assessed in the context of a neighborhood or community assessment.

(c) In additions, Owner & Tenant acknowledge that Owner is under no obligation and it may apply for a certificate of eligibility from the Department of Finance of the City of New York determining that Owner is eligible to apply for exemption from tax payment for the Real Property pursuant to the provisions of Section 511-256 through 11-267 (the "ICP Program") of the Administrative Code of the City of New York and the regulations promulgated pursuant to the ICIP Program. Any such Tax Exemption is referred to as the "Tax Exemption Period" [Owner represents to Tenant that as of the date of this Lease there is no Tax Exemption in effect.] Owner also agrees that Tenant shall not be required to (a) pay Real Estate taxes or charges which become due because of the willful neglect or fraud by Owner in connection with the ICIP Program or (b) otherwise relive or indemnify Owner from any personal liability arising under the ICIP Program, except where imposition of such Real Estate Taxes, charges or liability is occasioned by actions of Tenant in violation of the Lease. Tenant agrees to report to Owner, as often as is necessary under such regulations, the number of workers engaged in employment in the Premises, the nature of each worker's employment and the residency of each worker and to provide access to the Premises by employees and agents of the Department of Finance of the City of New York at all reasonable times at the request of Owner. Owner is under no obligation to pursue ICIP Program.

(d) Nothing contained herein shall require Tenant to pay or be charged for any portion of municipal, state, or federal capital levy, estate, succession, inheritance or transfer taxes of Owner corporation franchise taxes imposed on Owner, or any corporate owner of the fee of the Premises.

(e) Tenant and its authorized representative shall have the right to examine, copy and audit not more than one time per annum, and on no less than with fifteen (15) business days notice, all records of Owner pertinent to Real Estate Taxes at the building for the purpose of verifying the accuracy of any tax statement furnished by the Owner, only if the tax bills and statements submitted to the Tenant are not the exact copies of the bills and statements prepared by New York City Department of Finance.

33. **Captions** The Captions are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Lease nor the intent of any provision thereof.

34. **Definitions** Wherever it is expressly provided in this Lease that consent by Owner shall not be unreasonably withheld, such consent shall not be unreasonably delayed, conditioned or otherwise refused.

35. **Adjacent Excavation-Shoring** If an excavation shall be made upon land adjacent to the Premises, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation, license to enter upon the Premises for the purpose of doing such work as said person shall deem necessary to preserve the Premises, or the Building of

15

which the Premises form a part, from injury or damage and to support the same by proper foundations without any claim for damages or indemnity against Owner, or diminution or abatement of rent.

36. **Estoppel Certificate** Tenant, at any time, and from time to time, upon at least fifteen (15) days prior written notice by Owner, shall execute, acknowledge and deliver to Owner, and/or to any other person, firm or corporation specified by Owner, a statement certifying that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), stating the dates to which the rent and additional rent have been paid, and stating whether or not to Tenant's knowledge there exists any defaults by Owner under this Lease, and, if so, specifying each such default.

37. **Fibre Optics** Tenant shall have the right at Tenant's sole cost and expense to install, maintain and operate fibre optics in, from or upon the Premises as long as same does not affect the building systems are use by their Tenants.

38. **Bathroom Installation** Tenant shall have the right, at Tenant's sole cost and expense, to install bathrooms in the Premises that comply with all applicable laws, ordinances and regulations.

39. **Owner's Responsibility** Owner warrants and represents that it is the Owner of the leasehold premises in fee absolute. Owner hereby warrants that it has not upon information and belief received any notice of default of any obligation to the City of New York, nor, if applicable, have its officers, partners, principals or stockholders or the officers, partners or principals, or stockholders of any of its affiliates, been defendant(s) in any action(s) instituted by the City or State of New York or Federal Government.

40. **Investigations** The parties to this Lease agree to cooperate fully and faithfully with any investigation, audit or inquiry conducted by a State of New York (State) or City of New York (City) government agency or authority that is empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath, or conducted by the Inspector General of the New York City Off-Track Betting Corporation ("NYCOTBC") concerning any person or entity that is a party in interest to the Lease that is a subject of the investigation, audit or inquiry.

