**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x    **FOR PUBLICATION**
                                                            :
In re:                                                      :    Chapter 9
                                                            :
NEW YORK CITY OFF-TRACK BETTING                             :    Case No. 09-17121 (MG)
CORPORATION,                                                :
                                                            :
                            Debtor.                         :
                                                            :
------------------------------------------------------------x

**MEMORANDUM OPINION AND ORDER DENYING IN PART AND ABSTAINING IN**
**PART TO MOTIONS TO COMPEL THE DEBTOR TO COMPLY WITH THE**
**REQUIREMENTS OF THE NEW YORK RACING, PARI-MUTUEL WAGERING AND**
**BREEDING LAW AND MAKE CERTAIN STATUTORY DISTRIBUTIONS**

*A P P E A R A N C E S:*

CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, New York 10019
By:   Richard Levin, Esq.

*Attorneys for Debtor New York City Off-Track*
*Betting Corporation*

OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY LLP
Park Avenue Tower
65 East 55th Street
New York, New York 10022
By:   Michael S. Fox, Esq.
       Herbert C. Ross, Esq.
       David Y. Wolnerman, Esq.

LAW OFFICES OF MARVIN NEWBERG
33 North Street
Monticello, New York 12701
By:   Marvin Newberg, Esq.

*Attorneys for Empire Resorts, Inc.*

1

HODGSON RUSS LLP
60 E. 42nd Street, 37th Floor
New York, New York 10165
By:   Deborah Piazza, Esq.

HODGSON RUSS LLP
140 Pearl Street, Suite 100
Buffalo, New York 14202
By:   Steven W. Wells, Esq.
       Michael E. Reyen, Esq.

*Attorneys for Finger Lakes Racing Association, Inc.*

**MARTIN GLENN**
**United States Bankruptcy Judge**

Finger Lakes Racing Association ("Finger Lakes") and Empire Resorts, Inc. ("Empire"

collectively the "Tracks") move the Court to compel New York City Off-Track Betting

Corporation ("OTB") to immediately pay certain post-petition statutory distributions currently

owed and which will allegedly come due under the New York Racing, Pari-Mutuel Wagering

and Breeding Law (the "Racing Law").  The Tracks argue that these payments must be made

because (i) state law mandates the payments and OTB is required to conduct its ongoing business

as a chapter 9 debtor in compliance with state law; and (ii) the payments are "actual, necessary

costs and expenses of preserving the estate" entitled to administrative expense treatment under

Bankruptcy Code § 503(b).  OTB, for its part, admits it owes the Tracks amounts under the

Racing Law, but contends that the Racing Law does not require that the payments be made

immediately or on any particular schedule, and the amounts due cannot be treated as bankruptcy

administrative claims.

On July 13, 2010, the Court held an evidentiary hearing and heard argument on these

motions.  Following the hearing the Court requested briefing on whether the bankruptcy court

should resolve the state law issue of when the Racing Law requires the payment of statutory

distributions, or whether the bankruptcy court should lift the automatic stay and require the

2

parties to seek a determination of this state law issue from the New York State Racing and

Wagering Board ("Racing and Wagering Board").  The parties filed the requested additional

briefs on July 21, 2010.  (ECF #s 128 & 129.)

For the reasons discussed below the Court determines that the post-petition statutory

distributions OTB owes the Tracks are not administrative expenses under section 503(b) of the

Bankruptcy Code.  The Court further concludes that the bankruptcy court is not the appropriate

forum to resolve the state law issue of when these statutory payments must be made.  This issue

involves important legal and policy questions involving many stakeholders in the horse racing

business in New York State, and not simply the concerns of OTB and the Tracks that are parties

to these Motions.  The Court therefore abstains from deciding the state law issue, lifts the

automatic stay and directs the parties to commence an appropriate proceeding within seven (7)

days from the date of this Order to obtain a determination from the Racing and Wagering Board.

## I.    BACKGROUND[1]

OTB is a public benefit corporation, established and governed by the Racing Law, that

operates an off-track pari-mutuel betting system within New York City.  (Joint Pre-Trial

Stipulation at ¶¶ 4, 7.)  OTB was created to earn money from horse betting activities and halt

illegal wagering and bookmaking on horse races.  (*Id.* at ¶ 7.)  OTB is operated by a board of

directors consisting of five persons appointed by the Governor of New York.  (*Id.* at ¶ 8.)

Lawrence S. Schwartz is currently Chairman on OTB, having succeeded Meyer Frucher, who

---

[1]    This section is based on a Joint Pre-Trial Stipulation entered into by the parties.  Under the Joint Pre-Trial
Stipulation the Tracks and OTB have agreed that certain facts are undisputed for purposes of determining these
motions.  (*See* Joint Pre-Trial Stipulation, ECF # 113.)  In some instances only Empire, not Finger Lakes, has
stipulated to relevant facts.  Counsel for Finger Lakes, however, agreed at the July 13, 2010 hearing that the Court
could consider each of these facts as proven for purposes of resolving these motions.  (July 13, 2010 Tr. 17:7–
18:16.)  Thus, the Court will treat all facts in the Joint Pre-Trial Stipulation as undisputed for the purpose of
resolving the motions currently before the Court.

was Chairman at the time this case was filed.  Shortly after his appointment, Schwartz hired Greg

Rayburn, a former employee of FTI Consulting, as the new CEO of OTB.  (*Id.* at ¶ 86.)

OTB operates under the Racing Law and is heavily regulated by the Racing and

Wagering Board, which governs all off-track and on-track pari-mutuel betting in New York, as

well as all entities engaged in those activities.  (*Id.* at ¶ 9.)  Pari-Mutuel betting is a system where

particular types of bets on a single race are pooled together.  (*Id.* at ¶ 12.)  The pool of total bets

OTB receives on a race is called the "Handle."  Approximately 80% of the Handle is set aside

for the benefit of winning bettors.  The Racing Law requires OTB to distribute certain

percentages of the Handle to the state, local governments, horse breeding funds, and certain race

tracks including those operated by Empire and Finger Lakes.  (*See id.* at ¶ 13.)

As discussed in this Court's March 22, 2010 opinion, OTB has faced economic troubles

for years.  *In re New York City Off-Track Betting Corp.*, 427 B.R. 256, 262 (Bankr. S.D.N.Y.

2010).  Despite cost-cutting efforts and an eventual state takeover, OTB could not avoid filing

for bankruptcy on December 3, 2009.  *See id.* at 262–63.  OTB's financial troubles have been

caused, at least in part, by the Racing Law's requirement that OTB make distributions of its

Handle to stakeholders in the New York racing industry.  OTB has lobbied for the past five years

for changes to the Racing Law's mandatory statutory distributions.  *Id.* at 262; (Joint Pre-Trial

Stipulation at ¶¶ 59–65).  As of today, no legislative action appears imminent and the New York

Legislature may wait as much as a full year to make any changes.  (*See* Minutes of the Meeting

of the Board of Directors of OTB, Apr. 17. 2010 (Ex. S to Joint Pre-Trial Stipulation).)

OTB's financial results demonstrate its troubles.  In fiscal years ending June 30, 2006,

2007, 2008, and the nine-month period ending on March 31, 2009, OTB had operating deficits of

approximately $121 million, $30 million, $76 million, and $25 million respectively.  (Joint Pre-

4

Trial Stipulation at ¶ 58.)  Due to these losses OTB has repeatedly requested that the state

legislature change the payments required by the Racing Law.  (*See id.* at ¶ 59.)  The legislature

has recently made clear that it now favors a "short-term" solution to OTB's woes.  Any

permanent resolution will likely be deferred for as much as a year.  (*Id.* at ¶¶ 73–74.)

### A.  Statutory Commissions

The Racing Law sets certain fees OTB must pay to tracks based on the total betting

Handle OTB receives for races held at those tracks.  For purposes of this motion, these required

statutory payments are deemed "Direct Commissions."   (*Id.* at ¶ 15.)  OTB also simulcasts and

accepts bets on races from tracks outside of New York as well as on races from tracks inside of

New York but outside of OTB's region.  The Racing Law requires OTB to make payments from

the Handle received on these races to certain tracks within New York State.  These sums,

deemed "Indirect Commissions" for purposes of these motions, differ for harness racetracks and

thoroughbred racetracks.  (*Id.*)  In addition to the Direct and Indirect Commissions, OTB has

select contractual agreements with certain New York State thoroughbred racing tracks.  OTB

continues to make payments as required by these contracts (the "Contractual Payments").  (*Id.* at

¶ 16.)

### 1.   OTB's Direct Commissions to the Tracks

Empire owns and operates Monticello Casino and Raceway ("Monticello Raceway"),

which conducts approximately 200 harness race programs a year.  (*Id.* at ¶ 5.)  OTB simulcasts

races held by Empire and other New York State harness racing tracks.  Thus, pursuant to the

Racing Law, OTB owes Direct Commissions to these tracks.  The Racing Law does not specify

when these Direct Commissions must be paid, but post-petition OTB pays these commissions

within 30 days after the month they are incurred.  (*Id.* at ¶ 17.)

Similarly, Finger Lakes owns and operates Finger Lakes Gaming and Racetrack which holds numerous thoroughbred horse races and provides employment opportunities for New York's racing and breeding industry.  (*Id.* at ¶ 6.)  As OTB does with the harness tracks, OTB simulcasts races held at New York State thoroughbred racing tracks and accepts bets on those races.  The Racing Law requires OTB to pay Direct Commissions to the thoroughbred tracks.  Direct Commissions to thoroughbred tracks accrue at rates set by the Racing Law and are only paid to the track that hosts the races on which the bets are taken.  Since filing for chapter 9 protection, OTB has paid Direct Commissions to the thoroughbred tracks 30 days after the month they were incurred.  (*Id.* at ¶ 29.)

