DUANE MORRIS LLP
1540 Broadway
New York, New York 10036-4086
(212) 692-1000
(212) 692-1020 (facsimile)
William C. Heuer, Esq.
Patricia H. Heer, Esq.
*wheuer@duanemorris.com*
*pheer@duanemorris.com*

*Counsel to Standardbred Owners Association, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 9 |
| | ) |
| NEW YORK CITY OFF-TRACK BETTING | ) Case No. 09-17121 (MG) |
| CORPORATION, | ) |
| Debtor | ) |
| | ) |
| | ) |

**OBJECTION OF STANDARDBRED OWNERS ASSOCIATION, INC.**
**TO DEBTOR'S MOTION SEEKING APPROVAL OF A DISCLOSURE**
**STATEMENT AND PLAN FOR DISTRIBUTION TO CREDITORS**

Standardbred Owners Association, Inc. (the "Association"), a party in interest, through its

undersigned counsel, hereby objects (the "Objection") to the motion (the "Motion") filed by New

York City Off-Track Betting Corporation (the "Debtor") seeking approval of a disclosure

statement and plan (the "Disclosure Statement" and "Plan," respectively) for distribution to

creditors. In support of this Objection, the Association respectfully represents as follows:

**Background**

1.      The Association is the statutorily certified (Section 318 N.Y. Rac., Pari-Mut. Wag

& Breed. Law), as well as being the contractually recognized, bargaining representative for

owners, trainers and drivers of harness horses participating in races that principally take place at

Yonkers Raceway, which is owned by Yonkers Racing Corporation.

1

2.      The Association and Yonkers Racing Corporation are party to a contract, effective

as of January 1, 2004, to which the Debtor is not a party.  That contract remains enforceable as

between the Association and Yonkers Racing Corporation.  That contract is not before the Court.

However, amounts owed by Yonkers Racing Corporation to the Association under the terms of

that contract (and as a statutory obligation) are, in part, generated by amounts owed to Yonkers

Racing Corporation by the Debtor.  The Association estimates that this debt and liability of

Yonkers Racing Corporation to the Association and its members is approximately $11 million.

Through the Debtor's Plan, Yonkers Racing Corporation impermissibly seeks to insulate itself

from liability on this independent $11 million debt to the Association.

3.      For the reasons noted below, the Association believes there are flaws present in

the Plan and Disclosure Statement which demonstrate that the Plan is patently unconfirmable.[1]

Since the Plan, as drafted, cannot meet the requirements for confirmation, the Association asserts

this Objection to approval of the Disclosure Statement and Plan for distribution to creditors.

## **Argument**

4.      Although objections to a plan of reorganization are generally reserved for

confirmation, in order to gain approval for distribution to creditors, a disclosure statement must

describe a confirmable plan.  *In re Quigley Co*., 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007); *see*

*also In re Filex, Inc*., 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990) (refusing to approve a disclosure

statement for an unconfirmable plan).

5.      Where a plan is fatally flawed such that confirmation would not be possible,

consideration of the flaws in such a plan is appropriate at the disclosure statement stage.  *In re*

---

[1] The Association raises only the points noted in this Objection at this stage of the case, but reserves the right to
assert additional and different objections if the Plan and Disclosure Statement proceed to confirmation, or to seek
other or additional relief in connection with confirmation of this or any modified, amended or other plan.

DM2\2560128.5

*Phoenix Petroleum Co*., 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001). Thus, where a disclosure statement describes a plan that is "patently unconfirmable," it should not be approved for distribution to creditors. *See In re Quigley Co*., 377 B.R. at 115-16 (explaining that "if the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile."); *In re Beyond.com Corp*., 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) ("Because the underlying plan is patently unconfirmable, the disclosure statement may not be approved."); *In re Curtis Ctr. Ltd. Pshp*., 195 B.R. 631, 638 (Bankr. E.D. Pa. 1996) ("[A] disclosure statement should be disapproved where the plan it describes is patently unconfirmable."); *In re 266 Washington Assoc*., 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992) ("Having found patent legal defects in the Amended Plan rendering it not confirmable, the Court denies approval of the Debtor's first amended disclosure statement. A disclosure statement will not be approved where, as here, it describes a plan which is fatally flawed and thus incapable of confirmation.").