(a) If Owner or a principal of Owner who has been advised that his or her statement, and any information from such statement, will not be used against him or her in any subsequent criminal proceeding refuse to testify before a grand jury or other government agency or authority empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath concerning this Lease or; if any such person refuses to testify for a investigation, audit or inquiry conducted by a City or State government agency or authority empowered directly or by designation to compel the attendance of witnesses and to take testimony under oath, or by the Inspector General of NYCOTBC, that is a party in interest in, and is seeking testimony concerning this Lease, then; (i) The President of NYCOTBC or his designee shall convene a hearing, to determine if any penalties should attach for the failure of a

person to testify, and (ii) if Owner or a principal of Owner requests an adjournment, the agency head who convened the hearing may, upon granting the adjournment, suspend any lease, pending the final determination pursuant to paragraph "c" below without the City or NYCOTBC incurring any penalty or damages for delay or otherwise.

(b) The penalties which may attach after a final determination by agency head may include the cancellation or termination of any and all such existing NYCOTBC leases, without the City or NYCOTBC incurring any penalty or damages on account of such cancellation or termination of this Lease.

(c) The President or his designee shall consider and address in reaching his or her determination and in assessing an appropriate penalty the factors in clauses (a)(i) and (a)(ii) above. He or she may also consider, if relevant and appropriate, the criteria established in clause (iii) below in additional to any of the following information which may be relevant and appropriate: (i) The party's good faith endeavors or lack thereof to cooperate fully and faithfully with any government investigation or audit, including but not limited to the discipline, discharge, or disassociation of any person failing to testify, the production of accurate and complete books and records, and the forthcoming testimony of all members, agents, assignees or fiduciaries whose testimony is sought; (ii) The relationship of the person whose testimony is sought has an ownership interest in the entity and/or the degree of authority and responsibility the person has within the entity; and (iii) The nexus of the testimony sought to the subject entity and its contracts, leases, permits or licenses with the City.

(d) The term "license" or "permit" as used herein shall be defined as a license, permit, franchise or concession not granted as a matter of right. The term "person" as used herein shall be defined as any natural person doing business alone or associated with another person or entity as a partner, director, officer, principal or employee. The term "entity" as used herein shall be defined as any firm, partnership, corporation, association, or person that receives monies, benefits, licenses, leases, or permits from or through the NYCOTBC or otherwise transacts business with NYCOTBC. The term "member" as used herein shall be defined as any person associated with or another person or entity as a partner, director, officer, principal or employee.

(e) In addition to and notwithstanding any other provision of this Lease, the agency head may in his or her sole discretion terminate this Lease upon not less than three (3) days written notice in the event Owner fails to promptly report in writing to the Inspector General of NYCOTBC or the Commissioner of Investigation of the City of New York any solicitation of money, goods, requests for future employment or other benefit or thing of value by or on behalf of any employee of the City or NYCOTBC or other person, firm, corporation or entity for any purpose which may be related to the procurement or obtaining of this Lease by the Owner, or affecting the performance of this Lease.

41. **Brokerage Fee**  The parties hereto agree and represent to each other that no broker or any other person or entity who or which by law might be entitled to commissions was involved in this leasing transaction.

42. **Authority to Execute** (a) Owner warrants and represents that Owner has the full power and authority to enter into this Lease and to perform all of its obligations hereunder, that

17

execution and delivery of this Lease does not and will not violate or conflict with the provisions of any contract, mortgage, lien, lease, instrument, agreement, or judgment to which Owner is a party or by which he or his assets may be bound, that the person or persons executing this Lease on behalf of the Owner have been duly authorized to do so and that this Lease is duly binding against Owner and legally enforceable against Owner in accordance with its terms.

(b) Subject to and contingent upon obtaining the approval of the Board of Directors of the New York City Off-Track Betting Corporation to enter into this Lease and to use the Premises for the purposes as mentioned in Article 3 herein, Tenant warrants and represents that Tenant has the full power and authority to enter into this Lease and to perform all of its obligations hereunder, that execution and delivery of this Lease does not and will not violate or conflict with the provision of any contract, mortgage, lien, lease, instrument, agreement, or judgment, unless otherwise stated herein, to which Tenant is a party or by which it or its assets may be bound, that the person or persons executing this Lease on behalf of the Tenant have been duly authorized to do so and that this Lease is duly binding against Tenant and legally enforceable against Tenant in accordance with its terms.

43. **Successors and Assigns** The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Owner and Tenant and their respective heirs, distributees, executors, administrators, successors, and except as otherwise provided in this Lease, their assigns.