### 2.    *OTB's Indirect Commissions to the Tracks*

In addition to the Direct Commissions, the Racing Law also requires OTB to pay Indirect Commissions to harness racing tracks, including Monticello Raceway, for simulcasting and taking bets on out-of-state harness races.  (*See id.* at ¶¶ 19–20.)  The Racing Law requires OTB to pay a fixed percentage of the Handle it receives on out-of-state harness races it simulcasts to certain New York State harness racing tracks.  (*Id.* at ¶ 20.)  The calculation of the precise amount due varies on a number of factors including whether the New York State harness tracks run races on the day the out-of-state races are simulcast.  (*Id.*)  The Racing Law also requires OTB to pay Indirect Commissions to harness racing tracks within its region (Monticello Raceway, Yonkers Raceway, and Tioga Downs (the "Regional Harness Tracks")), on the Handle OTB collects on New York State harness races it simulcasts that occur outside of OTB's region.  The Indirect Commissions the Regional Harness Tracks are due on these races are based on a formula within the Racing Law.  (*Id.* at ¶¶ 14, 21.)

6

Similar to the harness racing tracks, the Racing Law also requires OTB to make Indirect Commission payments to New York State thoroughbred tracks based on the Handle it receives from out-of-state thoroughbred races.  Under the Racing Law, OTB may simulcast any out-of-state thoroughbred race so long as (i) it simulcasts and accepts bets on New York State thoroughbred races; and (ii) it receives approval from the Racing and Wagering Board to carry the out-of-state races and accept wagers on those races.  (*Id.* at ¶¶ 32–33.)  The precise formula governing the Indirect Commission owed to each thoroughbred track is provided by the Racing Law and includes whether the thoroughbred track operated races on the day the Indirect Commissions were incurred.  (*Id.* at ¶ 34.)

The Racing Law also provides for payments to the Regional Harness Tracks based on the Handle OTB receives on thoroughbred races held at Finger Lakes' track.  The Regional Harness Tracks are only entitled to these payments (i) on days when New York Racing Association ("NYRA")[2] is not running races; and (ii) if the Regional Harness Track is not simulcasting thoroughbred races and therefore does not receive bets on thoroughbred races.  (*Id.* ¶ 22.)  The Racing Law similarly requires OTB to make payments to the Regional Harness Tracks based on the Handle it receives when simulcasting out-of-state thoroughbred races.  (*Id.* at ¶ 23.)  On days when tracks operated by NYRA are not operating (*i.e.* are "dark"), OTB is allowed to accept bets on out-of-state thoroughbred races.  If a harness track is open on such a day when NYRA is dark and they do not take bets on any thoroughbred races that day, the Racing Law requires OTB to pay a portion of the commission it earned on the Handle received from the out-of-state thoroughbred races to the Regional Harness Tracks.  These so-called "Dark Day" Indirect

---

[2]    NYRA operates Aqueduct Racetrack, Belmont Park and Saratoga Race Course.  NYRA was a chapter 11 debtor in an earlier case in this court, *see* Case No. 06-12618 (JMP).  The successful reorganization of NYRA required the New York legislature to amend the Racing Law.  *Compare* Modified Third Amended Plan of Debtor Pursuant to Chapter 11 of the United States Bankruptcy Code ¶ 2.1(a)–(b), Case No. 06-12618 (JMP) (ECF # 1009) *with* 2008 N.Y. LAWS 77–81.

Commissions accrue in the amount of 1.5% of OTB's Handle on the thoroughbred races run outside of New York.  (*Id.* at ¶¶ 24–25.)

In addition to the Dark Day Indirect Commissions, the Racing Law also contemplates so-called "Maintenance of Effort" Indirect Commissions.  Maintenance of Effort payments require OTB to pay each Regional Harness Tracks at least the same amount it paid to that track in calendar year 2002.  This amount is calculated from the Handle OTB received each day on wagers placed on evening out-of-state harness races.  The calculations are not adjusted to account for demand, economic decline, or similar factors.  (*Id.* at ¶¶ 26–27.)  The Racing Law also contemplates a second type of "Maintenance of Effort" Indirect Commission:  once OTB's total Handle on out-of-state night time thoroughbred racing reaches $100 million, OTB must pay an additional 2% commission to its Regional Harness Tracks on the Handle from bets placed on future simulcast out-of-state night time thoroughbred races.  (*Id.* at ¶ 28.)

## B.  Timing of Payments

While the Racing Law provides the formulas for calculating Indirect Commissions, the statute is silent about *when* the payments must be made.  The Racing and Wagering Board has not adopted any regulations specifying the required timing of these payments.  Over the past five years, OTB has slowed the pace of payments on Indirect Commissions.  In 2005 OTB paid Indirect Commissions 30 days after they were incurred.  In 2006, however, OTB started making Indirect Commission payments two months after they were incurred.  By 2007, OTB delayed Indirect Commission payments three months.  The delay reached five months by the end of 2009.  (*Id.* at ¶ 41.)

Shortly after filing for chapter 9 protection, OTB stated its intent to pay both Direct and Indirect Commissions on a one month lag, and OTB made payments on that schedule for the first

three months of its bankruptcy case.  (*Id.* at ¶ 46.)  In March and April 2010, however, OTB

claimed it was running out of money and, faced with the prospect of shutting its doors, it sent

notice to its employees that operations would cease on April 11, 2010.  (*Id.* at ¶ 47.)  Instead of

closing, however, OTB decided to continue operating while the New York State legislature

debated a solution.  In order to save cash, OTB began deferring payment of Indirect

Commissions.  (*Id.* ¶¶ 48–51.)  Since making this decision, OTB has continued its operations,

but it has not paid *any* Indirect Commissions.  (*Id.* at ¶¶ 52, 84.)

As a result of these current and historical delays, OTB owes Empire prepetition Indirect

Commissions in the amount of $3,616,588 and post-petition Indirect Commissions of $782,073.

(*Id.* at ¶ 42.)  OTB owes Finger Lakes $2,044,051.20 in prepetition Indirect Commissions and

$1,259,851.10 in post-petition Indirect Commissions.  (*Id.* at ¶ 43.)  OTB has not paid any

Indirect Commissions to Empire or Finger Lakes since March 2010.  (*Id.* at ¶ 46.)

Unlike the Indirect Commissions, during OTB's bankruptcy case, OTB has paid Direct

Commissions one month after incurred.  (*Id.* at ¶ 53.)  Prepetition, however, OTB had fallen

behind on Direct Commission payments to Empire.  OTB owes Empire $1.7 million in

prepetition arrears for Direct Commissions.  (*Id.* at ¶ 55.)  Before OTB's bankruptcy filing

Empire filed an action against OTB in New York State court, requesting the $1.7 million in

prepetition Direct Commissions.  (*Id.* at ¶ 56.)  The state court action is currently stayed.

OTB's delay of payments has reduced the size of purses at Monticello Raceway.

Historically approximately 50% of all Dark Day Indirect Commissions received by Monticello

were put towards purses for races.  And Monticello Raceway has also traditionally relied on

Indirect Commission payments from OTB to account for 50% of all racing revenue earned by the

track.  Therefore, OTB's statutory commissions are vital to the continuing health of Monticello

Raceway and the harness racing industry in New York.  (*See id.* at ¶¶ 88–89.)  Finger Lakes also

relies on statutory payments from OTB.  Monticello Raceway and Finger Lakes rely on Indirect

Commissions based on OTB's simulcasting and accepting of wagers on out-of-state races to

make purse size competitive with those in other states.  (*Id.* at ¶¶ 90–91.)  Failure of OTB to

make its Indirect Commission payments could result in a reduction of races at Monticello and the

shutdown of Finger Lakers.  (*Id.* at ¶ 93.)

### C.  Required Segregation of Funds

Recent acts of the Racing and Wagering Board have forced OTB to begin sequestering

funds for payment of Indirect Commissions.  Under the Racing Law and federal laws, *see* 15

U.S.C. § 3001(a)(1) ("the States should have primary responsibility for determining what forms

of gambling may legally take place within their borders"), OTB must receive approval from the

Racing and Wagering Board to simulcast out-of-state races and accept bets on those races.  OTB

must receive authorization for each separate out-of-state "race meet" it plans on simulcasting and

accepting wages on.  (*Id.* at ¶ 75.)  Prior to April 17, 2010, authorization was routinely requested

and received.  On April 21, 2010, however, the Racing and Wagering Board requested additional

information regarding what OTB intended on doing with the funds it received from simulcasting

out-of-state races, including whether they would be used to make statutory payments to New

York racing agencies.  OTB responded on April 23, 2010, informing the Racing and Wagering

Board that it intended on deferring payment of Indirect Commissions to racing entities.  (*Id.* at ¶

76.)

Following OTB's April 23 response, the Racing and Wagering Board delayed decisions

on a number of OTB's applications to simulcast out-of-state races, effectively denying those

applications.  (*Id.* at ¶ 77.)  Following these denials, OTB and the Racing and Wagering Board

held discussions that resulted in two letters from OTB.  One of these letters, dated May 26, 2010, committed OTB to deposit commissions computed under the Racing Law from accepting bets on out-of-state races into a special segregated bank account.  (*Id.* at ¶¶78–79.)  Specifically, the letter stated that OTB would start depositing "portions of retained commissions from wagering payable to New York State racing entities (*i.e.*, New York State licensed race tracks and Breeding Funds) in accordance with applicable provisions of the Racing Law arising from acceptance by [OTB] of wagering on out-of-state races."  (*Id.* at ¶ 81.)  The letter called for weekly calculation and deposits into the segregated bank account.  Under the terms of the letter, OTB may withdraw funds from the account to fund statutory payments or, with 24 hours written notice to the Racing and Wagering Board, for purposes other than funding the statutory distributions under the Racing Law.  Any written notice must include the "nature, amount and corporate purpose for the withdrawal."  (*Id.* at ¶ 82.)

OTB did not pay or segregate funds to pay the Tracks' statutory distributions for the period from March 1, 2010 through May 27, 2010.  OTB maintains that, if forced to make these payments, OTB would have been forced out of business.  (*See id.* at ¶¶ 83, 105.)  The Tracks, however, seek precisely the relief OTB maintains will likely cause it to halt operations: immediate payment of post-petition Indirect Commissions.