6.      Here, the Debtor's Plan is fatally flawed because, among other things, the exculpation, release and injunction provisions included in Article VII.K.5 of the Disclosure Statement and Article V.J, L and M of the Plan are impermissibly broad and are beyond the jurisdiction of the Court to authorize. Accordingly, the Plan is not confirmable and the Disclosure Statement and Plan should not be approved for distribution.[2]

---

[2] Moreover, the foundation on which the Plan is built is the hope that a legislative enactment may be achieved at some point in time in the future after the Court has confirmed the Plan, and if this goal is not achieved postconfirmation, the Plan will not be feasible. Plans built on speculation such as this fail the feasibility test. *In re Young Broad., Inc*., 430 B.R. 99, 128 (Bankr. S.D.N.Y. 2010) (feasibility requirement prevents confirmation of visionary schemes and that "[w]here the financial realities do not support the proposed plan's projections or where proposed assumptions are unreasonable, confirmation of the plan should be denied.") (internal quotations omitted); *In re Kent Terminal Corp*., 166 B.R. 555, 562 (Bankr. S.D.N.Y. 1994). The feasibility test is "rooted in predictions based on objective fact." *In re Young Broad., Inc*., 430 B.R. at 129. Projections and assumptions must not be speculative, conjectural, or unrealistic. *Id*.; *see also In re Kent Terminal Corp*., 166 B.R. at 562 (plan was not feasible where it presented "mere conjecture and debtor's euphoria"). "Where the financial realities do not support the proposed plan's projections, or where proposed assumptions are unreasonable, confirmation of the plan should

3

**A.  The Exculpation, Release and Injunction Provisions in the Plan are Impermissibly Broad and Exceed the Jurisdiction of the Court to Authorize**

7.       The exculpation, release and injunction provisions in the Plan are exceedingly broad.  As drafted, the Plan asks the Court to approve relief that exceeds the Court's jurisdiction under the Bankruptcy Code.  Moreover, even if jurisdiction were present, the Disclosure Statement fails to demonstrate that sufficient grounds exist for the approval of such broad relief; in fact, in its effort to justify such an expansive request the Disclosure Statement actually demonstrates why, particularly in this case, the relief sought is inappropriate.

8.       In *In re Dreier, LLP*, 429 B.R. 112 (Bankr. S.D.N.Y. 2010), Judge Bernstein discussed the current state of the law on third party releases in the Second Circuit.  The court noted that where third party releases are concerned, there are two inquiries that must be made.  First, whether the claims sought to be released are within the Court's jurisdiction; second, assuming jurisdiction exists, whether a proper showing has been made to demonstrate that a third party release is appropriate.  *Id*. at 129-131 (generally); *id*. at 131 ("As a result, before the Bankruptcy Court decides whether the proponent of a plan settlement injunction has demonstrated the 'unusual circumstances' mandated by *Metromedia*, it must first decide whether it has subject matter jurisdiction under *Manville II*.") (citing *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685, 695 (Bankr. S.D.N.Y. 2010)).

9.       Where jurisdiction is concerned, the court reviewed *In re Johns-Manville Corp.*, 517 F.3d 52, 65 (2d Cir. 2008) ( hereinafter, "*Manville II*"), *vacated and remanded on other grounds*, __ U.S. __, 129 S.Ct. 2195 (2009), *affirming in part and reversing in part*, 600 F.3d

---

be denied." *In re 8315 Fourth Ave. Corp.*, 172 B.R. 725, 735 (Bankr. E.D.N.Y. 1994) (internal quotations omitted). Although the Association is not a creditor of the Debtor's estate, whether the Plan is feasible must be demonstrated by the Debtor in order for the Debtor to meet its burden of proposing a confirmable plan.