44. **Condominium** (a) This Lease is subject and subordinate to (A) the Declaration, By-Laws, Rules and Regulations of Declaration Establishing a Plan for Condominium Ownership of Premises at: 301 East 69th Street, New York, New York (Condominium) under the name: The 301/69 Condominium made May 13, 1986 as amended, covering the condominium unit known as the Commercial Unit ("Commercial Unit" or "Unit"), and (B) those ground and underlying leases and agreements and mortgages and renewals, modifications, consolidations, replacements and extensions thereto to which the Commercial Unit and the Condominium Agreement stated in Subdivision (A) is presently or may in the future be subject to. Tenant shall not do, or fail to do, any act that will constitute a violation or default of any of the terms or conditions of the agreements referred to in Subdivision (A) or (B). Tenant shall not exercise any right or privilege, or do anything, under this Lease which would constitute a default or violation of any of the terms, covenants or conditions of those agreements referred to in Subdivision (A) or (B), or fail to perform an act, the failure of which would constitute a default or violation of any of the agreements referred to in Subdivision (A) or (B).

(b) **Definition** (i) "Comparison Amount" shall mean with respect to Common charges (hereinafter defined), any amount greater than the exact sum of $28,188.00 which is assessed against the Condominium per calendar year at any time during the term of this Lease.

(ii) "Tenant's Proportionate Share" shall mean twenty-seven percent (27%).

(iii) "Base Common Charges" shall mean the exact sum of $28,188.00 assessed against the Owner herein as common charges ("Common Charges") by the Board of Managers of the Condominium (or such other entity as shall be empowered to operate and manage the unit as a condominium) or those charges or impositions payable by the Owner with reference to the

18

Common Charges or Impositions of the Condominium for the calendar year in the amount of $28,188.00.

        (iv) Tenant agrees to pay as additional rent during the term of this Lease Tenant's Proportionate Share of any increase in the Common Charges above the Base Common Charges in the amount of $28,188.00 and Tenant's Proportionate Share of all other charges assessed or chargeable to the Condominium by the Board of Managers of the Condominium. Said payments shall be made within ten (10) days after Owner furnishes Tenant with a statement setting forth such increase. The bill from the condominium Board of Managers or Owner in connection with Common Charges shall be conclusive evidence of the amount of such Common charges and shall be used for the calculation of amounts to be paid by Tenant.

        45. **Miscellaneous** (a) <u>ADA</u> - In all events and at Owner's sole cost and expense, Owner shall comply with all provisions of the Americans with Disabilities Act (the "ADA") and any successor law of like import then in force insofar as it relates to the Premises or the Building in effect as of the Commencement Date of this Lease, including, but not limited to, the performance of alterations, structural and otherwise, foreseen and unforeseen in order so to comply; provided however, that Tenant will be responsible for compliance therewith if and to the extent, but only if and to the extent, required as a result of Tenant's use of or alterations to the Building subsequent to said Commencement Date.

        (b) <u>Asbestos/Hazardous Materials</u> -- In the event Owner takes any action within the Premises which disturb any asbestos containing materials, Owner shall, at its expense, abate any problem within thirty (30) days of notification by Tenant or any government agency that such materials do not comply with applicable law or regulation or otherwise pose a hazard to the health or well-being of Tenant's agents, contractors, employees, invitees and licensees. In addition, Owner represents and warrants that to the best of Owner's knowledge, Owner has not received any notice of any claim, suit or other action or investigation with respect to the violation of any laws, orders, rules or regulations with respect to the presence of asbestos and/or any other hazardous materials or contaminants in or upon the Premises and Owner knows of no facts or circumstances that may give rise to any future civil, criminal or administrative proceeding relating to the presence of asbestos and/or any other hazardous materials or contaminants in or upon the Premises. Hazardous materials shall be defined as any flammable materials, explosives, radioactive materials, hazardous wastes, asbestos, toxic substances or similar materials, including, without limitation, any substances now or hereafter defined as or included in the definition of "hazardous substances", "hazardous wastes", or "toxic substances" under any applicable federal or state laws or regulations, including but not limited to § 101.(14) of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. Section 9601(14).

        (c) <u>Partial Invalidity</u> - If any term of this Lease or any application thereof shall be invalid or unenforceable, the remainder of this Lease and any other application of such term shall not be affected thereby.