## II.    DISCUSSION

The Tracks maintain that OTB must promptly pay its Indirect Commissions.  The Tracks further argue that these sums must be paid as administrative expenses under section 503(b) of the Bankruptcy Code, at least to the extent that they were incurred post-petition.  OTB responds, acknowledging that it owes the Tracks—plus other racing entities in New York State—Indirect Commissions, but arguing that the Racing Law does not require OTB to pay these sums on any

11

set schedule.  OTB further argues that the post-petition Indirect Payments are not entitled to

administrative expense status in a chapter 9 case.

### A.  Section 904 of the Bankruptcy Code

Before examining the issues at bar the Court must first address whether it has the

constitutional and statutory authority to decide the issues raised by these motions.  As a general

matter, section 904 of the Bankruptcy Code places severe limits on the power of courts to

compel any action from chapter 9 debtors.  Specifically, section 904 states:

> Notwithstanding any power of the court, unless the debtor consents
> or the plan so provides, the court may not, by any stay, order, or
> decree, in the case or otherwise, interfere with
>
> 1)  Any of the political or governmental powers of the debtor;
> 2)  Any of the property or revenues of the debtor; or
> 3)  The debtor's use or enjoyment of any income-producing
>     property.

11 U.S.C. § 904.

This section codifies the Tenth Amendment's general prohibition on a bankruptcy court's

power to interfere with a state entity.  *See* 6 COLLIER ON BANKRUPTCY ¶ 904.01 (Alan N.

Resnick & Henry J. Sommer eds., 16th ed. rev.) ("Section 904 compliments section 903 in

providing a constitutional shield for chapter 9 by limiting federal intrusion upon States' rights.").

Section 904's command is clear.  A bankruptcy court may not interfere with a chapter 9 debtor's

political or governmental powers, or the use of the debtor's property, without the debtor's

consent.  The first subsection of the statute shields chapter 9 debtors from federal meddling with

their political or governmental powers.  *Id.* at ¶ 904.01[1].  The remainder of the statute halts

bankruptcy courts from controlling a state entities' use of its property or revenues.  *Id.* at ¶

904.01[2].  In practice, this section prohibits bankruptcy courts from mandating that a chapter 9

debtor make specific payments in violation of the Tenth Amendment.  *See, e.g.*, *In re County of*

*Orange*, 179 B.R. 195, 199–200 (Bankr. C.D. Cal. 1995) (finding that ordering the interim payment of professional fees would violate section 904 of the Bankruptcy Code and opining that the rational for section 904 "was to circumvent any possible Tenth Amendment objection to municipal bankruptcy legislation"); 6 COLLIER ON BANKRUPTCY ¶ 904.01[2] ("[A] municipal debtor is not restricted in its ability to use, sell or lease its property, and the court is not to involve itself with the day to day operations of the municipality.").

The statute carves out an exception to the command that a bankruptcy court may not interfere with a chapter 9 debtor's use of property.  Specifically, a chapter 9 debtor may consent to an order of a bankruptcy court that would interfere with the use of the debtor's property.  11 U.S.C. § 904; *In re County of Orange*, 179 B.R. 185, 189–90 (Bankr. C.D. Cal. 1995) (observing that a chapter 9 debtor may consent to treatment that would otherwise violate section 904 of the Bankruptcy Code).  *See also* 6 COLLIER ON BANKRUPTCY ¶ 904.02[1] ("If the debtor has consented to an order of the court, the court's action will not be deemed interference with the affairs or property of the debtor . . . .").  The ability of a chapter 9 debtor to consent under section 904 is limited by section 903 of the Bankruptcy Code and federalism concerns.  Specifically, a chapter 9 debtor cannot consent to a court order that would violate a state law or administrative order.  6 COLLIER ON BANKRUPTCY ¶ 904.02[2][a] (observing that a "municipality could not, by it consent, empower the court to order the municipality to do an act that would be in violation of a law or administrative order of the state controlling its municipalities").

As demonstrated by OTB's submissions and through clarification at oral argument, OTB has consented to have this Court determine (i) whether the Indirect Commissions are administrative expenses and, if so, the schedule on which they must be paid; and (ii) whether the Racing Law, 28 U.S.C. § 959(b), or applicable bankruptcy law requires OTB to make immediate

13

payment of post-petition Indirect Commissions.  (*See* OTB Opp. Br. at 5 (ECF #105); July 13, 2010 Hr'g Tr. at 88:9–89:13.)

The Tracks argue, based on a mere utterance of OTB's counsel at a hearing, that OTB has consented to have this Court determine *every* issue presented by the motions.  A review of the record, however, demonstrates that this is not the case.  OTB initially tailored its consent to have this Court determine "whether either the bankruptcy law or the Racing Law requires [OTB] to make the payments" on Indirect Commissions under a particular schedule requested by the Tracks.  (Initial Resp. of OTB (ECF # 98); June 16, 2010 Hr'g Tr. 14:9–15:9.)  OTB, in its formal response to the motions, refined this position to include whether 28 U.S.C. § 959(b) required immediate payment of the Indirect Commissions.  (*See* OTB Opp. Br. at 5.)  Finally, at the July 13, 2010 hearing, OTB expanded its consent to have this Court determine whether the post-petition Indirect Commissions are administrative expenses and whether they must be paid on a schedule in accordance with the Track's wishes.  (July 13, 2010 Hr'g Tr. at 88:9–89:13.)  Thus, the Court rejects the Tracks' position and will limit itself to considering the issues to which OTB has consented.

**B.  The Indirect Commissions Are Not Administrative Expenses**

The Tracks argue that the Indirect Commissions that have accrued post-petition are entitled to administrative expense status under section 503(b) of the Bankruptcy Code.  (Empire Mot. to Compel at ¶ 18 (ECF # 86); Finger Lakes Mot. to Compel at ¶ 24 (ECF # 90).)  OTB responds, arguing that because there is no "estate" in chapter 9 cases the Indirect Commissions cannot be administrative expenses.  (OTB Opp. at 10.)

Section 503 of the Bankruptcy Code applies to chapter 9 debtors.  *See* 11 U.S.C. § 901(a).  Section 503(b) contemplates the creation of administrative expenses for "the actual,

necessary costs and expenses of preserving the *estate*" of the bankrupt entity.  11 U.S.C. §

503(b)(1)(A) (emphasis added).  But, as recently explained by the Bankruptcy Court for the

Central District of California, chapter 9 does not incorporate section 541 of the Bankruptcy

Code, which provides for the creation of a bankruptcy "estate."  *In re Valley Health Sys.*, 429

B.R. 692, 714 (Bankr. C.D. Cal. 2010).  Indeed, courts have clearly established that in chapter 9

cases, there is no "estate" property.  *See In re JZ L.C.C.*, 371 B.R. 412, 419 n.4 (9th Cir. B.A.P.

2007) (observing that "there is no property of the estate in chapter 9"); *In re City of Vallejo*, 403

B.R. 72, 78 n.2 (Bankr. E.D. Cal. 2009) ("In a chapter 9 case there is no estate.").  Commentators

agree with this approach.  6 COLLIER ON BANKRUPTCY ¶ 901.04[13][a] ("In a chapter 9 case there

is no 'estate.'"); 5 WILLIAM J. NORTON, JR. & WILLIAM L. NORTON III, NORTON BANKRUPTCY

LAW AND PRACTICE § 90:3 (3d ed. 2009) ("no estate of the debtor is created under chapter 9").

Because a chapter 9 debtor's property remains its own and does not inure into a

bankruptcy estate as provided by section 541 of the Bankruptcy Code, there can be no

administrative expenses for "the actual and necessary costs of preserving the estate" as

contemplated by section 503(b)(1)(A) of the Bankruptcy Code.  Both leading bankruptcy

treatises concur with this approach.  Collier observes that because there is no estate in a chapter 9

case, administrative expense claims under section 503 must be limited to "expenses incurred in

connection with the chapter 9 case itself" and not operating expenses.  6 COLLIER ON

BANKRUPTCY ¶ 901.04[13][a].  Norton agrees, observing in passing that no operating

administrative expenses are permitted in a chapter 9 bankruptcy case.  5 WILLIAM J. NORTON, JR.

& WILLIAM L. NORTON III, NORTON BANKRUPTCY LAW AND PRACTICE § 90:3.

In response, the Tracks argue that because OTB has consented to have the Court

determine whether the Indirect Commissions are administrative claims, it somehow permits the

Court to order administrative expenses pursuant to section 503(b)(1)(A) for "the actual necessary costs and expenses of preserving the estate." (Joint Reply Br. of Tracks ¶¶ 27–29 (ECF # 112).) The Tracks' reasoning does not convince.

The Tracks maintain that the only factor limiting a bankruptcy court's ability to deem an operating expense an administrative expense under section 503(b)(1) is section 904's prohibition on a bankruptcy court's power to interfere with the property of a chapter 9 debtor. Thus, the Tracks argue, because OTB has consented to have the Court determine whether the Indirect Commissions are administrative claims, the Court may deem any of OTB's operating expenses administrative expenses under 503(b). But this line of reasoning ignores the crucial fact that no bankruptcy estate exists in a chapter 9 case. As explained above, the plain language of chapter 9 does not contemplate the creation of an estate. As there is no bankruptcy estate in a chapter 9 case, there can be no "necessary costs and expenses" of preserving the estate. Moreover, when the Tracks invoke the limitations of section 904 in support of their position, they tacitly acknowledge that a chapter 9 debtor retains full title and control over its property in a bankruptcy case. *See Valley Health*, 429 B.R. at 714 ("By virtue of § 904, a debtor in chapter 9 retains title to, possession of, and complete control over its property and its operations, and is not restricted in its ability to sell, use, or lease its property"). This further confirms that no bankruptcy estate exists in a chapter 9 case and therefore no operating administrative expenses may be awarded pursuant to section 503(b)(1) in a chapter 9 case.