DM2\2560128.5

135 (2d Cir. 2010) (hereinafter, "*Manville III*"). After detailing the history and reasoning behind

the *Manville* decisions, the court summarized the jurisdictional inquiry as follows:

> "Related to" jurisdiction to enjoin a third party dispute exists where the subject of
> the third party dispute is property of the estate, or the dispute would have an effect
> on the estate.

*In re Dreier LLP*, 429 B.R. at 131.

10.    Assuming jurisdiction exists over the third party dispute, the question then

becomes whether, on the merits, a third party release is appropriate. The merits analysis focuses

on the standards set by the United States Court of Appeals for the Second Circuit in *Deutsche*

*Bank AG, et al., v. Metromedia Fiber Network, Inc., et al. (In re Metromedia Fiber Network,*

*Inc.)*, 416 F.3d 136 (2d Cir. 2005) (hereinafter, "*Metromedia*"). *See In re Dreier LLP*, 429 B.R.

at 131; *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. at 694-95.

11.    In *Metromedia*, the Court of Appeals emphasized that nondebtor releases, by their

very nature, are devices that lend themselves to abuse. *Metromedia*, 416 F.3d at 142. The Court

of Appeals also noted that although 11 U.S.C. § 105(a) is often looked to as a source of authority

for approving third party releases, the statute does not permit the whole cloth creation of new

rights that do not otherwise exist under the Bankruptcy Code. *Id*. Noting that "[n]o case has

tolerated nondebtor releases absent the finding of circumstances that may be characterized as

unique[,]" *id*. at 142, the Court of Appeals held:

> A nondebtor release in a plan of reorganization should not be approved absent the
> finding that truly unusual circumstances render the release terms important to
> success of the plan . . . .

*Id*. at 143.

12.    With these jurisdictional and merits limitations in view, the Association submits

that the exculpation, release and injunction provisions in the Plan (at pages 14-15), described at

DM2\2560128.5

pages 36-38 of the Disclosure Statement, simply cannot pass muster, and further submits that, as

a result, the Disclosure Statement should not be approved for distribution to creditors.

**B.     The Exculpation Provisions**

13.     With respect to exculpation, the Disclosure Statement provides:

> Exculpation. Except as otherwise specifically provided in the Plan or Plan
> Supplement, no *Exculpated Party* shall have or incur, and each Exculpated Party
> is released and exculpated from, any *Exculpated Claim*. In all respects such
> Persons shall be entitled to reasonably rely upon the advice of counsel with
> respect to their duties and responsibilities pursuant to the Plan.

*See* D. Stmt at Art.VII.K.3, Plan at Art.V.J (emphasis added).

14.     The term Exculpated Party is defined in the Plan.

> "Exculpated Party" means each of: (a) the Debtor, (b) the Creditors' Committee
> and the current and former members thereof and (c) with respect to each of the
> foregoing Persons in clauses (a) and (b), such Person's respective officers,
> directors, employees, members, agents, affiliates (including parents and
> subsidiaries), consultants, advisors, professionals, partners and representatives, in
> each case only in their capacity as such.

*See* Plan at Art.I.33 (emphasis added).  As drafted, the list of Exculpated Parties is overly broad.

Not only does it extend to persons involved in the Plan process, it actually extends to each and

every employee of each member of the Creditors' Committee.  It extends to affiliates and other

parties not before the Court, and that have no relationship to this case.  The term is not limited to

members of the Creditors' Committee in their capacity as members of the Creditors' Committee.