        (d) <u>Entire Agreement, Etc.</u> - This Lease, including the Exhibits and Riders, if any, attached hereto, sets forth the entire agreement between the parties with respect to the Premises. All prior conversations or writings between the parties hereto or their representatives with

respect to the Premises are merged herein and extinguished. This Lease may be changed, waived, discharged or terminated only by an instrument in writing, signed by the party against whom enforcement of such change, waiver, discharge or termination is sought. If any provision contained in any Rider, Exhibit or Schedule hereto is inconsistent or in conflict with any provision of the main body of this Lease, the provision contained in such Rider, Exhibit or Schedule shall supersede said main text provision and shall be paramount and superior.

(e) Provisions Binding - Except as otherwise provided in this Lease, all the terms, covenants, conditions and provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and permitted assigns.

(f) Governing Law - This Lease shall be construed and enforced in accordance with and governed by the laws of New York State.

(g) Counterparts - This Lease may be executed in several counterparts, each of which shall be deemed an original, and all such counterparts shall together constitute one and the same instrument.

**In Witness Whereof,** Owner and Tenant have respectively signed and sealed this Lease as of the day and year first written above.

OWNER:
**MacArthur Properties LLC**
**By MacArthur Management Corp.**
**It's Sole Managing Member**

By: _Antony Contomichalos_ _____
**Antony Contomichalos**
**President**


TENANT:

**NEW YORK CITY OFF-TRACK**
**BETTING CORPORATION**

By: _Denis McManus_ _____
**Denis McManus**
**Senior Vice President of Real Estate/**
**Business Development**

20

# ANNEX B

**STIPULATION AGREEMENT**

## STIPULATION

IT IS HEREBY STIPULATED AND AGREED by and between the undersigned that:

1.     The fixture claim of **NEW YORK CITY OFF-TRACK BETTING CORPORATION** ("OTB") arising from the acquisition by Metropolitan Transportation Authority ("MTA") of the trade fixtures (the "Fixtures") located upon a portion of the real property (the "Premises") identified as Block 1444 Condominium #377 (Former Lot 1) (a/k/a 1318 Second Avenue a/k/a 301 East 69th Street, New York, New York) on the Tax Map of the Borough of Manhattan, County of New York, City and State of New York, currently leased by OTB pursuant to, and to the full extent described in, a lease dated February 10, 2003 between OTB as tenant and MacArthur Properties LLC as owner, is settled and discontinued with prejudice subject to the terms and conditions set forth in this Stipulation.

2.     MTA and OTB stipulate and agree that the award of compensation, including any claim or entitlement to an additional allowance pursuant to Eminent Domain Procedure Law Section 701 or any other claim for just compensation, for the Fixtures be and hereby is one hundred eighty three thousand seven hundred thirty two dollars ($183,732.00), with applicable interest thereon commencing from the date of acquisition and that such amount is the total amount due OTB for the Fixtures.

3.     This Stipulation represents a final resolution of all claims and causes of action which OTB has or could have brought against MTA concerning just compensation and interest on such compensation, including any claim for an additional allowance pursuant to EDPL §701, which arise from MTA's acquisition of the Fixtures.

4.     As part of this agreement, OTB will execute a general release.

75145.1

5.   If any Court determines that any provision, paragraph, sentence, or subpart of this document is invalid, that provision, paragraph, sentence, or subpart shall be severable from the remainder of this document and shall not affect the validity of the remaining portions of this Stipulation.

6.   The parties hereby waive a viewing of the Fixtures by a Court, pursuant to Eminent Domain Procedure Law Section 510.