This conclusion is supported by the policies inherent to chapter 9 cases. As this Court has previously recognized, chapter 9 is permeated with dual sovereignty concerns. Respect for the sovereignty of state entities, including OTB, substantially constrains the Court's powers when dealing with a chapter 9 debtor. Section 903 makes clear that chapter 9 "does not limit or

impair the power of a State to control, by legislation or otherwise, a municipality . . . in the

exercise of the political or governmental powers of such municipality, including expenditures for

such exercise . . . ." 11 U.S.C. § 903. These constitutional underpinnings strongly caution

against the Court intruding upon a chapter 9 debtor's operations, despite any consent they may

have offered for the Court to do so. *Cf.* 6 COLLIER ON BANKRUPTCY ¶ 904.02[1][a] (observing

that a municipal debtor's consent must not violate section 903 of the Bankruptcy Code and that

section 903 may be violated where consent would lead to a bankruptcy court interfering too

greatly into the affairs of the chapter 9 debtor).

### C. No Applicable Law Requires the Payment of Indirect Commissions on a Specific Schedule

The Tracks argue forcefully that OTB violates New York State law by not making

immediate payment of the Indirect Commissions. The Tracks maintain that the Indirect

Commissions should be immediately paid as administrative expenses and that principles of

equity require OTB to make these payments promptly. The Tracks further argue that 28 U.S.C. §

959 requires OTB to operate in accordance with state law, including making prompt payment of

post-petition Indirect Commissions. Finally, the Tracks maintain that principles of federalism

require the immediate payment of the Indirect Commissions. The Court rejects all of these

arguments.

As an initial matter, as demonstrated above, the Court rejects the Tracks' argument that

there can be any administrative expenses for the preservation of the estate in chapter 9 cases, as

no estate exists in those bankruptcies. Therefore, all of the Tracks' arguments that the Court

should use its discretion to require the immediate payment of the Indirect Commissions as

administrative expenses are inapposite. (*See* Joint Reply Br. of Tracks ¶¶ 41–50.) The Court is

also not convinced that equity requires the immediate payment of the Indirect Commissions.

17

The Tracks argue that the Indirect Commissions must be paid immediately because OTB is earning revenue from the races taking place at the Tracks.  (Empire Mot. to Compel at ¶ 17; Finger Lakes Mot. to Compel at ¶ 23.)  The Tracks essentially argue that OTB is being unjustly enriched by refusing to pay the Indirect Commissions.  But the Indirect Commissions do not emanate from any products or services the Tracks provide to OTB.  Instead, as described above, the Racing Law alone requires the payment of Indirect Commissions to the Tracks.  Indeed, the Tracks earn Indirect Commissions merely for being in existence when OTB accepts wagers on other races.  Thus, the situation before the Court is not one of unjust enrichment.  Unjust enrichment requires the performance of services and the acceptance of those services.  *See, e.g.*, *Economist's Advocate, LLC v. Cognitive Arts Corp.*, No. 01 Civ. 9468, 2004 WL 728874, at *10 (S.D.N.Y. Apr. 6, 2004) (observing that, under New York law, a claim of unjust enrichment requires "(1) performance of services by plaintiff; (2) the defendant accepts and benefits from the services performed by plaintiff; and (3) the defendant under principles of equity and good conscience should not be permitted to keep the value of the services without restitution to the plaintiff").   In contrast, here the Tracks have not made any performance that has benefited OTB.  Therefore, because the Indirect Commissions are not provided in direct exchange for anything offered to OTB by the Tracks, the Court does not believe that principles of equity require the immediate payment of the Indirect Commissions.

The Tracks' remaining arguments—that 28 U.S.C. § 959(b) and principles of federalism require the immediate payment of the Indirect Commissions—distilled to their essence are requests for the Court to enforce the Racing Law, as currently in effect in New York State. Section 959(b) of title 28 requires most debtors to comply with the laws of the state where their property is located.  *See* 28 U.S.C. § 959(b) ("a trustee, receiver or manager appointed in any

cause pending in any court of the United States . . . shall manage and operate the property in his possession . . . according to the requirements of the valid laws of the State in which such property is situated . . . ."). This statute reflects Congress's concern that debtors continuing to operate in bankruptcy comply with state laws. *See In re Old Carco LLC*, 424 B.R. 633, 644 (Bankr. S.D.N.Y. 2010) (intimating that section 959(b) reflects the "federal policy concern with ensuring compliance by trustees with state law"). Principles of federalism, embodied in section 903 of the Bankruptcy Code, also mandate that chapter 9 debtors follow state law.

Section 903 of the Bankruptcy Code is the "constitutional mooring" for municipal debt readjustment and makes clear that nothing in chapter 9 should be interpreted to limit a State's power to control its municipalities. Section 903 also indicates that with regards to debt readjustment of municipal entities, chapter 9 preempts any coordinate state law. 6 COLLIER ON BANKRUPTCY ¶ 903.01. As nothing in chapter 9 may be interpreted to interfere with the power of a State to control its municipalities, it necessarily follows that debtors under chapter 9 must follow state laws, at least those that are not preempted by federal law.

In its papers OTB seemingly argued that it did not need to comply with New York State law—including the Racing Law—arguing through a highly technical statutory analysis that section 959(b) does not apply to chapter 9 debtors. (*See* OTB Opp. Br. at 6–10.) At the July 13, 2010 hearing counsel for OTB retreated from this position and admitted that OTB must comply with applicable state law, unless those state laws are preempted by the Bankruptcy Code. (July 13, 2010 Hr'g Tr. at 100:7–101:12 ("The Court: Do you agree that OTB must comply with state law in its operations, even if 959 doesn't apply to Chapter [9]? Mr. Levin: Yes . . . . OTB must comply with state law . . . .").) Counsel for OTB does not argue that the provisions of the Racing Law concerning Indirect Commissions are preempted. (*Id.* at 100:13–101:12 (acknowledging

19

that the Bankruptcy Code does not preempt state law with regards to post-petition Indirect

Commission payments).)  Therefore, it is unnecessary for the Court to decide whether section

959 applies to chapter 9 cases.  Thus, the only issue remaining to be determined is the schedule

on which the Racing Law requires payment of the Indirect Commissions.

    *1.  The Racing Law is Ambiguous Regarding the Payment of Indirect Commissions*

    Both the Tracks and OTB admit that the Racing Law does not include any timeline or

deadline for OTB to pay the Indirect Commissions.  (*See* Joint Reply Br. of Tracks ¶ 3; OTB

Opp. Br. at 6.)  The Court cannot determine from examining the language and structure of the

statutes establishing the Indirect Commissions what schedule the New York State Legislature

contemplated for payment.

    From the inclusion of detailed tables with payment percentages, the New York

Legislature clearly intended for OTB to pay Indirect Commissions on some type of regular

schedule.  *See, e.g.*, N.Y. RAC. PARI-MUT. WAG. & BREED. LAW § 1017 (McKinney 2009).  This

interpretation is buttressed by the New York Legislature's statement of intent when creating off-

track betting parlors, including OTB.  The Legislature concluded:

> It is also the intention of this article to ensure that off-track betting
> is conducted in a manner compatible with the well-being of the
> horse racing and breeding industries in this state, which industries
> are and should continue to be major sources of revenue to state and
> local government and sources of employment for thousands of
> state residents.

N.Y. RAC. PARI-MUT. WAG. & BREED. LAW § 518 (McKinney 2009).  Permitting OTB to

withhold payments indefinitely is simply not consistent "with the well-being of the horse racing

and breeding industries in" New York State.  Moreover, elsewhere the Legislature has concluded

that the revenues OTB distributes "plays an integral role in sustaining the viability of the entire

horse racing industry in New York state."  2008 N.Y. LAWS 3083.

Despite these pronouncements, the New York State Legislature has also concluded that "the continued operation of [OTB] is of paramount importance to the public interest." *Id.* Thus, it appears that the New York Legislature intends a balance between the financial well-being of the horse racing and breeding industries in New York and the continued operation of OTB. Indeed, OTB has tacitly supported a balancing effort by admitting that it cannot defer paying the Indirect Commissions indefinitely. (July 13, 2010 Hr'g Tr. at 93:12–24 ("The Court: . . . . Do you agree that the racing law should not be read so as to provide the unilateral authority to OTB to decide to defer payment of indirect commissions indefinitely? Mr. Levin: Underscoring the word 'indefinitely', yes, I agree.").) What balance the New York Legislature desires, however, is not clear. The New York Court of Appeals, the final authority for interpretations of New York State statutes, concurs with the Court's assessment of the clarity of the Racing Law. When interpreting statutes at issue here, Chief Judge Kaye opined that the "Racing, Pari-Mutuel Wagering and Breeding Law remains an imbroglio, being born out of the union of diverse racing industry interests and legislative compromise." *Suffolk Reg. Off-Track Betting Corp. v. New York State Racing and Wagering Bd.*, 11 N.Y.3d 559, 569–70 (2008) (internal quotation marks and citation omitted).

Nor should the Court extrapolate the intent of the New York Legislature from the previous performance of the parties. The history of OTB's payments to the Tracks does not offer any clarity regarding what schedule of payments the Racing Law requires. The payment of Indirect Commissions is contemplated by statute, not contract. If the Indirect Commissions arose by virtue of a contract between the Tracks and OTB, then the Court could look to the parties' previous course of dealings to determine what payment schedule is appropriate. *See, e.g.*, *Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC*, No. 07CV6665(HB), 2009 WL

21

1803458, at *4 (S.D.N.Y. June 23, 2009) ("Evidence of the parties' course of dealing over the course of their business relationship may be used to assist the Court's interpretation of the contracts where they are ambiguous.") (citations omitted).  But OTB and the Tracks cannot amend New York law through conduct alone.  Indeed, the Court is unaware of any canon of statutory construction that allows a court to consider the previous course of dealings between entities when interpreting the statute.  *See generally* 2A NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND STATUTORY CONSTRUCTION §§ 47:1–48:20 (7th ed. 2010) (canvassing statutory interpretation aids and omitting any "course of conduct" canon of statutory construction).