15.     The term Exculpated Claim, too, is exceedingly broad.  The Plan defines the term

as follows:

> "Exculpated Claim" means any claim, claim for relief, interest, obligation, right,
> suit, damages, cause of action, remedy and liability *related to any act or omission
> in connection* with, *relating to* or *arising out* of the Debtor's *restructuring efforts*,
> the Debtor's Case, *formulation*, *preparation*, dissemination, *negotiation* or filing
> of the Disclosure Statement or the Plan *or any contract, instrument, release or
> other agreement or document created or entered into in connection with the
> Disclosure Statement or Plan*, *formulation*, *preparation*, *negotiation*, *and
> adoption of the Legislation*, the filing of the Case, voting on the Plan, the pursuit

6

of Confirmation, the *pursuit of consummation* of the Plan, the *administration and implementation* of the Plan, the *distribution of property under the Plan* or any other related agreement, including the transfer of the ADW to Newco ADW, *the compromise of any Claim of any member of the Creditors' Committee or the elimination or reduction of the Debtor's prepetition, post-petition, and post-Effective Date Maintenance of Effort, Dark Day, and Indirect Commission obligations as provided for in the Plan and the Legislation*; provided, however, that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, fraud, or criminal conduct to the extent imposed by applicable non-bankruptcy law. No cause of action, obligation or liability expressly set forth as preserved by the Plan constitutes an Exculpated Claim.

*See* Plan at Art.I.32 (emphasis added).

16.     Each of these definitions is problematic in several respects.

> i.     *The Exculpation Provisions Reach Matters*
> *Beyond the Jurisdiction of the Court*

17.     Where members of the Creditors' Committee are involved, the term Exculpated Claim extends considerably beyond activities that could be considered as having been part of those members' duties as a member of the Creditors' Committee. Specifically, it extends to compromises of claims asserted or that could have been asserted against the estate by each member of the Creditors' Committee. *See* Plan at Art.I.32 (". . . the compromise of any Claim of any member of the Creditors' Committee or the elimination or reduction of the Debtor's prepetition, post-petition, and post-Effective Date Maintenance of Effort, Dark Day, and Indirect Commission obligations as provided for in the Plan and the Legislation. . ."). Any such compromise was not an obligation arising out of membership or service on the Creditors' Committee; to the contrary, it relates to each individual member's claims against the estate. Those actions, arising out of a member's claim and creditor status, cannot be insulated. The terms Exculpated Party, and Exculpated Claim, have an impermissible reach.

18.     The reason why this broad relief has been sought – attempting to insulate claims compromises by each member of the Creditors' Committee and reaching beyond merely

7

representative capacity – is evident when a broader context is brought into focus.  For example, under its contract with the Association and pursuant to law, Yonkers Racing Corporation is obligated to pay a portion of all amounts collected from the Debtor to the Association and its members.  If, in compromising its claim against the estate Yonkers Racing Association has violated an independent duty it owes to the Association, or has breached its contractual agreement with the Association, Yonkers Racing Corporation cannot be insulated from such liability through the Debtors 'Plan.  The Bankruptcy Code does not extend jurisdiction to provide such relief.  *See In re Dreier LLP*, 429 B.R. at 133 (noting that it is impermissible on a jurisdictional basis to release non-derivative, independent claims that could arise from a nondebtor party's "own wrongful conduct"); *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. at 695 (discussing *Manville II* and discussion therein that "a bankruptcy court only has jurisdiction to issue a non-debtor release where the released claims 'directly affect the *res* of the bankruptcy estate.'").[3]

19.     It appears from the Disclosure Statement that this kind of exculpation or release is precisely what is intended.  In the Disclosure Statement the Debtor touts $64.5 million worth of claims that are being "forgiven" under the Plan as a great sacrifice being made by members of the Creditors' Committee.  What the Disclosure Statement does not explain is that non-creditor (in this case) third parties such as the Association and its members, were the ultimate beneficiaries of a significant portion of those funds, but were not included in negotiations. Rather, Yonkers Racing Corporation negotiated that deal, wherein it effectively gave away

---

[3] Whether Yonkers Racing Corporation instituted conflict screening to keep separate its role as member of the Creditors' Committee, and its independent role as a creditor with duties and obligations – and a built-in liability exposure – to third parties arising out of its exposure in the Debtor's chapter 9 proceeding, is presently unknown. Such matters can be explored in discovery if necessary.