Dated:
March 23, 2010

**METROPOLITAN TRANSPORTATION AUTHORITY**

By:   _Anthony P. Semancik_

Name: Anthony P. Semancik
Title: Deputy General Counsel

Dated:
March 16, 2010

**NEW YORK CITY OFF-TRACK BETTING CORPORATION**

By:   _____

Name: Robt. Unger
Title: Sr. V.P. RE

Sen. V.P., Real Estate

# ANNEX C

**ASSIGNMENT OF CONDEMNATION AWARD AGREEMENT**

# ASSIGNMENT OF CONDEMNATION AWARD

1.    **NEW YORK CITY OFF-TRACK BETTING CORPORATION**, a public benefit corporation established by the laws of New York, having an address at 1501 Broadway, New York, New York 10036 (hereinafter referred to as the "Assignor") for and in consideration of the sum of **One Hundred Eighty Three Thousand Seven Hundred Thirty Two Dollars ($183,732.00) (the "Award")**, applicable interest, and other good and valuable consideration, hereby sells, assigns, transfers, and sets over to the **METROPOLITAN TRANSPORTATION AUTHORITY**, a New York public authority and public benefit corporation, having its principal office at 347 Madison Avenue, New York, New York 10017 (hereinafter referred to as "MTA"), its successors and assigns for its own benefit, use and behalf forever, any and all awards of just compensation and any interest thereon that may be awarded in a certain condemnation proceeding (the "Proceeding") under the New York Eminent Domain Procedure Law ("EDPL") which will be commenced in the Supreme Court of the State of New York, New York County, in furtherance of the Second Avenue Subway Project (the "Proceeding").

2.    In the Proceeding, the MTA intends to acquire all right, title and interest in trade fixtures listed in MTA's offer letter (the "Offer Letter"), dated January 25, 2010 (a copy of which is attached hereto as Exhibit A) (the "Fixtures") located upon a portion of the real property (the "Premises") identified as Block 1444 Condominium #377 (Former Lot 1) (a/k/a 1318 Second Avenue a/k/a 301 East 69th Street, New York, New York) on the Tax Map of the Borough of Manhattan, County of New York, City and State of New York, currently leased by Assignor pursuant to, and to the full extent described in, a lease dated February 10, 2003 between Assignor as tenant and MacArthur Properties LLC as owner, and to terminate Assignor's leasehold interest in the Premises.

except for, or as to, any right, title or interest in the Assignor's trademarks or intellectual property contained, embodied or expressed in the Fixtures.

3. The Assignor accepts the Award as payment in full of the just compensation for the Fixtures located on the Subject Property. For the purposes of this Assignment, the term "just compensation" shall be inclusive of all compensation, direct damages, indirect damages, legal and expert witness fees, penalties, incidental expenses, and any other sums and allowances which may be awarded or are awardable by the Courts for the State of New York under the EDPL, including Section 701 of the EDPL in connection with the MTA's acquisition of the Fixtures.

4. The Assignor hereby covenants and warrants that at the time of its execution of this Assignment for and on behalf of the MTA and at all times prior to and until the vesting of title in the Fixtures in the MTA, that it has free and unencumbered title to all Fixtures, that it has not encumbered and will not encumber title to the Fixtures and the Award of just compensation to be made by the MTA, the Award will be free and clear of all liens, other fixture claims, encumbrances, claims and rights of other persons against the Fixtures and Award therein, and that the said Assignor has full right and authority to make the assignment referred to herein; that to the best of its knowledge, no person or persons other than the Assignor has any right, title or claim to any portion of the Award.

5. Prior to receipt of the balance of the Award in full, the Assignor shall deliver to the MTA a release in the form attached hereto as Exhibit B and such other documents, if any, as the

MTA may reasonably require to demonstrate that the Assignor is authorized to enter into this Assignment and that the Assignor has unencumbered ownership of the Fixtures.

6. The Assignor represents and warrants that it has not knowingly taken nor will it knowingly take any actions which would adversely affect the MTA's rights under this Assignment or the MTA's proposed acquisition of the Fixtures.

7. The Assignor hereby represents and warrants that it has not previously assigned its rights to the Award for the Fixtures.

8. Assignor agrees not to oppose MTA's petition to acquire the Fixtures and Assignor's leasehold interest in the Premises in the Proceeding.

9. Assignor will vacate and surrender possession of the Premises within thirty (30) days of receipt of the Award, subject to any liens or encumbrances, if any, but in no event will Assignor be compelled to vacate the Premises sooner than ten (10) business days following the running of the Belmont Stakes scheduled for June 5, 2010. "Vacate" means to vacate entirely, leave the Property in a clean condition, to arrange for the shut-off of all utilities, and to deliver the Property free and clear of any and all (a) occupants or other persons with any possessory interests other than the afore-mentioned owner or its mortgagee(s), (b) personal property, trash and waste, and (c) equipment leased from or provided by third parties. Assignor agrees not to file any opposition to an application by MTA for the issuance of a writ of assistance under EDPL § 405 if such becomes necessary.

10. This Assignment shall inure to the benefit of the MTA its successors and assigns and bind the distributees, legal representatives, successors and assigns of the Assignor.