And even if the Court could consider the parties' previous course of dealings, it would not assist in interpreting the requirements of the Racing Law.  The undisputed evidence shows that prior to bankruptcy, OTB paid Indirect Commissions in periods varying from 30 to 150 days.  Immediately following filing for bankruptcy, OTB paid the Tracks Indirect Commissions 30 days' in arrears, at least through April 2010.  At that point OTB began withholding payment of Indirect Commissions.  Thus, even if the Court could look to the previous course of dealings, it would be forced to choose from a wide range of potential deadlines for payment of the Indirect Commissions.

The lack of a contractual relationship between OTB and the Tracks also prohibits the court from looking to industry norms regarding the payment schedules of Indirect Commissions to assist in interpreting the Racing Laws.  *Cf. JA Apparel Corp. v. Abboud*, 682 F. Supp. 2d 294, 303 (S.D.N.Y. 2002) (observing that courts may examine usage of trade, or how an issue is commonly dealt with in an industry when interpreting contracts).  Nor could the Court do so, as there is no evidence in the record regarding how other regional off-track betting entities pay the

Indirect Commissions commanded by the Racing Law.  (*See* July 13, 2010 Hr'g Tr. at 78:6–

79:2.)

### D.    The Regulatory Structure of Racing and Wagering Board and the Ambiguity of the Racing Laws Compel the Court to Abstain From Determining a Payment Schedule for the Indirect Commissions

Confronted with this ambiguous statute—and keenly aware of the federalism concerns

that permeate chapter 9 bankruptcy cases—the Court questioned the parties at the July 13, 2010

hearing whether the Racing and Wagering Board would be a more appropriate forum to

determine the schedule on which OTB must pay the Indirect Commissions.  (July 13, 2010 Hr'g

Tr. at 51:24–52:7, 93:25–94:10.)  The Court requested and received additional briefing on this

matter.  OTB argues that the Court must abstain pursuant to 28 U.S.C. § 1334(c)(2).

Alternatively, OTB argues that the Court should use its discretion to abstain from resolving this

matter under 28 U.S.C. § 1334(c)(1).  In response the Tracks argue that neither mandatory nor

permissive abstention can or should be applied.

Most practitioners are aware of general federal court abstention principles.  *Cf.* Erwin

Chemerinsky, FEDERAL JURISDICTION 735–834 (3rd ed. 1999) (discussing the various judge-

made federal abstention doctrines).  Those unfamiliar with bankruptcy law, however, would

likely be surprised to learn that Congress has passed a statute, 28 U.S.C. § 1334(c), codifying

abstention principles in bankruptcy cases.  Section 1334 generally discusses the jurisdiction of

bankruptcy courts and 1334(c)(1) provides:

> Except with respect to a case under chapter 15 of title 11, nothing
> in this section prevents a district court in the interest of justice, or
> in the interest of comity with State courts or respect for State law,
> from abstaining from hearing a particular proceeding arising under
> title 11 or arising in or related to a case under title 11.

Abstention pursuant to this subsection of 1334 is not mandatory; "it merely gives the district court the discretion to abstain if abstention is in the interest of justice, or in the interest of comity with State courts or respect for State law." 1 COLLIER ON BANKRUPTCY ¶ 3.05[1]. In contrast, section 1334(c)(2) of title 28 provides for certain situations where a bankruptcy court is *required* to abstain from making a determination and reads:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C § 1334(c)(2). This section is only applicable to proceedings based on state law claims or causes of action merely "related to" bankruptcy cases, not those causes of action that arise under the Bankruptcy Code or a bankruptcy case. *Id.*; 1 COLLIER ON BANKRUPTCY ¶ 3.05[2]. Collier opines that the difference between the two sections of the statute give a court greater discretion to abstain from hearing a matter under 1334(c)(1) than 1334(c)(2). 1 COLLIER ON BANKRUPTCY ¶ 3.05[1].

Courts in this Circuit have developed twelve factors to assist in determining when abstention is appropriate pursuant to section 1334(c)(1):

1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention,

2) the extent to which state law issues predominate over bankruptcy issues,

3) the difficulty or unsettled nature of the applicable state law,

4) the presence of a related proceeding commenced in state court or other nonbankruptcy court,

5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334,

6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case,

7) the substance rather than form of an asserted "core" proceeding,

8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court,

9) the burden on the court's docket,

10) the likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties,

11) the existence of a right to a jury trial, and

12) the presence in the proceeding of nondebtor parties.

*In re Ephedra Prods. Liab. Litig.*, No. 04 MDL 1598(JSR), 2010 WL 882988, at *2 n.2 (S.D.N.Y. Mar. 8, 2010) (quoting *N.Y. City Employees' Ret. Sys. v. Ebbers (In re WorldCom, Inc. Sec. Litig.)*), 293 B.R. 308, 332 (S.D.N.Y. 2003)). *See also In re Bozel S.A.*, --- B.R. ----, 2010 WL 2816369, at *9–10 (Bankr. S.D.N.Y. July 20, 2010) (listing factors courts consider when determining when to abstain pursuant to section 1334(c)) (quoting *In re Cody, Inc.*, 281 B.R. 182, 190–91 (S.D.N.Y. 2002)).

Little guidance exists, however, regarding the interplay between section 1334(c)(1) and traditional federal abstention doctrines. Some courts maintain that section 1334(c)(1) grants bankruptcy courts broader discretion than permitted by traditional federal abstention doctrines to abstain from hearing matters. *Bricker v. Martin*, 348 B.R. 28, 32–33 (W.D. Pa. 2006) (concluding that, unlike normal abstention situations, section 1334(c)(1) grants bankruptcy courts "broad discretion" to determine whether to abstain from determining a claim) (quoting *Wood v. Wood*, 825 F.2d 90, 93 (5th Cir. 1987)). And at least one court has opined in passing that the existence of section 1334(c) makes traditional abstention doctrines inapplicable. *Life Flight of Puerto Rico Inc. v. Triple-S, Inc. (SSS) (In re Life Flight of Puerto Rico, Inc.)*, Nos. 09-

00057, 08-08870 BKT, 2009 WL 2885109, at *1 (Bankr. D.P.R. Aug. 18, 2009) (determining certain traditional abstention doctrines as "inapplicable in the face of" section 1334(c)).

The Second Circuit has determined that section 1334(c) "was intended to codify judicial abstention doctrines . . . ." *In re Pan Am. Corp.*, 950 F.2d 839, 845 (2d Cir. 1991).  The Second Circuit only reached this determination after researching and finding a dearth of legislative history for section 1334(c).  Given the lack of legislative history on section 1334(c), the court turned to legislative history for former section 1471(d) of title 28 of the Bankruptcy Act, as the two statutes are substantially similar.  The court observed that the legislative history of section 1471(d) clearly stated that the statute "codifie[d] present case law relating to the power of abstention in particular proceedings by the bankruptcy court." *Id.* (quoting H.R. REP. NO. 595, 95th Cong., 1st Sess. 51 (1977), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5963, 6012).  Thus, the court concluded that Congress "intended that section 1334(c)(1) be informed by principles developed under the judicial abstention doctrines." *Id.* (internal citation and quotation marks omitted). [3]

Despite this guidance, courts in this Circuit have not fully addressed how to reconcile the twelve factors used to assist in the application of section 1334(c)(1) with traditional abstention doctrines.  Some courts use traditional abstention doctrines to buttress their analysis of the

---

[3]     As noted by the Second Circuit, the legislative history of historical section 1471(d) references a Supreme Court abstention case, *Thompson v. Magnolia Petroleum Co.*, 309 U.S. 478 (1940). *In re Pan Am.*, 950 F.2d at 845. The *Magnolia* Court concluded that abstention is most appropriate where state law issues predominate or when a case raises unresolved state law questions. *Rosetta Res. Operating LP v. Pogo Producing Co. (In re Calpine Corp.)*, 361 B.R. 665, 669–70 (Bankr. S.D.N.Y. 2007) (interpreting the holding of *Magnolia*) (citing *Magnolia*, 309 U.S. at 483). The Court notes that the reference to *Magnolia* in the legislative history could be interpreted to somehow limit the codification of abstention principles in section 1334(c) to the concepts within *Magnolia*, but observes that any such conclusion is at odds with the Second Circuit's clear direction that "section 1334(c)(1) should be informed by principles developed under judicial abstention doctrines"—not just the concept announced in *Magnolia*. *In re Pan Am.*, 950 F.2d at 846. Indeed, the district court decision the Second Circuit cited in support of its statement that section 1334(c) should be viewed through the prism of judicial abstention doctrines specifically stated that section 1334(c) "may summarize and incorporate federal non-bankruptcy abstention doctrines found in *Railroad Commission v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943)." *In re Gen. Am. Commc'ns Corp.*, 130 B.R. 136, 146 (S.D.N.Y. 1991).

twelve section 1334(c) factors. *In re Taub*, 417 B.R. 186, 194 (Bankr. E.D.N.Y. 2009)

(employing traditional abstention doctrines in analysis of the twelve section 1334(c) factors).

Other courts seemingly ignore the existence of the various federal abstention doctrines in favor

of an analysis of the twelve section 1334(c)(1) factors. *See, e.g.*, *Baker v. Simpson*, 413 B.R. 38,

45 (E.D.N.Y. 2009) (limiting review of bankruptcy court's decision to abstain to section

1334(c)(1) and omitting an examination of other federal abstention principles); *Langston Law*

*Firm v. Mississippi*, 410 B.R. 150, 156 (S.D.N.Y. 2008) (same). Yet other courts have focused

their analysis on federal abstention doctrines instead of the section 1334(c)(1) factors. *See*

*Kurtzman v. Mut. Benefit Life (In re Philips Offset Co.)*, 152 B.R. 836, 838 (Bankr. S.D.N.Y.

1992) (referencing section 1334(c)(1), but concentrating abstention analysis on traditional

federal abstention doctrine).