DM2\2560128.5

millions of dollars that it was obligated to collect for the benefit of the Association and each of its members, and which never would have inured to the benefit of the Raceway.

20.     Instead of trying to collect, Yonkers Racing Corporation used the claim that was "forgiven" as a "throw-away" in negotiations, and used those concessions as a chip through which it bargained for greater benefits solely and exclusively for its own benefit, to the severe economic detriment of the Association and its members.  For example, under the Plan, Class 3 claimants – the NY Tracks – take ownership of Newco ADW.  *See* Plan at Art.II.B.3, Art.III.D.2; *see also* D. Stmt at Art.VII.D.5.  The Association, whose claim is being negotiated away, receives none of this benefit.  Racetracks are also relieved of co-investment requirements, giving the NY Tracks a direct financial benefit.  *See* D. Stmt. at Art.VII.D.8.[4]  At the same, Yonkers Racing Corporation walks away from its claim for amounts previously owed and which, in the Association's estimation, require payment to the Association and its members of approximately $11 million (the Association's calculations show that amounts owed to the Association comprise more than 50% of what is being "forgiven" by Yonkers Racing Corporation).  *See* D. Stmt at Art.VI.C (chart).

21.     The independent liability exposure that this kind of activity by Yonkers Raceway Corporation brings with it to third parties that either are or are not creditors in this case – potential claims for breach of contract or other, common-law claims – has nothing to do with the *res* that constitutes the Debtor's estate.  Such claims cannot be released through the Plan through an exculpation provision due to a lack of jurisdiction.[5]

---

[4] Other examples exist, but need not be identified in detail here.

[5] In addition, the Plan purports to provide a defense of sorts to each and every Exculpated Party to the extent they "reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan." *See* D. Stmt. At Art.VII.K.3, Plan at Art.V.J.  Because the exculpation provision is not limited to actions of members of the Creditors' Committee in their representative capacity, but also reach actions taken in their capacity as creditors, this "defense" provision is another example of overreaching.

9

##### ii. *On the Merits, the Metromedia Standard is not Met*

22.     The *Metromedia* standard requires a showing that "truly unusual circumstances" are present in order for a third party, nondebtor release to be permissible.  Here, the necessary factual predicate is not present for the exculpation and third party release contemplated by the Plan.

23.     The unusual circumstances that the Disclosure Statement identifies point directly at the Association.  The Debtor contends that because the Association has stated its intention to pursue third parties that have liability to the Association independent of the Debtor's Plan, that broad releases are necessary.  But this is precisely the kind of claim that falls outside the jurisdiction granted by the Bankruptcy Code, as is noted above.  It cannot be correct that asserting that those kinds of rights – claims by a nondebtor third party against a nondebtor third party – is an "unusual circumstance" that satisfies the *Metromedia* standard on the merits.  This chapter 9 *case* may be unique, but the facts and circumstances that are touted as the reason for granting a third party release, are not.[6]

24.     In addition to the fact that the circumstances present are not unique is the question of what has or have some of the Exculpated Parties – specifically, members of the Creditors' Committee, such as Yonkers Racing Corporation – "given up" in exchange for this exculpation and release?  They are nondebtors.  The consideration noted in the Disclosure Statement is a waiver of $65.45 million in claims, but as is noted above, much of the claim that is being forgiven was never going to flow to the benefit of members of the Creditors' Committee in any event.  In large part, they are giving away someone else's money (namely, millions owed to the

---

[6] The Association submits that in chapter 9 cases there should be, as a matter of policy, heightened sensitivity to the types of releases, exculpation and injunctions sought through the Plan.  The power of the State of New York is implicated.  Because such considerations are present, third party releases such as those sought here should be subjected to an even more exacting standard than is otherwise applied in a chapter 11 case.