11.  The undersigned acknowledges that he has read this document, understands all its terms, and executes it voluntarily with full knowledge of its significance.

IN WITNESS WHEREOF, the Assignor has hereunto set her name this 16th day of March, 16, 2010.

NEW YORK CITY OFF-TRACK BETTING CORPORATION

By: _____

Name: Robert Unger
Title: Senior Vice President, Real Estate

STATE OF NEW YORK    )
                     ) SS.:
COUNTY OF NEW YORK   )


On this _16th_ day of March, 2010, before me personally came Robert Unger, to me known to be the person who executed the foregoing instrument, and who, being duly sworn by me, did depose and say that he/she is Senior Vice President, Real Estate of New York City Off-Track Betting Corporation, a public benefit corporation established by the laws of New York, and that he/she executed the foregoing instrument in the name of New York City Off-Track Betting Corporation and that he/she has authority to sign the same, and he/she acknowledged to me that he/she executed the same as the act and deed of said corporation for the uses and purposes therein mentioned.

**MARC H. ROSENBAUM, ESQ.**
Notary Public, State of New York
No. 60-4998786
Qualified in Westchester County
Certificate Filed in New York County
Commission Expires July 6, 2011

_____
NOTARY PUBLIC

# EXHIBIT A

**OFFER LETTER**



# Metropolitan Transportation Authority

State of New York

Via Certified Mail # 7005 1820 0002 0557 5652

January 25, 2010

Mr. Marc H. Rosenbaum, Esq.
Off Track Betting Corporation
1501 Broadway, 15th Floor
NY, NY 10001

Re: Offer of compensation for fixtures at the property known as OTB located at 1318 2nd Avenue, Manhattan Block 1444, Lot 1 (the "Property").

Dear Mr. Rosenbaum:

As you know, Metropolitan Transportation Authority ('MTA") intends to acquire a portion of the above referenced Property to construct a new entry facility that will support the Second Avenue Subway project (the "Project"). To construct and operate this new public transit facility, occupants of the impacted area of the Property must be permanently vacated before construction begins. MTA has begun to provide, and will continue to provide, information about relocation assistance and benefits to all eligible building occupants, see attached "Description of Relocation Benefits". The following describes the process for payment of eligible trade fixtures and an offer of compensation.

<u>Offer and Advance Payment of Awards for Fixtures and Improvements</u>.

Under the New York State Eminent Domain Procedure Law and applicable federal regulations, occupants of property in which interests are acquired by condemnation may be entitled to compensation for certain of their trade fixtures. <u>Accordingly, MTA hereby offers the sum of $146,986 (One Hundred Forty Six Thousand, Nine Hundred Eighty Six Dollars) as just compensation for your compensable trade fixtures that are located at this site.</u>

This offer constitutes the fair market value (based on each item's reproduction cost less accrued depreciation) for the compensable fixtures as determined by MTA's highest appraisal. Attached to this letter is a schedule of trade fixtures that were inventoried and appraised by MTA's fixture appraiser during his site visit. Please notify us if you believe that there are any errors on this list or if you believe that it omits any items that should be included. If appropriate, MTA will revise the fixture offer to reflect any new information that we receive from you.

MTA's offer is subject to your obligation to furnish satisfactory proof of ownership of the installed fixtures (including copies of any leases, lease extensions or assignments, and subleases, where requested) and to satisfy or obtain releases from all outstanding mortgages, UCC financing statements, lease compensation claims, liens, or other claims against the fixtures. If more than one party is entitled to share in this offer of compensation, all parties must agree as to how the

*The agencies of the MTA*

| MTA New York City Transit | MTA Long Island Bus | MTA Bridges and Tunnels | MTA Bus Company |
| MTA Long Island Rail Road | MTA Metro-North Railroad | MTA Capital Construction | |

award is to be apportioned and to whom the payments should be made and must advise MTA accordingly. Your landlord and any other tenants, subtenants, or occupants of the premises will be notified of this offer by a copy of this letter.

In accordance with New York State Eminent Domain Procedure Law, any party entitled to this offer may either (1) accept the offer as payment in full, or (2) reject this offer, accept the amount of the offer as an advance payment of the condemnation award, and file a claim for additional compensation. Upon your election of one of these two alternatives, MTA shall make arrangement to provide payment of just compensation, together with appropriate interest if applicable, either as payment in full or as an advance payment.