　　　This Court need not harmonize these approaches as it concludes that abstention is

appropriate under analyses of both section 1334(c)(1) and traditional abstention doctrines.

Because the Court concludes that it should abstain under these theories, it is unnecessary to

examine whether mandatory abstention under section 1334(c)(2) is required in this case. *See In*

*re Taub*, 417 B.R. at 197 (omitting discussion of mandatory abstention as the court had decided

to abstain under section 1334(c)(1)).

　　　*1. Permissive Abstention Pursuant to Section 1334(c)(1)*

　　　The Tracks argue vehemently that the twelve factors used to examine section 1334(c)(1)

do not warrant permissive abstention. The Court does not agree. While the Court acknowledges

its "virtually unflagging obligation . . . to exercise the jurisdiction" given to it by Congress, the

extraordinary circumstances present in this case require abstention. *Kirschner v. Grant Thornton*

*LLP (In re Refco, Inc. Secs. Litig.)*, 628 F. Supp. 2d 432, 446 (S.D.N.Y. 2008) (quoting *Colorado*

*River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)) (internal quotation

marks omitted).

As observed by the Supreme Court, abstention is born of a desire to "soften the tensions

inherent in a system that contemplates parallel judicial processes." *Pennzoil v. Texaco, Inc.*, 481

U.S. 1, 11 n.9 (1987).   And the Second Circuit has concluded that abstention doctrines embody

"federal respect for State law and policy." *In re Pan Am.*, 950 F.2d at 846.  As discussed above,

federalism concerns resonate loudly in chapter 9 bankruptcies.  Indeed, this Court can think of no

instance where respect for State law is more paramount than in a municipal bankruptcy case

under chapter 9 of the Bankruptcy Code.  These strong federalism concerns weigh heavily on the

Court's analysis of the twelve factors used when examining abstention under section 1334(c)(1).

> a.   The effect or lack thereof on the efficient administration of the estate if a
> Court recommends abstention

The Tracks argue that abstention will greatly impede the progress of this case.  The

Tracks maintain that the Racing and Wagering Board has historically resisted making any

determinations regarding disputes between the various regional off-track betting entities and race

tracks.  The Tracks claim that the Racing and Wagering Board's history on making these

determinations is so poor that abstention is tantamount to denial of their motions.  (Supplemental

Joint Mem. of Tracks at 8–9.)  While there is some evidence in the record to support the Tracks'

position, recent acts of the Racing and Wagering Board illustrates willingness to take an active

role in OTB's payments.

The parties do not dispute the Racing and Wagering Board's power to issue a regulation

or otherwise determine when the Indirect Commissions must be paid.  (Supplemental Joint Mem.

of Tracks at 3 ("accepting that the Board has jurisdiction to determine when [OTB] must pay

commissions"); Supplemental Statement of OTB at 2.)  Indeed, the Racing and Wagering Board

has the necessary adjudicative powers to determine this dispute.  The relevant racing regulation

states that disputes between any regional OTB and a race track "with respect to the purposes or

objectives set forth in section 518 of the Racing, Pari-Mutuel Wagering and Breeding Law shall

be submitted in writing to the board for determination."  N.Y. COMP. CODES R. & REGS. tit. 9, §

5201.04 (2010).  Section 518 of the Racing Law is a general provision discussing the purpose of

off-track betting.  The statute reads as follows:

> In the exercise of the power vested in it by subdivision one of
> section nine of article one of the state constitution, the legislature
> hereby prescribes that off-track pari-mutuel betting on horse races,
> conducted under the administration of the state racing and
> wagering board in the manner and subject to the conditions
> provided for in this article, shall be lawful, notwithstanding the
> provisions of any other law, general, special or local, including any
> law prohibiting or restricting lotteries, pool-selling or bookmaking
> or any other kind of gambling; it being the purpose of this article to
> derive from such betting, as authorized by this article, a reasonable
> revenue for the support of government, and to prevent and curb
> unlawful bookmaking and illegal wagering on horse races.  It is
> also the intention of this article to ensure that off-track betting is
> conducted in a manner compatible with the well-being of the horse
> racing and breeding industries in this state, which industries are
> and should continue to be major sources of revenue to state and
> local government and sources of employment for thousands of
> state residents.

N.Y. RAC. PARI-MUT. WAG. & BREED. LAW § 518 (McKinney 2009).  Thus the Racing and

Wagering Board has power to determine when the Indirect Commissions should be paid.

Specifically the final clause regarding the requirement that off-track betting occur in a manner

compatible with the well-being of the horse racing and breeding industries in the state gives the

Racing and Wagering Board wide power to resolve the dispute at bar.

While the Racing and Wagering Board has not yet used its adjudicative powers to require

payment of the Indirect Commissions, it has taken steps consistent with these powers as recently

as April and May of this year.  Specifically, as indicated above, OTB must seek approval from

the Racing and Wagering Board to simulcast and accept bets on out-of-state races.  (Joint Pre-

Trial Stipulation at ¶ 75.)  On April 21, 2010, in response to a request to simulcast an out-of-state

meet, counsel for the Racing and Wagering Board requested information from OTB regarding

how it intended to use the proceeds OTB would earn from accepting bets on this meet.  The

Racing and Wagering Board was specifically concerned whether OTB would use the proceeds to

make the statutory payments contemplated by the Racing Law.  (*Id.* ¶ 76.)  OTB answered the

Racing and Wagering Board, noting that it would defer paying the required Indirect

Commissions due to the Tracks.  (*See id.* at ¶ 76; Letter from Ira H. Block, Executive Vice

President OTB, to Robert A. Feuerstein, Counsel New York State Racing and Wagering Board

(Apr. 23, 2010) (Ex. J to Joint Pre-Trial Stipulation).)  In response, the Racing and Wagering

Board delayed ruling on OTB's request to simulcast out-of-state races, effectively denying

OTB's application.  (Joint Pre-Trial Stipulation at ¶ 77.)  In an effort to start simulcasting out-of-

state races once more, OTB agreed with the Racing Board to begin depositing the amounts of

Indirect Commissions otherwise due into a separate account, reporting weekly to the Racing

Board on its computation of amounts due.  (*Id.* at ¶¶ 78, 82; Letter from Ira H. Block, Executive

Vice President OTB, to Robert A. Feuerstein, Counsel New York State Racing and Wagering

Board (May 26, 2010) (Ex. L to Joint Pre-Trial Stipulation).)  And OTB admits that it must

obtain the approval of the Racing and Wagering Board before simulcasting an out-of-state race.

(July 13, 2010 Hr'g Tr. at 37:15–25.)

     As the Racing and Wagering Board has recently withheld approval from OTB to

simulcast out-of-state races, it seems clear that the Racing and Wagering Board is exercising its

authority to regulate the horse racing and pari-mutuel businesses while this chapter 9 case is

pending.  Indeed, OTB concedes that the Racing and Wagering Board has power to do so while OTB is a chapter 9 debtor.  (July 13, 2010 Hr'g Tr. 101:22–24 ("The Court:  And you agree that that form of regulation [withholding approval to simulcast out-of-state races] is not preempted by the Bankruptcy Code?  Mr. Levin:  Correct.").)

The Court therefore concludes that abstention will not have an overwhelmingly adverse effect on the administration of this case.  It is clear that the Racing and Wagering Board has the authority—and has taken recent steps—to resolve the issues on which the Court abstains.  In the highly-regulated horse racing and pari-mutuel wagering businesses, this exercise of regulatory powers is wholly appropriate and should not be interfered with by a bankruptcy court.  This appears to an appropriate exercise of state police power, respected in all bankruptcy cases, and especially appropriate in a chapter 9 case.

b.   The extent to which state law issues predominate over bankruptcy issues

The Tracks argue that the issues raised in their motions—specifically the payment of the Indirect Commissions as administrative expenses—are pure bankruptcy issues.  With regards to administrative expense issues, the Tracks are correct.  Whether the Tracks are entitled to administrative expense claims under section 503 for post-petition Indirect Commissions, assuming that state law requires that Indirect Commissions be paid on a current basis, is indeed a core bankruptcy issue.  The Court, however, disposed of this issue in the discussion above, concluding that section 503 does not apply to operating expenses of a chapter 9 debtor.

In contrast, the lone issue on which the Court now abstains—the schedule on which OTB must pay Indirect Commissions to the Track—is a pure question of state law.  Moreover, a state entity exists that is able to balance the various competing interests in the New York racing and pari-mutuel industry required to make this determination.  Thus, this factor weighs heavily in favor of abstention.

31

c.   The difficulty or unsettled nature of the applicable state law

The Tracks maintain that the issues of state law at issue here are "not difficult" and thus the Court should decide when OTB must pay the Indirect Commissions.  But both the language of the statutes and the history of the dealings between the parties belie the Tracks' position.

As demonstrated above, the Racing Law is, at best, ambiguous regarding when OTB must pay the Indirect Commissions to the Tracks.  It clearly lacks any provision stating when the Indirect Commissions must be paid.  Moreover, there is a clear tension in the Racing Law between proclamations that off-track betting should be "conducted in a manner compatible with the well-being of the horse racing and breeding industries in" New York and statements that "the continued operation of [OTB] is of paramount importance to the public interest."  *Compare* N.Y. RAC. PARI-MUT. WAG. & BREED. LAW § 518 (McKinney 2009) *with* 2008 N.Y. LAWS 3083. Requiring OTB immediately to pay all indirect commissions will likely result in a shut down of OTB, with adverse consequences to the State and to many other stakeholders that benefit from distributions from OTB.  Balancing these competing interests is more appropriately done by the State Legislature and the State Agency that regulates the business.  Further, from the history of payments, it appears that the parties themselves have never determined the appropriate schedule for payment of the Indirect Commissions.  The record clearly demonstrates that OTB previously paid Indirect Commissions between 30 to 150 days after accrual.