DM2\2560128.5

Association and its members). The only other thing offered is an effort to "lobby" for and support the Legislation. And through that Legislation, racetracks such as Yonkers Racing Corporation hope to gain significant benefits for themselves – benefits which were likely gained in exchange for trading away someone else's money.

25. On the facts of this case, the *Metromedia* standard has not been met. Unique circumstances necessary to satisfy the *Metromedia* standard are not present, and the consideration being given up by members of the Creditors Committee, such as Yonkers Racing Corporation, is insufficient to have "earned" a release. As Judge Gerber found in *In re Adelphia Commcn's Corp.*, 368 B.R. 140, 267-69 (Bankr. S.D.N.Y. 2007):

> The "give ups" that parties made were of rights to recover that were subject to fair debate. In the case of creditors, even those that are Settling Parties, they were merely striking the kinds of deals with respect to their shares of the pie that chapter 11 contemplates. I don't doubt that in this case the Settling Parties engaged, as the Plan Proponents argue, in "tireless efforts" to come together to work out a global compromise aimed at resolving these cases. But that's not unique. It's something creditors have to do in every chapter 11 case, at the risk of destroying themselves (or their recoveries in the case) with their own quests for incremental recoveries.

Judged by that standard, here, the Plan is unconfirmable on its face.

### iii. The Exculpation Provisions are Prospective, and Grant Immunity From Future Extrajudicial Activity

26. Finally, the definition of Exculpated Claim includes within its scope actions to be taken in the postconfirmation context. It reaches negotiations and "adoption" of the Legislation. The Legislation will not be "adopted" until postconfirmation, and it is likely that negotiations over the Legislation will continue in the postconfirmation context. It reaches consummation of the Plan, and the administration and implementation of the Plan: again, all postconfirmation activities. The Debtor has asked the Court to provide immunity from liability for extrajudicial

11

actions that have not yet taken place. The term Exculpated Claim is a prospective bar or release

for actions, and should not be approved.

## C. The Release Provisions

27.     The defects noted above continue beyond the "exculpation" provisions alone.

The Plan and Disclosure Statement also contain an impermissibly expansive third party release.

> Limited Third Party Release. As of the Effective Date, all Persons shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged the *Track Parties* from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing *or hereafter arising*, in law, equity or otherwise, that such Person would have been legally entitled to assert (whether individually or collectively), *based on or relating to, or in any manner arising from, the Debtor's restructuring efforts*, the Case, *the Legislation* or the *relationship of any Track Party and the Debtor*; provided, however that this Article V.L shall not release any Track Party from any cause of action solely arising out of any failure of that Track Party to pay into the purse account such Applicable Contractual Percentage of any annual profits that such Track Party actually receives from Newco ADW on account of that Track Party's equity interest in Newco ADW; provided, further, that this Article V.L shall not release the NY Tracks from any cause of action held by a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other domestic state, city, or municipal tax code; (ii) the environmental laws of the United States or any domestic state, city, or municipality, (iii) any criminal laws of the United States or any domestic state, city, or municipality, (iv) the securities laws of the United States or any domestic, state, city or municipality, (v) the Employee Retirement Income Security Act of 1974, as amended, or (vi) the law and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security; provided, further, that this Article V.L shall not release the Track Parties from any cause of action related to any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud (to the extent imposed by applicable non-bankruptcy law).

*See* D. Stmt at Art.VII.K.5, Plan at Art.V.L (emphasis added).

28.     To track the breadth of this release, the term Track Parties, which in turn

incorporates the term NY Tracks, must be reviewed. Those terms provide:

> "Track Parties" means the NY Tracks and their respective officers, directors, employees, members, agents, affiliates (including parents and subsidiaries),

DM2\2560128.5

consultants, advisors, professionals, partners and representatives, in each case only in their capacity as such.