This offer may be subject to final approval by the MTA Board. MTA reserves the right to withdraw this offer at any time in the event that the condemnation does not proceed or your property is not required for this project. MTA also reserves the right to adjust or revise the amount of this offer to reflect correction of errors or miscalculations, or to reflect any new data about the property that may not have been considered in MTA's appraisal report.

All property and fixtures for which MTA will pay compensation will become the property of MTA upon title vesting. No item for which compensation is paid may be removed from the premises without MTA's consent.

Use and Occupancy Obligations of Holdover Occupants.

When MTA acquires title to the Property through a negotiated agreement or condemnation, all existing leases and subleases for the property will be terminated. If you remain in occupancy of the Property, you will be obligated to pay MTA a sum for use and occupancy until the time you are required to vacate the site. Occupants who occupied space pursuant to a sublease will no longer pay rent to the prime leaseholder but will pay use and occupancy to MTA.

We are prepared to negotiate the details of such use and occupancy charges with you if you remain in occupancy after MTA condemns the premises or acquires it by negotiated agreement, and to work out a mutually agreeable time to vacate the premises.

If you have any questions about trade fixtures matters, please contact Charles Webb or Kenneth Applebaum of Berger & Webb, MTA's counsel, at 212-319-1900. For any questions about relocation assistance and benefits, processing claims for moving costs, re-establishment expenses, or other relocation issues, please contact Delores Singletary of O.R. Colan, MTA's relocation consultant, at 212-535-5005.

Sincerely,

Jeffrey B. Rosen
Director, Real Estate

Enclosure

cc: Mr. Kirk P. Tzanides, Esq.
Tzanides Law Firm, PLLC
275 Madison Avenue, suite 1000
N.Y., N.Y. 10016

Mr. Robert Hetu
301/69 Owners Corp
301 East 69th Street
NY, NY 10021

H. Cinque
A. Parikh
A. Semancik
A. Schwartz
C. Webb
K. Applebaum
JR Chron/JR File

# Description of Relocation Benefits

# Schedule of Trade Fixtures

# RUSCIANO

APPRAISERS & CONSULTANTS INC.

271 NORTH AVENUE

ROOM 201

NEW ROCHELLE, NEW YORK 10801

(914) 664-7770

Joseph A. Rusciano, President P.E., A.S.A.

Joseph J. Rusciano, Vice President - Secretary, C.R.A.

Anthony J. Rusciano, Vice President - Treasurer

- Technical Fixture & Machinery Appraisals
- Construction Reproduction Cost Estimates
- Relocation Cost Appraisals
- Personal Property Loss Appraisals
- Engineering Feasibility Studies
- Full Service Consultation

## METROPOLITAN TRANSIT AUTHORITY
## SECOND AVENUE SUBWAY PROJECT

### TECHNICAL APPRAISAL
### COMPENSABLE FIXTURE ITEMS

OTB

1318 2nd Avenue

New York, New York

Our E.I. #: 132664479

NB-4200-L

May 2008

RUSCIANO APPRAISERS & CONSULTANTS, INC.

Appraisal Itemization NB-4200-L
OTB
1318 2nd Avenue
New York, New York

Item

## INTERIOR

1.  Resilient flooring, 1512 SF

2.  Suspended acoustical tile
    ceiling, 2x4 grid with carrier
    channels, 1512 SF

3.  Toilet 6' x 8'

    a. Watercloset with rough-in

    b. Wall mounted sink with rough-in

    c. Electric wall mounted hand
       dryer

    d. 2' x 3' wall mirror

    e. Partition 8'H x 28 LF
       with door

    f. Two (2) aluminum hand rails
       One (1) 3'L
       One (1) 2'L

    g. Sheet rock ceiling, 48 SF

RUSCIANO APPRAISERS & CONSULTANTS, IN.C

Item

3.  Continuing

    h.  Ceramic tile
        Floor - 48 SF
        Walls - 28 LF x 8'H

    i.  Electric with wiring
        One (1) switch
        One (1) receptacle
        One (1) recessed 4/24 fluorescent