As the statute is silent on when the Indirect Commissions must be paid, the competing policy interests behind the Racing Law are of paramount importance.  The Racing and Wagering Board is better able to balance competing New York policy interests, and it has authority to issue regulations and adjudicate disputes regarding the Racing Law.  This Court will not usurp the role of the Racing and Wagering Board in balancing these competing interests.  *Cf.  Piccolo v. Commodity Futures Trading Comm'n*, 388 F.3d 387, 391 (2d Cir. 2004) (observing that courts in

32

the Second Circuit "accord[] a high degree of deference to administrative agencies where their

special expertise is implicated") (internal quotation marks and citation omitted).  Thus, this

factor weighs in favor of abstention.

> d.  The presence of a related proceeding commenced in state court or other
> nonbankruptcy court

There is no proceeding currently pending before the Racing and Wagering Board to

determine the appropriate schedule for paying the Indirect Commissions.  The Tracks maintain

that this factor is of particular importance when determining whether to abstain under section

1334(c)(1).  This Court does not agree.  The cases that articulate the twelve factors used to assist

in determining whether abstention is appropriate do not indicate that any single factor is of more

importance than the others.  In contrast, courts opine that not all twelve factors must be

considered.  *In re Bozel S.A.*, 2010 WL 2816369, at *14 n.23 (observing that courts need not

consider all twelve factors when determining whether to abstain under section 1334(c)(1)) (citing

*In re Cody, Inc.*, 281 B.R. at 190–91); *Langston Law Firm*, 410 B.R. at 156 (same).

While this factor weighs against abstention, the Court gives it little weight.  Given the

recent actions of the Racing and Wagering Board to force OTB to segregate funds for Indirect

Commissions, there is little indication that abstention would cause undue delay.  Moreover,

whatever need the Tracks have for a quick resolution of these issues pales in comparison to

issues of federalism, the idea of comity, and respect for state law inherent in section 1334(c)(1).

In the first instance the Wagering and Racing Board should make a determination with wide-

ranging effects on New York's racing and pari-mutuel industry even though no proceeding has

so far been commenced.

e.   The jurisdictional basis, if any, other than 28 U.S.C. § 1334

This factor weighs in favor of abstention.  If this matter was brought in a district court, there would be no federal question jurisdiction over the determination of when the Indirect Payments are due.  Moreover, as both entities are only located in New York, there would be no diversity jurisdiction.  As this dispute is only in federal court due to the Bankruptcy Code, it weighs in favor of abstention.  *See Bricker*, 348 B.R. at 35–36 (concluding that this factor weighs in favor of abstention where there is no federal question or diversity jurisdiction for a dispute).

f.   The degree of relatedness or remoteness of the proceeding to the main bankruptcy case

This factor weighs against abstention.  From the start of this litigation it has been clear that legislative changes are required to statutory distributions—including the Indirect Commissions—to ensure the continued operation of OTB.  *See In re New York City Off-Track Betting Corp.*, 427 B.R. at 278 (observing that legislative changes are needed for OTB's survival).  Moreover, OTB has admitted that a determination regarding when the Indirect Commissions must be paid would likely impact the ability OTB to continue operating.  (July 13, 2010 Hr'g Tr. at 34:15–18.)  Thus, it is clear that the timing of payments of the Indirect Commissions is central to OTB's bankruptcy case.

g.   The substance rather than form of an asserted "core" proceeding

This factor focuses on ensuring that parties do not clothe an issue of pure state law as a core bankruptcy proceeding.  *See Bricker*, 348 B.R. at 36 (quoting *In re Republic Reader's Serv., Inc.*, 81 B.R. 422, 427–28 (Bankr. S.D. Tex. 1986)).  Here, there is no question that the issue to be decided is one of pure state law; therefore this factor weighs in favor of abstention.

34

h.  The feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court

This factor weighs in favor of abstention.  While the Tracks argue that it is not feasible to sever the determination of when the Indirect Commissions must be paid because it would be a *de facto* denial of their motions, the Tracks misapply this factor.  First, as demonstrated above, it is not clear that the Racing and Wagering Board will wait an unreasonable period of time before making a determination on this issue.  Second, the Tracks' arguments have little to do with feasibility.  Feasible means "capable of being done, accomplished or carried out; possible, practicable."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED (2002).  Thus, even if the Court accepted the Tracks' position that requiring the parties to seek a determination on the schedule of payments would cause a lengthy delay, this argument is irrelevant to whether severing is possible.  As the Racing and Wagering Board exists and has recently taken an active role in matters regarding the payment of the Indirect Commissions by OTB, the Court determines that the Board may determine the proper payment schedule.  This determination may then be enforced by this Court.

i.  The burden on the court's docket

This factor neither weighs in favor or against abstention.  This Court will promptly decide the matters properly before it, regardless of the burdens it may impose on the Court's docket.

j.  The likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties

This factor is also neutral.  There is nothing in the record to indicate that the Tracks engaged in forum shopping by bringing their motions in this Court.  In fact, many of the Tracks' initial arguments regarding administrative expenses could only be determined by a bankruptcy

35

court.  The Tracks also argue that the Racing and Wagering Board has essentially deferred to allow this Court to determine when the Indirect Commissions must be paid.  (Supplemental Joint Mem. of Tracks at 12.)  The Tracks further maintain that deference of the Racing and Wagering Board is appropriate in this case for internal state political reasons.  (*Id.* at 12–13.)  Specifically, the Tracks claim that it is inappropriate for the Racing and Wagering Board, constructed of members appointed by the Governor, to resolve a dispute with OTB, an executive entity.

As an initial matter, the Court is uncertain what bearing these arguments have on forum shopping issues.  Even if they were relevant to forum shopping, the Court does not believe that internal state political reasons make it appropriate for the Racing and Wagering Board to defer to this Court.  The Tracks argue that deference of the Racing and Wagering Board is appropriate to this Court merely because it is an executive entity, with members appointed by the Governor of New York, and it would need to review the actions of OTB, another executive entity.  Yet this precise situation occurs in administrative law courts across the country every day.

In addition, the Court concludes, given the strong competing state policy interests at play in determining the proper schedule to pay the Indirect Commissions, it would be inappropriate for the Racing and Wagering Board to defer to this Court's judgment.  At best, it would not be consistent with comity and respect for state institutions to have this Court usurp the role of the Racing and Wagering Board and determine these issues.  Moreover, even if the Racing and Wagering Board were to abdicate its responsibilities, this Court cannot—even when invited to do so—displace the role of a state administrative entity.  Such an act is clearly prohibited by principles of federalism and the Tenth Amendment of the United States Constitution.

       k.  The existence of a right to a jury trial

This factor is neutral.  The parties will not be entitled to a jury trial either before this Court or the Racing and Wagering Board.

l.    The presence in the proceeding of non-debtor parties

This factor weighs heavily in favor of abstention.  The Tracks, just two entities, are the only non-debtor moving parties on these motions.  The Racing Law, and in particular the provisions dealing with Indirect Commissions, reflect important policy choices by the State Legislature regarding the entire racing industry, with its many different constituencies.  Any decision by this Court with respect to the meaning and application of the Racing Law has broad implications not just for the parties before this Court, but for the entire industry.  Yet the Tracks ask the Court to make a determination on an issue that will likely implicate the rights of every track and other entity that receives statutory distributions in New York State.  This strongly favors deferring to the Racing and Wagering Board, where the opinions and desires of other stakeholders in the New York racing industry may be canvassed and incorporated into a decision without the filing of formal motion papers, as is required in this Court.

2.  *Burford Abstention*

In addition to abstention under section 1334(c), the Court concludes that another basis for abstention exists.  In *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), the Supreme Court identified that federal court abstention was appropriate in certain situations "to avoid needless conflict with the administration by a state of its own affairs."  17A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER & VIKRAM DAVID AMAR, FEDERAL PRACTICE AND PROCEDURE §4244, at 382 (3d. ed 2007).  The *Burford* Court reviewed an action brought by Sun Oil assailing a decision of the Texas Railroad Commission allowing Burford to drill oil wells on a particular oil field in eastern Texas.  *Burford*, 319 U.S. at 316–17.  The Court observed the various policy interests that the Texas Railroad Commission balanced when granting authority to drill. Specifically, the Court acknowledged that the Texas Commission must balance the conservation of oil and gas with the generation of tax revenue—and was granted broad discretion to do so.  *Id.*

37

at 320.  The Court also noted the practical needs for consistent and thorough regulation of oil

fields to encourage economic and efficient oil drilling and acknowledged that the order in

question was "part of the general regulatory system devised for the conservation of oil and gas in

Texas."  *Id.* at 319.  The Court also noted that judicial state review of the Railroad Commission's

decision was available and concentrated in certain Texas courts.  *Id.* at 326.  The Court then

determined that the issues at bar "so clearly involve[d] basic problems of Texas policy that

equitable discretion should be exercised to give Texas Courts the first opportunity to consider

them."  *Id.* at 332.

Throughout the years the Supreme Court has refined this general concept into a doctrine

now known as *Burford* abstention.  The Court's latest attempt to articulate the doctrine is as

follows:

> Where timely and adequate state-court review is available, a
> federal court sitting in equity must decline to interfere with the
> proceedings or orders of state administrative agencies:  (1) when
> there are "difficult questions of state law bearing on policy
> problems of substantial public important whose importance
> transcends the results in the case at bar"; or (2) where the "exercise
> of federal review of the question in a case and in similar cases
> would be disruptive of state efforts to establish a coherent policy
> with respect to a matter of substantial public concern."