* * *

"NY Tracks" means Yonkers Racing Corporation, Empire Resorts, Inc., Monticello Raceway Management, Inc. and Monticello Raceway, Finger Lakes Racing Association, Inc., Delaware North Companies, Delaware North Companies Gaming & Entertainment, Inc., Vernon Downs and Tioga Downs and NYRA.

*See* Plan at Art. I.45, 62.

29.     Similar to the "exculpation" provisions, the Plan's release language is prospective and impermissible.  It seeks immunity from extrajudicial activity that, by its very nature and definition, will take place in the postconfirmation context.

30.     Moreover, the term Track Parties is defined in the Plan and, as with the term Exculpated Party, goes so far as to reach every employee of each of the NY Tracks, as well as their advisors and affiliates, regardless of whether they even had a role in this case.  This is an impermissibly broad definition.  Moreover, it is entirely unclear precisely what is being released through the "relationship of any Track Party and the Debtor" provision that is included, but a fair reading of this language suggests that it is intended to reach the same kind of third party claims noted above.  The same defect is present for the release of claims "based on or relating to, or in any manner arising from, the Debtor's restructuring efforts" language that is included.  A fair reading of this provision is that its intent is to release claims that third parties such as the Association may have against NY Tracks, such as Yonkers Racing Corporation, for independent duties and obligations those parties owed to the Association.

31.     To make matters worse, and underscoring the need for heightened scrutiny of third party release provisions in the chapter 9 context, the proposed Legislation, in and of itself, appears to include a broad exculpation and release provision for the benefit of all Track Parties.  *See* D. Stmt at Art.VII.D.15 (page 29).  In this provision, the Debtor recognizes that the

13

obligation to pay amounts that would flow through racetracks such as Yonkers Racing Corporation to the Association and its members, are statutory. The Debtor and Track Parties seek a release – both from this Court and from the New York Legislature – for failure to meet existing statutory obligations of which the Association and its members are, at the very least, intended third party beneficiaries.

32.     The release of claims contemplated by the Plan is beyond the jurisdiction of this Court to grant, and consistent with what is detailed above in the Exculpation discussion, there are no "unusual circumstances" present to satisfy the *Metromedia* standard. Under either analysis, the Plan is unconfirmable.

**D.     The Injunction Provisions**

33.     Finally, the Plan seeks approval of an injunction designed to prevent anyone from even challenging the types of claims for which the release, injunction and exculpation provisions try to reach.

> Injunction. From and after the Effective Date, all persons are permanently enjoined from commencing or continuing in any manner, any cause of action released or to be released pursuant to the Plan or the Confirmation Order.

*See* D. Stmt at Art.VII.K.6, Plan at Art.V.M.

34.     For each the reasons noted above, this provision, too, is impermissible.

DM2\2560128.5

## Conclusion

In this chapter 9 proceeding, as a matter of policy, the exculpation, release and injunction provisions sought for the benefit of nondebtor third parties over claims that are not before the Court and which will have no impact upon the *res* that comprises the Debtor's estate, should be subjected to heightened scrutiny since they are potentially subject to broad abuse. Here, those provisions fail any such analysis. The claims sought to be released are beyond the jurisdiction granted pursuant to 28 U.S.C. § 1334, and the circumstances detailed in the Plan and Disclosure Statement fail to meet the *Metromedia* test. The Plan that has been proposed is, thus, patently unconfirmable. Based upon the foregoing, the Association respectfully requests that the Court deny the relief sought in the Motion, and grant such other and further relief as the Court deems necessary and appropriate.

Dated: New York, New York          **DUANE MORRIS LLP**
        November 23, 2010

                                           */s/William C. Heuer*
                                           William C. Heuer, Esq.
                                           Patricia H. Heer, Esq.
                                           1540 Broadway
                                           New York, New York 10036-4086
                                           (212) 692-1000
                                           (212) 692-1020 (facsimile)
                                           *wheuer@duanemorris.com*
                                           *pheer@duanemorris.com*

DM2\2560128.5