4.  Nine (9) 4/48 recessed
    fluorescents with wiring

5.  Eight (8) 4/24 recessed
    fluorescents with wiring

6.  Wall paneling with furring
    1710 SF

7.  Vertical slat blinds
    8"H x 26 LF

8.  Aluminum and glass partition
    8'H x 30 LF with five (5)
    3' x 7' doors

Item _____

9.  Counter 2'-6"D x 3'-7"H x 20LF
    with 3'-6"H x 20 LF bullet-proof
    glass, five (5) speakers through
    glass

10. 3' x 7' HM door with hardware
    and double lock

11. Fluorescent lighting with wiring
    Eight (8) 2/48 surface mounted
    Ten (10) 4/48
    Ten (10) receptacles
    Four (4) switches

12. Central heating - ventilating -
    air conditioning system 10 ton

13. Men's Toilet
    a.  One (1) watercloset with rough-in

    b.  One (1) lavatory with rough-in

    c.  Ceramic tile floor - 32 SF

    d.  Ceramic tile wall - 96 SF

    e.  Partition 8'H x 24 LF with door

    f.  One (1) soap dispenser

    g.  One (1) 14" x 18" mirror

Item _____

14. Ladies Toilet

    a. One (1) watercloset with rough-in

    b. One (1) lavatory with rough-in

    c. Ceramic floor tile - 50 SF

    d. Ceramic wall tile - 120 SF

    e. Partition 8'H x 30 LF with door

    f. Soap dispenser

    g. Wall mirror

15. Thirteen (13) 18'W x 30"H x 2"D
    wall directories with glass door

16. Hookups to the following moveable
    items:
    Five (5) betting machines
    Thirteen (13) TV units
    Three (3) Sam betting machines

17. Installation for leased ADT
    Security System
    Two (2) motion detectors,
    contacts for four (4) doors,
    alarm, central system
    two (2) pads and five (5) panic buttons,
    two (2) security systems

RUSCIANO APPRAISERS & CONSULTANTS, IN.C

Item _____

<u>Exterior</u>

18. Pipe frame fabric awning x 35 LF
    with individual letters
    14"H - "OTB"
    6"H - "1318"

# EXHIBIT A

**RELEASE**

# RELEASE

1.   Condemnee/Claimant **NEW YORK CITY OFF-TRACK BETTING CORPORATION** ("Claimant"), a public benefit corporation established by the laws of New York, for and in consideration of the sum of Ten Dollars ($10.00) and other good and adequate consideration, the receipt of which is acknowledged, by these presents does for itself, its successors and assigns, remise, release and forever discharge the Condemnor, **METROPOLITAN TRANSPORTATION AUTHORITY** ("MTA"), and MTA's successors and assigns, of and from any and all claims and causes of action which Claimant has or could have brought against MTA arising from MTA's termination of Claimant's leasehold interest and acquisition of Claimant's trade fixtures (except for, or as to, any right, title or interest in the Assignor's trademarks or intellectual property contained, embodied or expressed in the trade fixtures} .

located in a portion of the real property identified as Block 1444 Condominium #377 (Former Lot 1) (a/k/a 1318 Second Avenue a/k/a 301 East 69th Street, New York, New York) on the Tax Map of the Borough of Manhattan, County of New York, City and State of New York, leased by Claimant pursuant to, and to the full extent described in, a lease dated February 10, 2003

between Claimant as tenant and MacArthur Properties LLC as owner, including any claims for

allowances under Section 701 of the Eminent Domain Procedure Law.

Dated: New York, NY
March 16, 2010

**NEW YORK CITY OFF-TRACK BETTING CORPORATION**

By: _____

Name: Robert Unger

Title: Snr. V. P., Real Estate

STATE OF NEW YORK )
                         ) SS.:
COUNTY OF NEW YORK )

On this 16th day of March, 2010, before me personally came Robert Unger, to me known to be the person who executed the foregoing instrument, and who, being duly sworn by me, did depose and say that he/she is Senior Vice President, Real Estate of New York City Off-Track Betting Corporation, a public benefit corporation established by the laws of New York, and that he/she executed the foregoing instrument in the name of New York City Off-Track Betting Corporation and that he/she has authority to sign the same, and he/she acknowledged to me that he/she executed the same as the act and deed of said corporation for the uses and purposes therein mentioned.

**MARC H. ROSENBAUM, ESQ.**
Notary Public, State of New York
No. 60-4998786
Qualified in Westchester County
Certificate Filed in New York County
Commission Expires July 6, 10 2011

_____
NOTARY PUBLIC

75063
01600-003

2