*New Orleans Pub. Serv. v. Counsel of New Orleans*, 491 U.S. 350, 361 (1989) (quoting

*Colorado River*, 424 U.S. at 814).  More recently, however, the Supreme Court has cautioned

against the mechanical application of the *Burford* doctrine and the cases on which it is based.[4]

The Court stressed that the *Burford* doctrine emanates "from the discretion historically enjoyed

---

[4]        Commentators agree with this approach.  The leading treatise on federal practice and procedure observes
that "it seems too narrow to try to confine *Burford*, and the later case of *Alabama Public Service Commission v.
Southern Railway Co.* to their own facts and to hold that this kind of abstention is proper only when a case involves
basic matters of state policy, complicated by nonlegal considerations of a predominantly local nature, and the state
has specially concentrated all judicial review of administrative orders of the sort involved in a single state court."
17A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER & VIKRAM DAVID AMAR, FEDERAL
PRACTICE AND PROCEDURE §4244, at 383–84 (footnotes omitted).

by courts of equity," and indicated that courts must look to "principles of federalism and comity" when exercising discretion to abstain under *Burford*. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 727–28 (1996) (quoting *Growe v. Emison*, 507 U.S. 25, 32 (1993)) (internal quotation marks omitted). When making this equitable decision, the Supreme Court has instructed lower courts to balance competing interests:

> This equitable decision [of whether to abstain] balances the strong federal interest in having certain classes of cases, and certain federal rights, adjudicated in federal court, against the State's interests in maintaining uniformity in the treatment of an essentially local problem and retaining local control over difficult questions of state law bearing on policy problems of substantial public import.

*Id.* at 728 (internal citations and quotation marks omitted). As indicated above, concern for "principles of federalism and comity" are at their zenith in chapter 9 cases. Moreover, New York State has great interest in maintaining uniform treatment of the schedule of payments of Indirect Commissions—adjudication of which raises difficult questions of state law and significant public policy issues—while the federal government has little interest in having the matter resolved in federal court.

The Second Circuit has identified three factors to assist in determining when *Burford* abstention is appropriate: "(1) the degree of specificity of the state regulatory scheme; (2) the need to give one or another debatable construction to a state statute; and (3) whether the subject matter of the litigation is traditionally one of state concern." *Liberty Mut. Ins. Co. v. Hurlbut*, 585 F.3d 639, 650 (2d Cir. 2009) (quoting *Hachamovitch v. DeBuono*, 159 F.3d 687, 697 (2d Cir. 1998)) (quotation marks omitted). All three factors support abstention here.

The first factor does not rest on the mere specificity of the state regulatory scheme a court is being asked to review. Instead, it focuses on "on the extent to which the federal claim requires the federal court to meddle in a complex state scheme." *KShel Realty Corp. v. City of New York*,

No. 01 Civ. 9039(LMM), 2003 WL 21146650, at *6 (S.D.N.Y. May 16, 2003) (quoting

*Hachamovitch*, 159 F.3d at 697) (internal quotation marks omitted).  Thus, if a party claims that

a state regulatory structure violates the Constitution, so long as a federal court can limit its

review to the constitutional issue, this factor typically will not weigh in favor of abstention.  *See*

*Hachamovitch*, 159 F.3d at 697 (observing that because a federal constitutional claim did not

require review of substantive provisions of a complex state scheme, it did not weigh in favor of

abstention).  *See also KShel Realty Corp.*, 2003 WL 21146650, at *6 (same).  In contrast, here

the Tracks request the Court directly interfere with the interpretation of a detailed scheme of

state statutory distributions to various racing entities by determining when the Indirect

Commissions must be paid.  As this case requires the Court to intrude in New York's complex

scheme for remuneration of statutory commissions to race tracks and other racing industry

stakeholders, possibly disrupting future attempts by the Racing and Wagering Board to establish

a coherent policy, this factor weighs in favor of abstention.

The second factor, whether this Court would need to "give one or another debatable

construction to a state statute," also weighs in favor of abstention.  The Racing Law is silent on

the schedule when the Indirect Commissions must be paid.  Thus, the Court would be forced to

create, essentially out of whole cloth, a timeline for payments when making a determination in

this case.  This situation is far worse than that which concerned the Second Circuit when it

formulated factors to guide courts in determining when *Burford* abstention is appropriate.  Here

the Court would not be deciding between two different debatable interpretations of a statute; it

would essentially be reading an entirely new term into a state statute.  This clearly demonstrates

that difficult questions of state law exist in this case that would require the Court to balance the

important policy interests of OTB and New York's various racing constituencies.

40

The third factor also weighs in favor of abstention.  The United States government is not an active participant in regulating pari-mutuel bets on horse races.  Indeed, Congress has specifically stated that "the States should have primary responsibility for determining what forms of gambling may legally take place within their borders."  15 U.S.C. § 3001(a)(1).  Congress has passed limited legislation, however, "to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers."  15 U.S.C. § 3001(a)(3).  This legislation is limited to a single section of the U.S. Code which lays out procedures for the acceptance of interstate bets on horse races and does not contemplate the structure of payments to different constituencies or the timing of those payments.  *See* 15 U.S.C. § 3004.  Thus, this factor also supports abstention.

In sum, the Court concludes that the proper timing of payment of the Indirect Commissions is a difficult question of state law that would require the Court to balance state policy interests between OTB and the recipients of its statutory distributions.  This decision would affect not just OTB and the Tracks, but all of the entities receiving distributions from OTB.  Moreover, it is likely that this Court's interpretation of the Racing Law would be used in other proceedings against other off-track betting entities in New York.  Any interpretation this Court would make would also disrupt the New York Legislature's intent to have the Racing and Wagering Board create a coherent policy regarding horse racing and betting issues in the state.  Thus, abstention is appropriate in this case under either section 1334(c) or the *Burford* abstention doctrine.

This conclusion is consistent with the recent decision of the Second Circuit in *Liberty Mutual Insurance Co. v. Hurlbut*.  The court, invoking *Burford*, concluded that a district court's decision to abstain from a suit challenging certain amendments to New York's Workers'

Compensation Law ("WCL") was correct.  The court reasoned that the WCL is a complex statute

that governs an intricate system that seeks to balance the interests of New York employers and

employees.  *Hurlbut*, 585 F.3d at 650.  The court also observed that its intervention could lead to

inconsistent results to the extent its conclusions differed from those of the state Workers'

Compensation Board ("WCB").  *Id.* at 651.  Here, too, there is a complex state statute governing

a system of statutory distributions that seeks to balance interests of different state constituencies.

There is also a possibility that this Court's determination for the proper timing for payment of the

Indirect Commissions could differ from a future determination of the Racing and Wagering

Board, resulting in inconsistent results.[5]

## III.    CONCLUSION

Deferring to the Racing and Wagering Board for a determination of the meaning and

application of the Racing Law with respect to Indirect Commissions does not strip this Court of

its power and responsibility with respect to the administration of this case.  While arguing that

the Racing Law does not require payment of Indirect Commissions within a specified time

period, OTB acknowledges that the payments cannot be deferred indefinitely.  Indeed, the

Stipulation of Facts highlights the potentially grave consequences to the Tracks and the entire

industry if these statutorily required payments continue to be withheld.  At bottom, if OTB is

going to be successfully reorganized, the state legislature must modify portions of the Racing

Law regarding required payments.  For at least five years, no legislative solution has emerged.

---

[5]    The Court observes in coming to this determination that a factor present in many cases where courts find *Burford* abstention appropriate, the consolidation of judicial review of administrative actions in a single state court, is not present here.  *See, e.g.*, *Ala. Pub. Serv. Comm'n v. S. Ry. Co.*, 341 U.S. 341, 348 (1951) (observing that state statute contemplated review of agency decisions by a single appellate court); *Burford*, 319 U.S. at 326 (noting that state legislation provided for review of agency decisions by a single court).  The Second Circuit, however, has determined that this factor is not "indispensible to *Burford* abstention." *Bethpage Lutheran Serv. Inc. v. Weicker*, 965 F.2d 1239, 1245 (2d Cir. 1992).  Moreover, any such mechanical approach is anathema to the Supreme Court's command that abstention doctrines "be applied in a pragmatic, flexible manner with a view to the realities of the case at hand." *Id.* at 1244 (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 21 (1983)).

Time, at least for OTB and more likely for many parts of the racing and wagering industry, is running out.  This Court cannot mandate the necessary legislative changes.  The hearing record reflects comments attributed to the Legislature that it wants to wait another year before considering basic changes to the formulas for payments required by the Racing Law.  The State Legislature may be able to wait a year, but this Court cannot.  The Court therefore orders the parties to formally seek resolution of the timing for payment of the Indirect Commissions from the Racing and Wagering Board within seven days from the date of this Opinion and Order.

As the Court advised the parties at the argument, section 930 permits the Court to dismiss a chapter 9 case for cause, including "unreasonable delay by the debtor that is prejudicial to creditors . . . ."  11 U.S.C. § 930(a)(2).  The record clearly establishes that many of OTB's creditors are being substantially harmed by OTB's failure to complete a plan for the adjustment of its debts, and to pay undisputed amounts due to creditors during the administration of this case.  While the Court does not have the power to order OTB to pay particular creditors, the Court does have the power to dismiss the case where unreasonable delay by the debtor is prejudicial to creditors.  The free-for-all that may ensue if the case is dismissed is unlikely to benefit any of the parties in interest, but it will leave the important decisions where they properly belong, namely with the Governor, the New York State Legislature and the Racing and Wagering Board.

Finally, given the impasse that has existed for many years in resolving the industry-wide issues that have afflicted many of the parties in interest in this case, the Court will also enter an order requiring the parties to mediate the broad issues in dispute.  If the various racing industry constituencies can resolve or at least substantially narrow their disagreements about the restructuring of OTB, and the statutory changes required to accomplish it, they will increase the

43

chances of legislative or regulatory changes.  The parties can simultaneously pursue both

avenues—administrative proceedings before the Racing and Wagering Board and mediation of

the disputes.  Consequently, the Court will abstain from deciding the state law issues, and lift the

automatic stay so the parties can commence an appropriate proceeding before the Racing and

Wagering Board to obtain a resolution of the state law issues.  OTB is further ordered within

seven days from the date of this Order to seek such a determination from the Racing and

Wagering Board.  Also, within the same seven day period, the parties shall confer on the

selection of a mediator.  If the parties cannot agree upon a mediator within that time, the Court

will appoint one.

**IT IS SO ORDERED.**

DATED:        August 5, 2010
              New York, New York

**_____/s/Martin Glenn_____**
MARTIN GLENN
United States Bankruptcy Judge