Richard Levin (RL 1651)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone:     (212) 474-1000
Facsimile:     (212) 474-3700

*Attorneys for Debtor New York City Off-Track
Betting Corporation*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 9 |
| NEW YORK CITY OFF-TRACK BETTING CORPORATION, | Case No. 09-17121 (MG) |
| Debtor.[1] | |

### BLACKLINE OF DISCLOSURE STATEMENT IN CONNECTION WITH NEW YORK CITY OFF-TRACK BETTING CORPORATION'S SECOND AMENDED PLAN OF DEBT ADJUSTMENT UNDER CHAPTER 9 DATED NOVEMBER 30, 2010

Attached hereto as Annex A is a blackline of the *Disclosure Statement In Connection With New York City Off-Track Betting Corporation's Second Amended Plan Of Debt Adjustment Under Chapter 9 Dated November 30, 2010* against the *Disclosure Statement In Connection With New York City Off-Track Betting Corporation's First Amended Plan Of Debt Adjustment Under Chapter 9 Dated November 29, 2010*. Exhibit A to the blackline provides a comparison of *New York City Off-Track Betting Corporation's First Amended Debt Adjustment Plan* dated November 30, 2010 against *New York City Off-Track Betting Corporation's Debt Adjustment Plan* dated November 29, 2010.

---

[1] NYC OTB's address is 1501 Broadway, New York, NY 10036. The Debtor's tax identification number is 13-2664509.

Dated: November 30, 2010

Respectfully submitted,

CRAVATH, SWAINE & MOORE
LLP

By :    _s/ Richard Levin_
RICHARD LEVIN (RL 1651)
A member of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

_Attorneys for Debtor New York City_
_Off-Track Betting Corporation_

# <u>Annex A</u>

**Blackline of Disclosure Statement**
**In Connection With**
**New York City Off-Track Betting Corporation's**
**Second Amended Plan Of Debt Adjustment Under Chapter 9**
**Dated November 30, 2010**

Richard Levin (RL 1651)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone:     (212) 474-1000
Facsimile:     (212) 474-3700

*Attorney for Debtor New York City Off-Track
Betting Corporation*

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 9 |
| NEW YORK CITY OFF-TRACK BETTING CORPORATION,<br><br>Debtor.[1] | Case No. 09-17121 (MG) |

**DISCLOSURE STATEMENT IN CONNECTION
WITH NEW YORK CITY OFF-TRACK BETTING CORPORATION'S
~~FIRST~~SECOND AMENDED PLAN OF DEBT ADJUSTMENT UNDER CHAPTER 9
DATED NOVEMBER ~~29,~~30, 2010**


**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.   THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

---

[1]   New York City Off-Track Betting Corporation's address is 1501 Broadway, New York, NY 10036.  New York City Off-Track Betting Corporation's tax identification number is 13-2664509.

**NEW YORK CITY OFF-TRACK BETTING CORPORATION, A CHAPTER 9 DEBTOR ("NYC OTB"), BELIEVES THAT THE CHAPTER 9 PLAN FOR THE ADJUSTMENT OF THE DEBTOR'S DEBTS DATED NOVEMBER 29, 2010 AND ATTACHED AS <u>EXHIBIT A</u> TO THIS DISCLOSURE STATEMENT IS IN THE BEST INTERESTS OF CREDITORS AND URGES ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN.**

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS APPROVED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. NYC OTB HAS NOT AUTHORIZED REPRESENTATIONS CONCERNING THE DEBTOR, ITS BUSINESS OPERATIONS OR THE VALUE OF ITS ASSETS, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN AND IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BUT TO AID AND SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN. IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN.

ALL CLAIMANTS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE EXHIBITS TO THE PLAN AND TO READ THIS ENTIRE DISCLOSURE STATEMENT CAREFULLY BEFORE DECIDING WHETHER TO VOTE TO ACCEPT THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF. THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF.

CLAIMANTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH SUCH CLAIMANT SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION AS TO ANY CONTESTED MATTER, ADVERSARY PROCEEDING OR OTHER ACTION OR THREATENED ACTION BUT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

TABLE OF CONTENTS

ARTICLE I: INTRODUCTION .................................................................................................. 1

ARTICLE II: PURPOSE OF DISCLOSURE STATEMENT AND PROCEDURE FOR PLAN
CONFIRMATION ........................................................................................................................ 2
A.      Purpose and General Information ............................................................................ 2
B.      Manner of Voting ....................................................................................................... 4
C.      Confirmation of the Plan ........................................................................................... 6

ARTICLE III: THE DEBTOR ................................................................................................... 7
A.      General Summary ....................................................................................................... 7
B.      History of Debtor ....................................................................................................... 8
C.      Factors Precipitating Chapter 9 Filing .................................................................... 9
D.      Governance ................................................................................................................ 14
E.      Operations ................................................................................................................. 14

ARTICLE IV: MAJOR EVENTS IN OR IN CONNECTION WITH CHAPTER 9 CASE ....... 17
A.      Commencement and Administration of Case .......................................................... 17
B.      Objections to the Debtor's Petition ......................................................................... 17
C.      Official Unsecured Creditors' Committee .............................................................. 18
D.      Motions to Compel Payment .................................................................................... 18
E.      Assumption and Rejection of Executory Contracts and Leases ........................... 19
F.      Changes In Management ......................................................................................... ~~19~~**20**
G.      Changes In Operations ............................................................................................. 20
H.      Negotiations with the Creditors' Committee .......................................................... 20
I.      Bar Date .................................................................................................................. ~~20~~**21**

ARTICLE V: FINANCIAL STATEMENTS .............................................................................. 21

ARTICLE VI: SUMMARY OF DEBTOR'S ASSETS AND LIABILITIES ............................... 21
A.      Assets ........................................................................................................................ 21
B.      Summary of Liabilities ............................................................................................. 21
C.      Summary of Pre- and Post-Petition Debt .............................................................. 22

ARTICLE VII: SUMMARY OF PLAN OF DEBT ADJUSTMENT ......................................... 23
A.      Introduction .............................................................................................................. 23
B.      Classification of Claims Under The Plan ................................................................ 23
C.      Projected Payments Under The Plan ....................................................................... 24
D.      Legislation ................................................................................................................ 27
E.      Restructuring Plan ................................................................................................... 30
F.      Executory Contracts and Unexpired Leases .......................................................... 31
G.      Conditions Precedent to the Effective Date ........................................................... 32
H.      Miscellaneous Plan Provisions ............................................................................... 33
I.      Certain Material U.S. Federal Income Tax Consequences .................................. ~~33~~**34**

[[3253436]]

J.       Means for Implementation and Execution of the Plan........................................36
K.      Discharge..............................................................................................................37

ARTICLE VIII:  CONFIRMATION.............................................................................39
A.      Acceptance............................................................................................................40
B.      Feasibility..............................................................................................4041
C.      Best Interests Test.................................................................................................41

ARTICLE IX:  CERTAIN RISK FACTORS TO BE CONSIDERED...........................41
A.      ADW Operational Risk for Class 3 Claimants....................................................4142
B.      Legislative Risk....................................................................................................4142

ARTICLE X:  ALTERNATIVES TO CONFIRMATION OF PLAN............................42

ARTICLE XI:  CONCLUSIONS AND RECOMMENDATION...................................43

[[3253436]]

TABLE OF EXHIBITS


EXHIBIT A      CHAPTER 9 PLAN FOR NEW YORK CITY OFF-TRACK BETTING CORPORATION

EXHIBIT B      AUDITED FINANCIAL STATEMENTS AND SUPPLEMENTARY INFORMATION FOR THE FISCAL YEAR ENDED MARCH 31, 2010 AND THE NINE-MONTH PERIOD ENDED MARCH 31, 2009.

EXHIBIT C      AUDITED FINANCIAL STATEMENTS AND SUPPLEMENTARY INFORMATION FOR THE FISCAL YEARS ENDED JUNE 30, 2007 AND 2008.

EXHIBIT D      NYC OTB 5 YEAR PRO FORMA INCOME STATEMENT AND CASH FLOW

[[3253436]]

New York City Off-Track Betting Corporation (the "**Debtor**" or "**NYC OTB**"), a chapter 9 debtor, provides the following Disclosure Statement (the "**Disclosure Statement**") in the above-captioned chapter 9 case.

# ARTICLE I: INTRODUCTION

The Debtor is providing this Disclosure Statement to all of the Debtor's known Claimants in connection with the Debtor's plan for the adjustment of the Debtor's debts (as amended or modified, the "**Plan**")[2] under chapter 9 of Title 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**"), a copy of which is attached as Exhibit A to this Disclosure Statement. The Plan has been developed based upon a thorough review and analysis of the Debtor's financial condition, business plan, and rehabilitation alternatives. The Disclosure Statement is being furnished pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of votes to accept or reject the Plan. The following summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing in the Plan.

The following table briefly summarizes the classification and treatment of Claims under the Plan and which classes are impaired within the meaning of Bankruptcy Code section 1124 ("**Impaired**"). The table also identifies the Classes entitled to vote on the Plan under the Bankruptcy Code. For a summary of the estimates of the Claims against the Debtor, please see Article VI below. For a more detailed description of the classification and treatment of Claims under the Plan, please see Article VII below.

| Class: | Allowed Claim: | Treatment — Will Receive: | Voting Status: |
|--------|----------------|---------------------------|----------------|
| N/A | Administrative Expenses | Payment in full in Cash. | N/A |
| Class 1 | Secured Claims | At the option of the Debtor, (i) payment in full in Cash, (ii) reinstatement and payment in the ordinary course, or (iii) transfer of the collateral to the Claimant. | Unimpaired; NOT entitled to vote. |
| Class 2 | New York State Statutory Claims | Payment in Cash from the Segregated Account of a pro rata share of $110,000. | Impaired; entitled to vote |
| Class 3 | New York Racing Industry Claims | A pro rata share based on its Claim of membership interests in Newco ADW, to which the Debtor will transfer its ADW business. | Impaired; entitled to vote |
| Class 4 | Customer Claims | (i) If such Claim is a Customer ADW Claim, assumption by Newco ADW of the Customer | Unimpaired; NOT entitled to vote. |

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

[[3253436]]

| | | ADW Claim or (ii) if such Claim is a Customer Wining Ticket Claim, payment in full in Cash in the ordinary course of business. | |
|---|---|---|---|
| Class 5 | Ordinary Course Claims | Payment in full in Cash in the ordinary course of business. | Unimpaired; NOT entitled to vote. |
| Class 6 | General Unsecured Claims | Payment in Cash from the Segregated Account of a pro rata share of (i) $3,280,000, if the Court determines that Pari-mutuel Pool Obligations are general unsecured Claims, or (ii) $3,280,000 less any amount required by Court order to be paid on account of the Pari-mutuel Pool Obligations. | Impaired; entitled to vote |

Except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as practicable.

The Debtor believes that the Plan provides fair and equitable treatment of all Classes of Claimants, the greatest feasible recovery to Claimants, and that the Plan is in the best interest of Claimants.

The Debtor urges every Claimant holding a Claim in an Impaired Class to accept the Plan.

## ARTICLE II: PURPOSE OF DISCLOSURE STATEMENT AND PROCEDURE FOR PLAN CONFIRMATION

**A.** **Purpose and General Information**.

Pursuant to section 1125 of the Bankruptcy Code, the Debtor submits this Disclosure Statement to provide Claimants with adequate information to allow them to make an informed judgment about the Plan. A copy of the Plan accompanies this Disclosure Statement. Terms defined in the Plan have the same meaning in this Disclosure Statement. The first letter of words defined in the Plan are capitalized in this Disclosure Statement. Please refer to the Plan for the treatment of Claims. The provisions of the Plan are binding on all Claimants. Therefore, please read the Plan carefully.

By order dated [●], 2010 the Bankruptcy Court approved this Disclosure Statement finding that it contains "adequate information", as that term is used in section 1125 of the Bankruptcy Code, to inform Claimants entitled to vote on the Plan of their treatment under

2

the Plan and the basis for this treatment. However, the Bankruptcy Court has not passed on the merits of the Plan. Claimants should carefully read the Plan and the Disclosure Statement, in their entirety, before voting on the Plan.

NO REPRESENTATIONS ABOUT THE DEBTOR, PARTICULARLY ABOUT THE DEBTOR'S PROJECTED FUTURE INCOME AND OPERATIONS OR THE VALUE OF ITS PROPERTY, ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY ANY CREDITOR. ANY ADDITIONAL REPRESENTATION OR INDUCEMENT SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR WHO, IN TURN, WILL PROVIDE THE INFORMATION TO THE BANKRUPTCY COURT OR TAKE OTHER APPROPRIATE ACTION.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. FOR THE FOREGOING REASON, AS WELL AS BECAUSE OF THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES AND PROJECTIONS INTO THE FUTURE WITH ACCURACY, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS COMPLETE AND ACCURATE, ALTHOUGH REASONABLE AND APPROPRIATE EFFORT HAS BEEN MADE TO PRESENT COMPLETE AND ACCURATE INFORMATION. THE RECORDS KEPT BY THE DEBTOR RELY FOR THEIR ACCURACY ON INTERNAL BOOKKEEPING. THE RECORDS KEPT BY THE DEBTOR ARE NOT WARRANTED OR REPRESENTED TO BE FREE OF ANY INACCURACY. HOWEVER, REASONABLE EFFORT HAS BEEN MADE TO PRESENT ACCURATE INFORMATION. COUNSEL TO THE DEBTOR HAS NOT INDEPENDENTLY VERIFIED ANY OF THE INFORMATION PROVIDED BY THE DEBTOR AND DOES NOT MAKE ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE TRUTH OR ACCURACY OF ANY OF THE INFORMATION PRESENTED.

CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE FORWARD LOOKING PROJECTIONS AND FORECASTS, BASED UPON CERTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON BY ANY PERSONS FOR ANY OTHER PURPOSE OTHER THAN BY HOLDERS OF CLAIMS ENTITLED TO VOTE FOR THE PURPOSE OF DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR LEGAL EFFECTS OF THE REORGANIZATION ON THE DEBTOR OR THE HOLDERS OF CLAIMS.

ALL PARTIES ENTITLED TO VOTE ON THE PLAN ARE URGED TO REVIEW IN FULL THE PLAN AND THIS DISCLOSURE STATEMENT TOGETHER WITH ALL EXHIBITS ATTACHED THERETO, PRIOR TO VOTING ON THE PLAN, AND MAY DESIRE TO CONSULT LEGAL COUNSEL PRIOR TO VOTING TO ENSURE COMPLETE UNDERSTANDING OF THEIR TREATMENT UNDER THE PLAN.  THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF CREDITORS OF THE DEBTOR TO ENABLE THEM TO MAKE AN INFORMED DECISION ABOUT THE PLAN.

EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN TO IT UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND FOREIGN TAX LAWS.  THE DEBTOR MAKES NO WARRANTIES OR REPRESENTATIONS REGARDING THE TAX IMPACT OF THE PLAN ON ANY CREDITOR.

THE DEBTOR BELIEVES THAT THE PLAN IS FEASIBLE, FAIR AND EQUITABLE AND IN THE BEST INTEREST OF CREDITORS.

B.      **Manner of Voting**.

1. *Classes Entitled to Vote*.  The Plan divides the Claims against the Debtor into six classes.  Only classes of Claims that are Impaired under a plan for debt adjustment are entitled to vote on a plan.  Generally, and subject to the specific provisions of the Bankruptcy Code, this includes creditors whose Claims or interests will be modified under a plan in terms of principal, interest, length of time for payment, or other contractual, legal or equitable rights. Each holder of a Claim in a Class that is not Impaired under the Plan is conclusively presumed to have accepted the Plan, and solicitation of acceptances from the holders of such Claims is not required and will not be undertaken.

Classes 1, 4 and 5 are not Impaired under the Plan.  Classes 2, 3 and 6 are Impaired under the Plan.  The members of each of the Impaired Classes are entitled to vote to accept or reject the Plan.

2. *Solicitation Process*.  The following documents and materials constitute the Debtor's "***Solicitation Package***":

- Plan;

- Disclosure Statement;

- Order approving the Disclosure Statement and related solicitation procedures (the "***Disclosure Statement Order***");

- Notice of the hearing at which Confirmation of the Plan will be considered (the "***Confirmation Hearing Notice***");

- A class-appropriate Ballot or Ballots; and

4

- A letter from the Creditors' Committee supporting Confirmation of the Plan.

The Debtor intends to distribute the Solicitation Packages no fewer than 25 calendar days before the voting deadline.

The Solicitation Package will be distributed to holders of record of Claims in Classes 2, 3 and 6 as of the date of entry of an order approving this Disclosure Statement (the "*Voting Record Date*"), and to such other Persons or entities as the Debtor may determine, in accordance with these Solicitation Procedures. If a Ballot is damaged or lost, a replacement Ballot may be obtained: (a) by written request (sent via first class mail) to R. Earl Benson Jr., Esq., Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York, NY 10019; or (b) by e-mailing Mr. Benson at ebenson@cravath.com.

Other nonvoting parties entitled to receive the Solicitation Package will be served copies of the order approving the Disclosure Statement, the Disclosure Statement and all exhibits to the Disclosure Statement, including the Plan, and the Confirmation Hearing Notice. Additional copies of these documents may be obtained (a) by written request (sent via first class mail) to R. Earl Benson Jr., Esq., Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York, NY 10019; or (b) via PACER at http://pacer/psc.uscourts.gov.

3. *Procedure For Voting*. All Claimants entitled to vote may cast their vote by (a) completing the ballot included with this Disclosure Statement; (b) indicating a decision either to accept or reject the Plan; (c) signing and dating the Ballot; and (d) returning the Ballot to the address set forth below by first-class mail, overnight courier or personal delivery so that the Ballot is **actually received** no later than the Voting Deadline:

Richard Levin, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

IN ORDER TO BE COUNTED, THE COMPLETED BALLOT MUST BE *RECEIVED* NO LATER THAN [●] (THE "*VOTING DEADLINE*"). A BALLOT DOES NOT CONSTITUTE A VALID PROOF OF CLAIM IN THE DEBTOR'S CASE. ANY EXECUTED BALLOT THAT IS TIMELY RECEIVED BUT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE PLAN.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTOR OR THE COURT DETERMINES OTHERWISE.

*Prior to deciding whether and how to vote on the Plan, each holder of a Claim in a voting Class should consider carefully all of the information in the Plan and this Disclosure*

*Statement.  Whether or not a Claimant votes on the Plan, such Claimant will be bound by the terms and treatment set forth in the Plan if the Plan is confirmed by the Bankruptcy Court.*

##### C.    Confirmation of the Plan.

1. *Solicitation of Acceptance of the Plan.*  By order dated [●], 2010, this Disclosure Statement has been approved by the Bankruptcy Court in accordance with section 1125 of the Bankruptcy Code and has been provided to all Claimants and parties in interest in this Case.  This Disclosure Statement is intended to assist Claimants with their evaluation of the Plan and their decision to accept or reject the Plan.  Your acceptance of the Plan may not be solicited unless you have been sent a copy of this Disclosure Statement at the time of, or before, such solicitation.

2. *Votes Considered in Determining Acceptance of the Plan.*  When acceptance of the Plan is determined by the Bankruptcy Court, in accordance with Bankruptcy Code section 1126 and Rule 3018 of the Bankruptcy Rules, votes of Claimants will be counted only if submitted by a Claimant with an Allowed Claim that is in Classes 2, 3 or 6.

3. Under section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if Class members holding at least two-thirds (2/3) in amount and more than one-half (1/2) in number of all Allowed Claims of Class members actually voting have voted in favor of the Plan.

4. *Hearing on Confirmation of the Plan.*  The Bankruptcy Court has set a hearing to determine if the requirements for Confirmation of the Plan outlined in the Bankruptcy Code have been satisfied.  The hearing on Confirmation of the Plan will commence at [●] Eastern Time, on [●], 2010 in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, Courtroom 501, New York, New York 10004 before the Honorable Martin Glenn.

If all of the Impaired Classes accept the Plan, and if the Bankruptcy Court finds that the other conditions set forth in section 1129(a) of the Bankruptcy Code are met, then the Plan will be confirmed.

5. *Confirmation of the Plan Without Consent of all Impaired Classes.*  The Plan may be confirmed even if not accepted by all Impaired Classes, if the Bankruptcy Court finds that the other applicable requirements of Confirmation under sections 1129 and 943(b) of the Bankruptcy Code are satisfied.  The requirements include those set forth in section 1129(b) of the Bankruptcy Code, and require, generally, a showing that the Plan does not discriminate unfairly and that the Plan is "fair and equitable" with respect to each Class of Claims that is Impaired under, and has not accepted, the Plan.  In a chapter 9 case, in order to be "fair and equitable" as required by section 1129(b) of the Bankruptcy Code, the Plan should provide creditors with as much as reasonably can be expected under the circumstances.  If the Plan is not accepted by an Impaired Class or Classes, the Debtor will rely on the applicable nonconsensual confirmation provisions of section 1129(b) of the Bankruptcy Code and seek Confirmation of the Plan notwithstanding the non-acceptance by an Impaired Class or Classes.

[[3253436]]

6. *Objection to Confirmation.*  Any objection to Confirmation of the Plan must be in writing, state the basis of such objection with specificity and be filed with the Office of the Clerk of the Court no later than [●], 2010 at [●].M. (Eastern Time) (the "Objection Deadline"), and served upon counsel for NYC OTB, Cravath, Swaine & Moore LLP, Worldwide Plaza, 825 Eighth Avenue, New York, NY 10019, Attn: Richard Levin Esq., and upon counsel for the Official Committee of Unsecured Creditors, Blank Rome LLP, The Chrysler Building, 405 Lexington Avenue, New York, NY 10174, Attn: Marc E. Richards & Andrew B. Eckstein.

# ARTICLE III: THE DEBTOR

## A.     **General Summary**.

The Debtor is a public benefit corporation, which operates an off-track pari-mutuel wagering system on thoroughbred and harness horse races held at all 11 race tracks located in New York State (the "***State***" or "***New York***") and certain race tracks located outside of the State.

Pari-mutuel wagering is a betting system in which all bets of a particular type on a particular race are placed together into a commingled pool, a certain amount (the "***Wagering Commission***") is removed for the benefit of the tracks and the off-track betting corporations (the "***OTBs***"), and the payoff is calculated by allocating the remaining pool among all winning wagers.

The Debtor was created by and operates under Articles V and VI of the Racing Law.  The Debtor was designated to operate as a public benefit corporation to raise revenue for the State and certain municipalities and to combat organized crime's hold on horse-race related gambling by providing a legal alternative.  It was the State Legislature's intention that off-track betting would operate in a manner compatible with the well being of the New York horse racing industry.

The Debtor offers off-track pari-mutuel wagering on thoroughbred and harness horse racing to customers in the City of New York (the "***City***") through its branch offices, teletheaters, restaurants and its account wagering (internet and telephone betting) business.  Additionally the debtor broadcasts racing content for cable television customers in the City on Channel 71 and Channel 73.

The Debtor is administered by a board of directors (the "***Board***") consisting of five members appointed by the Governor.  The Governor designates one of the Board members to be the Chairman of the Board (the "***Chairman***").  Members of the Board serve without compensation, but are authorized to be reimbursed for their actual and necessary expenses incurred during the performance of their official duties.

The Debtor's operations are regulated by the State.  In accordance with the Racing Law, the R&W Board exercises oversight and regulatory authority over the Debtor.  The R&W Board has general jurisdiction over all off-track and on-track pari-mutuel wagering in the

[[3253436]]

State, on-track horse racing in the State, and the corporations, associations, and persons engaged in such activities.

On December 3, 2009 (the "***Petition Date***"), the Debtor filed its petition under chapter 9 of the Bankruptcy Code.

**B.     History of Debtor**.

1. *Establishment*.

On April 22, 1970, the State enacted legislation that created the Debtor and established the structure of off-track wagering on thoroughbred and harness horse races.

On April 8, 1971, the Debtor commenced operations.  Initially, the Debtor accepted transactions through a small number of manually supported branches with limited services.  By August 1971, all of the Debtor's branches were automated through an all-betting and all-cashing computer system and, by 1980, live race calls from NYRA tracks were broadcast in several branches.  In 1981, the Debtor initiated telecasts of live racing, called simulcasts, in many locations.  In 1993, the Debtor began installing self-service betting terminals in its branches and also began upgrading customer amenities.  The Debtor opened its first teletheater, the Inside Track, in Manhattan in 1986, and in 1997, the Debtor opened its first restaurant location.

In March of 1995, the Debtor began home simulcasting on the public access channels of New York City Cable TV.  In 1997, the Debtor produced and broadcast its first television show and offered customers the ability to utilize a touch-tone activated Automated Telephone Account Betting System to place wagers from home.  In February 2000, the Debtor established the NYC OTB Racing Network, which aired a number of different shows throughout the year.  On August 24, 2007, the Debtor initiated Internet wagering on its ibetOTB.com website.

By November 30, 2009, the Debtor was accepting wagering transactions at 66 locations, including 55 branch offices, 8 restaurants and 3 teletheaters, in addition to accepting such transactions over the phone and the Internet.

2. *Pre-petition Business Operations*.

The Debtor receives a percentage (the "***Wagering Commission Rate***") of the Handle, or total dollars wagered through its services on a race, as well as a statutorily imposed surcharge on certain bets.  The statutory surcharge is derived after winning bettors receive approximately 80% of the amounts wagered on each race.  The Debtor must distribute certain percentages of the Handle to local governments, the State and the State's horse racing industry, composed of various horse race tracks and horse breeding funds.  The Debtor also makes payments to certain horse race tracks, both in- and out-of-state, under its negotiated simulcast contracts.  In addition payments are made to local governments from the statutory surcharge.  All mandatory distributions and contractual payments made to these various entities come from the Wagering Commission actually received by the Debtor, based on a percentage of the Handle.

[[3253436]]

Accordingly, this statutory scheme requires the Debtor to make payments to the State's racing industry and state and local government based on the Debtor's gross Handle instead of the residual Wagering Commissions net of operating expenses. The required payments often exceed the Debtor's earnings after operating expenses, significantly degrading the Debtor's financial performance.

Moreover, due to this statutory scheme, the Debtor has lacked sufficient funds to make needed capital improvements to its branches or invest in new technology. In prior years, the Debtor's earnings less operating expenses have been in excess of $100 million per year. In more recent years, however, the Debtor has lost money, because its operating expenses and required payments to government and the racing industry have exceeded its residual Wagering Commissions.

In 2001, the State Legislature reduced the Wagering Commission Rate for races conducted at racetracks operated by NYRA, reducing the Debtor's Wagering Commissions by $5.5 million annually. Between 2003 and 2005, additional legislatively imposed payment obligations increased the Debtor's mandatory distributions by an average of $7.8 million annually. These additional payment obligations included the introduction of a regulatory fee in 2003, Maintenance of Effort payments (also known as "hold harmless payments") in 2003 to support and protect the harness racing industry from new competition created by the nighttime simulcast of out-of-state thoroughbred races and, in 2005, an increase in the regulatory fee to support the operations of the R&W Board.

As a result of these factors, the Debtor has operated at a deficit for the last seven years. For the fiscal years ending June 30, 2007, 2008 and March 31, 2009, the Debtor had deficits of $30,060,000, $76,485,000 and $42,817,000, respectively.

As of November 1, 2009, the Debtor employed approximately 1,343 employees, of whom approximately 1,216 were members of unions. Of the union members, approximately 1,027 were represented by Local 2021 of District Counsel 37, approximately 167 were represented by Local 858 of the International Brotherhood of Teamsters, approximately 20 were represented by Local 3 of the International Brotherhood of Electrical Workers and approximately six were represented by the Organization of Staff Analysts. At the Petition Date, the Debtor was party to labor-related collective bargaining agreements (collectively, the "*CBAs*") with each of the four unions.

C.      **Factors Precipitating Chapter 9 Filing**.

1. *Cost Reduction Efforts*.

The Debtor has taken aggressive action to reduce its operational costs. In February of 2004, the Debtor substantially reduced its headquarters staff by laying off 17% of its management personnel. This led to first-year savings of more than $700,000, and savings totaling nearly $25 million by the end of the 2008 financial year. The Debtor also closed underperforming branches, reduced employees' overtime hours, surrendered a quarter of its headquarters space, reduced supply purchases, decreased security expenses

and reduced energy costs. These cost-cutting initiatives resulted in additional savings totaling nearly $20 million by the end of the 2008 fiscal year. Between 2004 and the end of beginning of the 2009 fiscal year, the Debtor derived savings of nearly $45 million.

| Cost Savings Fiscal Years 2004 through 2008 | | | | | | |
|---|---|---|---|---|---|---|
| | **FY2004** | **FY2005** | **FY2006** | **FY2007** | **FY2008** | **Total** |
| Rent/RE Taxes Savings from Closed Branches | | 45,000 | 303,000 | 697,000 | 498,000 | 1,543,000 |
| Staff Reduction Savings | 712,000 | 2,772,000 | 6,215,000 | 7,573,000 | 7,528,000 | 24,800,000 |
| Sunday Overtime | | 1,089,000 | 1,096,000 | 618,000 | 722,000 | 3,525,000 |
| Regular Overtime | | 378,000 | 125,000 | 107,000 | 537,000 | 1,147,000 |
| FICA/Medicare Tax Savings @ 7.65% | 54,000 | 324,000 | 569,000 | 635,000 | 672,000 | 2,254,000 |
| Marketing | 690,000 | 780,000 | 1,335,000 | 1,471,000 | 1,471,000 | 5,747,000 |
| Rent (1501 Broadway) | | | | 1,099,000 | 1,117,000 | 2,216,000 |
| Miscellaneous Supplies | | 250,000 | 320,000 | 300,000 | 300,000 | 1,170,000 |
| Guard Service | | 180,000 | 258,000 | 263,000 | 263,000 | 964,000 |
| Telephone Switches | 340,000 | 156,000 | 156,000 | 156,000 | 156,000 | 964,000 |
| Equipment | | 70,000 | 100,000 | 85,000 | 85,000 | 340,000 |
| Total Savings | 1,796,000 | 6,044,000 | 10,477,000 | 13,004,000 | 13,349,000 | 44,670,000 |

2. *Efforts to Create Legislative Solutions to Financial Problems*.

In addition to cost cutting measures, the Debtor has repeatedly petitioned the State legislature to alter the legislative distribution scheme to permit the Debtor to return to profitability. On May 17, 2005, the Debtor's then-President and CEO, Raymond V. Casey, appeared before a joint hearing of the Senate Standing Committee on Racing, Gaming and Wagering and the Assembly Standing Committee on Racing and Wagering. After describing the structural problems inherent in the legislative distribution scheme, Mr. Casey explained that in the previous two years, managerial cuts and branch closings resulted in over $10 million of operational savings. However, Mr. Casey emphasized that further expense-cutting actions would eventually result in lower revenues for the Debtor and, consequently, smaller mandatory distributions. He argued that the imbalance of the legislative distribution scheme, which does not account for operating costs incurred by the NYC OTB to generate the Handle on which the mandatory distributions are based, must be altered in order to return the Debtor to profitability.

During the summer of 2006, the City retained the services of the Boston Consulting Group ("**BCG**") to conduct an in-depth study of the Debtor and the horse racing industry to identify ways to maximize the Debtor's value to the City. In April of 2007, BCG issued a report entitled "New York City Off-Track Betting Corporation: A Plan For Transformation and Growth" (the "**BCG Report**"). BCG determined that a revision of the statutory distribution scheme was necessary to achieve any of the initiatives proposed in its report. BCG concluded:

"While there are significant expansion opportunities for NYCOTB (and the racing industry in New York), the only way to ensure operational and financial stability for NYCOTB is through a legislative restructuring of NYCOTB's mandatory distribution payments. Without an alignment of economic interests among various racing entities in the State, not only will NYCOTB be unable to invest in the initiatives that support future growth but, more urgently, it will likely be forced to curb its operations or even discontinue them altogether. Suspending NYCOTB's operations would not only moot this study's recommendations but would quite probably set in motion an economic chain reaction of diminished revenue and other distributions generated through NYCOTB's acceptance of more than $1 billion in wagers each year. The prolonged interruption of existing distributions from this substantial volume of off-track wagering would be devastating to New York's entire horseracing and breeding industry. There would simply be no means of instantly replacing such a large gap in the State's OTB network."

(BCG Report at p. 9)

On May 21, 2007, Mr. Casey appeared before the Senate Standing Committee On Racing, Gaming & Wagering again to present specific legislative proposals for changes to the Racing Law. The proposed legislation limited mandatory distributions to fixed percentages of each OTB's net earnings, eliminated the hold harmless payments of the OTBs to the harness tracks and phased out statutory payments from OTBs to any track that received certain video lottery terminal revenues from a video lottery racino operated on its site.

On December 4, 2007, Mr. Casey appeared before the City Council's Finance Committee, alongside Deputy Mayor Daniel L. Doctoroff. The Deputy Mayor emphasized to the City Council's Finance Committee that despite a substantial operating profit for the 2007 fiscal year, the payment of the mandatory distributions under the legislative distribution scheme resulted a fourth consecutive year of deficits for the Debtor. The Deputy Mayor emphasized that future deficits were expected and that the City would not spend any taxpayer funds to ensure the Debtor's continued operation. Mr. Casey later informed the City Council's Finance Committee that the Debtor's management had developed plans for the complete shutdown and wind up of all aspects of corporation's operations (the "***Closure Plan***").

The Closure Plan anticipated the closing of all branches, all teletheaters, all restaurant wagering facilities, the Debtor's Account Deposit Wagering business, the Debtor's headquarters at 1501 Broadway and the Debtor's satellite warehouse facility. The Closure Plan also contemplated the layoff of all 1,466 employees of the Debtor, the winding up of the Debtor's real estate interests, and personal property and the disposition of Claims against the Debtor. The Debtor estimated that removal of all equipment from the branch locations would be completed within 60 days of closing. The Closure Plan designated Sunday, June 15, 2008 as the

final day of wagering operations. Nearly all personnel layoffs were scheduled to occur the following day, along with the dismantling of the branch system and the telephone call center.

On April 9, 2008, Mr. Casey appeared before the City Council's Finance Committee again. In his presentation, Mr. Casey advised that initial steps had been taken to facilitate the Closure plan and that shutdown would be inevitable without state legislative action. Following the hearing, the City Council passed Resolution No. 1235: "Resolution calling upon the Legislature of the State of New York to amend the New York State Racing, Pari-Mutuel Wagering and Breeding Law to Reduce State-imposed financial mandates on off-track betting corporations which have recently been absorbing a growing portion of the New York City-Off Track Betting Corporation's revenues, driving the corporation into insolvency, and yielding no residual revenues for the City of New York." However, the State Legislature did not make changes to the statutory distribution scheme. Accordingly, Mr. Casey continued to take action to cease operations according to the Closure Plan.

3. *State Takeover.*

On June 16, 2008, the Debtor's management commenced the shutdown of the Debtor's operations according to the Closure Plan. However, Governor David A. Paterson announced the State takeover of the Debtor and halted the cessations of operations, instructing the Debtor's workforce to report to work the next day. Within 24 hours, the State Legislature passed **Chapter 115** of the Laws of 2008 ("***Chapter 115***"), which amended the Racing Law to remove the Debtor as a component unit of the City and designate the Debtor as a component unit of the State. Additionally, Chapter 115 made certain limited changes to the Racing Law in an effort to provide the Debtor with additional sources of revenue for its operations, including increasing the amount of the surcharge that the Debtor could retain on winning bets and raising the take-out amount on most out-of-state bets. On June 17, 2008, Governor Paterson signed Chapter 115 into law.

Though Chapter 115 transferred effective control of the Debtor from the City to the State, most business operations remained unaffected. The Debtor retained its status as a public benefit corporation, its name, and its authorization to operate an off-track pari-mutuel betting system on thoroughbred and harness horse races. Its employees were permitted to continue to be members of the New York City Employees Retirement System for pension purposes and the rights of retired employees to participate in, and receive benefits from, any City-authorized health insurance or welfare benefit program were unaltered, provided that the Debtor reimbursed the City for the actual cost of such benefits. All obligations of the Debtor under any contracts, memoranda of understanding or leases were continued in full force and effect, any unions that had collective bargaining agreements with the Debtor at the time of the effective date of Chapter 115 continued their representation rights for the Debtor's employees who were members of their unions, and the collective bargaining agreements continued in full force and effect until such time as new ones were negotiated and would become effective. However, one notable change was that the Debtor's fiscal year end was changed from June 30 to March 31 to align the Debtor's accounting policies with that of other State entities.

[[3253436]]

Shortly after the enactment of Chapter 115, Governor Paterson named members to the Debtor's new Board. Governor Paterson reappointed the previous Chairman, David B. Cornstein, to the Board and continued him in the position of Chairman, though the other four members of the previous Board were not reappointed. The new Board, working with senior management and, with the assistance of personnel from a variety of State agencies, conducted a comprehensive assessment of the operations of the corporation. That assessment led to the appointment of Meyer S. Frucher as the new Chairman in June 2009 with Mr. Cornstein continuing as a regular member of the board of directors. Mr. Frucher was charged by the Governor with the responsibility to work with the board of directors and management to develop a plan to assure the survival of the Debtor.

4. *Plan Development.*

Upon Mr. Frucher's assuming his duties as Chairman, the Debtor began an analysis of its financial condition. The Debtor's expenses were exceeding its revenue, the Debtor had nearly $100 million dollars in outstanding debt, the Debtor faced various court actions with initial adverse judgments to the Debtor's financial interest and the Debtor was expected to run out of cash for operations by the end of 2009. The Debtor's business model was outdated because it relied on too many branch locations that required costly labor and because the parlors attracted a limited, aging demographic. Accordingly, action was required to reduce the amount of outstanding debt, exit long term lease agreements for unprofitable branch locations, close underperforming branches, exit unprofitable contracts, and make investments in improved branch locations. In consultation with various members of the racing industry and outside consultants, the Debtor developed a plan for financial stability. The key plan provisions were: (1) close two-thirds of the Debtor's branch locations and terminate the leases; (2) negotiate severance agreements and new labor agreements to reduce headcount; (3) build a small number of modern "super parlors" to attract a broader demographic; (4) upgrade technologies to make the Debtor's services more user-friendly and less dependent on expensive labor; (5) alter the statutory distribution scheme so that the Debtor would pay in-state tracks a contractually agreed-upon market rate to purchase simulcast signals, as it does with out-of-state tracks, and make any additional distributions to in-state industry participants based on any surplus, rather than on gross receipts; (6) repay in full all arrearages to creditors; and (7) issue bonds to finance all of the above.

The plan required a revision of the Racing Law to allow for private financing through bonds and changes to the statutory distribution scheme, to allow distributions to the industry and state and local government to be made from residual income after operating expenses were paid. The plan also called for investment in betting terminals that would be placed in various locations throughout the city and would replicate the functions of the Debtor's branches without the accompanying labor and overhead costs.

Through the bond financing, the plan would have provided for payment of 100% of the outstanding debt and make an initial payment to racing industry creditors as a bridge payment until the Debtor was able to generate sufficient funds to make its own payments. If the State had been willing to provide a contingent liability guarantee to back the bonds, then the

bonds could have been sold at a lower interest rate and a longer term, allowing the Debtor to make additional interim payments to racing industry creditors.

Because the Debtor was running out of cash, and creditors were actively pursuing their Claims against the Debtor, the Debtor determined that a bankruptcy filing would likely be necessary to avoid shutdown and allow time for negotiations concerning the necessary changes to the Racing Law. On September 1, 2009, Governor David Patterson issued Executive Order No. 27, authorizing the Debtor to file for bankruptcy protection. On December 3, 2009, the Debtor filed its chapter 9 petition.

**D.    Governance.**

The Debtor is administered by a Board consisting of five members appointed by the Governor. Members of the Board serve without compensation, but are authorized to be reimbursed for their actual and necessary expenses incurred during the performance of their official duties. The directors, their remaining term of office, and title are listed below:

| Directors | Term of Office | Title |
|---|---|---|
| Lawrence S. Schwartz | 12/31/10 | Chairman |
| David B. Cornstein | 12/31/12 | Member |
| Anthony Bergamo | 12/31/14 | Member |
| Steven Newman | 12/31/14 | Member |
| Peter Davidson | 12/31/15 | Member |

**E.    Operations.**

1. *Statutory Payment Obligations to the Racing Industry*.

Under the Racing Law, the Debtor must make a variety of payments to racetracks within the Debtor's statutorily defined region (collectively, the "***Regional Tracks***"). The Debtor's statutory region encompasses three harness racing tracks, Monticello Raceway, Yonkers Raceway and Tioga Downs (i.e., the Regional Harness Tracks) and two thoroughbred racing tracks operated by NYRA: Aqueduct Race Track and Belmont Park. There are two other thoroughbred tracks in New York: Saratoga Race Course, operated by NYRA, and Finger Lakes Race Track, operated by Finger Lakes.

The Debtor is also required to contribute 0.5% of Handle from bets on thoroughbred or steeplechase races to the New York State Thoroughbred Breeding and Development Fund and 1.0% of Handle from bets on harness races to the Agriculture and New York State Breeding and Development Fund. These breeding funds are also paid a portion of revenue that the Debtor records from the rounding down of winning payoffs.

The Debtor simulcasts signals of live racing from the Regional Harness Tracks and the four in-state thoroughbred tracks when they are running races and accepts wagers on those races. The Racing Law sets fees to be paid to in-state tracks for wagers accepted by the Debtor for races held at those tracks, based on the Handle that wagering on those races generates

through the Debtor (i.e., Direct Commissions).  The Debtor has paid all the Direct Commissions incurred since the Petition Date within 30 days after the end of the month in which they were incurred.

In addition to the Direct Commissions, the Racing Law obligates the Debtor to make payments to the Regional Harness Tracks and the four in-state thoroughbred tracks based on the Debtor's Handle from races run at tracks outside of the State and based on the Debtor's Handle from races run at tracks within the State that are outside of the Debtor's statutory region (i.e., Indirect Commissions).  The Indirect Commissions are structured differently for the Harness Tracks and for the Thoroughbred Tracks.

a.  Indirect Commission Payments to Harness Tracks.

Under the Racing Law, the amount of the Handle from out-of-state harness races that each of the three Regional Harness Tracks receives depends on races on that day and is based upon the average daily Handle from wagers placed with the Debtor on races each of the harness tracks has hosted during the preceding month.  The Regional Harness Tracks are also entitled to receive payments based on wagers on out-of-region thoroughbred racing at Finger Lakes Race Track when the Debtor carries the signal from and accepts wagers on those races. On days when Finger Lakes is running races, the Regional Harness Tracks are entitled to receive payments based on the Debtor's Handle from wagers on those races, provided two conditions are met:  (1) NYRA is not running races on that day; and (2) the Regional Harness Track is not simulcasting or taking wagers any thoroughbred races.  The portion of the Dark Day commission to which each of the Regional Harness Tracks is entitled based upon the Debtor's Handle from wagers on races at the Finger Lakes Racetrack is determined based on a formula that is similar to the formula for distribution of the out-of-state harness Indirect Commissions.

Moreover, the Regional Harness Tracks are entitled to receive payments based on wagers on races run at thoroughbred tracks in other states.  The Regional Harness Tracks are entitled to receive Dark Day payments in the aggregate amount of 1.5% of the Debtor's Handle from wagering on thoroughbred races run at tracks outside of New York, provided that:  (1) NYRA is dark and (2) the Regional Harness Tracks do not simulcast and accept wagers on any thoroughbred races.

The Debtor also must pay each of the Regional Harness Tracks at least as much as it paid that track during calendar year 2002 from its Handle from wagers on out-of-state evening (6:00 P.M. ET or later) harness racing run on those calendar dates in 2002 corresponding to those dates in the current year on which the Debtor accepted wagers on out-of-state night-time (7:30 P.M. to midnight, ET) thoroughbred races.  Additionally, once the year-to-date cumulative Handle at all OTB's in New York State from nighttime (between 7:30 P.M. and midnight ET) thoroughbred racing at out-of-state tracks reaches $100 million, the OTBs are required to pay an additional 2% commission to the Regional Harness Tracks on the Handle from each wager on night-time thoroughbred racing placed thereafter.  These payments are typically referred to in the industry as "Maintenance of Effort" payments.

b.  Indirect Commission Payments to Thoroughbred Tracks.

[[3253436]]

Under the Racing Law, in-state thoroughbred tracks are entitled to receive a percentage of the Debtor's daily Handle from wagering on thoroughbred racing from outside of New York. The specific percentage to which each is entitled varies based upon whether: (1) any NYRA track is running races that day; (2) Finger Lakes is running races that day; (3) the Handle is from wagers on the "initial" or "other than initial" out-of-state track that the Debtor has carried and accepted wagering on for that day; and (4) whether the wager is considered "regular", "multiple", or "exotic". NYRA is also entitled to receive payments based upon the Debtor's Handle from wagering on races hosted by Finger Lakes if NYRA is hosting races at any of its tracks on the same day.

2. *Statutory Payment Obligations to State and Local Governments.*

Under the Racing Law, the Debtor is required to pay pari-mutuel taxes to the State on the amount of Handle wagered through its operations, according to varying rates based on type of wager, location and type of race. Additionally, the Debtor is required to relinquish all uncashed pari-mutual tickets (i.e. uncollected winning tickets) held on April 1 for the preceding calendar year to the State and is also required to pay the State a portion of the revenue the Debtor receives from the rounding down of winning payoffs. If the uncashed pari-mutuel tickets are not relinquished in a timely manner, the Debtor incurs a one time penalty of five percent (5%) and accrues an interest penalty at a rate of one percent (1%) per month from the due date. The Racing law also requires the Debtor to pay regulatory fees to the R&W Board totaling 0.50% of Handle. If the payment is not timely made, the Debtor incurs a one time penalty of five percent (5%) and accrues an interest penalty at a rate of one percent (1%) per month from the due date.

The Debtor pays a portion of the surcharge it collects on wagers to each of the local governments where the tracks are located. Each of the local governments receive fifty percent (50%) of the surcharge revenue on wagers with the exception of Ontario County which receives five percent (5%) of surcharge revenue. The Debtor also pays to the City fifty percent (50%) of the surcharge revenue from wagers earned by the Debtor at Aqueduct and twelve and one half percent (12.5%) of surcharge revenue from wagers earned by the Debtor at Belmont Park, since a smaller portion of Belmont Park's property is located within the City's limits, with the other thirty-seven and one half percent (37.5%) going to Nassau County.

3. *Contractual Payment Obligations to the Racing Industry.*

The Debtor is party to contractual agreements with in-state thoroughbred tracks to simulcast live racing. The Debtor's simulcast contract with NYRA has expired but the Debtor continues to remit simulcast signal payments in accordance with the terms of the expired contract and NYRA continues to accept such payments in return for providing the simulcast signal.

The Debtor is also party to contracts with harness and thoroughbred tracks outside of the State that permit the Debtor to receive a signal of the tracks' races as they are run and to accept wagers on those races. The amount that the Debtor pays to each of the out-of-state tracks is set by contractual terms negotiated by the parties.

[[3253436]]

The Debtor has historically remitted payments required by contract within 15 days of wagering activity as required by the majority of the Debtor's contracts.

4. *Operating Expenses*.

As of March 31, 2010, the Debtor operated 54 branches, three teletheaters, eight restaurant locations, one warehouse and a headquarters operation that occupies nearly three floors at 1501 Broadway in Manhattan. The Debtor also offered account wagering for telephone and internet betting and broadcasted racing content on Channels 71 and 73. The Debtor employed approximately 1,300 employees, of whom approximately 90% were represented by unions. For further information concerning the Debtor's operating expenses, including employment obligations, see the Debtor's audited financial statements attached hereto as Exhibit B.

5. *Financial Performance*.

During the audited 12-month period ended March 31, 2010, the Debtor processed total Handle of $815.6 million. Winning bettors received $647.5 million of this amount, leaving the Debtor with $203.1 million in Wagering Commission as its actual revenue after including approximately $35 million for surcharge, uncashed tickets and other operating revenues. The Debtor made the following mandatory distributions for the same period: $78.4 million to the State's horse racing industry, $5.4 million to the City and other local governments, and $12.6 million to the State. This left $106.7 million for the Debtor to cover $142.6 million (excluding certain non-cash expenses) in operating expenses. Consequently, the Debtor incurred an operating deficit of $35.9 million for the year. Reorganization expenses increased the operating deficit by $13 million resulting in an operating loss of $37.2 million.

## ARTICLE IV: MAJOR EVENTS IN OR IN CONNECTION WITH CHAPTER 9 CASE

### A.    Commencement and Administration of Case.

On December 3, 2009, the Debtor filed a voluntary petition under chapter 9 of the Bankruptcy Code. The Debtor also filed a List of Claimants Holding 20 Largest Unsecured Claims and a List of Claimants in accordance with section 924 of the Bankruptcy Code.

On December 7, 2009, the Bankruptcy Court held a hearing on the Debtor's requests for interim relief. On December 9, 2009, the Bankruptcy Court entered an order approving the form, content, extent and manner of notice of commencement of the Debtor's chapter 9 case and setting January 4, 2010 as the deadline for filing objections to the Debtor's Petition.

### B.    Objections to the Debtor's Petition.

On January 4, 2010, NYRA filed an objection to the Debtor's petition, arguing that NYC OTB failed to satisfy the requirements to be a debtor under chapter 9 and that NYC OTB filed the petition in bad faith. NYRA's objection was joined by New York Thoroughbred

[[3253436]]

Horsemen's Association on January 4, 2010, and by New York Thoroughbred Breeders, Inc. on January 6, 2010.

After an evidentiary hearing on February 22, 2010, the Bankruptcy Court ruled on March 22, 2010 that NYC OTB was eligible to be a debtor in chapter 9 and entered an order for relief. On April 5, 2010, NYRA appealed the ruling to the District Court for the Southern District of New York. On May 26, 2010, NYC OTB filed a motion to dismiss NYRA's appeal on jurisdictional grounds, arguing that NYRA had filed an improper appeal from non-final orders. NYC OTB and NYRA have agreed, with the District Court's approval to extend the time for responses to the appellate briefs until February 1, 2011. Oral argument on the appeal will be scheduled accordingly.

C.      **Official Unsecured Creditors' Committee**.

Section 1102 of the Bankruptcy Code requires that the United State Trustee appoint a committee of creditors holding unsecured Claims as soon as practicable after the order for relief in the chapter 9 case. On March 30, 2010, the United States Trustee for Region 2 appointed the Official Committee of Unsecured Creditors of New York City Off-Track Betting Corporation (i.e., the Creditors' Committee). The Creditors' Committee consists of the following seven members: Yonkers Racing Corporation, NYRA, Empire Resorts, Inc. ("***Empire***"), District Council 37, Local 2021, Finger Lakes Racing Association, Inc. ("***Finger Lakes***"), Churchill Downs, Incorporated, and Paramount Leasehold, L.P. On June 4, 2010, the Court entered an order approving the Creditors' Committee's employment of Blank Rome LLP as its Counsel.

On May 10, 2010, the Debtor first met with the Creditors' Committee to discuss a plan for the restructuring of the Debtor's operations. Since that first meeting, the Debtor has continued to negotiate with the Creditors' Committee to determine a feasible and effective plan of debt adjustment.

D.      **Motions to Compel Payment**.

On April 17, 2010, the Debtor began to defer payment of Dark Day and Maintenance of Effort payments and of statutory commissions owing to racing industry participants that are based on Handle for out-of-state tracks, (i.e., Indirect Commissions), to preserve cash for operations. Upon notice that the Debtor intended to delay payments of the Indirect Commissions, the R&W Board denied the Debtor's applications to simulcast out-of-state races. After discussion with the R&W Board, the Debtor represented that it would deposit the Indirect Commissions into the Segregated Account on a weekly basis. Additionally, the Debtor represented that it would withdraw funds from the account to make statutory payments or for other purposes only with 24 hours written notice to the R&W Board indicating the nature, amount and corporate purpose for the withdrawal. Upon these representations, the R&W Board resumed the approval of simulcast applications.

On May 7, 2010, Empire filed a motion in the Bankruptcy Court for an order to compel NYC OTB to pay the postpetition Indirect Commissions to its subsidiary, Monticello

Raceway, Inc., within 30 days after the end of the month in which the commissions accrued. On May 24, 2010, Finger Lakes filed a nearly identical motion.

In the motions, Empire and Finger Lakes argued that section 959(b) of Title 28 of the United States Code requires NYC OTB to comply with State law in its operations during the chapter 9 case, that the Racing and Wagering Law requires prompt payment of Indirect Commissions and that the amounts owing are first priority chapter 9 administrative expenses that must be paid currently. Empire and Finger Lakes asked the Bankruptcy Court to use its equitable powers under section 105(a) of the Bankruptcy Code to compel NYC OTB to make the Indirect Commissions within 30 days after the month in which the payments accrued. NYC OTB did not dispute its liability for the payments, but argued that the Racing Law did not require the payments to be made on a particular schedule and that the amounts due are not to be treated as administrative claims.

After an evidentiary hearing on July 13, 2010, the Bankruptcy Court issued a ruling on August 5, 2010, holding that the statutory payments are not administrative expenses, and lifted the automatic stay to allow the parties to commence proceedings before the R&W Board to allow that body to resolve the issue of when the payments must be made.

On August 11, 2010, the Debtor sent a letter to the R&W Board requesting a determination of the appropriate timing for payment of the Indirect Commissions. The R&W Board agreed to make a determination and solicited input from all of the off-track betting corporations and industry stakeholders. The R&W Board held a hearing on the issue on October 27, 2010, but has not yet rendered a decision on the appropriate timing of the payments.

E.      **Assumption and Rejection of Executory Contracts and Leases**.

As of the Petition Date, the Debtor was the lessee under 60 unexpired leases of nonresidential real property (the "Leases"). Under section 365(d)(4) of the Bankruptcy Code, the initial 120-day period in which the Debtor must assume or reject the Leases expired on July 20, 2010. In response to the Debtor's timely motion under section 365(d)(4)(B)(i) of the Bankruptcy Code for additional time to determine which Leases to assume or reject, the Bankruptcy Court entered an order on July 15, 2010, extending the time to assume or reject the Leases until October 18, 2010.

On August 17, 2010, in response to the Debtor's motion under section 365(a) of the Bankruptcy Code, the Bankruptcy Court entered an order authorizing rejection of nine of the Leases.

On October 15, the Debtor filed a motion for an order further extending time to assume its Leases from October 18, 2010 to December 31, 2010. Under section 365(d)(4), a further extension of the time for the Debtor to assume or reject an unexpired nonresidential real property lease after October 18, 2010 is permissible only if the Debtor receives written consent for such an extension from the lessor. The Debtor received written consent for an extension through December 31, 2010 from 41 lessors. To avoid automatic rejection of the remaining

[[3253436]]

leases on October 18, the Debtor filed an omnibus motion on October 15, 2010 to assume the remaining seven leases.

On October 19, the Debtor filed a stipulation with the lessor for its lease at 991 Second Avenue for approval by the Bankruptcy Court. Rejection of the lease at 991 Second Avenue had been authorized by the Bankruptcy Court's August 17, 2010 order, subject to the approval of the R&W Board for the cessation of operations at the branches under the lease. Subsequently, the Debtor determined that continued operations at the premises under the lease was desirable and advised the R&W Board accordingly. As such, the stipulation provides that upon the approval of the Bankruptcy Court, the lease will be rejected and reinstated in amended form to allow for continued use of the premises for at least three additional years.

**F.     Changes In Management.**

Mr. Frucher submitted his resignation to the Governor on June 4, 2010. Subsequently, the Governor appointed Lawrence Schwartz as Chairman. Upon his appointment, Mr. Schwartz engaged in a comprehensive review of the Debtor's operations. On July 7, 2010, Mr. Schwartz announced that he had accepted the resignation of Raymond V. Casey, and the Debtor's board of directors appointed Gregory F. Rayburn as President and Chief Executive Officer of the Debtor.

**G.     Changes In Operations.**

Since the Petition Date, the Debtor has sought to streamline operations, reduce underperforming branches and reduce headcount to improve operating results. Accordingly, the Debtor allowed leases for two branch locations to expire by their terms and exercised early termination provisions to terminate leases for four other branch locations. The Debtor also reduced the number of restaurants it operates from eight to seven and closed eight branches through rejection as described above. The reduction in physical locations has allowed the Debtor to reassign many employees to part time status and thereby reduce labor costs. The Debtor terminated 35 non union employees in April of 2010 and has terminated or accepted the resignation of approximately 60 additional employees since that time.

**H.     Negotiations with the Creditors' Committee.**

In the beginning of August 2010, the Debtor resumed negotiations with the Creditors' Committee to develop a new plan of debt adjustment. From August through October 2010, representatives of the Debtor and the Creditors' Committee engaged in extensive negotiation to develop a term sheet outlining the main provisions of a plan. On October 15, 2010, the Debtor and the Creditors' Committee agreed on a term sheet outlining the material terms of the Plan.

Separately, the Debtor negotiated with each of the unions representing its employees to amend the terms of the collective bargaining agreements to support the operational adjustments contemplated by Plan. District Council 37, Local 2021, the International Brotherhood of Teamsters, Local 858 and the Organization of Staff Analysts each agreed to amend their respective collective bargaining agreements to provide for workforce reductions and

the elimination of costly overtime provisions.  However, the International Brotherhood of Electrical Workers, Local 3 ("Local 3") did not agree to the Debtor's requests to eliminate an exclusivity provision in Local 3's collective bargaining agreement.  Accordingly, Local 3's collective bargaining agreement will be rejected under the Plan, but the Debtor will continue to employ members of Local 3 on the terms and conditions set forth in the collective bargaining agreement, except for the exclusivity provision.  The Debtor's collective bargaining agreements will not bind Newco ADW.

## I.      Bar Date.

On November 9, 2010, the Bankruptcy Court set a bar date (deadline) for filing proofs of claim in the Debtor's chapter 9 case for December 21, 2010.  Pursuant to the Plan, that bar date applies except with respect to Administrative Claims and Claims arising from the rejection of an executory contract or unexpired lease as to which the order authorizing rejection is dated after the date of the entry of the Court order establishing the bar date.  Proof of such rejection Claims must be filed on or before the later of the bar date and the date that is thirty days following the entry of the order approving such rejection.

## ARTICLE V:FINANCIAL STATEMENTS

Attached hereto as Exhibit B is a true and correct copy of the Debtor's Audited Financial Statements and Supplementary Information for the fiscal year ended March 31, 2010 and the nine-month period ended March 31, 2009.  Attached hereto as Exhibit C is a true and correct copy of the Debtor's Audited Financial Statements and Supplementary Information for the fiscal years ended June 30, 2007 and 2008.  The Debtor's auditors, UHY LLP, certified public accountants, have stated that they conducted the Debtor's audit in accordance with generally accepted auditing standards in the United States and standards applicable to financial audits contained in Government Auditing Standards, issued by the Comptroller of the United States.

## ARTICLE VI:SUMMARY OF DEBTOR'S ASSETS AND LIABILITIES

## A.      Assets.

The Debtor's assets include an estimated $20,000,000 in cash on hand as of December 31, 2010, which amount includes such amounts as are currently held in the Segregated Account, and its ADW, which the Debtor believes to be worth approximately $19.8 million, based on a valuation prepared by Innovation Capital, LLC ("Innovation").  Cravath, Swaine & Moore LLP, as counsel to the Debtor, retained Innovation to produce a valuation report containing a valuation range for the Debtor's ADW, which was delivered on November 28, 2010.  Innovation valued the Debtor's ADW as being worth between $14.1 million and $25.5 million, with a mid-point valuation of $19.8 million.

## B.      Summary of Liabilities.

The Claims against the Debtor can be placed in the following general categories. The figures set forth below are approximations and estimates.

1. Claims arising on or before the Petition Date that are (i) secured by Collateral or (ii) subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Collateral or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or as agreed to, in writing, by the Debtor and the holder of such Claim (Class 1 under the Plan) in the estimated, approximate sum of $10,000.

2. Claims of the State of New York or any commission, board, agency or department of the State of New York (Class 2 under the Plan) arising on or before the Effective Date in the approximate amount of $11,200,000.

3. Claims of NY Tracks (Class 3 under the Plan), arising on or before the Effective Date in the approximate amount of $67,200,000.

4. Claims that are Customer Claims (Class 4 under the Plan), arising on or before the Effective Date.

5. Claims that are Ordinary Course Claims (Class 5 under the Plan), arising on or before the Effective Date.

6. General Unsecured Claims (Class 6 under the Plan) in the estimated, approximate total amount of $19,890,000.

**C.** **Summary of Pre- and Post-Petition Debt**.

A summary of the Debtor's pre- and post-petition debt is set forth below:

| Summary of Pre- & Post-Petition Debt | | | | | |
|---|---|---|---|---|---|
| (in millions) | Pre-Petition | Dec 09-Oct 10 | Monthly Run-rate | Post-Petition | Estimate Due @ Jan 2011 |
| NYRA | 14.90 | 11.60 | 1.30 | 15.50 | 30.40 |
| Yonkers | 18.50 | 3.90 | 0.30 | 4.80 | 23.30 |
| Monticello | 4.60 | 2.50 | 0.25 | 3.25 | 7.85 |
| Finger Lakes | 2.40 | 1.80 | 0.30 | 3.00 | 5.40 |
| Saratoga | 0.03 | - | - | - | 0.03 |
| Batavia | 0.01 | - | - | - | 0.01 |
| Tioga | 0.10 | 0.07 | 0.01 | 0.10 | 0.20 |
| Vernon | 0.01 | - | - | - | 0.01 |
| **Total In-state Tracks** | **40.55** | **19.87** | | **26.65** | **67.20** |
| | | | | | |
| NYS Unclaimed Tickets | 5.90 | 1.80 | 0.20 | 2.40 | 8.30 |
| NYS RWB Fee | 2.10 | - | - | - | 2.10 |
| NYS Pari-Mutuel Tax | 0.80 | - | - | - | 0.80 |
| **Total State Claims** | **8.80** | **1.80** | | **2.40** | **11.20** |
| | | | | | |
| NY Thoroughbred Fund | 2.10 | 1.40 | 0.18 | 1.94 | 4.04 |
| NY Standardbred Fund | 0.90 | 0.65 | 0.08 | 0.89 | 1.79 |
| Out-of-State Tracks & Tote | 3.77 | - | - | - | 3.77 |
| Unsecured trade | 1.79 | - | - | - | 1.79 |
| Unsecured Health Plan (NYC) | 3.10 | - | - | - | 3.10 |
| Unsecured NYCERS (NYC Pension) | 3.10 | - | - | - | 3.10 |
| Unsecured Local Gov't (Surcharge) | 0.30 | - | - | - | 0.30 |
| Unsecured Leases | 2.00 | - | n/a | - | 2.00 |
| **Total Unsecured Claims** | **17.06** | **2.05** | | **2.83** | **19.89** |
| | | | | | |
| Assumed Contracts Cure Amounts | 0.30 | - | n/a | - | 0.30 |
| Secured trade | 0.01 | - | n/a | - | 0.01 |
| | | | | | |
| **Total Pre- & Post-Petition Debt** | **66.72** | **23.72** | | **31.88** | **98.60** |

## ARTICLE VII:SUMMARY OF PLAN OF DEBT ADJUSTMENT

### A.    **Introduction**.

This Disclosure Statement contains a summary of the Plan and is qualified in its entirety by the full text of the Plan itself.  All terms defined in the Plan have the same meaning in this Disclosure Statement.  The definitions do not appear in the summary set forth below (please see Article I of the Plan for the definitions).

The Plan, if confirmed, will bind the Debtor, any entity acquiring property under the Plan or otherwise transferring property pursuant to the Plan, and all Claimants in the Debtor's Case. The Plan is intended to deal with all Claims against the Debtor of whatever character, whether or not contingent or unliquidated and whether or not allowed by the Bankruptcy Court pursuant to Bankruptcy Code section 502. All Claimants and other interested parties are urged to read the Plan carefully.

The Plan designates six Classes of Claims. Administrative Expenses have not been classified and are excluded from the designation of Classes. A Claim is classified in a particular class only to the extent that the Claim qualifies within the description of that Class and classified in a different Class to the extent that any remainder of the Claim qualifies within the description of such different Class. A Claim is in a particular Class only to the extent that the Claim is an Allowed Claim in that Class.

**B.** **Classification of Claims Under The Plan**.

1. *Administrative Claims*. Administrative Claims are any Claims against the Debtor for payment of an administrative expense of a kind allowable in the Case under section 503(b) of the Bankruptcy Code, including Professional Fee Claims. Administrative Claims are not classified and are excluded from the Classes.

2. *Class 1 (Secured Claims)*. Class 1 consists of each Allowed Claim against the Debtor that arose on or before the Petition Date and that is (a) secured by Collateral or (b) subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Collateral or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or as agreed to, in writing, by the Debtor and the holder of such Claim. To the extent that the value of the Collateral or setoff right is less than the amount of the Claim that is secured by the Collateral or subject to setoff, the unsecured portion of the Claim is a Class 6 Claim unless, in any such case, the Class of which such Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a secured Claim to the extent Allowed.

3. *Class 2 (New York State Statutory Claims)*. Class 2 consists of each Allowed Claim against the Debtor that arose on or before the Effective Date and that is prescribed by statute or rule or regulation based on the Handle or any wagers, winnings, betting surcharge or the like and that is owed to the State of New York or any commission, board, agency of the State of New York.

4. *Class 3 (New York Racing Industry Claims)*. Class 3 consists of each Allowed Claim against the Debtor that arose on or before the Effective Date and that is prescribed by statute or rule or regulation or contract based on, or is otherwise determined by reference to, the Handle or any wagers, winnings, betting surcharge or the like and that is held by a NY Track, including any Pari-mutuel Pool Obligation owing to a NY Track.

[[3253436]]

5. *Class 4 (Customer Claims).* Class 4 consists of each Allowed Claim against the Debtor that arose on or before the Effective Date and that is a Customer ADW Claim or a Customer Winning Ticket Claim.

6. *Class 5 (Ordinary Course Claims).* Class 5 consists of each Allowed Claim against the Debtor that arose on or before the Effective Date and that is an Ordinary Course Claim.

7. *Class 6 (General Unsecured Claims).* Class 6 consists of each Allowed Claim against the Debtor that arose on or before the Effective Date and that is not an Administrative Claim, a Class 1 Claim, a Class 2 Claim, a Class 3 Claim, a Class 4 Claim or a Class 5 Claim.

## C. Projected Payments Under The Plan.

The Debtor projects that it will have approximately $18,800,000 in cash on hand as of January 31, 2011, which includes such amounts as are currently held in the Segregated Account. Additionally, the Debtor believes its ADW business has a value of approximately $19.8 million.

The Debtor will pay to each holder of an Administrative Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, Cash in the unpaid amount of such Claim on the earliest of (i) the Effective Date, (ii) as soon thereafter as such Claim becomes an Allowed Claim or (iii) as soon thereafter as is practicable.

Each holder of a Class 1 Claim will receive in full satisfaction, settlement, release and discharge of, and in exchange for, such Class 1 Claim, one of the following, at the Debtor's sole discretion, on the Effective Date or as soon as practicable thereafter: (1) payment in full of the Allowed amount of the Claim in Cash, (2) reinstatement of the debt and payment pursuant to the original terms of the documents governing such secured Claim in the ordinary course of business or (3) transfer of the Collateral securing the Allowed Claim to the holder of the Allowed Claim. Class 1 is not impaired under the Plan. In accordance with section 1126(f) of the Bankruptcy Code, each holder of a Claim in Class 1 is conclusively presumed to have accepted the Plan, and solicitation of acceptances with respect to members of such Classes is not required.

Each holder of a Class 4 Claim shall receive in full satisfaction, settlement, release and discharge of, and in exchange for, such Class 4 Claim, (i) if such Claim is a Customer ADW Claim, assumption by Newco ADW of the Customer ADW Claim or (ii) if such Claim is a Customer Winning Ticket Claim, payment in full of the Allowed amount of the Claim in Cash in the ordinary course of business. Class 4 is not impaired under the Plan. In accordance with section 1126(f) of the Bankruptcy Code, each holder of a Claim in Class 4 is conclusively presumed to have accepted the Plan, and solicitation of acceptances with respect to members of such Classes is not required.

Each holder of a Class 5 Claim will receive in full satisfaction, settlement, release and discharge of, and in exchange for, such Class 5 Claim, payment in full of the Allowed Amount of the Claim in Cash in the ordinary course of business. Class 5 is not impaired under

[[3253436]]

the Plan. In accordance with section 1126(f) of the Bankruptcy Code, each holder of a Claim in Class 5 is conclusively presumed to have accepted the Plan, and solicitation of acceptances with respect to members of such Classes is not required.

The Debtor will solicit acceptances of the Plan from each Impaired Class. Classes 2, 3, and 6 are Impaired under the Plan. The Impaired Classes will be treated as follows:

Each holder of a Class 2 Claim will receive in full satisfaction, settlement, release and discharge of, and in exchange for, such Class 2 Claim, a Cash distribution from the Segregated Account on the Effective Date or as soon as practicable thereafter in an amount equal to such holder's pro rata share based on the aggregate amount of Allowed Class 2 Claims of $110,000.

Each holder of a Class 3 Claim will receive in full satisfaction, settlement, release and discharge of, and in exchange for, such Class 3 Claim, its pro rata share based on the aggregate amount of Allowed Class 3 Claims of membership interests in Newco ADW to which the Debtor will transfer ownership of its ADW operations and assets listed on Exhibit B to the Plan, free of any and all liabilities and Claims except Customer ADW Claims and any Claims expressly assumed by Newco ADW which are listed on Exhibit C to the Plan, on the Effective Date. The Debtor estimates that based on the current projected Claims of Class 3 Creditors through the Effective Date of $67.20 million, and a valuation of the ADW of approximately $19.8 million, recovery on Class 3 Claims would be approximately 29.46%.

Each holder of a Class 6 Claim will receive in full satisfaction, settlement, release and discharge of, and in exchange for, such Class 6 Claim, a Cash distribution from the Segregated Account on the Effective Date or as soon as practicable thereafter in an amount equal to (i) if the Court determines by a Final Order that Pari-mutuel Pool Obligations are general unsecured Claims, which are in Class 6, and are not entitled to any other treatment such as trust Claims, such holder's pro rata share, based on the aggregate amount of Allowed Class 6 Claims, of $3,280,000 or (ii) otherwise, such holder's pro rata share, based on the aggregate amount of Allowed Class 6 Claims, of $3,280,000 minus any amount required by such determination to be paid on account of the Pari-mutuel Pool Obligations.

The Debtor accepts wagers on races run at tracks other than the NY Tracks. The amount it receives from the bettors on a race are pooled, consistent with the principles of pari-mutuel betting, with all wagers placed on the race from all sources that participate in the pari-mutuel pool, including the track where the race is run. From the pool for each race, the operators that have accepted wagers on the race (that is, the track where the race is run and locations other than the track, such as other tracks and off-track betting locations) may withhold a predetermined portion for their own fees associated with the wagers and would remit to (or receive from, depending on the betting facility at which winning wagers were placed) the other operators an amount to pay the expenses (the take out percentage) to which the operator is entitled and the holders of winning tickets. At least one track that is not a NY Track has asserted that amounts that the Debtor has collected that are owing to the other operators to be paid to the holders of winning tickets, referred to in the Plan as the "Pari-mutuel Pool Obligations", are held

in trust by the Debtor and must be paid in full to the operators. The Debtor disputes this characterization of the Pari-mutuel Pool Obligations.

The Debtor estimates that the total amount of Pari-mutuel Pool Obligations owing to operators other than the NY Tracks as of the Effective Date of the Plan will be approximately $2,025,000. The Debtor has a limited amount of cash available for distribution to holders of Class 6 Claims ($3,280,000). This figure was derived by taking $18,800,000, the estimated amount of Cash the Debtor will have on January 31, 2011, and subtracting the amounts estimated to be required to (i) pay Administrative Claims ($3,200,000), (ii) pay Secured Claims ($10,000), (iii) fund operating cash requirements ($10,500,000), (iv) transfer to Newco ADW under Section V.G.1. of the Plan the ADW customer balances ($1,400,000); and (v) pay New York State an amount yielding approximately a one percent (1%) recovery on their Claims ($110,000). To the extent that holders of the Pari-mutuel Pool Obligations are entitled to payment in full on a theory that the Debtor holds the funds owing to the holders of the Pari-mutuel Pool Obligations in trust, the aggregate distribution to other Class 6 Claimants will be reduced accordingly.

Any objection by a holder of a Pari-mutuel Pool Obligation to the treatment of such a Claim as a general unsecured Claim in Class 6 must be filed and served by the deadline for objecting to Confirmation. The Debtor expects that the Court will resolve the issue of whether the Debtor holds the funds in trust at or in connection with the Confirmation hearing. The Debtor can give no assurance of how the Court may resolve the issue.

If the Court determines that the Pari-mutuel Pool Obligations are not trust fund obligations, so that the full $3,280,000 allocated to Class 6 is distributed among Class 6 Claimants, and based on the Debtor's current estimates of the aggregate allowable amount of Class 6 Claims, the Debtor estimates that the recovery on Class 6 Claims would be approximately 16.5%.

A summary of the sources and uses of the Debtor's projected payments under the Plan is set forth below:

[[3253436]]

| Sources | Value (in mm): | Uses | Value Received (in mm): |
|---|---|---|---|
| Estimated Cash on Hand 1/31/2011 | $18.80 | Administrative Claims | $3.20 |
| Value of ADW business | $19.80 | Operating Cash NYC OTB | $10.50 |
| | | ADW Accounts (transfer) | $1.40 |
| | | Assumed contracts | $0.30 |
| | | Class 1 | $0.01 |
| | | Class 2 | $0.11 |
| | | Class 3 | $19.80 |
| | | Class 6 | $3.28 |
| **Total Sources** | **$38.60** | **Total Uses** | **$38.60** |

 

**D.**      **Legislation**.

        The Plan contemplates the enactment of the Legislation as a condition precedent to the Effective Date.  The Legislation will not include any change to any statute that requires NYC OTB to pay to any NY Track that is represented on the Creditors' Committee any commissions for wagering accepted by NYC OTB on races at that track (i.e., "dailies").

        A summary of the changes that the Legislation would make is set forth below. For the purposes of this section, Year 1 commences on the Effective Date.

     1.      All Dark Day and Maintenance of Effort payments are eliminated for NYC OTB.

     2.      The Indirect Commissions (other than Dark Day and Maintenance of Effort payments and other than Indirect Commissions based on wagers placed on races run at Finger Lakes Racing Association, Inc.'s track) paid to NY Tracks from NYC OTB are reduced on the following basis:

| | Indirect Commission Reduction |
|---|---|
| Year 1 | 50% |
| Year 2 | 40% |
| Year 3 | 30% |
| Year 4 | 20% |

[[3253436]]

The remaining 20% holdback decreases to 10% if NYC OTB's annual Handle is between $600 million and $620 million, and decreases to zero in any year in which NYC OTB's annual Handle exceeds $620 million.

3.      All state pari-mutuel tax rates in effect before the Effective Date on NYC OTB Handle are reduced by 50% for Year 1 and Year 2. After Year 2, the tax rates are increased as the following NYC OTB Handle levels are achieved:

| For Year Ending Handle (in $MM) | NYC OTB Tax Rate as a percentage of pre-Effective Date Tax Rate |
|---|---|
| 610-615 | 57.5% |
| 616-620 | 62.5% |
| 621-629 | 75.0% |
| 630-635 | 82.5% |
| 636-640 | 92.5% |
| 641 and up | 100.0% |

4.      NYC OTB may retain all funds from tickets that were uncashed as of April 1, 2010 and previously escheated to New York State and all funds from future uncashed tickets.

5.      The transfer, ownership and operation of the ADW as provided in the Plan is authorized.

6.      NYC OTB's payments to the harness breeding fund are reduced to the same percentage levels as the thoroughbred breeders fund.

7.      Monticello Raceway Management, Inc. ("MRMI"), Tioga Downs and Vernon Downs are permitted to offer subsidized (i.e., nontaxable) promotional credits to their customers up to 10.0% of the total revenue wagered on their video lottery terminals at the vendor track after payout for prizes. All other racinos in New York State are permitted to offer subsidized (i.e., nontaxable) promotional credits to their customers up to 7.5% of the total revenue wagered on their video lottery terminals at the vendor track after payout for prizes.

8.      The VLT Capital Improvement Fund co-investment requirement for racetracks that now or in the future have more than 1,100 video lottery terminals will be eliminated.

9.      Effective on and after May 1, 2010, MRMI shall be eligible for a vendor's capital award of 1.5% of the total revenue from wagering on its video lottery terminals at its facility after payout for prizes, but upon relocation, if any, of its facility from the real property currently owned by MRMI in Monticello, N.Y., it will no longer be eligible for this vendor's capital award.

[[3253436]]

10. NYC OTB must offer all tracks on the Creditors' Committee the opportunity to join their out-of-state racing simulcasting contracts if such tracks choose to do so, subject to such tracks being responsible for any resulting increase in contract cost.

11. The minimum number of race dates for MRMI under Racing Law section 318(5) is reduced from 90% to 70%, and the minimum number of race dates for MRMI under Racing Law section 307(5-a) is reduced from 100% to 80%.

12. NYC OTB is barred from filing a chapter 9 petition in the future.

13. NYC OTB will be governed by an expanded board of directors that will include three additional non-voting members, comprised of a harness track representative, a thoroughbred track representative and a union representative, which shall be the collective bargaining representative with the greatest number of NYC OTB employees.

14. NYC OTB's annual budgets must be balanced and independently reviewed by the Director of the State Budget. If the Director of the State Budget determines that the budget is not balanced, NYC OTB will revise the budget to comply with the Director of the State Budget's determination of what is needed to balance the budget.

15. The following are NYC OTB events of default:

    a. Failure to make payment of any commissions due to the NY Tracks within 60 days after the last day of the month in which the commissions accrued, with an additional 30-day cure period available to NYC OTB.

    b. Failure to achieve positive EBITDA in any two consecutive fiscal years.

    c. Failure to have a balanced budget reviewed by the Director of the State Budget in any fiscal year.

16. In the event of one or more defaults outlined in section 15 above, the management of NYC OTB will be assumed by Newco ADW. NYRA and the Yonkers Racing Corporation will be jointly responsible for the management of NYC OTB on behalf of Newco ADW and will not receive compensation of any kind for their services. However, NYC OTB will continue to be governed and owned in a form consistent with the governance and ownership existing at the time of the transfer of management.

17. Track Parties shall not have any liability or obligation to any person or entity for any act or omission (except such as may be the result of gross negligence, fraud, willful misconduct or criminal conduct by the Released Party) in connection with or arising out of (i) the negotiation of a restructuring of NYC OTB's business and operations, (ii) the operation of NYC OTB's business prior to the Effective Date of the Plan, (iii) the pursuit of approval and consummation of the Plan, (iv) the transactions contemplated under the Plan, (v) the property to be distributed under the Plan, or (vi)

the Claims or other obligations extinguished or impaired under the Plan, including any deficiency in contributions to purses that arises out of NYC OTB's failure to pay the pre-petition or post-petition Claims of the NY Tracks, whether such contributions are required by statute or contract.

**E.     Restructuring Plan**.

Following the Effective Date, NYC OTB will restructure certain of its operations (the "***Restructuring Plan***").

A summary of the Restructuring Plan is set forth below:

1. NYC OTB will maintain its approximately 50 remaining branch locations and seek to negotiate more favorable lease terms on these locations.

2. NYC OTB will make moderate investments in those locations where it is clear to NYC OTB that the Handle can be increased (for example, expansion in some locations that are currently crowded due to a previous branch closure nearby). NYC OTB's intent is to slow the rate of Handle decline at the remaining locations.

3. NYC OTB will seek private industry partners to build at least one new prototype location similar to the off-track wagering facility at Woodbridge, New Jersey. Any NY Track within 30 miles of a proposed location will have the right of first refusal to be the financial partner with NYC OTB and any other similar facility that is proposed and built. If more than one NY Track is located within 30 miles, both NY Tracks will have the right of first refusal and may partner together.

4. The overhead of NYC OTB will be substantially reduced with the elimination of roughly 400 positions (including reductions since the Petition Date and the reduction in ADW positions). NYC OTB will fund a targeted voluntary severance program for employees that are displaced by the overhead reduction.

5. Remaining overhead expenses will be limited in purpose to serve the daily needs of the ongoing branches (security, supplies, reporting, etc.) and to make investments in new Handle prototypes. NYC OTB will seek to outsource certain overhead functions required by the branches.

6. NYC OTB will obtain estimates from qualified tote companies to upgrade all existing machines and service those machines going forward. NYC OTB will make available, subject to the vendor's requirements, the opportunity to participate in the tote upgrade and service contract to each of the NY Tracks.

7. NYC OTB will reduce its space requirements to no more than half of the existing space at its headquarters at 1501 Broadway, New York and at its warehouse in Maspeth.

8. NYC OTB will implement a "New York First" program wherein New York racing product is featured. Other than on major event dates (Triple Crown, Breeders' Cup, etc.),

NYC OTB will carry all operating in-state tracks and will feature these events on the largest screens available in the parlors. NYC OTB will also reduce the number of out-of-state signals historically broadcast in the parlors.

9. Upon the Effective Date, NYC OTB will no longer be required to deposit funds into the Segregated Account and will pay its general operating expenses in the ordinary course of business.

### F.    Executory Contracts and Unexpired Leases.

On the Effective Date, (a) the Debtor assumes each executory contract and unexpired lease of the Debtor (i) that has not expired by its own terms on or before the Effective Date and (ii) that has not previously, with the approval of the Court before the Effective Date, been (A) assumed and assigned or (B) rejected and (b) the Debtor assumes its collective bargaining agreements with (i) District Council 37, Local 2021 as modified by the memorandum of agreement dated September 13, 2010, (ii) the International Brotherhood of Teamsters, Local 858 as modified by the memorandum of agreement dated September 10, 2010, and (iii) The Organization of Staff Analysts, as modified by the memorandum of agreement dated November 1, 2010, which collective bargaining agreements shall not bind Newco ADW. Upon the Effective Date, the Debtor rejects the collective bargaining agreement with International Brotherhood of Electrical Workers, Local 3, however, after the Effective Date, the Debtor shall abide by all of the terms and conditions of employment of its collective bargaining agreement with International Brotherhood of Electrical Workers, Local 3, despite the rejection of the agreement, except for any exclusivity or similar term or condition.

Any amount required to cure monetary defaults under an executory contract or unexpired lease assumed under the Plan shall be satisfied by Cure Payments on the Effective Date or upon such other terms and dates as the parties to such executory contract or unexpired lease otherwise may agree. Any party to an executory contract or unexpired lease with NYC OTB that NYC OTB will assume under the Plan who asserts a right to a Cure Payment other than current payments owing under the contract or lease in the ordinary course of business must file proof of such Cure Payment claim with the Office of the Clerk of the Court no later than the Objection Deadline and serve it upon counsel for NYC OTB, Cravath, Swaine & Moore LLP, Worldwide Plaza, 825 Eighth Avenue, New York, NY 10019, Attn:  Richard Levin and upon counsel for the Official Committee of Unsecured Creditors, Blank Rome LLP, The Chrysler Building, 405 Lexington Avenue, New York, NY 10174, Attn:  Marc E. Richards & Andrew B. Eckstein so as to be received by the Objection Deadline.

Any Claim for damages arising from the rejection of an executory contract or unexpired lease of the Debtor under the Plan shall be forever barred and unenforceable against the Debtor, its properties, agents, successors, or assigns, unless a proof of claim is filed with the Court on or before the later of (i) the date that is 30 days after the date of entry of an order by the Court authorizing rejection of a particular executory contract or unexpired lease (including the Confirmation Order) or (ii) the Bar Date. Any such Claim that is timely filed as provided herein and Allowed shall be classified as a Class 6 Claim and treated accordingly.

[[3253436]]

NYC OTB's OPEB Liabilities arising on and after the ~~Petition~~**Effective** Date will be assumed by NYC OTB on and following the Effective Date. Any OPEB Liabilities that arose before the Petition Date will not be assumed by NYC OTB but will be treated as Class 6 Claims. NYC OTB estimates that such pre-Petition Date OPEB Liabilities total approximately $3,100,000.

      **G.**    **Conditions Precedent to the Effective Date**.

The occurrence of the Effective Date is subject to satisfaction of the following conditions precedent:

(1) The Confirmation Order is in a form and substance satisfactory to the Debtor;

(2) The Confirmation Order has been entered;

(3) The Legislation has been enacted;

(4) All agreements and instruments contemplated by, or to be entered into pursuant to, the Plan are in form and substance acceptable to the Debtor and all conditions to their effectiveness (other than execution and delivery) have been satisfied or waived;

(5) All other actions and documents necessary to implement the Plan or required by the Racing Law, as it may be amended, have been effected or executed, as applicable; and

(6) The Effective Date occurs on or before January 31, 2011 (the Outside Date).

NYC OTB, with the approval of the Creditors' Committee, may waive the conditions to the Effective Date set forth in section VII.A.3 (Legislation) or section VII.A.6 (Outside Date) of the Plan in whole or in part. As to the Creditors' Committee's waiver of conditions precedent to the Plan going effective as required in section VII.A.3 relating to specific points of the Legislation enumerated in Exhibit A to the Plan, (a) the waiver or modification of points 2, 5, 7, 8, 9, 10, 11 and/or 17 of the Legislation enumerated in Exhibit A to the Plan shall require a vote in favor of waiver by all of the NY Tracks, (b) the waiver or modification of points 14, 15 and/or 16 of the Legislation enumerated in Exhibit A shall require a vote in favor of waiver by a supermajority of the Creditors' Committee and (c) the waiver or modification of points 1, 3, 4, 6, 12 and/or 13 of the Legislation enumerated in Exhibit A shall require a vote in favor of waiver by a simple majority of the Creditors' Committee. For the purposes of this provision, "supermajority" shall mean, of those Creditors' Committee members voting on the issue, a vote meeting the following requirements: (i) abstentions shall not count as votes, (ii) if four or fewer than four members shall be voting on the issue, unanimous acceptance of the proposal shall be required; (iii) if five members shall be voting on the issue, four affirmative votes shall be required; (iv) if six members shall be voting on the issue, five affirmative votes shall be required; and (v) if seven members shall be voting on the issue, five affirmative votes shall be required.

[[3253436]]

The Debtor may assert the failure to satisfy or waive any condition to the Effective Date as a basis for not consummating the Plan, regardless of the circumstances giving rise to the failure of such condition to be satisfied or waived.

If the conditions to the Effective Date have not been timely satisfied, upon notice filed by the Debtor with the Court, (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the rights and obligations of the Debtor and all Claimholders shall be restored to the status quo as of the day immediately preceding the Confirmation Date as though Confirmation had never occurred and (d) all of the Debtor's rights and obligations and Claimants' rights and obligations with respect to the Claims shall remain unchanged, and nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtor or any other entity or to prejudice in any manner the rights of the Debtor or any other entity in any further proceedings involving the Debtor.

## H.    **Miscellaneous Plan Provisions**.

1. *Nonconsensual Confirmation*.  If Class 2, Class 3 or Class 6 does not accept the Plan in accordance with section 1126 of the Bankruptcy Code, the Debtor will request that the Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code.

2. *Continued Vesting of Property of the Debtor*.  Except as otherwise provided in Section V.G. of the Plan with respect to the ADW, the property of the Debtor, including all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, will remain vested in the Debtor on the Effective Date.  As of the Effective Date, all such property of the debtor will be free and clear of all Claims and liens with respect thereto, except as specifically provided for the in Plan or Confirmation Order.

3. *Post-Confirmation Operations*.  On and after the Effective Date, the Debtor will continue in existence as authorized by the laws of the State of New York and shall retain all rights and have all responsibilities applicable under such laws.  The Debtor will continue to conduct its operations and business and such other activities as it may be permitted to conduct by applicable law and the Plan, as amended or superseded from time to time.

4. *Court Fees*.  On or before the Effective Date, all fees (if any) due from the Debtor to the Clerk of the Court will be paid in full.

5. *Execution and Delivery of Documents*.  The Debtor is authorized to execute, deliver and record documents and instruments as is necessary or appropriate to the successful implementation and execution of the Plan or to carry out the purposes of the Plan.

6. *Modification/Amendment*.  Subject to certain restrictions and requirements set forth in section 942 of the Bankruptcy Code and Rule 3019 of the Bankruptcy Rules, the Debtor reserves the right, to be exercised in its sole discretion, to alter, amend, modify, revoke or withdraw the Plan prior to its substantial consummation.

## I.    **Certain Material U.S. Federal Income Tax Consequences**.

34

[[3253436]]

The following is a summary of certain of the expected U.S. Federal income tax consequences of the Plan to the Debtor and Claimants in Classes entitled to vote on the Plan. This summary is not a complete analysis of every potential U.S. Federal income tax consequences that may be relevant to any particular Claimant, and does not address any tax consequences arising under any state, local or foreign tax laws or Federal estate or gift tax laws.

This summary is based on the Internal Revenue Code of 1986, as amended (the "*Code*"), Treasury Regulations promulgated thereunder, judicial decisions and published rulings and administrative pronouncements of the Internal Revenue Service (the "*IRS*"), all as in effect on the date of this Disclosure Statement. These authorities may change, possibly with retroactive effect, which may result in U.S. Federal income tax consequences that differ from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to any of the matters discussed below.

This summary does not address the U.S. Federal income tax consequences of the Plan to Claimants that are not U.S. persons. Moreover, this summary does not address all of the U.S. Federal income tax considerations that may be relevant to a particular Claimant in light of such Claimant's particular circumstances or to Claimants otherwise subject to special tax treatment (including banks, governmental authorities or agencies, financial institutions, insurance companies, pass through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies and regulated investment companies).

THIS SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING. NEITHER THE DEBTOR NOR ITS PROFESSIONAL ADVISORS WILL HAVE ANY LIABILITY TO ANY PERSON ARISING FROM OR RELATED TO THE TAX CONSEQUENCES OF THE PLAN OR THE DISCUSSION BELOW.

**IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE CODE. STATEMENTS REGARDING TAX IMPLICATIONS CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) ARE NOT WRITTEN TO SUPPORT THE MARKETING OR PROMOTION OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

1. *Consequences to the Debtor*. The Debtor is a unit of the State of New York whose income is excluded from gross income under Section 115 of the Code. Accordingly, the Plan will not have any U.S. Federal income tax impact on the Debtor.

[[3253436]]

2. *Consequences to Claimants.*  The U.S. Federal income tax consequences to Claimants of the various transactions contemplated by the Plan, including the character, timing and amount of any income, gain or loss recognized by the Claimants upon consummation of the Plan, will depend upon the particular circumstances relevant to each Claimant.  Claimants should therefore consult their own tax advisors to determine the particular tax consequences to them of the various transactions contemplated by the Plan.  The following summary assumes that no Claimant has claimed a bad debt loss with respect to all or any portion of any Claim during the current or any preceding taxable year.

a.  <u>Allocation of Consideration to Interest</u>.  Distributions to Claimants under the Plan will be allocated first to principal and then to accrued but unpaid interest (if any).  For U.S. Federal income tax purposes, however, it is possible that the IRS will disregard the stated allocation to principal and interest under the Plan.  Any portion of a distribution allocable to accrued but unpaid interest will be taxable to the Claimant as interest income, except to the extent the Claimant has already reported the previously-accrued amount as income under its method of accounting.  Conversely, a Claimant will generally recognize a deductible loss to the extent that any accrued but unpaid interest previously reported as income is not paid in full.  The portion of any distribution under the Plan that is not allocated to interest will be considered received by the Claimant in respect of the principal amount of its Allowed Claim.

b.  <u>Holders of New York State Statutory Claims</u>.  Holders of New York State Statutory Claims in Class 2 are governmental authorities whose tax treatment will depend upon the particular circumstances relevant to each holder.  Holders of New York State Statutory Claims should consult their own tax advisors regarding the U.S. Federal income tax consequences of receiving Cash in satisfaction of their New York State Statutory Claims pursuant to the Plan.

c.  <u>Holders of New York Racing Industry Claims</u>.  Holders of New York Racing Industry Claims in Class 3 should recognize gain or loss on the Effective Date in an amount equal to the difference between (1) the fair market value of such Claimant's pro rata share of membership interests in Newco ADW on the Effective Date (reduced by any amount allocated to accrued but unpaid interest) and (2) the Claimant's adjusted tax basis in the Racing Industry Claim.  Holders of New York Racing Industry Claims should consult their own tax advisors regarding the consequences of holding their interests in the transferred ADW through a limited liability company.

d.  <u>Holders of General Unsecured Claims</u>.  Holders of General Unsecured Claims in Class 6 should recognize gain or loss on the Effective Date in an amount equal to the difference between (1) the Cash received in respect of the General Unsecured Claim (reduced by any amount allocated to accrued but unpaid interest) and (2) the Claimant's adjusted tax basis in the General Unsecured Claim.

e.  <u>Information Reporting and Backup Withholding</u>.  The Debtor may be obligated to furnish information to the IRS regarding the consideration received by Claimants pursuant to the Plan.  Claimants may be subject to backup withholding on

consideration received pursuant to the Plan. Certain Claimants (including corporations) generally are not subject to backup withholding. A Claimant that is not otherwise exempt may generally avoid backup withholding by furnishing its taxpayer identification number ("*TIN*") and certifying, under penalties of perjury, that the TIN provided is correct and that the Claimant has not been notified by the IRS that it is subject to backup withholding. Backup withholding is not an additional tax. Taxpayers may apply any amounts withheld as a credit against their U.S. Federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

**J.      Means for Implementation and Execution of the Plan.**

1. *Funding the Plan*.  Plan will be funded by a combination of cash on hand at the Effective Date, including cash from the Segregated Account, and the distribution of membership interests in Newco ADW.  On the Effective Date, the Debtor will transfer to Newco ADW from a segregated account any Cash that is attributable to a customer ADW account.

2. *Disbursements*.  The Debtor will make all distributions to the holders of the Allowed Claims, as soon as practicable following the Effective Date.

3. *Reserve for Disputed Claims*.  On and after the Effective Date, the Debtor will reserve distributions for the holders of disputed Claims ("*Disputed Claims*") in a segregated account (the "*Disputed Claims Reserve*") for the benefit of the holders of the Disputed Claims entitled thereto under the Plan.  Except to the extent that the court has estimated under section 502(c) of the Bankruptcy Code or otherwise determined that a sufficient reserve for Disputed Claims is less than the full amount thereof, there will be deposited into the Disputed Claims Reserve an amount of cash which would have been distributed on account of all Disputed Claims if all Disputed Claims were allowed in the full amount claimed by the holders thereof.  At such time as a Disputed Claim becomes an Allowed Claim, the distribution that would have been distributed had the Disputed Claim been an Allowed Claim on the Effective Date shall be released from the Disputed Claims Reserve and delivered to holder of such Allowed Claims within 30 days.  At such time as all Disputed Claims have been finally determined, the balance of the cash not theretofore distributed will be distributed pro rata to the holders of Allowed Claims in Class 6.

4. *Holding of Unclaimed Distributions:*  If any distribution to any Claimant is returned to the Debtor as undeliverable, no further distributions will be made to the Claimant unless and until the Debtor is notified, in writing, of the Claimant's then-current address.  An unclaimed distribution will remain in the Debtor's possession until such time as the unclaimed distribution becomes deliverable.  All entities ultimately receiving undeliverable Cash shall not be entitled to any interest or other accruals of any kind.  Nothing contained in the Plan requires the Debtor to attempt to locate any holder of an Allowed Claim.  Any Claim in respect of an unclaimed distribution will be made on or before the first anniversary of the date the distribution was returned to the Debtor as undeliverable.  After such date, all Claims in respect of unclaimed distributions will be discharged and forever barred, and the Debtor will retain all moneys related thereto.

[[3253436]]

5. *Objections to Claims*.  The Debtor may, in its sole discretion, litigate to judgment, settle or withdraw objections to Claims against the Debtor without further Court approval.  Rule 9019 of the Bankruptcy Rules, which requires Bankruptcy Court approval of any settlement, will not apply to the settlement or withdrawal of any objection.  Except as otherwise provided in the Plan, the Confirmation Order or other Final Order, no compromise, waiver or release of Claims, demands or causes of action held by the Debtor that may be provided for in the Plan or in any Final Order will in any way limit or impair the right of the Debtor to prosecute objections to Claims against the Debtor, and the Debtor hereby retains all objections to the allowability of any Claim against the Debtor and all affirmative and negative defenses associated with such objections.  Notwithstanding the existence of a colorable objection to any Claim against the Debtor, the Debtor may, in its sole discretion, determine whether an objection to any Claim against the Debtor should be filed and may, in its sole discretion, decline to file or prosecute any objection to any Claim against the Debtor.

6. *Retention and Enforcement of Claims*.  Any Claim owned by the Debtor against any entity, causes of action that could have been brought by a Claimant on the Debtor's behalf not waived or released under the Plan shall be the property of, and may be pursued by, the Debtor as provided in the Plan, except any Claims against any NY Track, which are released under the Plan.  The Debtor shall have the exclusive right to settle or compromise any such Claim or cause of action, without Court approval.

K.      **Discharge**.

1. *Discharge of Debts*.  The provisions of the Debtor's Plan, if confirmed, will bind the Debtor, any entity acquiring property under the Plan and all Claimants, whether or not a proof of such Claimant's Claim is filed or deemed filed under section 501 of the Bankruptcy Code, whether or not such Claim is allowed under section 502 of the Bankruptcy Code, and whether or not such Claimant has accepted the Plan.  Except as otherwise provided in the Plan or the Confirmation Order, all consideration distributed under the Plan is in full satisfaction, settlement, release, and discharge of, and in exchange for, all Claims of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred thereon, against the Debtor or any of its assets, properties or interests in property.  Pursuant to section 944 of the Bankruptcy Code, upon the Effective Date, the Debtor shall be discharged as of the Effective Date from all debts of the Debtor and Claims against the Debtor.

2. *Discharge Injunction*.  All entities are enjoined from the commencement or continuation against the Debtor, its successors or assigns (including the post-confirmation NYC OTB), its agents and employees, or its respective assets, properties or interests in property, any other or further Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date, regardless of whether or not the facts or legal bases therefor were known or existed before the Effective Date, whether or not a proof of Claim was filed, whether or not the holder thereof accepted the Plan and whether or not the Claim is an Allowed Claim.

3. **Exculpation.  Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is**

[[3253436]]

released and exculpated from, any Exculpated Claim. In all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

       **4. Consenting Creditor Release of Exculpated Parties. As of the Effective Date, each Claimant who has accepted the Plan is deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged each Exculpated Party from any and all Claims that were not the result of gross negligence, fraud, willful misconduct or criminal conduct by the Exculpated Party.**

       **5. Limited Third Party Release. As of the Effective Date, all Persons shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged the Track Parties from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, the Debtor's restructuring efforts, the Case, the Legislation or the relationship of any Track Party and the Debtor; provided, however that this Article V.L shall not release any Track Party from any cause of action solely arising out of any failure of that Track Party to pay into the purse account such Applicable Contractual Percentage of any annual profits that such Track Party actually receives from Newco ADW on account of that Track Party's equity interest in Newco ADW; provided, further, that this Article V.L shall not release the NY Tracks from any cause of action held by a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other domestic state, city, or municipal tax code; (ii) the environmental laws of the United States or any domestic state, city, or municipality, (iii) any criminal laws of the United States or any domestic state, city, or municipality, (iv) the securities laws of the United States or any domestic, state, city or municipality, (v) the Employee Retirement Income Security Act of 1974, as amended, or (vi) the law and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security; provided, further, that this Article V.L shall not release the Track Parties from any cause of action related to any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud (to the extent imposed by applicable non-bankruptcy law).**

       The Debtor and Creditors' Committee believe that the harness and thoroughbred horsemen, including owners, trainers and drivers, throughout New York State (collectively, the "Horsemen") will benefit greatly from the restructuring of NYC OTB. The Horsemen are not creditors of NYC OTB. The Racing Law requires that each NY Track allocate to purses a certain percentage of any revenues actually received by NYC OTB. The Horsemen are the primary beneficiaries of such purses. Additionally, the Standardbred Owner's Association ("SOA"), Monticello Harness Horsemen's Association, Inc. ("MHA") and several other horsemen associations (collectively, "Horsemen Associations"), on behalf of certain Horsemen, are parties to contracts with certain of the NY Tracks that also require a specific percentage of any revenues actually received by the NY Tracks from NYC OTB be allocated to purses (the "Contractual Percentage").

After the Effective Date, each NY Track will distribute to purses (for the benefit of the Horsemen) the applicable Contractual Percentage of any annual profits that such NY Track receives on account of its equity interest in Newco ADW.

The SOA has publicly called for the liquidation of NYC OTB and has expressed its intention to sue any NY Track that supports or facilitates NYC OTB's rehabilitation. In light of these threats, each NY Track has determined that it can only support NYC OTB's restructuring and refrain from opposing the Plan if it obtains the benefits of the exculpation and release provisions contained in sections V.J and V.L of the Plan. Such provisions will prohibit the Horsemen Associations and the Horsemen from asserting causes of action or Claims against the NY Tracks for their participation in NYC OTB's restructuring. Such releases will not prevent a Horsemen Association or the Horsemen from asserting that a NY Track has failed to pay into its purse account that portion of any annual profits that the NY Track receives on account of its equity interest in Newco ADW that is based on the same percentage as the percentage of Indirect Commissions that a Track Party has agreed to pay into the purse account under the Track Party's current contract with its relevant Horsemen's Association.

The NY Tracks' support is necessary to obtain certain crucial legislative changes that will allow NYC OTB to restructure and to further obtain a confirmable Plan. For instance, the Debtor cannot operate as a going concern if its statutorily-mandated Dark Day and Maintenance of Effort obligations are not eliminated. Solely upon the condition that the NY Tracks obtain the benefits of the exculpation and release provisions contained in sections V.J and V.L of the Plan, the NY Tracks have agreed to support NYC OTB's restructuring by, among other things, (i) forgiving their pre and post petition Claims aggregating $65.45 million and (ii) lobbying for and supporting (a) the elimination of all NYC OTB's future Dark Day and Maintenance of Effort obligations and (b) the significant reduction in the Indirect Commissions NYC OTB would otherwise owe the NY Tracks going forward. The Debtor believes that there is a substantial risk that the NY Tracks would not support NYC OTB's restructuring and the corresponding legislative changes, if they remained exposed to litigation, including the litigation already threatened by the SOA.

6. **Injunction. From and after the Effective Date, all persons are permanently enjoined from commencing or continuing in any manner, any cause of action released or to be released pursuant to the Plan or the Confirmation Order.**

## ARTICLE VIII: CONFIRMATION

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtor, including that:

- the Plan has classified Claims in a manner permitted by the Bankruptcy Code;

- a disclosure statement has been submitted as required by section 1125 of the Bankruptcy Code;

40

- the Debtor has complied with the other applicable provisions of the Bankruptcy Code;

- all amounts to be paid by the Debtor or any other person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable;

- the Debtor is not prohibited by law from taking any action necessary to carry out the Plan;

- the Debtor, as proponent of the Plan, has proposed the Plan in good faith and not by any means forbidden by law;

- the Plan has been accepted by the requisite votes, except to the extent that cram down is available under section 1129(b) of the Bankruptcy Code, of creditors and equity interest holders; and

- the Plan is in the best interests of creditors and is feasible.

A.    **Acceptance**.

A plan is accepted by a Class of Claims if holders of at least two thirds in dollar amount and a majority in number of Claims of that class vote to accept the plan.  Only those Claimants who actually accept or reject the plan count in this tabulation.  Sections 1129(a)(8) and 1129(a)(10) of the Bankruptcy Code require as a condition to Confirmation that each Class of Claims accept the Plan or be unimpaired under the Plan.  Section 1129(b) of the Bankruptcy Code allows the Court to confirm a plan over the nonacceptance of Impaired Classes if the requirements of sections 943 and 1129(a) of the Bankruptcy Code are met and the plan does not discriminate unfairly and is fair and equitable with respect to the nonaccepting Classes.

Courts have determined that a plan is fair and equitable if no holder of an allowed Claim in a class junior to a nonaccepting class receives any payment for its allowed Claim unless the nonaccepting class receives full payment for its allowed Claims.  Additionally, a fair and equitable plan does not permit any class senior to a nonaccepting class to receive more than 100% of its allowed Claims.  In chapter 9 cases, courts typically determine that a plan is fair and equitable if the plan provides creditors all that can be reasonably expected under the circumstances.   The Debtor believes that the Plan is fair and equitable because there are no junior classes to the Impaired Classes that would receive or retain any property under the Plan, and the holders of Allowed Claims in Class 1 will not receive more than 100% of their Allowed Claims.  Additionally, the Debtor has evaluated various alternatives to the Plan and determined that given the value of the Debtor's operations, the amount of available Cash and the requirements of the Racing Law, the Plan provides Claimants all that can be reasonably expected in the present circumstances.

Courts typically determine that a plan does not discriminate unfairly if a nonaccepting Class is treated substantially equally with respect to other Classes of equal seniority.  The Debtor does not believe that the Plan unfairly discriminates against any Class that

[[3253436]]

may not accept the Plan.  Therefore, if Class 2, Class 3 or Class 6 does not accept the Plan, the Debtor will request that the Court confirm the Plan on a nonconsensual basis under section 1129(b) of the Bankruptcy Code.

B.      **Feasibility**.

Section 943(b)(7) states that a plan must be "feasible".  The feasibility test in section 943(b)(7) has been construed to mean that such plan is likely to allow the chapter 9 debtor to make the payments required under the plan while maintaining its operations at a level that the debtor selects as necessary to its continued viability.  Debtor's Plan provides for distributions to the Classes on or near the Effective Date in exchange for and in complete satisfaction, discharge and release of all Claims.  The Debtor's five-year pro forma income statement and cash flow statement attached hereto as Exhibit D indicate that the Debtor expects to generate positive free cash flow within two years after the Effective Date and to earn positive EBITDA in each of the five years after the Effective Date.  Accordingly, the Debtor projects that after the Effective Date, it will be able to make all payments required under the Plan while maintaining its operations in a manner necessary to viability.  Therefore, the Debtor believes that the Plan is feasible.

C.      **Best Interests Test**.

Section 943(b)(7) states that a plan must be "in the best interests of creditors". The best interests of the creditors test in section 943(b)(7) has been construed to mean that such Plan provides a better option to Claimants than the alternatives, including dismissal of the chapter 9 case.  The Debtor has considered various alternatives to the Plan, including dismissal of the chapter 9 case.  A discussion of such alternatives is provided in Article X below.  The Debtor has determined that the Plan provides a better option to Claimants than the alternatives because it provides for compensation of Claims for all Impaired Classes at or near the Effective Date with minimal post-Confirmation risk to Claimants.  Accordingly, the Debtor believes that the Plan is in the best interests of creditors.


### ARTICLE IX:CERTAIN RISK FACTORS TO BE CONSIDERED

CLAIMANTS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.

THESE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

A.      **ADW Operational Risk for Class 3 Claimants**.

Claimants receiving ADW interests transferred to Newco ADW in satisfaction of Class 3 Claims face the risk that Newco ADW is unable to operate in a profitable and sustainable manner in the future. Such Claimants would have no recourse against the Debtor once the transfer of the ADW business is consummated on the Effective Date.

**B.** **Legislative Risk**.

Enactment of the Legislation is a condition precedent to the Effective Date of the Plan. There can be no guarantee that the State Legislature will enact the Legislation in a timely manner. If there is significant delay between Confirmation and the enactment of the Legislation, the Debtor may run out of Cash designated for operations, thereby reducing the available Cash recovery to Claimants under an alternative plan. Additionally, there can be no guarantee that the State Legislature will not enact future legislation that frustrates or changes the Legislation's intended effect on the Debtor and the Claimants.

## ARTICLE X: ALTERNATIVES TO CONFIRMATION OF PLAN

In considering whether the Plan should be confirmed, the alternatives to Confirmation of the Plan should be considered. The "best interests of creditors" test in the context of a chapter 9 case compares treatment under the Plan to other realistic alternatives to the plan.

It is the opinion of the Debtor, after careful consideration, that Confirmation of the Plan is more advantageous to Claimants of the Debtor, lessees of the Debtor, the racing industry, state and local governments and the general public, than are the alternatives to Plan confirmation. Alternatives to the Plan include the dismissal of the Debtor's chapter 9 case or the development of an alternate plan for the Debtor's reorganization.

If the Court were to dismiss the Debtor's chapter 9 case, the Debtor would be unable to pay its debts. Moreover, the Debtor would have to expend significant time and expense to handle the number of Claims that likely would be pursued in a number of different forums. The result would be a smaller recovery overall for Claimants than contemplated by the Plan and an uneven distribution to similarly-situated Claimants.

The Debtor has considered a variety of other options for adjustment of debts including public financing, private ownership, the transfer of various components of operations to third parties and partnerships with third parties. However, significant changes to the Racing Law would be required to allow the Debtor to seek public financing, private ownership or allow the third parties to carry out or partner in the current functions of the Debtor. The Debtor believes that the changes to the Racing Law that would be required for such alternatives would be more difficult to achieve than the changes embodied in the Legislation. Moreover, the Debtor believes that such alternatives would not provide as immediate and sizable a recovery to Claimants as is provided by the current Plan. None of the other options that have been considered appear to present a feasible basis for providing Claimants with a recovery as great as is provided pursuant to the Plan.

[[3253436]]

## ARTICLE XI: CONCLUSIONS AND RECOMMENDATION

The Debtor and Creditors' Committee believe that the confirmation and implementation of this Plan is preferable to any other alternative. Thus, the Debtor and Creditors' Committee recommend confirmation and implementation of the Plan.

Dated:  New York, New York
          November ~~29,~~**30,** 2010

The New York City Off-Track Betting Corporation,

By: _____

| | |
|---|---|
| Name: | Greg Rayburn |
| Title: | President and Chief Executive Officer |

CRAVATH, SWAINE & MOORE LLP

By :     /s/ Richard Levin
           RICHARD LEVIN (RL 1651)

       Worldwide Plaza
         825 Eighth Avenue
           New York, NY 10019
            (212) 474-1000

*Attorney for the New York City Off-Track Betting Corporation*

44

[[3253436]]

Richard Levin (RL 1651)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Debtor New York City Off-Track*
*Betting Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 9 |
| NEW YORK CITY OFF-TRACK BETTING CORPORATION, | Case No. 09-17121 (MG) |
| Debtor.[1] | |

**NEW YORK CITY OFF-TRACK BETTING CORPORATION'S**
**~~FIRST~~SECOND AMENDED DEBT ADJUSTMENT PLAN**

**Dated:**      **New York, New York**
               **November ~~29,~~30, 2010**

---

[1] New York City Off-Track Betting Corporation's address is 1501 Broadway, New York, NY 10036.  New York City Off-Track Betting Corporation's tax identification number is 13-2664509.

**TABLE OF CONTENTS**

Introduction and Overview......................................................................................................i
ARTICLE I: DEFINITIONS AND RULES OF CONSTRUCTION.....................................1
   A.     Definitions...........................................................................................................1
   B.     Rules of Construction.........................................................................................6
ARTICLE II: CLASSIFICATION OF CLAIMS.....................................................................6
   A.     General Terms and Conditions..........................................................................6
   B.     Designation of Classes of Claims.....................................................................6
ARTICLE III: TREATMENT OF CLAIMS............................................................................7
   A.     Administrative Claims........................................................................................7
   B.     Class 1 (Secured Claims)...................................................................................7
   C.     Class 2 (New York State Statutory Claims)......................................................8
   D.     Class 3 (New York Racing Industry Claims)....................................................8
   E.     Class 4 (Customer Claims).................................................................................8
   F.     Class 5 (Ordinary Course Claims)......................................................................8
   G.     Class 6 (General Unsecured Claims)..................................................................8
   H.     Court Fees...........................................................................................................9
   I.     Nonconsensual Confirmation.............................................................................9
ARTICLE IV: EXECUTORY CONTRACTS AND UNEXPIRED LEASES........................9
   A.     Treatment of Executory Contracts and Unexpired Leases.................................9
   B.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases......9
   C.     Rejection Damage Claims.................................................................................10
   D.     OPEB Liabilities...............................................................................................10
ARTICLE V: MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN....10
   A.     Effective Date...................................................................................................10
   B.     Business Restructuring Plan..............................................................................10
   C.     Distributions.....................................................................................................11
   D.     Withholding and Reporting Requirements........................................................12
   E.     Continued Vesting of Property of the Debtor...................................................13
   F.     Post-Effective Date Operations........................................................................13
   G.     ADW.................................................................................................................13
   H.     Execution and Delivery of Documents; Other Actions.....................................14
   I.     Retention and Enforcement of Claims..............................................................14
   J.     Exculpation.......................................................................................................14
   K.     Consenting Creditor Release of Released Parties.............................................14
   L.     Limited Third Party Release..............................................................................14
   M.     Injunction.........................................................................................................15
ARTICLE VI: GENERAL PROCEDURES FOR OBJECTING TO CLAIMS AND
RESOLVING AND TREATING DISPUTED CLAIMS........................................................15
   A.     Debtor Objection Deadline...............................................................................15
   B.     Prosecution of Objections.................................................................................15
   C.     Preservation of Objections................................................................................15
   D.     No Distributions Pending Resolution of Objections........................................16
ARTICLE VII: CONDITIONS PRECEDENT........................................................................16
   A.     Conditions Precedent to the Effective Date......................................................16
   B.     Waiver of Conditions........................................................................................16

C.      Effect of Failure of Conditions...............................................................................17
ARTICLE VIII:  DISCHARGE............................................................................................17
A.      Discharge of Debts.............................................................................................17
B.      Injunction...........................................................................................................17
C.      Judgments Obtained on Discharged Debts Are Void........................................17
ARTICLE IX:  MODIFICATION OF PLAN.......................................................................17
A.      Modification........................................................................................................17
ARTICLE X:  GENERAL PROVISIONS............................................................................18
A.      Jurisdiction.........................................................................................................18
B.      Interpretation......................................................................................................18
C.      Binding Effect.....................................................................................................18
D.      Applicable Law...................................................................................................18
E.      Severability.........................................................................................................18
F.      Service of Documents.........................................................................................18
G.      No Successor Liability........................................................................................19
H.      Term of Automatic Stay.....................................................................................19
I.      Creditors' Committee.........................................................................................19
J.      Revocation or Withdrawal of the Plan...............................................................19
K.      Time Is of the Essence........................................................................................20

## TABLE OF EXHIBITS

EXHIBIT A—LEGISLATION

EXHIBIT B—ADW ASSETS

EXHIBIT C—NEWCO ADW ASSUMED CLAIMS

EXHIBIT D—ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES

# PLAN OF DEBT ADJUSTMENT

## Introduction and Overview

The New York City Off-Track Betting Corporation (the "Debtor" or "NYC OTB"), a chapter 9 debtor, proposes the following plan for the adjustment of the Debtor's debts (inclusive of all exhibits hereto, the "Plan") under chapter 9 of Title 11, United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code").

The Debtor is unable to pay all of its obligations as they become due as a result of a variety of factors, including a decline in Handle, excess operating expenses, a statutory structure that imposes monetary obligations on the Debtor based on its Handle, rather than on its operating revenues or income and the absence of capital. The Debtor believes that it will not be able to operate without continuing losses unless the Legislation is enacted and this Plan is confirmed and becomes effective. Therefore, the Plan contemplates that the Debtor's debts will be adjusted by a distribution to the Racing Claimants of equity interests in a newly-formed limited liability company to which the Debtor will transfer its ADW and a distribution of Cash to Governmental Claimants and holders of General Unsecured Claims in full satisfaction and in exchange for their Claims. Administrative expenses will be paid in full in Cash upon consummation of the Plan.

Please refer to the accompanying Disclosure Statement for a discussion of the Debtor's history, operations, and financial condition, and for a summary and analysis of the Plan and other important information. Under sections 901 and 1125(b) of the Bankruptcy Code, a vote to accept or reject the Plan may not be solicited from a Claimant until the Disclosure Statement has been approved by the Court and distributed to all Claimants.

All Claimants who are entitled to vote on the Plan are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan. The Debtor may modify the Plan and the Exhibits as provided in and to the fullest extent permitted by sections 942 and 1127(d) of the Bankruptcy Code and Rule 3019 of the Bankruptcy Rules

# ARTICLE I:DEFINITIONS AND RULES OF CONSTRUCTION

## A.     Definitions

For the purposes of the Plan, except as expressly provided herein or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings specified below.

(1)     "Administrative Claim" means any Claim against the Debtor for payment of an administrative expense of a kind allowable in the Case under section 503(b) of the Bankruptcy Code, including Professional Fee Claims and Claims by members of the Creditors' Committee for actual and necessary expenses incurred in the performance of their duties.

(2)     "ADW" means the Account Deposit Wagering business of the Debtor.

(3)     "Allowed", when used in reference to a Claim, means any Claim against the Debtor, including any Administrative Claim, (i) proof of which is timely and properly filed before the Bar Date and to which no objection has been filed, (ii) if no proof of claim was timely and properly filed before the Bar Date, that is deemed filed under applicable law or by an order of the Court, or (iii) that has been allowed by a Final Order.

(4)     "Applicable Contractual Percentage" means the percentage of Indirect Commissions received by a Track Party that such Track Party has agreed to pay into the purse account under such Track Party's current contract with its relevant horsemen's association.

(5)     "Bankruptcy Code" has the meaning ascribed in the preamble to the Plan.

(6)     "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Case or proceedings therein, and the Local Rules of the United States Bankruptcy Court for the Southern District of New York, as applicable to the Case or proceedings therein.

(7)     "Bar Date" means the last day for filing proofs of claim against the Debtor as fixed by order of the Court.

(8)     "Business Day" means a day other than a Saturday, Sunday, "Legal Holiday" (as defined in Bankruptcy Rule 9006(a)), or other day on which commercial banks in New York City are authorized or required to close.

(9)     "Case" means the above-captioned and -numbered chapter 9 debt adjustment case of the Debtor, pending before the Court.

(10)     "Cash" means effective legal tender of the United States of America.

(11)     "Claim" has the meaning ascribed to "claim" in section 101(5) of the Bankruptcy Code.

1

(12) "Claimant" means a holder of a Claim against the Debtor.

(13) "Class" means one of the classes of Claims established under section II.B of the Plan pursuant to section 1122 of the Bankruptcy Code.

(14) "Collateral" means any property or interest in property of the Debtor that is subject to an unavoidable lien to secure the payment or performance of a Claim.

(15) "Confirmation" means the entry of the Confirmation Order by the Court.

(16) "Confirmation Date" means the date of Confirmation.

(17) "Confirmation Order" means the order or orders (including any revision or modification thereof) issued by the Court confirming the Plan under section 1129 of the Bankruptcy Code.

(18) "Contractual Payments" means payments required to be made by contracts the Debtor has with certain New York State thoroughbred racing tracks.

(19) "Court" means the United States Bankruptcy Court for the Southern District of New York or, if such court ceases to exercise jurisdiction over the Case, the United States District Court for the Southern District of New York.

(20) "Creditors' Committee" means the Official Committee of Unsecured Creditors of New York City Off-Track Betting Corporation, established on March 30, 2010 and composed of the following seven members: Yonkers Racing Corporation; NYRA; Empire Resorts, Inc.; District Council 37; Local 2021; Finger Lakes Racing Association, Inc.; Churchill Downs, Incorporated; and Paramount Leasehold, L.P.

(21) "Customer ADW Claim" means a Claim against the Debtor on account of the customer's ADW account.

(22) "Customer Winning Ticket Claim" means a Claim against the Debtor on account of a winning bet that is not a Customer ADW Claim.

(23) "Dark Day" means a day when tracks operated by NYRA are not operating (i.e., are dark) and when NYC OTB is allowed to accept bets on out-of-state thoroughbred races.

(24) "Debt" means liability on a Claim.

(25) "Debtor" has the meaning ascribed in the preamble to the Plan.

(26) "Direct Commission" means the statutorily prescribed payment the Debtor must pay to NY Tracks based on the total betting Handle the Debtor receives for races held at those tracks pursuant to the Racing Law.

[[3251169]]3253435]]

(27)  "Disbursing Agent" means the agent to serve as disbursing agent under section V.C of the Plan.

(28)  "Disclosure Statement" means the Disclosure Statement, as it may be amended, modified or supplemented from time to time, filed by the Debtor in connection with the Plan.

(29)  "Disputed Claim" means any Claim against the Debtor as to which any party has interposed a timely objection in accordance with the Bankruptcy Code and the Bankruptcy Rules, which objection has not been withdrawn or determined by a Final Order.

(30)  "EBITDA" means, for any period, income for such period plus, without duplication and to the extent deducted in determining such net income, the sum of (i)  interest expense for such period, (ii)  income tax expense for such period, (iii) all amounts attributable to depreciation and amortization for such period and (iv) any non-cash charges (other than the write-down of current assets) for such period, all determined on a basis in accordance with generally accepted accounting principles used by state and local governments as established by the Governmental Accounting Standards Board.

(31)  "Effective Date" means the first Business Day after all of the conditions precedent to consummation of the Plan set forth in Article VII have been satisfied or waived.

(32)  "Exculpated Claim" means any claim, claim for relief, interest, obligation, right, suit, damages, cause of action, remedy and liability related to any act or omission in connection with, relating to or arising out of the Debtor's restructuring efforts, the Debtor's Case, formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement or the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or Plan, formulation, preparation, negotiation, and adoption of the Legislation, the filing of the Case, voting on the Plan, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, the distribution of property under the Plan or any other related agreement, including the transfer of the ADW to Newco ADW, the compromise of any Claim of any member of the Creditors' Committee or the elimination or reduction of the Debtor's prepetition, post-petition, and post-Effective Date Maintenance of Effort, Dark Day, and Indirect Commission obligations as provided for in the Plan and the Legislation; provided, however, that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, fraud, or criminal conduct to the extent imposed by applicable non-bankruptcy law.  No cause of action, obligation or liability expressly set forth as preserved by the Plan constitutes an Exculpated Claim.

(33)  "Exculpated Party" means each of: (a) the Debtor, (b) the Creditors' Committee and the current and former members thereof and (c) with respect to each of the foregoing Persons in clauses (a) and (b), such Person's respective officers, directors, employees, members, agents, affiliates (including parents and subsidiaries), consultants, advisors, professionals, partners and representatives, in each case only in their capacity as such.

[[3251169]]3253435]]

(34)  "Exhibit" means, unless otherwise specified, an exhibit attached to the Plan, each of which is incorporated by reference into the Plan and forms part of the Plan as though set forth in full herein.

(35)  "Final Order" means an order or judgment of the Court, as entered on the docket in the Case, or any entered order or judgment of a court properly having jurisdiction over the Debtor, whether or not the subject of an appeal, the operation or effect of which has not been stayed, reversed, vacated or modified.

(36)  "General Unsecured Claim" shall have the meaning ascribed in section II.B.(6) of the Plan.

(37)  "New York State Statutory Claim" shall have the meaning ascribed in section II.B.(2) of the Plan.

(38)  "Handle" means the aggregate dollar amount wagered through the Debtor.

(39)  "Indirect Commission" means a statutorily prescribed payment the Debtor must pay to certain NY Tracks that is not a Direct Commission.

(40)  "Legislation" means legislation in the form described in Exhibit A, unless otherwise agreed to by the Creditors' Committee.

(41)  "Maintenance of Effort" means (i) the requirement that NYC OTB pay each Regional Harness Track the same amount it paid to such track in calendar year 2002, calculated from the Handle NYC OTB received each day on wagers placed on evening out-of-state harness races, unadjusted for demand, economic decline, or similar factors and (ii) the requirement that once the total state-wide off-track betting Handle of all off-track betting corporations on out-of-state night time thoroughbred racing exceeds $100,000,000, each off-track betting corporation in New York State must pay an additional 2% commission to the Regional Harness Tracks on the Handle from bets placed on future simulcast out-of-state night time thoroughbred races.

(42)  "Newco ADW" has the meaning ascribed in section III.D.(2) of the Plan.

(43)  "NYC OTB Transaction Fees" has the meaning ascribed in section V.G.(3)(a) of the Plan.

(44)  "NYRA" means the New York Racing Association, Inc.

(45)  "NY Tracks" means Yonkers Racing Corporation, Empire Resorts, Inc., Monticello Raceway Management, Inc. and Monticello Raceway, Finger Lakes Racing Association, Inc., Vernon Downs and Tioga Downs and NYRA.

(46)  "Objection Deadline" means January 12, 2011 at 5:00 P.M. (Eastern Time).

(47) "OPEB Liabilities" means liabilities related to the Debtor's provision of other post-employment benefits, which include health insurance, Medicare Part B reimbursements and welfare fund contributions, to eligible retirees and beneficiaries.

(48) "Ordinary Course Claim" means a Claim for goods or services provided to the Debtor after the Petition Date or any Claim for Direct Commissions after the Petition Date.

(49) "Pari-mutuel Pool Obligation" means any obligation of NYC OTB to pay a track a bettor's winnings on an amount wagered at the track by a bettor, whether or not the track has already paid the amount to the bettor, but does not include any takeout or other commission amount that the track does not owe to a bettor.

(50) "Petition Date" means December 3, 2009, the date on which the Debtor filed its chapter 9 petition with the Clerk of the Court.

(51) "Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

(52) "Plan" has the meaning ascribed in the preamble to the Plan.

(53) "Professional" means any professional employed in the Case under section 1103 of the Bankruptcy Code.

(54) "Professional Fee Claim" means a Claim of a Professional for compensation or reimbursement of costs and expenses related to services performed on or after the Petition Date and through the Effective Date.

(55) "Racing Industry Claim" shall have the meaning ascribed in section II.B(3) of the Plan.

(56) "Racing Law" means the New York Racing, Pari-Mutuel Wagering and Breeding Law (L.1982, c. 865, § 1, as amended, New York Consolidated Laws Chapter 47-A), as in effect from time to time.

(57) "R&W Board" means the New York State Racing and Wagering Board.

(58) "Regional Harness Tracks" means Monticello Raceway Management Incorporated, Yonkers Racing Corporation, and Tioga Downs.

(59) "Released Parties" means the members of the Creditors' Committee and each of the members' respective officers, directors, employees, members, agents, affiliates (including parents and subsidiaries), advisors and professionals, in their capacities as such.

(60) "Restructuring Claims" has the meaning ascribed in section V.J of the Plan.

[[3251169]3253435]]

(61)     "Segregated Account" means the segregated account established pursuant to a May 26, 2010 letter to the R&W Board in which the Debtor voluntarily agreed to begin segregating funds for payment of Indirect Commissions.

(62)     "Track Parties" means the NY Tracks and their respective officers, directors, employees, members, agents, affiliates (including parents and subsidiaries), consultants, advisors, professionals, partners and representatives, in each case only in their capacity as such.

## B.     Rules of Construction

1.     Any term used in the Plan that is not defined herein, but that is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules.

2.     The rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan.

3.     Section captions used in the Plan are for convenience only, and shall not affect the construction of the Plan.

4.     A reference to an article, a section or an Exhibit means an article, a section of or an Exhibit to the Plan unless otherwise specified.

5.     In computing any period of time prescribed or allowed by the Plan the provisions of Bankruptcy Rule 9006(a) shall apply.

6.     Whenever the context requires, terms shall include the plural as well as the singular number.

7.     The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan.

## ARTICLE II: CLASSIFICATION OF CLAIMS

**A.     General Terms and Conditions**.  Administrative Claims are not classified and are excluded from the Classes.  A Claim against the Debtor is in a particular Class only to the extent that the Claim qualifies within the description of that Class and is in a different Class to the extent that any remainder of the Claim qualifies within the description of the different Class. A Claim is in a particular Class only to the extent that the Claim is an Allowed Claim and such Claim has not been paid, released or otherwise settled before the Effective Date.  Multiple proofs of claim filed by a creditor that qualify for inclusion within the same Class shall be aggregated and, if Allowed, shall constitute a single Allowed Claim.

**B.     Designation of Classes of Claims**.

1.	*Class 1 (Secured Claims)*:  Class 1 consists of each Allowed Claim against the Debtor that arose on or before the Petition Date and that is (i) secured by Collateral or (ii) subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Collateral or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or as agreed to, in writing, by the Debtor and the holder of such Claim.  To the extent that the value of the Collateral or setoff right is less than the amount of the Claim that is secured by the Collateral or subject to setoff, the unsecured portion of the Claim is a Class 6 Claim unless, in any such case, the Class of which such Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a secured Claim to the extent Allowed.

2.	*Class 2 (New York State Statutory Claims)*:  Class 2 consists of each Allowed Claim against the Debtor that arose on or before the Effective Date and that is prescribed by statute or rule or regulation based on the Handle or any wagers, winnings, betting surcharge or the like and that is owed to the State of New York or any commission, board, agency or department of the State of New York.

3.	*Class 3 (New York Racing Industry Claims)*:  Class 3 consists of each Allowed Claim against the Debtor that arose on or before the Effective Date and that is prescribed by statute or rule or regulation or contract based on, or is otherwise determined by reference to, the Handle or any wagers, winnings, betting surcharge or the like and that is held by a NY Track, including any Pari-mutuel Pool Obligation owing to a NY Track.

4.	*Class 4 (Customer Claims)*:  Class 4 consists of each Allowed Claim against the Debtor that arose on or before the Effective Date and that is a Customer ADW Claim or a Customer Winning Ticket Claim.

5.	*Class 5 (Ordinary Course Claims)*:  Class 5 consists of each Allowed Claim against the Debtor that arose on or before the Effective Date and that is an Ordinary Course Claim.

6.	*Class 6 (General Unsecured Claims)*:  Class 6 consists of each Allowed Claim against the Debtor that arose on or before the Effective Date and that is not an Administrative Claim, a Class 1 Claim, a Class 2 Claim, a Class 3 Claim, a Class 4 Claim or a Class 5 Claim.

## ARTICLE III:TREATMENT OF CLAIMS

**A.	Administrative Claims**.  The Debtor shall pay to each holder of an Administrative Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, Cash in the unpaid amount of such Claim on the earliest of (i) the Effective Date, (ii) as soon thereafter as such Claim becomes an Allowed Claim or (iii) as soon thereafter as is practicable.

**B.	Class 1 (Secured Claims)**.

1.	*Impairment*.  Class 1 is not impaired.

7

2.   *Treatment*.  Each holder of a Class 1 Claim shall receive in full satisfaction, settlement, release and discharge of, and in exchange for, such Class 1 Claim, one of the following, at the Debtor's sole discretion, on the Effective Date or as soon as practicable thereafter:  (1) payment in full of the Allowed amount of the Claim in Cash, (2) reinstatement of the debt and payment pursuant to the original terms of the documents governing such secured Claim in the ordinary course of business, or (3) transfer of the Collateral securing the Allowed Claim to the holder of the Allowed Claim.

**C.**     **Class 2 (New York State Statutory Claims)**.

1.   *Impairment*.  Class 2 is impaired.

2.   *Treatment*.  Each holder of a Class 2 Claim shall receive in full satisfaction, settlement, release and discharge of, and in exchange for, such Class 2 Claim, a Cash distribution from the Segregated Account on the Effective Date or as soon as practicable thereafter in an amount equal to such holder's pro rata share, based on the aggregate amount of Allowed Class 2 Claims, of $110,000.

**D.**     **Class 3 (New York Racing Industry Claims)**.

1.   *Impairment*.  Class 3 is impaired.

2.   *Treatment*.  Each holder of a Class 3 Claim shall receive in full satisfaction, settlement, release and discharge of, and in exchange for, such Class 3 Claim, its pro rata share based on the aggregate amount of Allowed Class 3 Claims of membership interests in a newly-formed limited liability company (the "Newco ADW") to which the Debtor will transfer ownership of its ADW operations and assets, as listed on Exhibit B, free of any and all liabilities and Claims except Customer ADW Claims and any Claims expressly assumed by Newco ADW which are listed on Exhibit C, on the Effective Date.

**E.**     **Class 4 (Customer Claims)**.

1.   *Impairment*.  Class 4 is not impaired.

2.   *Treatment*.  Each holder of a Class 4 Claim shall receive in full satisfaction, settlement, release and discharge of, and in exchange for, such Class 4 Claim, (i) if such Claim is a Customer ADW Claim, assumption by Newco ADW of the Customer ADW Claim or (ii) if such Claim is a Customer Wining Ticket Claim, payment in full of the Allowed amount of the Claim in Cash in the ordinary course of business.

**F.**     **Class 5 (Ordinary Course Claims)**.

1.   *Impairment*.  Class 5 is not impaired.

2.   *Treatment*.  Each holder of a Class 5 Claim shall receive in full satisfaction, settlement, release and discharge of, and in exchange for, such Class 5 Claim, payment in full of the Allowed amount of the Claim in Cash in the ordinary course of business.

8

G.     **Class 6 (General Unsecured Claims)**.

1.     *Impairment*.  Class 6 is impaired.

2.     *Treatment*.  Each holder of a Class 6 Claim shall receive in full satisfaction, settlement, release and discharge of, and in exchange for, such Class 6 Claim, a Cash distribution from the Segregated Account on the Effective Date or as soon as practicable thereafter in an amount equal to (i) if the Court determines by a Final Order that Pari-mutuel Pool Obligations are general unsecured Claims, which are in Class 6, and are not entitled to any other treatment such as trust Claims, such holder's pro rata share, based on the aggregate amount of Allowed Class 6 Claims, of $3,280,000 or (ii) otherwise, such holder's pro rata share, based on the aggregate amount of Allowed Class 6 Claims, of $3,280,000 minus any amount required by such determination to be paid on account of the Pari-mutuel Pool Obligations.

H.     **Court Fees**.  On the Effective Date, the Debtor shall pay any fees due from the Debtor to the Clerk of the Court in Cash in full.

I.     **Nonconsensual Confirmation**.  If Class 2, Class 3 or Class 6 does not accept the Plan in accordance with section 1126 of the Bankruptcy Code, the Debtor requests that the Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

## ARTICLE IV: EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.     **Treatment of Executory Contracts and Unexpired Leases**.  On the Effective Date, (a) the Debtor assumes each executory contract and unexpired lease of the Debtor (i) that has not expired by its own terms on or before the Effective Date and (ii) that has not previously, with the approval of the Court before the Effective Date, been (A) assumed and assigned or (B) rejected, including each executory contract and unexpired lease listed on Exhibit D hereto and (b) the Debtor assumes its collective bargaining agreements with (i) District Council 37, Local 2021 as modified by the memorandum of agreement dated September 13, 2010, (ii) the International Brotherhood of Teamsters, Local 858 as modified by the memorandum of agreement dated September 10, 2010, and (iii) The Organization of Staff Analysts, as modified by the memorandum of agreement dated November 1, 2010, which collective bargaining agreements shall not bind Newco ADW.  Upon the Effective Date, the Debtor rejects the collective bargaining agreement with International Brotherhood of Electrical Workers, Local 3, however, after the Effective Date, the Debtor shall abide by all of the terms and conditions of employment of its collective bargaining agreement with International Brotherhood of Electrical Workers, Local 3, despite the rejection of the agreement, except for any exclusivity or similar term or condition.  The Debtor's collective bargaining agreements will not bind Newco ADW.

B.     **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**.  Any amount required to cure monetary defaults under an executory contract or unexpired lease assumed under the Plan shall be satisfied by payment of the amount in Cash that is sufficient to cure defaults under such contract or lease in accordance with section 365(b)(1) of the Bankruptcy Code (a "Cure Payment") on the Effective Date or upon such other terms and dates as the parties to such executory contract or unexpired lease otherwise may agree.  Any party to an executory contract or unexpired lease with NYC OTB that NYC OTB will assume under the

[[3251169][3253435]]

Plan who asserts a right to a Cure Payment other than current payments owing under the contract or lease in the ordinary course of business must file proof of such Cure Payment claim with the Office of the Clerk of the Court no later than the Objection Deadline and serve it upon counsel for NYC OTB, Cravath, Swaine & Moore LLP, Worldwide Plaza, 825 Eighth Avenue, New York, NY 10019, Attn: Richard Levin and upon counsel for the Official Committee of Unsecured Creditors, Blank Rome LLP, The Chrysler Building, 405 Lexington Avenue, New York, NY 10174, Attn: Marc E. Richards & Andrew B. Eckstein so as to be received by the Objection Deadline. The Court shall retain jurisdiction to resolve any dispute regarding (a) the amount of any Cure Payment, (b) the ability of the Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the executory contract or unexpired lease to be assumed or (c) any other matter pertaining to assumption, and any Cure Payment required by section 365(b)(1) of the Bankruptcy Code shall be made promptly after a Final Order resolving such dispute.

C. **Rejection Damage Claims**. Any Claim for damages arising from the rejection of an executory contract or unexpired lease of the Debtor under the Plan shall be forever barred and unenforceable against the Debtor, its properties, agents, successors, or assigns, unless a proof of claim is filed with the Court on or before the later of (i) the date that is 30 days after the date of entry of an order by the Court authorizing rejection of a particular executory contract or unexpired lease (including the Confirmation Order) or (ii) the Bar Date. Any such Claim that is timely filed as provided herein and Allowed shall be classified as a Class 6 Claim and treated accordingly.

D. **OPEB Liabilities**. NYC OTB's OPEB Liabilities arising on and after the ~~Petition~~**Effective** Date (but not any OPEB Liabilities that ~~accrued~~**arose** before the Petition Date) shall be assumed by NYC OTB on and following the Effective Date.

## ARTICLE V:MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

A. **Effective Date.** Each of the actions required to take place on the Effective Date shall be taken by the Debtor or such other Person, as applicable, on the Effective Date.

B. **Business Restructuring Plan.** To implement the Plan, the Debtor shall undertake the following:

1. NYC OTB will maintain its approximately 50 remaining branch locations and seek to negotiate more favorable lease terms on these locations.

2. NYC OTB will make moderate investments in those locations where it is clear to NYC OTB that the Handle can be increased (for example, expansion in some locations that are currently crowded due to a previous branch closure nearby). NYC OTB's intent is to slow the rate of Handle decline at the remaining locations.

3. NYC OTB will seek private industry partners to build at least one new prototype location similar to the off-track wagering facility at Woodbridge, New Jersey. Any NY Track within 30 miles of a proposed location will have the right of first refusal to be the financial partner with NYC OTB and any other similar facility that is proposed and built. If

more than one NY Track is located within 30 miles, both NY Tracks will have the right of first refusal and may partner together.

4.      The overhead of NYC OTB will be substantially reduced with the elimination of roughly 400 positions (including reductions since the Petition Date and the reduction in ADW positions). NYC OTB will fund a targeted voluntary severance program for employees that are displaced by the overhead reduction.

5.      Remaining overhead expenses will be limited in purpose to serve the daily needs of the ongoing branches (security, supplies, reporting, etc.) and to make investments in new Handle prototypes. NYC OTB will seek to outsource certain overhead functions required by the branches.

6.      NYC OTB will obtain estimates from qualified tote companies to upgrade all existing machines and service those machines going forward. NYC OTB will make available, subject to the vendor's requirements, the opportunity to participate in the tote upgrade and service contract to each of the NY Tracks.

7.      NYC OTB will reduce its space requirements to no more than half of the existing space at its headquarters at 1501 Broadway, New York and at its warehouse in Maspeth.

8.      NYC OTB will implement a "New York First" program wherein New York racing product is featured. Other than on major event dates (Triple Crown, Breeders' Cup, etc.), NYC OTB will carry all operating in-state tracks and will feature these events on the largest screens available in the parlors. NYC OTB will also reduce the number of out-of-state signals historically broadcast in the parlors.

9.      Upon the Effective Date, NYC OTB will no longer be required to deposit funds into the Segregated Account and will pay its general operating expenses in the ordinary course of business.

**C.      Distributions**.

1.      *Disbursing Agent*:  On or after the Effective Date, the Debtor may retain one or more agents to perform or assist it in performing the distributions to be made pursuant to the Plan. The Debtor may provide reasonable compensation to any such agent(s) without further notice or Court approval.

2.      *Delivery of Distributions*:  Subject to Rule 9010 of the Bankruptcy Rules, distributions to any Claimant shall be made at the Claimant's address as set forth in the books and records of the Debtor or its agents unless superseded by the address set forth on a proof of claim filed by the Claimant, or at the last known address of the Claimant if no proof of claim is filed or if the Debtor has been notified in writing of a change of address.

3.      *Manner of Distributions Under the Plan*:  Unless the Claimant receiving a Distribution agrees otherwise, any Distribution to be made by the Debtor shall be made, at the Debtor's election, by check drawn on a domestic bank or by wire transfer from a domestic bank.

[[3251169]]3253435]]

The Debtor need not make any payment to a Claimant of less than $10 until such time, if ever, as the amount payable to the Claimant is equal to or greater than $10.

4.    *Timeliness of Payments*:  Any payments or distributions to be made pursuant to the Plan shall be deemed to be timely made if made within 14 days after the dates specified in the Plan.  Whenever any distribution to be made under the Plan shall be due on a day that is not a Business Day, such distribution instead shall be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

5.    *Prepayments*:  The Debtor may prepay, without penalty, all or any portion of an Allowed Claim at any time, but only in accordance with the terms of the Plan.

6.    *Time Bar to Cash Payments*:  Checks issued by the Debtor on account of Allowed Claims shall be null and void if not negotiated within six months from and after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Debtor by the holder of the Allowed Claim with respect to which such check originally was issued.  Any Claim in respect of such a voided check shall be made on or before the first anniversary of the date of the check.  After such date, all Claims in respect of voided checks shall be discharged and forever barred, and the Debtor shall retain all moneys related thereto.

7.    *Holding of Unclaimed Distributions*:  If any distribution to any Claimant is returned to the Debtor as undeliverable, no further distributions shall be made to the Claimant unless and until the Debtor is notified, in writing, of the Claimant's then-current address.  An unclaimed distribution shall remain in the possession of the Debtor until such time as the unclaimed distribution becomes deliverable.  All entities ultimately receiving undeliverable Cash shall not be entitled to any interest or other accruals of any kind.  Nothing contained in the Plan requires the Debtor to attempt to locate any holder of an Allowed Claim.  Any Claim in respect of an unclaimed distribution shall be made on or before the first anniversary of the date the distribution was returned to the Debtor as undeliverable.  After such date, all Claims in respect of unclaimed distributions shall be discharged and forever barred, and the Debtor shall retain all moneys related thereto.

8.    *No Post-Petition Accrual*:  Unless otherwise specifically provided in the Plan or Allowed by order of the Court, the Debtor shall not be required to pay to any holder of a Claim any interest, penalty or late charge accruing with respect to such Claim on or after the Petition Date.

9.    *Allocation of Plan Distributions Between Principal and Interest*:  To the extent that any Allowed Claim entitled to a distribution pursuant to the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated, for all income tax purposes, to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

**D.    Withholding and Reporting Requirements.**  All payments and distributions under the Plan are subject to applicable legal withholding and reporting requirements imposed by any federal, state, provincial, local or foreign taxing authority with respect to payments or

distributions under the Plan. The Debtor shall, to the extent applicable, comply with all such requirements. The Debtor may take all actions necessary and appropriate to comply with such requirements. As a condition of making any payment or distribution under the Plan, the Debtor may require the holder of a Claim to provide the holder's taxpayer identification number and such other information, certification or forms as necessary to comply with applicable tax reporting and withholding laws. Notwithstanding any other provision of the Plan, each entity receiving a payment or distribution under the Plan shall have sole and exclusive responsibility for the satisfaction and payment of tax obligations on account of any such payment or distribution.

E. **Continued Vesting of Property of the Debtor.** Except as otherwise provided in Section V.G. with respect to the ADW, the property of the Debtor, including all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, shall remain vested in the Debtor on the Effective Date. As of the Effective Date, all such property of the Debtor shall be free and clear of all Claims and liens with respect thereto, except as specifically provided for in the Plan or the Confirmation Order.

F. **Post-Effective Date Operations.** On and after the Effective Date, the Debtor shall continue in existence as and to the extent authorized by the laws of the State of New York and shall retain all rights and have all responsibilities provided under such laws. The Debtor may continue to conduct its operations and business and such other activities as it may be permitted to conduct by applicable law and the Plan, as amended or superseded from time to time.

G. **ADW.**

1. **ADW Cash Transfer.** On the Effective Date, the Debtor will transfer to Newco ADW from a segregated account any Cash that is attributable to a customer ADW account.

2. **ADW Operational Requirements**. Following the Effective Date:

(a) NYC OTB shall not operate, or, except as provided below, affiliate with the operator of, an account deposit wagering business. NYC OTB shall have the right to enter into joint ventures or management agreements with Newco ADW for the operation of parlors or restaurants, except that any such right shall be subordinate and subject to any right of first refusal granted to an individual NY Track that holds a membership interest in Newco ADW.

(b) The employment of existing ADW employees shall be terminated as of the Effective Date.

(c) Newco ADW customers shall have the option of making deposits and withdrawals at NYC OTB parlors to or from their Newco ADW accounts.

[[3251169][3253435]]

(d) NYC OTB parlors shall prominently display offers to sign up for new Newco ADW accounts.

3. **ADW Pricing**. Following the Effective Date:

(a) Newco ADW shall pay the NYC OTB (A) an administrative fee per transaction of 0.25% of the amount of each deposit and withdrawal at its branch network, up to a maximum of $10 per transaction and (B) a fee of 2% of the amount of each betting transaction performed on a NYC OTB terminal, up to a maximum of $10 per transaction (collectively, the "NYC OTB Transaction Fees").

(b) Each wager on a race run at a NY Track placed with Newco ADW shall be deemed to have been placed at the racetrack for purposes of Direct Commission payments. The amount paid to the NY Track at which such wager was deemed placed shall be reduced by an amount equal to 1% of the total takeout (which shall be used to pay management fees). This distribution calculation shall not be modified except by a vote of greater than 66 2/3% of the membership interests in Newco ADW.

(c) For all wagers on out-of-state racetracks accepted by Newco ADW, all indirect purse commissions shall remain at historical NYC OTB statutory levels and shall be considered as expenses of Newco ADW before any equity distribution.

**H.      Execution and Delivery of Documents; Other Actions**.  The Debtor shall take all actions and shall execute, deliver and record such documents or instruments as is necessary or appropriate to the successful implementation and execution of the Plan, to consummate the transactions contemplated by the Plan or to carry out the purposes of the Plan.

**I.      Retention and Enforcement of Claims**.  Any Claim owned by the Debtor against any entity and any cause of action that could have been brought by a Claimant on the Debtor's behalf not waived or released under the Plan shall be the property of, and may be pursued by, the Debtor as provided in the Plan, except any Claims against any NY Track, which are hereby released.  The Debtor shall have the exclusive right to settle or compromise any such Claim or cause of action, without Court approval.

**J.      Exculpation.  Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim.  In all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

**K.      Consenting Creditor Release of Released Parties.  As of the Effective Date, each Claimant who has accepted the Plan is deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged each Exculpated Party**

[[3251169]]3253435]]

from any and all Claims that were not the result of gross negligence, fraud, willful misconduct or criminal conduct by the Exculpated Party.

**L.      Limited Third Party Release.**  As of the Effective Date, all Persons shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged the Track Parties from any and all claims, interests, obligations, rights, suits, damages, claims for relief, causes of action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, the Debtor's restructuring efforts, the Case, the compromise of any Claim of any member of the Creditors' Committee, the Legislation or the relationship of any Track Party and the Debtor; <u>provided</u>, <u>however</u> that this Article V.L shall not release any Track Party from any cause of action solely arising out of any failure of that Track Party to pay into the purse account such Applicable Contractual Percentage of any annual profits that such Track Party actually receives from Newco ADW on account of that Track Party's equity interest in Newco ADW; <u>provided</u>, <u>further</u>, that this Article V.L shall not release the NY Tracks from any cause of action held by a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other domestic state, city, or municipal tax code; (ii) the environmental laws of the United States or any domestic state, city, or municipality, (iii) any criminal laws of the United States or any domestic state, city, or municipality, (iv) the securities laws of the United States or any domestic, state, city or municipality, (v) the Employee Retirement Income Security Act of 1974, as amended, or (vi) the law and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security; <u>provided</u>, <u>further</u>, that this Article V.L shall not release the Track Parties from any cause of action related to any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud (to the extent imposed by applicable non-bankruptcy law).

**M.      Injunction.**  From and after the Effective Date, all persons are permanently enjoined from commencing or continuing in any manner, any cause of action released or to be released pursuant to the Plan or the Confirmation Order.

**ARTICLE VI:GENERAL PROCEDURES FOR OBJECTING TO CLAIMS AND RESOLVING AND TREATING DISPUTED CLAIMS**

**A.      Debtor Objection Deadline**.  The Debtor may file any objection to the allowance of a Claim against the Debtor with the Court and serve the objection on the holder of such Claim at any time before the administration of the Case has been completed and a final decree closing the Case has been entered, unless another date is established by the Court or by amendment to the Plan.  If the Debtor has not filed an objection to a Claim against the Debtor by the deadline established under the Plan, the Claim shall be treated as an Allowed Claim unless it is otherwise a Disputed Claim.

**B.      Prosecution of Objections**.  The Debtor shall, in its sole discretion, litigate to judgment, settle or withdraw objections to Claims against the Debtor without further Court

[[3251169]]3253435]]

approval. Rule 9019 of the Bankruptcy Rules does not apply to the settlement or withdrawal of any objection.

**C. Preservation of Objections**. Except as otherwise provided in the Plan, the Confirmation Order or other Final Order, no compromise, waiver or release of Claims held by the Debtor that may be provided for in the Plan or in any Final Order shall in any way limit or impair the right of the Debtor to prosecute an objection to a Claim against the Debtor, and the Debtor hereby reserves all rights to object to the allowability of any Claim against the Debtor and reserves all defenses against any such Claim. Notwithstanding the existence of a colorable objection to any Claim against the Debtor, the Debtor may, in its sole discretion, determine whether an objection to any Claim against the Debtor should be filed and may, in its sole discretion, decline to file or prosecute any objection to any Claim against the Debtor.

**D. No Distributions Pending Resolution of Objections**. Notwithstanding any other provision of the Plan, no Distributions shall be made with respect to a Disputed Claim (or any portion of a Disputed Claim if such Claim is not severable) by the Debtor unless and until all objections to such Disputed Claim have been determined by a Final Order. Distributions made after the Effective Date in respect of Claims that were not Allowed as of the Effective Date (but which later became Allowed) shall be deemed to have been made as of the Effective Date.

## ARTICLE VII:CONDITIONS PRECEDENT

**A. Conditions Precedent to the Effective Date**. The "effective date of the plan," as used in section 1129 of the Bankruptcy Code, shall not occur, and the Plan shall be of no force and effect, until the Effective Date. The occurrence of the Effective Date is subject to satisfaction of the following conditions precedent:

      1.     The Confirmation Order is in a form and substance satisfactory to the Debtor;

      2.     The Confirmation Order has been entered;

      3.     The Legislation has been enacted;

      4.     All agreements and instruments contemplated by, or to be entered into pursuant to, the Plan are in form and substance acceptable to the Debtor and all conditions to their effectiveness (other than execution and delivery) have been satisfied or waived;

      5.     All other actions and documents necessary to implement the Plan or required by the Racing Law, as it may be amended, have been effected or executed, as applicable; and

      6.     The Effective Date occurs on or before January 31, 2011 (the "Outside Date").

**B. Waiver of Conditions**. NYC OTB, with the approval of the Creditors' Committee, may waive the conditions to the Effective Date set forth in section VII.A.3 (Legislation) or section VII.A.6 (Outside Date) in whole or in part. As to the Creditors'

Committee's waiver of conditions precedent to the Plan going effective as required in section VII.A.3 relating to specific points of the Legislation enumerated in Exhibit A hereto, (a) the waiver or modification of points 2, 5, 7, 8, 9, 10, 11 and/or 17 of the Legislation enumerated in Exhibit A shall require a vote in favor of waiver by all of the NY Tracks, (b) the waiver or modification of points 14, 15 and/or 16 of the Legislation enumerated in Exhibit A shall require a vote in favor of waiver by a supermajority of the Creditors' Committee and (c) the waiver or modification of points 1, 3, 4, 6, 12 and/or 13 of the Legislation enumerated in Exhibit A shall require a vote in favor of waiver by a simple majority of the Creditors' Committee. For the purposes of this provision, "supermajority" shall mean, of those Creditors' Committee members voting on the issue, a vote meeting the following requirements: (i) abstentions shall not count as votes, (ii) if four or fewer than four members shall be voting on the issue, unanimous acceptance of the proposal shall be required; (iii) if five members shall be voting on the issue, four affirmative votes shall be required; (iv) if six members shall be voting on the issue, five affirmative votes shall be required; and (v) if seven members shall be voting on the issue, five affirmative votes shall be required. The Debtor may assert the failure to satisfy or waive any condition to the Effective Date as a basis for not consummating the Plan, regardless of the circumstances giving rise to the failure of such condition to be satisfied or waived. The failure of the Debtor to exercise any of its foregoing rights is not a waiver of any of its other rights. Each such right is an ongoing right that may be asserted at any time.

      **C.**     **Effect of Failure of Conditions**. If the conditions to the Effective Date have not been timely satisfied, upon notice filed by the Debtor with the Court, (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the rights and obligations of the Debtor and all Claimholders shall be restored to the status quo as of the day immediately preceding the Confirmation Date as though Confirmation had never occurred and (d) all of the Debtor's rights and obligations and Claimants' rights and obligations with respect to the Claims shall remain unchanged, and nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtor or any other entity or to prejudice in any manner the rights of the Debtor or any other entity in any further proceedings involving the Debtor.

<h2 style="text-align:center">ARTICLE VIII:DISCHARGE</h2>

      **A.**     **Discharge of Debts**. Except as otherwise provided in the Plan or the Confirmation Order, all consideration distributed under the Plan is in full satisfaction, settlement, release, and discharge of, and in exchange for, all Claims of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred thereon, against the Debtor or any of its assets, properties or interests in property. Pursuant to section 944 of the Bankruptcy Code, upon the Effective Date, the Debtor shall be discharged on the Effective Date from all debts of the Debtor and Claims against the Debtor.

      **B.**     **Injunction**. All entities are enjoined from the commencement or continuation against the Debtor, its successors or assigns (including the post-confirmation NYC OTB), its agents and employees, or its respective assets, properties or interests in property, any other or further Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date, regardless of whether or not the facts or legal bases therefor were known or existed before the Effective Date, whether or not a proof of Claim was

[[3251169]]3253435]]

filed, whether or not the holder thereof accepted the Plan and whether or not the Claim is an Allowed Claim.

      **C.**    **Judgments Obtained on Discharged Debts Are Void**.  As provided in sections 901(a) and 524(a)(1) of the Bankruptcy Code, the Debtor's discharge upon Confirmation under section 944(b) of the Bankruptcy Code voids any judgment at any time obtained, to the extent that such judgment is a determination of liability of the Debtor with respect to any Debt discharged, whether or not discharge of such Debt is waived.

## ARTICLE IX:MODIFICATION OF PLAN

      **A.**    **Modification**.  The Debtor may modify the Plan and the Exhibits as provided in and to the fullest extent permitted by sections 942 and 1127(d) of the Bankruptcy Code and Rule 3019 of the Bankruptcy Rules.

## ARTICLE X:GENERAL PROVISIONS

      **A.**    **Jurisdiction**.  The Court shall retain jurisdiction after Confirmation to the fullest extent permitted by law.

      **B.**    **Interpretation**.  To the extent that the terms of the Plan are inconsistent with the terms of any agreement or instrument concerning any Claim against the Debtor, or any other matter, the terms of the Plan shall control.

      **C.**    **Binding Effect**.  Upon Confirmation, the Debtor, any entity acquiring property under the Plan, and all Claimants, whether or not a proof of such Claimant's Claim is filed or deemed filed under section 501 of the Bankruptcy Code, whether or not such Claim is allowed under section 502 of the Bankruptcy Code, and whether or not such Claimant has accepted the Plan, shall be bound by the provisions of the Plan, in accordance with section 944(a) of the Bankruptcy Code.

      **D.**    **Applicable Law**.  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that an Exhibit hereto provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the Bankruptcy Code and, to the extent not inconsistent therewith, the laws of the State of New York, without giving effect to principles of conflicts of laws.

      **E.**    **Severability**.  If, prior to the Confirmation Date, the Court holds any term or provision of the Plan invalid, void or unenforceable, the Court, with the consent of the Debtor, may alter or interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**F.      Service of Documents**.  Any notice, request or demand required or permitted to be made or provided to or upon the Debtor under the Plan shall be: (a) in writing, (b) served on the Debtor by (i) certified mail, (ii) hand delivery, (iii) overnight delivery service, (iv) first class mail or (v) electronic mail, (c) deemed to have been duly given or made when actually delivered or, in the case of notice by electronic mail, when received and confirmed by a corresponding electronic notice of receipt and (d) addressed as follows:

|  | With a copy to: | With a copy to: |
|---|---|---|
| NEW YORK CITY OFF-TRACK BETTING CORPORATION Attn: General Counsel 1501 Broadway New York, NY 10019 Facsimile: (212) 704-5678 | CRAVATH, SWAINE & MOORE LLP Richard Levin Worldwide Plaza 825 Eighth Avenue New York, NY 10019 Facsimile:  (212) 474-3700 Email:  rlevin@cravath.com | BLANK ROME LLP Attn: Marc E. Richards & Andrew B. Eckstein The Chrysler Building 405 Lexington Avenue New York, NY 10174 Email: MRichards@BlankRome.com AEckstein@BlankRome.com |

**G.      No Successor Liability**.  No Claimant may, on account of its Claim or interest, seek or receive any payment or other distribution from, or seek recourse against, the Debtor or its successors, assigns or property, except as expressly provided in the Plan.

**H.      Term of Automatic Stay**.  The automatic stay applicable to the Case under Bankruptcy Code section 362 shall remain in full force and effect until the Effective Date.

**I.      Creditors' Committee**.  On the Effective Date, the Creditors' Committee shall be dissolved and, upon such dissolution, the Creditors' Committee, members of the Creditors' Committee and the Creditors' Committee's professionals shall be released and discharged from any further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Case.

**J.      Revocation or Withdrawal of the Plan**.  The Debtor reserves the right to (a) revoke or withdraw the Plan before Confirmation or (b) move the Court for the dismissal of the Case or any other relief.

[[3251169]]3253435]]

**K.**    **Time Is of the Essence**.  Time is of the essence with respect to all provisions of the Plan.

Dated:  New York, New York
        November 29,**30,** 2010

                                NEW YORK CITY OFF-TRACK BETTING
                                CORPORATION,

                    By:    _____

                           Name:    GREG RAYBURN

                           Title:    Chief Executive Officer

By :    /s/ Richard Levin
        _____
        RICHARD LEVIN (RL 1651)
        CRAVATH, SWAINE & MOORE LLP
        Worldwide Plaza
            825 Eighth Avenue
            New York, NY 10019
                (212) 474-1000

        *Attorney for the New York City Off-Track*
        *Betting Corporation*

[[3251169]]3253435]]

**LEGISLATION**

A condition precedent to the Effective Date is that the State of New York enact legislation that includes the content of each of the following provisions set forth below and does not include any change to any statute that requires NYC OTB to pay to any NY Track that is represented on the Creditors' Committee any commissions for wagering accepted by NYC OTB on races at that track (i.e., "dailies"). For the purposes of this Exhibit A, Year 1 commences on the Effective Date.

1.    All Dark Day and Maintenance of Effort payments are eliminated for NYC OTB.

2.    The Indirect Commissions (other than Dark Day and Maintenance of Effort payments and other than Indirect Commissions based on wagers placed on races run at Finger Lakes Racing Association, Inc.'s track) paid to NY Tracks from NYC OTB are reduced on the following basis:

|         | Indirect Commission Reduction |
|---------|-------------------------------|
| Year 1  | 50%                           |
| Year 2  | 40%                           |
| Year 3  | 30%                           |
| Year 4  | 20%                           |

The remaining 20% holdback decreases to 10% if NYC OTB's annual Handle is between $600 million and $620 million, and decreases to zero in any year in which NYC OTB's annual Handle exceeds $620 million.

3.    All state pari-mutuel tax rates in effect before the Effective Date on NYC OTB Handle are reduced by 50% for Year 1 and Year 2. After Year 2, the tax rates are increased as the following NYC OTB Handle levels are achieved:

| For Year Ending Handle (in $MM) | NYC OTB Tax Rate as a percentage of pre-Effective Date Tax Rate |
|---------------------------------|----------------------------------------------------------------|
| 610-615                         | 57.5%                                                          |
| 616-620                         | 62.5%                                                          |
| 621-629                         | 75.0%                                                          |
| 630-635                         | 82.5%                                                          |
| 636-640                         | 92.5%                                                          |
| 641 and up                      | 100.0%                                                         |

4.    NYC OTB may retain all tickets that were uncashed as of April 1, 2010 and that were previously escheated to New York State and all future uncashed tickets.

5.      The transfer, ownership and operation of the ADW as provided in the Plan is authorized.

6.      NYC OTB payments to the harness breeding fund are reduced to the same percentage levels as the thoroughbred breeders fund.

7.      Monticello Raceway Management, Inc. ("MRMI"), Tioga Downs and Vernon Downs are permitted to offer subsidized (i.e., nontaxable) promotional credits to their customers up to 10.0% of the total revenue wagered on their video lottery terminals at the vendor track after payout for prizes. All other racinos in New York State are permitted to offer subsidized (i.e., nontaxable) promotional credits to their customers up to 7.5% of the total revenue wagered on their video lottery terminals at the vendor track after payout for prizes.

8.      The VLT Capital Improvement Fund co-investment requirement for racetracks that now or in the future have more than 1,100 video lottery terminals will be eliminated.

9.      Effective on and after May 1, 2010, MRMI shall be eligible for a vendor's capital award of 1.5% of the total revenue from wagering on its video lottery terminals at its facility after payout for prizes, but upon relocation, if any, of its facility from the real property currently owned by MRMI in Monticello, N.Y., it will no longer be eligible for this vendor's capital award.

10.      NYC OTB must offer all tracks on the Creditors' Committee the opportunity to join their out-of-state racing simulcasting contracts if such tracks choose to do so, subject to such tracks being responsible for any resulting increase in contract cost.

11.      The minimum number of race dates for MRMI under Racing Law section 318(5) is reduced from 90% to 70%, and the minimum number of race dates for MRMI under Racing Law section 307(5-a) is reduced from 75% to 60% and from 100% to 80%.

12.      NYC OTB is barred from filing a chapter 9 petition in the future.

13.      NYC OTB will be governed by an expanded board of directors that will include three additional non-voting members, comprised of a harness track representative, a thoroughbred track representative and a union representative, which shall be the collective bargaining representative with the greatest number of NYC OTB employees.

14.      NYC OTB's annual budgets must be balanced and independently reviewed by the Director of the State Budget. If the Director of the State Budget determines that the budget is not balanced, NYC OTB will revise the budget to comply with the Director of the State Budget's determination of what is needed to balance the budget.

15.      The following are NYC OTB events of default:

[[3251169]]3253435]]

a.  Failure to make payment of any commissions due to the NY Tracks within 60 days after the last day of the month in which the commissions accrued, with an additional 30-day cure period available to NYC OTB.

b.  Failure to achieve positive EBITDA in any two consecutive fiscal years.

c.  Failure to have a balanced budget reviewed by the Director of the State Budget in any fiscal year.

16.  In the event of one or more defaults outlined in section 15 above, the management of NYC OTB will be assumed by Newco ADW.  NYRA and the Yonkers Racing Corporation will be jointly responsible for the management of NYC OTB on behalf of Newco ADW and will not receive compensation of any kind for their services. However, NYC OTB will continue to be governed and owned in a form consistent with the governance and ownership existing at the time of the transfer of management.

17.  Track Parties shall not have any liability or obligation to any person or entity for any act or omission (except such as may be the result of gross negligence, fraud, willful misconduct or criminal conduct by the Released Party) in connection with or arising out of (i) the negotiation of a restructuring of NYC OTB's business and operations, (ii) the operation of NYC OTB's business prior to the Effective Date of the Plan, (iii) the pursuit of approval and consummation of the Plan, (iv) the transactions contemplated under the Plan, (v) the property to be distributed under the Plan, or (vi) the Claims or other obligations extinguished or impaired under the Plan, including any deficiency in contributions to purses that arises out of NYC OTB's failure to pay the pre-petition or post-petition Claims of the NY Tracks, whether such contributions are required by statute or contract.

[[3251169]]3253435]]

**ADW ASSETS**


NYC OTB shall transfer the following assets under the Plan to Newco ADW:

1)     Any and all title and ownership rights or interests that NYC OTB may possess in its current ADW accounts, along with any and all information that NYC OTB has concerning the ADW accounts and the holders thereof, including customer lists and other customer data;

2)     All funds that NYC OTB holds for ADW account holders at the time of transfer, which are currently held (and will continue to be held until the time of transfer) in a segregated account;

3)     The rights to or interests in the NYC OTB's telephone numbers used by the holders of the ADW accounts to reach NYC OTB's current ADW operations;

4)     The domain names held by NYC OTB with respect to its internet wagering platform (e.g., www.ibetOTB.com) and the right, if NEWCO ADW chooses, to continue to use AmTote as the totalisator backend to the internet wagering platform;

5)     Any right that NYC OTB might currently have, or might in the future have, to conduct an ADW operation, unless NYC OTB acts in partnership with the NEWCO ADW in so doing.

ADW assets to be transferred to NEWCO ADW do not include terminals and furnishings used by NYC OTB's telephone betting operators, the lease interest NYC OTB holds to the space which the terminals, furnishings and operators occupy, and personnel.

[[3251169]3253435]]

EXHIBIT C
**NEWCO ADW ASSUMED CLAIMS**

Newco ADW shall assume the following liabilities:

1)      All customer ADW accounts.

[[3251169]]3253435]]

EXHIBIT D
**ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

<u>Executory Contracts</u>:

(1)     ATM Placement Agreement with ATM Management Incorporated, dated February 24, 2006.

(2)     Winner's Circle Contract with J.HG.E Restaurant Inc., dated May 1, 2000.

(3)     The Inside Track Contract with Joe Ray Bar & Restaurant Inc., dated May 1, 2000.

(4)     Race Results Contract with ICN Corporation, dated May 17, 2001.

(5)     Vending Agreement Contract with Compass Group USA Inc., dated May 10, 2007.

(6)     EFT Contract with Money Movers of America, Inc., dated September 27, 2006.

(7)     Insurance Brokerage and Risk Management Contract with Marsh USA, Inc., dated June 27, 2010.

(8)     Lease Management Contract with GMAC Real Estate IPG, dated October 1, 2008.

(9)     Accounting/Auditing Services Contract with UHY LLP, dated June 12, 2003.

(10)    Engineering and Architectural svcs Contract with Cashin Associates P.C., dated April 26, 2010

(11)    Subscription plan for state/local government contract with Lexis Nexis, dated December 18, 2008.

(12)    Contract with Austin's Ale House, dated December 31, 2003.

(13)    Fiddler's Elbow Restaurant Contract with Fiddler's Elbow, INC, dated February 15, 2001.

(14)    Hunter's Steak and Ale House Restaurant Contract with Gorm Restaurant INC., dated September 26, 2000.

(15)    The New Irish Circle Restaurant Contract with J&F Tavern Corp., dated August 1, 2002.

(16)    The Playwright Irish Pub Restaurant Contract with N & A Productions, dated September 30, 2004.

(17)    O'Neill's Restaurant Contract with 65th Place Restaurant, Inc, dated September 26, 2000.

[[3251169]|3253435]]

(18)     IL Fornetto's Restaurant Contract with Angelo's on the Bay, INC., dated January 15, 2003.

(19)     Contract with the City of New York, dated June 16, 2008.

(20)     Public Telephone Services Contract with TCC Teleplex, dated October 18, 2006.

(21)     Contract with Benefit Resource, INC., dated October 5, 2007.

(22)     Microsoft ELA – NYSOGS Contract with Microsoft Licensing, GP, dated April 25, 2009.

(23)     License Agreement with Equibase Company LLC, dated April 1, 2004.

(24)     McAfee OFT ELA Contract with NYS CIO/OFT, dated October 15, 2009.

(25)     Contract with Verizon Business, dated December 3, 1998.

(26)     Graphics Display System Contract with TeLeView, dated December 1998.

(27)     Frame Relay Network Service Contract with RCN, dated October 2007.

(28)     Decoders Contract with RCN/SI Games, dated year to year.

(29)     Call Accounting Contract with Xtend Communications, dated year to year.

(30)     Maintenance Support Contract with Siemens ICN, dated year to year.

(31)     Long Distance Service Contract with AT&T, dated year to year.

(32)     Branch Cable Service Contract with Time Warner Cable, dated year to year.

(33)     Contract with Direct TV, dated year to year.

(34)     ISP Connectivity Contract with Matrix, dated year to year.

(35)     NYSOGS Contract with Granicus Inc., dated as needed.

(36)     Payroll/HR Contract with PeopleStartegy.com, dated as needed.

(37)     Betting System Contract with Amtote International Inc., dated June 27, 2002.

(38)     Contract with MAZU Networks, dated August 31, 2009.

(39)     Citrix Contract with Citrix Systems, dated September 30, 2009.

(40)     Maintenance and Support Contract for Veritas Backup beginning January 14, 2009 to January 15, 2011.

(41)    NYSOGS Contract with Verizon, dated until April 1, 2011.

(42)    NYSOGS Contract with Verizon Wireless, dated until April 1, 2011.

(43)    NYSOGS Contract with AT&T, dated annually.

(44)    Support & Maintenance Contract with DoubleTake Software Baker, dated March 30, 2009.

(45)    Support & Maintenance Contract with Nexus Consortium, dated July 14, 2009.

(46)    Support & Maintenance Contract with GCS Computers Inc., dated April 1, 2009.

(47)    License & Support Contract with SHI, dated May 11, 2010.

(48)    Licenses Contract with Cyber Patrol, dated May 18, 2010.

(49)    Support & Maintenance Contract with Web Sense, dated April 30, 2009.

(50)    Support & Maintenance Contract with Web Sense, dated April 30, 2009.

(51)    Support & Maintenance Contract with Teneo Inc, dated September 1, 2008.

(52)    Support & Maintenance Contract with Fatpipe Networks, dated June 1, 2009.

(53)    Support & Maintenance Contract with Chelsea Tech, dated June 30, 2009.

(54)    Support & Maintenance Contract with RIM, dated June 30, 2009.

(55)    Registration Contract with Verisign Inc., dated February 9, 2009.

(56)    Support & Maintenance Switches with Computer Network Solution, dated November 31, 2009.

(57)    Registration Contract with Verisign Inc., dated February 9, 2009.

(58)    Support & Maintenance Contract with ScriptLogic Corp, dated March 30, 2009.

(59)    Domain Registrations & Renewals Contract with Network solutions, dated as needed.

(60)    NYSOGS Contract with Broadview Networks, dated April 1, 2009.

(61)    NYSOGS Contract with Broadview Networks, dated August 31, 2009.

(62)    NYSOGS Contract with Iron Mountain, dated September 15, 2008.

(63)    Web Site Design and Related Services Contract with Spiralaxis iDesigns Inc., dated August 3, 2007.

(64)     iCandy Data Contract with C-Scape Consulting Corp., dated August 30, 2006.

(65)     Facilities System Contract with Maintenance Connection Inc., dated 2007.

(66)     Financial System Contract with Epicor Software Corp., dated May 7, 2009.

(67)     Timekeeping Contract with Kronos Inc., dated August 1999.

(68)     Wagering and Simulcasting Contract with Arlington Park, dated February 19, 2008.

(69)     Wagering and Simulcasting Contract with Atlantic City Race Course, dated April 13, 2009.

(70)     Wagering and Simulcasting Contract with Balmoral Park, dated March 27, 2006.

(71)     Wagering and Simulcasting Contract with Beulah Park, dated December 30, 2005.

(72)     Wagering and Simulcasting Contract with Cal Expo, dated January 1, 1999.

(73)     Wagering and Simulcasting Contract with Calder Race Course, dated February 19, 2008.

(74)     Wagering and Simulcasting Contract with Canterbury Park, dated July 15, 2004.

(75)     Wagering and Simulcasting Contract with Charles Town Races, dated September 3, 2004.

(76)     Wagering and Simulcasting Contract with Churchill Downs, dated February 19, 2008.

(77)     Wagering and Simulcasting Contract with Colonial Downs, dated June 1, 2006.

(78)     Wagering and Simulcasting Contract with Del Mar Thoroughbred Club, dated May 15, 2006.

(79)     Wagering and Simulcasting Contract with Delaware County Fair, dated September 7, 2006.

(80)     Wagering and Simulcasting Contract with Delaware Park, dated April 1, 1997.

(81)     Wagering and Simulcasting Contract with Delta Downs, dated October 24, 2003.

(82)     Wagering and Simulcasting Contract with Dover Downs, dated January 1, 1999.

(83)     Wagering and Simulcasting Contract with Ellis Park, dated February 19, 2008.

(84)     Wagering and Simulcasting Contract with Emerald Downs, dated April, 15, 1999.

(85)     Wagering and Simulcasting Contract with Evangeline Downs, dated March 8, 2007.

[[3251169]|3253435]]

(86)      Wagering and Simulcasting Contract with Fair Grounds Race Course, dated February 19, 2008.

(87)      Wagering and Simulcasting Contract with Fairplex Park, dated September 10, 1998.

(88)      Wagering and Simulcasting Contract with Finger Lakes Race Track, dated March 27, 2006.

(89)      Wagering and Simulcasting Contract with Fort Erie Race Track, dated April 21, 2005.

(90)      Wagering and Simulcasting Contract with Freehold Raceway, dated July 17, 2003.

(91)      Wagering and Simulcasting Contract with Golden Gate Fields, dated February 19, 2008.

(92)      Wagering and Simulcasting Contract with Gulfstream Park, dated February 19, 2008.

(93)      Wagering and Simulcasting Contract with Harrah's Louisiana Downs, dated June 23, 1999.

(94)      Wagering and Simulcasting Contract with Harrington Raceway, dated May 3, 1999.

(95)      Wagering and Simulcasting Contract with Hastings Racecourse, dated June 3, 2005.

(96)      Wagering and Simulcasting Contract with Hollywood Park, dated October 10, 2008.

(97)      Wagering and Simulcasting Contract with Hoosier Park, dated February 19, 2008.

(98)      Wagering and Simulcasting Contract with Indiana Downs, dated March 21, 2007.

(99)      Wagering and Simulcasting Contract with Keeneland Racing Association, dated April 1, 1999.

(100)    Wagering and Simulcasting Contract with Los Alamitos Race Course, dated January 1, 1999.

(101)    Wagering and Simulcasting Contract with Laurel Park, dated February 19, 2008.

(102)    Wagering and Simulcasting Contract with Lone Star Park, dated February 19, 2008.

(103)    Wagering and Simulcasting Contract with Maywood Park, dated March 27, 2006.

(104)    Wagering and Simulcasting Contract with The Meadows, dated February 19, 2008.

(105)    Wagering and Simulcasting Contract with Meadowlands Racetrack, dated December 15, 1998.

(106)    Wagering and Simulcasting Contract with Mohawk & Woodbine Racetracks, dated August 22, 2008.

[[3251169][3253435]]

(107)    Wagering and Simulcasting Contract with Monmouth Park, dated April 21, 2005.

(108)    Wagering and Simulcasting Contract with Montaineer Race Track, dated May 20, 2003.

(109)    Wagering and Simulcasting Contract with New York Racing Association (NYRA), dated November 13, 1998.

(110)    Wagering and Simulcasting Contract with Northfield Park, dated January 1, 1999.

(111)    Wagering and Simulcasting Contract with Northlands Park, dated September 28, 2007.

(112)    Wagering and Simulcasting Contract with Ocean Downs, dated June 22, 2005.

(113)    Wagering and Simulcasting Contract with Oak Tree Racing Association, dated September 20, 2007.

(114)    Wagering and Simulcasting Contract with Oaklawn Park, dated February 19, 2008.

(115)    Wagering and Simulcasting Contract with Penn National Race Course, dated March 27, 2006.

(116)    Wagering and Simulcasting Contract with Philadelphia Park, dated January 1, 1999.

(117)    Wagering and Simulcasting Contract with Pinnacle Race Course, dated February 19, 2008.

(118)    Wagering and Simulcasting Contract with Pimilico Race Course, dated February 19, 2008.

(119)    Wagering and Simulcasting Contract with Pocono Downs, dated March 10, 2006.

(120)    Wagering and Simulcasting Contract with Pompano Park, dated March 10, 2006.

(121)    Wagering and Simulcasting Contract with Portland Meadows, dated February 19, 2008.

(122)    Wagering and Simulcasting Contract with Prairie Meadows, dated April 1, 1999.

(123)    Wagering and Simulcasting Contract with Presque Isle Downs, dated August 10, 2007.

(124)    Wagering and Simulcasting Contract with Red Mile, dated August 15, 2002.

(125)    Wagering and Simulcasting Contract with Remington Park, dated February 19, 2008.

(126)    Wagering and Simulcasting Contract with Retama Park, dated July 17, 2003.

(127)    Wagering and Simulcasting Contract with River Downs, dated June 20, 2008.

(128)    Wagering and Simulcasting Contract with Rockingham Park, dated June 1, 2006.

(129)    Wagering and Simulcasting Contract with Sam Houston Race Park, dated November 4, 1999.

(130)    Wagering and Simulcasting Contract with Santa Anita Race Park, dated February 19, 2008.

(131)    Wagering and Simulcasting Contract with Suffolk Downs, dated April 30, 2008.

(132)    Wagering and Simulcasting Contract with Tampa Bay Downs, January 1, 1999.

(133)    Wagering and Simulcasting Contract with Thistledown Racetrack, dated February 19, 2008.

(134)    Wagering and Simulcasting Contract with Thoroughbred Horsemen's Group, LLC, dated January 1, 2008.

(135)    Wagering and Simulcasting Contract with Tioga Downs, dated April 16, 2009.

(136)    Wagering and Simulcasting Contract with Turf Paradise, dated September 30, 2009.

(137)    Wagering and Simulcasting Contract with Turfway Park/Kentucky Downs, dated September 5, 2001.

(138)    Wagering and Simulcasting Contract with Vernon Downs, dated April 16, 2009.

(139)    Wagering and Simulcasting Contract with Woodbine Racetrack, dated June 29, 2008.

(140)    Wagering and Simulcasting Contract with Yavapai Downs, dated March 14, 2006.

(141)    Wagering and Simulcasting Contract with Yonkers Raceway, dated May 1, 1999.

(142)    Wagering and Simulcasting Contract with Zia Park, dated September 13, 2006.

(143)    Monitoring and Maintenance of Burglar Alarm Systems Contract with ADT Installation, dated June 8, 2007.

(144)    Uniform Rental Contract with Aramark Uniform Rental, dated September 7, 2010.

(145)    Rubbish Removal/Pick-up Contract with Filco Carting, dated May 08, 2007.

(146)    Rubbish Removal/Pick-up Contract with Gaeta Int., dated May 04, 2007.

(147)    Rubbish Removal/Pick-up Contract with City Waste, dated May 04, 2007.

(148)    Rubbish Remove/Pick-up with Action Carting, dated May 04 2007.

(149)    Archiving Contract with Archive System, dated September 03, 2008.

(150)    Armored Carrier Contract with Garda, dated October 18, 2005.

(151)     Auto Parts Contract with Steinway, dated June 17, 2009.

(152)     Background/Credit Checks Contract with Transunion, dated September 09, 2010.

(153)     Car Wash Contract with Ionian, dated June 18, 2009.

(154)     Air Compressor Maintenance Contract with Blackler, dated September 03, 2008.

(155)     Delivery Service Contract with UPS-1501 Bwy., dated February 11, 2009.

(156)     Electrical Service Contract with Kanta Electric.

(157)     Emergency Broadcast Service Contract with CBS Radio (1010 Wins), dated April 21, 2009.

(158)     Fire Extinguisher Service Contract with Chase Fire, dated December 15, 2008.

(159)     Art Framing Contract with 33rd Street Gallery, dated June 15, 2009.

(160)     HVAC Maintenance Contract with Integrated HVAC.

(161)     Sharpening Blades Contract with ABC Knife, dated September 01, 2010.

(162)     Messenger Service Contract with City Expeditor, dated September 24, 2009.

(163)     Photo Service Contract with Modernage, dated June 01, 2007.

(164)     Plumbing Service Contract with Blue Water Plumbing & Heating Inc.

(165)     Sign Maintenance Contract with Broadway Sign, dated March 20, 2009.

(166)     Transmission Repair Contract with Master Transmission, dated June 12, 2009.

(167)     Towing Service Contract with VIP Towing, dated June 09, 2009.

(168)     Guard Service Contract with Andrews International, dated June 29, 2006.

(169)     Waste Removal Contract with Safety Kleen Corp., dated September 01, 2010.

(170)     Financial Reports Contract with Dun & Bradstreet, dated August 24, 2010.

(171)     Elevator Maintenance Contract with U.S. Elevator, dated July 14, 2009.

(172)     Exterminator Contract with Quality Tech., dated July 28, 2006.

(173)     Freon Contract with Hudson Technologies, dated June 19, 2009.

(174)     Gasoline Contract with Sprague, dated July 22, 2008.

[[3251169]]3253435]]

(175)    Generator Maintenance Contract with Power Performance Industries, dated August 26, 2010.

(176)    Glazing Contract, Awaiting Board Approval.

(177)    GPX Maintenance Contract with Network Car, dated August 04, 2009.

(178)    Lock Repairs Contract with Commercial Lock, dated July 16, 2009.

(179)    Mail Equipment Contract with Neopost, dated February 05, 2007.

(180)    Sewer/Drain Contract with A&L Cesspool, "Awaiting Board Approval".

(181)    Papers Contract with Thoro-graph Inc., dated April 21, 2010.

(182)    Copier Paper Contract with Paper Mart,, dated August 31, 2010.

(183)    Envelopes Contract with Argo Envelopes, dated May 03, 2007.

(184)    Golf Pencils Contract with Write-On Pencils, dated June 29, 2009.

(185)    Lamps Contract with Graybar Electrical, dated June 15, 2009.

(186)    Fixtures Contract with Graybar Electrical, dated December 01, 2008.

(187)    NCR Paper Contract with Sharda Paper, dated June 23, 2009.

(188)    Office Supplies Contract with Staples, dated January 16, 2009.

(189)    Paper Products Contract with Appco Paper, dated June 16, 2009.

(190)    Poly Liners Contract with Central Poly, dated December 11, 2008.

(191)    Press Supplies Contract with Philben Litho, dated November 19, 2008.

(192)    Racing Form Contract with Daily Racing Form, dated April 21, 2009.

(193)    Printing Ink Contract with H.A. Metzger, dated October 31, 2008.

(194)    Roll Paper Contract with Gould Paper, dated September 17, 2008.

(195)    Towels/Tissue Contract with United Supply Systems, dated December 03, 2008.

(196)    Water/Coolers Contract with Nestle Water, dated June 20, 2006.

(197)    Copier Purchase & Maintenance Contract with Xerox, dated February 17, 2009.

(198)    Batteries Contract with KC Electronics, dated June 14, 2007.

(199)    Beverages Contract with Imagetech, dated June 16, 2009.

[[3251169]]3253435]]

(200)    Building Supplies Contract with Ozone Park Lumber, dated November 14, 2008.

(201)    Corrugated Containers Contract with President Container, dated June 24, 2009.

(202)    HP Cartridges Contract with W.B Mason, dated June 30, 2009.

(203)    Computer Paper Contract with Enterprise Group, dated June 19, 2009.

(204)    Okidata Ribbons Contract with Emtec Inc., dated February 01, 2010.


Unexpired Leases:

| No. | Lessor | Location |
|---|---|---|
| 1. | **12-10 30th Avenue Corp.**<br>159 Northern Blvd.<br>Suite 203<br>Great Neck, New York 11021 | 31-35 Downing Street<br>Queens, NY 11354 |
| 2. | **25 Park Place Associates, LLC**<br>224 Centre St. 5th Floor<br>New York, NY 10013 | 25 Park Place<br>New York, NY 10017 |
| 3. | **53 Grand Associates LLC**<br>c/o Steel Equities<br>700 Hicksville Rd<br>Bethpage, NY 11714 | 53-06 Grand Avenue<br>Maspeth, NY 11378 |
| 4. | **94-00 Liberty, Inc.**<br>c/o Einsidler Management, Inc<br>535 Broad Hollow Rd<br>Suite # A 15<br>Melville, N.Y. 11747 | 94-00 Liberty Avenue<br>Ozone Park NY 11417 |
| 5. | **253-01 Corporation**<br>c/o Won Bok Choi<br>253 Northern Blvd<br>Little Neck, NY11362 | 253-01 Northern Blvd.<br>Queens NY 11362 |
| 6. | **1436-1438 Williamsbridge Road, LLC**<br>Attn: Moon Oh<br>162-20 77th Road<br>Flushing, NY 11366 | 1434 Williamsbridge Road,<br>Bronx, NY 10461 |
| 7. | **1520 Flatbush Ave. Inc.** | 1520 Flatbush |

[[3251169]]3253435]]

| No. | Lessor | Location |
|---|---|---|
|  | c/o Sam Sutton<br>1407 Broadway 30th Fl<br>New York, NY 10018 | Brooklyn, NY 11210 |
| 8. | **1935 Westchester Avenue Realty Associates, LLC**<br>110 West 34th Street<br>New York, NY 10001 | 1935 Westchester Avenue<br>Bronx, NY 10462 |
| 9. | **2000 Rockaway Parkway Associates**<br>c/o ISJ Management Corp.<br>110 West 34th Street<br>9th Floor<br>New York, NY 10001 | 2112-14 Rockaway Parkway<br>Brooklyn, NY 11236 |
| 10. | **Amity Holding Co.**<br>c/o Flushing-Kent Realty Corp.<br>136-48 39th Avenue<br>Flushing, NY 11354 | 136-55 Roosevelt Avenue<br>Queens, NY 11354 |
| 11. | **Angelo Kantlis**<br>26-20 203rd Street<br>Bayside, NY 11360 | 69-67 Grand Avenue<br>Queens, NY 11378 |
| 12. | **Anthony F. Guarino**<br>2425 West 2nd Street<br>Brooklyn, NY 11223 | 276 Avenue X<br>Brooklyn, NY 11223 |
| 13. | **B&J 609 LLC**<br>c/o Stonecrest Mgmt.<br>7-11 North Broadway Suite 400<br>White Plains, NY 10601 | 87-16 Astoria Blvd.<br>Queens, NY 11369 |
| 14. | **Baldwin Sung**<br>160 Northern Group<br>c/o AR -160<br>132 East 43rd St Suite #557<br>New York, NY 10017<br><br>**Louis Cerrone and Mary Ann Cerrone (Owner)**<br>29-39 214th Place<br>Bayside, NY 11360 | 160-38 Northern Blvd.<br>Queens, NY 11358 |

[[3251169]3253435]]

| No. | Lessor | Location |
|---|---|---|
| 15. | **Bellerose Realty Associates, LLC**<br>421 Seventh Avenue 15th Fl<br>New York, NY 10001 | 245-19 Jamaica Avenue,<br>Queens, NY 11426 |
| 16. | **Benjamin Partners**<br>c/o 110 Lafayette Assoc.<br>589 Broadway<br>New York, NY 10012 | 106-110 Lafayette Street<br>New York, NY 10013 |
| 17. | **ELO Realty Corporation**<br>42 West 48th Street<br>Suite 206<br>New York, NY 10036 | 42-46 West 48th Street<br>New York, NY 10036 |
| 18. | **Eltingville Shopping Center LLC**<br>118-35 Queens Blvd. 16th Fl<br>Forest Hills, NY 11375 | 4324 Amboy Road<br>Staten Island, NY 10312 |
| 19. | **Fourback LLC**<br>c/o Vincent J. Romano, Esq.<br>59 80th Street<br>Brooklyn, NY 11209 | 8621 Fifth Avenue<br>Brooklyn, NY 11209 |
| 20. | **Frank Fontana and Mary Fontana**<br>2580 National Drive<br>Brooklyn, NY 11234 | 2901 Avenue U<br>Brooklyn, NY 11229 |
| 21. | **Fred Zellinger**<br>461 Abeale Road<br>Cedarhurst, NY 11516 | 179-30 Hillside Avenue,<br>Queens, NY 11432 |
| 22. | **Grand Basket Co., Inc.**<br>53-06 Grand Avenue<br>Maspeth, NY 11378 | 53-10 Grand Avenue<br>Maspeth, NY 11378 |
| 23. | **Han Suk Kang**<br>11 Loretta Drive<br>Syosset, NY 11791 | 6305 18th Avenue<br>Brooklyn, NY 11204 |
| 24. | **Harold Coyne and Selma Coyne**<br>12234 Congressional Avenue<br>Boynton Beach, FL 33437 | 5704 Fifth Avenue<br>Brooklyn, NY 11220 |

| No. | Lessor | Location |
|---|---|---|
| | **Mildred Coyne**<br>7356 Fairfax Drive<br>Tamarac, FL 33321 | |
| 25. | **Jaeger Brothers**<br>1101 Victory Blvd.<br>Staten Island, NY 10301<br><br>**John Vander Neut, Esq.**<br>1855 Victory Blvd.<br>Staten Island, NY 10314 | 1410 Forest Avenue<br>Staten Island, NY 10302 |
| 26. | **Kaled Management Corp.**<br>7001 Brush Hollow Rd.<br>Westbury, NY 11590 | 107-40 Queens Boulevard<br>Forest Hills, NY 11375 |
| 27. | **La Casa Realty Corp.**<br>Attn: Chan San Chan<br>41080 Case Street<br>Elmhurst, NY 11373 | 2168 86th Street<br>Brooklyn, NY 11214 |
| 28. | **Levin Properties, L.P.**<br>c/o Levin Management Corporation<br>P.O. Box 326<br>Plainfield, NJ 07061 | 4325 Boston Post Road<br>Bronx, NY |
| 29. | **Livingston Associates**<br>80 Livingston Street<br>Brooklyn, NY 11201 | 86 Livingston Street<br>Brooklyn, NY 11201 |
| 30. | **LSG Holdings, LLC**<br>3 Dogwood Court<br>Glen Head, NY 11545 | 756 Manhattan Avenue<br>Brooklyn, NY 11222 |
| 31. | **Mitchell Enterprises**<br>2050 Center Avenue<br>Fort Lee, NJ 07024 | 170 West 233rd Street<br>Bronx, NY 10463 |
| 32. | **Par West LLC**<br>143 West 72nd Street<br>New York, NY 10023 | 143 West 72nd Street<br>New York, NY 10023 |
| 33. | **Paramount Leasehold<br>Management Corp.** | 1501 Broadway<br>New York, NY 10036 |

[[3251169][3253435]]

| N o. | Lessor | Location |
|---|---|---|
|  | c/o Newmark and Company Real Estate, Inc. 125 Park Avenue New York, NY 10017 |  |
| 34. | **PJC 170 John Commercial, LLC** 333 West 56th Street Apt. 5M New York, NY 10019 | Yankee Clipper 170 John Street New York, NY 10038 |
| 35. | **Raber Enterprises LLC** 175 Canal Street New York, NY 10013 | 105 Delancey Street New York, NY 10002 |
| 36. | **RJSE Holdings, LLC** c/o Sean H. Rooney, Esq. 175 Remsen Street Brooklyn, NY 11201 | 117-09 Jamaica Avenue Queens, NY 11418 |
| 37. | **Sabastian Piccinn** 203 Bay 8th Street Brooklyn, NY 11228 | 6719 Bay Parkway Brooklyn, NY 11204 |
| 38. | **Schindler, Paris, Youngerman** 120 North Street Teterboro, NJ 07608 | 991 Second Avenue New York, NY 10022 |
| 39. | **Subong Estates Inc.** c/o Su Y. Choi 45 Bristol Drive, Manhasset, NY 11030 | 62-17 Roosevelt Avenue Queens, NY 11377 |
| 40. | **T & T Property Holding** 815 52nd St. Brooklyn, NY 11220 | 7206 13th Avenue Brooklyn, NY 11228 |
| 41. | **Utica and Remsen II LLC** c/o Wharton Realty Corp. 500 5th Avenue 54th Floor New York, NY 10110 | 45 Remsen Avenue Brooklyn, NY 11212 |

[[3251169]] [3253435]]



**(A Component Unit of the
State of New York)**

AUDITED FINANCIAL STATEMENTS
AND
SUPPLEMENTARY INFORMATION

Year Ended March 31, 2010 and
Nine-Month Period Ended March 31, 2009

# NEW YORK CITY OFF-TRACK BETTING CORPORATION
**(A Component Unit of the State of New York)**

## TABLE OF CONTENTS

|  | Page |
|---|---|
| **Independent Auditor's Report on the Financial Statements** | 1-2 |
| **Management's Discussion and Analysis** | 3-9 |
| **Financial Statements** |  |
| Statements of Net Deficiency | 10 |
| Statements of Revenues, Expenses, and Changes in Net Deficiency | 11 |
| Statements of Cash Flows | 12 |
| Notes to Financial Statements | 13-27 |
| **Supplementary Information (Unaudited)** |  |
| Statements of Section 516 Revenues and Expenses (as Required by the State of New York Racing and Wagering Board) | 28 |
| Summary of Revenues and Expenses by Branch (as Required by the State of New York Racing and Wagering Board) | 29-30 |
| Capital Acquisition Fund – Balance Sheets (as Required by the State of New York Racing and Wagering Board) | 31 |
| Capital Acquisition Fund – Statements of Revenues, Expenses and Changes in Fund Net Assets (as Required by the State of New York Racing and Wagering Board) | 32 |
| **Independent Auditor's Report on Internal Control over Financial Reporting and on Compliance and Other Matters Based on an Audit of Financial Statements Performed in Accordance with *Government Auditing Standards*** | 33-35 |



**INDEPENDENT AUDITOR'S REPORT ON THE FINANCIAL STATEMENTS**


Board of Directors
New York City Off-Track Betting Corporation


We have audited the accompanying statements of net deficiency of New York City Off-Track Betting Corporation, a component unit of the State of New York, as of March 31, 2010 and 2009, and the related statements of revenues, expenses, and changes in net deficiency, and cash flows for the year ended March 31, 2010 and for the nine-month period ended March 31, 2009. These financial statements are the responsibility of New York City Off-Track Betting Corporation's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in Government Auditing Standards, issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and the significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of New York City Off-Track Betting Corporation as of March 31, 2010 and 2009, and the changes in its financial position and its cash flows for the year ended March 31, 2010 and for the nine-month period ended March 31, 2009 in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming that New York City Off-Track Betting Corporation will continue as a going concern. As discussed in Notes 1 and 2 to the financial statements, on December 3, 2009, New York City Off-Track Betting Corporation filed a petition for adjustment of its debts under Chapter 9 of Title 11 of the United States Bankruptcy Code, a municipal bankruptcy case, in the United States Bankruptcy Court for the Southern District of New York. The process of developing and negotiating a plan for adjusting its debts is underway. As a result, the accompanying financial statements do not purport to reflect or provide for the consequences of the bankruptcy proceedings. In particular, such financial statements do not purport to show (a) as to assets, their realizable value on a liquidation basis or their availability to satisfy liabilities; (b) as to pre-petition liabilities, the amounts that may be allowed for claims or contingencies, or the status and priority thereof; and (c) as to operations, the effect of any changes that may be made in its business. As also discussed in Note 1 to the financial statements, New York City Off-Track Betting Corporation has suffered recurring operating losses, has a net deficiency, and is experiencing significant industry challenges. These conditions raise substantial doubt about its ability to continue as a going concern. Management's plans regarding those matters also are described in Notes 1 and 2. The financial statements do not include any adjustments that might result from the outcome of these uncertainties.



In accordance with Government Auditing Standards, we have also issued our report dated June 28, 2010, on our consideration of New York City Off-Track Betting Corporation's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements and other matters. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on the internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with Government Auditing Standards and should be considered in assessing the results of our audit.

The management's discussion and analysis, on pages 3 through 9, is not a required part of the basic financial statements but is supplementary information required by accounting principles generally accepted in the United States of America. We have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the required supplementary information. However, we did not audit the information and express no opinion on it.

Our audits were conducted for the purpose of forming an opinion on the basic financial statements of New York City Off-Track Betting Corporation taken as a whole. The supplementary information on pages 28 through 35 is presented for the purpose of additional analysis and is not a required part of the basic financial statements. Such information has not been subjected to the auditing procedures applied in the audit of the basic financial statements and, accordingly, we express no opinion on it.

*UHY LLP*

New York, New York
June 28, 2010

# MANAGEMENT'S DISCUSSION AND ANALYSIS

# NEW YORK CITY OFF-TRACK BETTING CORPORATION
**(A Component Unit of the State of New York)**

## MANAGEMENT'S DISCUSSION AND ANALYSIS

New York City Off-Track Betting Corporation's (the "Corporation" or "NYCOTB") financial report consists of two parts: *management's discussion and analysis* (this section) and the *basic financial statements*. Management's discussion and analysis provides an introduction and overview to the financial statements for the fiscal year ended March 31, 2010. The information contained in this section should be considered in conjunction with the basic financial statements, including the notes to the financial statements for the fiscal year ended March 31, 2010.

### Our Business

The mission of the Corporation, a public benefit corporation, is threefold: first, to generate revenue for municipal and state governments; second, to help fund the state's horse racing and breeding industry; and, third, to help stamp out illegal wagering on horse races. NYCOTB offers off-track pari-mutuel wagering on thoroughbred and harness horse racing to customers in the City of New York (the "City" or "NYC") through its network of fifty-three branch offices, eight restaurants, and three teletheaters and through its account wagering (telephone and internet betting) operation. NYCOTB broadcasts on Channels 71 and 73 for in home cable television reception by its customers in the City of New York.

To understand the Corporation's business, it is necessary to look at the following financial components:

- Net handle – the total amount wagered by the Corporation's customers on races.

- Earned on handle – the revenues that result from the portion of the handle that is not paid out in winning bets to customers.

- Surcharge revenues – made up of 5% and 1% surcharges on certain winning wagers.

- Operating expenses – the expenses that are required to operate NYCOTB.

- Statutory expenses – the amount of revenues that the Corporation is required by the State of New York (the "State" or "NYS") laws to distribute to each of its constituencies: the racing industry, the State of New York, the City of New York, and other local governments.

- Operating income (loss) – the surplus or deficit that remains after expenses.

### Statutory Requirement

New York Racing, Pari-Mutuel Wagering and Breeding Law (the "Racing Law") mandates that NYCOTB distribute revenues to its constituencies based on percentages of handle instead of percentages of revenue earned on handle from the wagering monies after allowances for costs and expenses.

Due to this statutory requirement, NYCOTB has been unable to reinvest in its own business and has incurred debts that are substantially greater than its current ability to pay. Accordingly, NYCOTB has not had sufficient resources to modernize, expand or adequately maintain its facilities, nor has it been able to invest in new technologies to create operating efficiencies to substantially lower costs.

# NEW YORK CITY OFF-TRACK BETTING CORPORATION
**(A Component Unit of the State of New York)**

## MANAGEMENT'S DISCUSSION AND ANALYSIS

### Legislative Change

On June 17, 2008, Governor Paterson signed legislation, designated as Chapter 115 of the Laws of 2008, that provided for a State takeover of the Corporation. In connection with this takeover, provisions of the Racing Law were amended to reflect the Corporation's status change from being a component unit of the City of New York to becoming a component unit of the State of New York. With respect to the Corporation's financial operations and reporting status, the following were changes in the legislative scheme significantly affecting the Corporation:

- Racing Law § 527(6) was amended to provide that the Corporation shall use any net amount remaining after payment of taxes and distributions to pay all liabilities of the Corporation that existed as of the effective date of the legislation, and thereafter, once such liabilities are paid off, for such net amount to be paid to the State general fund.

- Racing Law § 532 was amended to provide that the Corporation will retain for its corporate purposes the portion of the surcharge not distributable to localities where New York State racetracks are located.

- Racing Law § 609 was amended to provide that the Corporation shall be subject to the procurement requirements under State Finance Law §§ 139-j and 139-k.

- Racing Law § 610 was amended to provide that the Director of the Division of the Budget will review the books and accounts of the Corporation.

- Racing Law § 624 was amended to provide that upon termination of the Corporation, all corporate assets will vest in the State.

- Public Officers Law §17 was amended to include the Corporation's officers, directors and employees within the definition of "employee" for purposes of defense and indemnification by the State in civil actions, and thereby transfer from the Corporation to the State the obligation to indemnify the Corporation's officers, directors or employees in civil actions.

- Chapter 115 further provided that all funds in the Corporation's Capital Acquisition Fund prior to July 1, 2008, or deposited thereafter, shall be made available to the Corporation for general corporate purposes.

- Chapter 115 of the Laws of 2008 created a task force on the future of off-track betting in NYS.

**NEW YORK CITY OFF-TRACK BETTING CORPORATION**
(A Component Unit of the State of New York)

**MANAGEMENT'S DISCUSSION AND ANALYSIS**


**Bankruptcy and Chapter 9 Filing**

In enacting Chapter 115 of the Laws of 2008, the New York State Legislature found that NYCOTB was insolvent, that its continued operation is of paramount importance to the public interest and that the "static statutory framework has caused economic distress among the regional off-track betting corporations". Notwithstanding the changes made to the Racing Law by Chapter 115 of the Laws of 2008, the financial condition of the Corporation continued to deteriorate following the transfer to State control. Part of the continuing decline in the Corporation's fiscal health was attributable to the general decline in economic conditions which led to a more than 10 % reduction in the Corporation's overall handle. But even more significant was the absence of material change to the structure and framework of statutory distribution set forth in the Racing Law that continued to require the Corporation to pay out more in statutory payments from retained commissions on wagering revenue than was available after satisfying the Corporation's expenses of operation. As result of this ongoing downward trend and in an effort to permit the Corporation to maintain ongoing operations without interruption, on December 3, 2009, NYCOTB filed a petition under Chapter 9 of Title 11 of the Federal Bankruptcy Code for reorganization and adjustment of its debts in the United States Bankruptcy Court for the Southern District of New York. Additional information about the Corporation's Chapter 9 proceedings is provided in Note 2 of the accompanying financial statements.

**Financial Summary of the Corporation**

NYCOTB is a public benefit corporation established under the laws of the State of New York. The Corporation has no component units and was a component unit of the City of New York until June 17, 2008 when, under Chapter 115 of the Laws of 2008, the Corporation became a component unit of the State of New York. Under Chapter 115 of the Laws of 2008 the public benefit corporation known as the "New York City Off-Track Betting Corporation" was continued in existence and "continued to be the public benefit corporation authorized to operate the system for off-track pari-mutuel wagering on horse races within the City of New York" as a component unit of the State of New York. NYCOTB follows enterprise fund reporting; accordingly, the financial statements are presented using the economic resources measurement focus and the accrual basis of accounting. Enterprise fund statements offer short and long-term financial information about the activities and operations of the Corporation.

The Corporation has prepared the financial statements for the fiscal year ended March 31, 2010, which will be incorporated in the State of New York's Comprehensive Annual Financial Report.

The basic financial statements are accompanied by a report of the independent auditors. Their report includes an explanatory paragraph that concludes that substantial doubt about the Corporation's ability to continue as a going concern remains. NYCOTB management's plans in this regard are discussed in Notes 1 and 2 to the financial statements.

**Financial Summary of the Corporation** (Continued)

The following table summarizes the revenues, expenses and changes in net deficiency for the fiscal year ended March 31, 2010 and for the twelve-month period ended March 31, 2009 ($ in thousands):

| | Year Ended March 31, 2010 | (Unaudited) Twelve-Month Period Ended March 31, 2009 (2) | % Increase (Decrease) |
|---|---|---|---|
| Net handle | $ 815,557 | $ 914,189 | -10.8% |
| Operating revenues | $ 203,111 | $ 225,173 | -9.8% |
| Operating expenses | | | |
| Annual OPEB cost | 14,371 | 31,651 | -54.6% |
| Other operating expenses | 128,259 | 129,018 | -0.6% |
| Total operating expenses | 142,630 | 160,669 | -11.2% |
| Operating income before statutory expenses and reorganization expenses | 60,481 | 64,504 | -6.2% |
| Statutory expenses | | | |
| Racing industry | 78,362 | 84,080 | -6.8% |
| State of New York (1) | 12,604 | 13,884 | -9.2% |
| Other local governments | 2,274 | 2,353 | -3.4% |
| Surcharge received from other OTB communities | 1,613 | 1,997 | -19.2% |
| Surcharge earned for and distributed to City of New York | 1,509 | 5,007 | -69.9% |
| Total statutory expenses | 96,362 | 107,321 | -10.2% |
| Operating loss before reorganization expenses | (35,881) | (42,817) | -16.2% |
| Reorganization expenses (3) | 1,306 | - | 100.0% |
| Operating loss | (37,187) | (42,817) | -13.1% |
| Total net deficiency, beginning of period | (253,977) | (211,160) | 20.3% |
| Total net deficiency, end of period | $ (291,164) | $ (253,977) | 14.6% |

(1) Includes New York State Racing and Wagering Board regulatory fee.

(2) As a result of the Corporation's change in fiscal year end from June 30 to March 31, the twelve-month period ended March 31, 2009 has been presented for comparative purposes.

(3) Professional expenses incurred related to the Corporation's Chapter 9 filing and the development of reorganization plan.

### Financial Summary of the Corporation (Continued)

#### Net Handle

The weak economy and continued competition for the wagering dollar resulted in the Corporation experiencing a decrease in net handle for 2010 of 10.8% as compared to the comparable twelve-month period ended March 31, 2009. During fiscal year 2010 three branches were closed. Management continues to review the closing of unprofitable branches along with the enhancement of existing branches.

The following table shows the sources of the Corporation's net handle for the fiscal year ended March 31, 2010 and for the twelve-month period ended March 31, 2009 ($ in thousands):

| | Year Ended March 31, 2010 | (Unaudited) Twelve-Month Period Ended March 31, 2009 | % Increase (Decrease) |
|---|---|---|---|
| Branch offices | $ 541,604 | $ 594,702 | -8.9% |
| Advance deposit wagering | 160,482 | 184,032 | -12.8% |
| Teletheaters | 81,107 | 96,845 | -16.3% |
| Restaurants | 32,364 | 38,610 | -16.2% |
| Total | $ 815,557 | $ 914,189 | -10.8% |

#### Operating Revenue

Operating revenue as a percentage of handle was 24.9% and 24.6% for the fiscal year ended March 31, 2010 and for the twelve-month period ended March 31, 2009, respectively. The $98.6 million decrease in handle between 2010 and 2009 is the primary cause for the lower revenue.

#### Operating Expenses

Operating expenses, excluding the annual other postemployment benefits cost of $14.4 million and $31.7 million in 2010 and 2009, totaled $128.3 million and $129.0 million in 2010 and 2009, respectively. The $0.7 million decrease was the net result of $3.4 million in certain increased expenses primarily including rent, broadcasting fees and insurance costs and $4.1 million in certain decreased expenses primarily including salaries, fringe benefits and depreciation expenses.

The Corporation provides other postemployment benefits ("OPEB"), which include basic health care benefits to eligible retirees and dependents at no cost to most of the participants. In 2009, $31.7 million was recorded as an operating expense (about $5.5 million was funded during 2009). In 2010, $14.4 million was expensed (about $4.5 million was funded during 2010), raising the estimated future funding requirements to approximately $218.8 million. Effective with the enactment of Chapter 115 of the Laws of 2008, the Corporation assumed from the City of New York the costs of reimbursing Medicare Part B premiums to eligible retirees and beneficiaries. An adjustment to the accrual for Medicare Part B premiums in the prior period is the primary cause for the decrease between 2009 and 2010.

**MANAGEMENT'S DISCUSSION AND ANALYSIS**

**Financial Summary of the Corporation** (Continued)

### Statutory Expenses

The amounts required to be distributed to each of the Corporation's constituencies are determined primarily by provisions of New York State law and are usually related to handle. The $98.6 million decrease in handle is the primary cause for the decrease in statutory expenses from $107.3 million in 2009 to $96.4 million in 2010. The Corporation makes distributions to the City of New York for surcharge with respect to races run at Aqueduct and Belmont Park. It also acts as the collection agent for the City of New York for surcharge due from other community off-track betting corporations. Distributions to the City of New York from the Corporation and through the Corporation from other community off-track betting corporations decreased by $3.9 million from 2009 to 2010 because of the decline in handle and the change in legislation. Net revenue after payment of taxes and distributions will go towards paying off the pre-existing liabilities of the Corporation as of the effective date of Chapter 115 of the Laws of 2008 and, thereafter, when such liabilities have been fully paid any such remaining net revenue will be paid to the State general fund.

### Net Deficiency

The following table summarizes the Corporation's financial position as of March 31, 2010 and 2009 ($ in thousands):

|  | March 31, 2010 | March 31, 2009 |
|---|---|---|
| Restricted cash and cash equivalents - |  |  |
| Advance deposit wagering accounts | $ 1,483 | $ 1,688 |
| Capital acquisition fund | - | 25 |
| Other current assets | 22,602 | 18,244 |
| Capital assets, net | 7,520 | 9,169 |
| Total assets | 31,605 | 29,126 |
| Current liabilities - |  |  |
| Advance deposit wagering accounts | 1,483 | 1,688 |
| Other current liabilities | 105,443 | 74,006 |
| Long-term liabilities | 215,843 | 207,409 |
| Total liabilities | 322,769 | 283,103 |
| Net deficiency |  |  |
| Invested in capital assets, net of related debt | 7,304 | 9,133 |
| Restricted for acquisition of capital assets | - | 25 |
| Unrestricted deficit | (298,468) | (263,135) |
| Total net deficiency | (291,164) | (253,977) |
| Total liabilities and net deficiency | $ 31,605 | $ 29,126 |

**Financial Summary of the Corporation** (Continued)

**Net Deficiency** (Continued)

The impact of additional expense accrued for future postemployment benefits plus the required distributions and mandated contractual expenses in excess of revenue available resulted in net deficiency increasing $37.2 million during 2010.

**Liquidity and Capital Resources**

At March 31, 2010, the Corporation had $22.1 million of cash and cash equivalents, which is a $3.7 million increase from $18.4 million at March 31, 2009, primarily as a result of the deferral of payments of certain prepetition liabilities as well as certain other statutory and contractual obligations. As of March 31, 2010, $1.5 million of the cash and cash equivalents was cash in the vaults of the Corporation's operating locations, and $1.5 million was attributable to advance deposit wagering customer balances.

The summer represents the seasonal high point in NYCOTB cash levels. The seasonal low point occurs in the late winter. Much of NYCOTB's cash is either formally restricted or is required for payment of specific obligations. Without New York State legislation to address the fact that NYCOTB's distributions and expenses exceed NYCOTB's revenue, management expects that the decline in net assets of the past seven years will continue. Absent changes to the mandated distribution scheme in the laws under which NYCOTB operates, this decline will continue to cause cash shortfalls and continue to impair the Corporation's ability to pay its debts as they come due.

Since 1990, the majority of the Corporation's capital expenditures have been made through its capital acquisition fund.  As discussed in the Notes to the Financial Statements, the Corporation collects a supplemental 1% surcharge on certain wagering pools that was retained to finance the acquisition, construction and equipping of its facilities. However, under Chapter 115 of the Laws of 2008 all funds in the capital acquisition fund prior to July 1, 2008 or deposited into such fund thereafter are made available to the Corporation for general corporate purposes. During 2010, the Corporation collected $3.1 million of capital acquisition surcharge which was expended on capital assets and operating expenses.

# FINANCIAL STATEMENTS

# NEW YORK CITY OFF-TRACK BETTING CORPORATION
**(A Component Unit of the State of New York)**
**STATEMENTS OF NET DEFICIENCY**
**(In 000's)**

| | March 31, | |
| | 2010 | 2009 |
|---|---:|---:|
| **Assets** | | |
| **Current Assets** | | |
| Unrestricted cash and cash equivalents | $ 20,664 | $ 16,701 |
| Restricted cash and cash equivalents - | | |
|   Advance deposit wagering accounts | 1,483 | 1,688 |
|   Capital acquisition fund | - | 25 |
|     Total cash and cash equivalents | 22,147 | 18,414 |
| Accounts receivable and other current assets | 1,938 | 1,543 |
|     Total current assets | 24,085 | 19,957 |
| **Capital Assets, net** | 7,520 | 9,169 |
|     Total assets | $ 31,605 | $ 29,126 |
| **Liabilities and Net Deficiency** | | |
| **Current Liabilities** | | |
| Accounts payable and accrued expenses | $ 81,927 | $ 56,275 |
| Due to City of New York | 808 | 2,517 |
| Due to State of New York - | | |
|   Outstanding pari-mutuel tickets | 6,687 | 3,648 |
|   Pari-mutuel tax and breakage | 807 | 39 |
|   New York State Racing and Wagering Board regulatory fee | 2,167 | 27 |
| Due to other local governments | 358 | 47 |
| Outstanding pari-mutuel tickets | 311 | 480 |
| Advance deposit wagering accounts | 1,483 | 1,688 |
| Compensated leave time, current | 3,208 | 2,853 |
| Other postemployment benefits obligation, current | 9,116 | 8,095 |
| Other | 54 | 25 |
|     Total current liabilities | 106,926 | 75,694 |
| **Long-term Liabilities** | | |
| Compensated leave time, non-current | 6,037 | 6,640 |
| Other postemployment benefits obligation, non-current | 209,644 | 200,769 |
| Other | 162 | - |
|     Total long-term liabilities | 215,843 | 207,409 |
|     Total liabilities | 322,769 | 283,103 |
| **Commitments and Contingencies** | | |
| **Net Deficiency** | | |
| Invested in capital assets, net of related debt | 7,304 | 9,133 |
| Restricted for acquisition of capital assets | - | 25 |
| Unrestricted deficit | (298,468) | (263,135) |
|     Total net deficiency | (291,164) | (253,977) |
|     Total liabilities and net deficiency | $ 31,605 | $ 29,126 |

*See notes to financial statements.*

**NEW YORK CITY OFF-TRACK BETTING CORPORATION**
**(A Component Unit of the State of New York)**
**STATEMENTS OF REVENUES, EXPENSES, AND CHANGES IN**
**NET DEFICIENCY**
**(In 000's)**

| | Year Ended March 31, 2010 | Nine-Month Period Ended March 31, 2009 |
|---|---|---|
| **Net handle** | $ 815,557 | $ 657,628 |
| | | |
| **Operating revenues** | | |
| Earned on handle | $ 168,135 | $ 134,787 |
| Distributable surcharge and surcharge breakage | 3,783 | 2,988 |
| Capital acquisition surcharge | 3,127 | 2,491 |
| Surcharge received from other OTB communities | 1,613 | 1,490 |
| Breakage | 3,376 | 2,720 |
| Uncashed pari-mutuel tickets allocable to State of New York | 2,605 | 1,990 |
| Revenue derived from surcharge | 19,418 | 15,508 |
| Other | 1,054 | 881 |
| Total operating revenues | 203,111 | 162,855 |
| | | |
| **Operating expenses** | | |
| Operations | 110,320 | 83,826 |
| Administrative and selling | 15,363 | 10,771 |
| Depreciation and amortization | 2,576 | 3,149 |
| Annual other postemployment benefits cost | 14,371 | 15,821 |
| Total operating expenses | 142,630 | 113,567 |
| | | |
| Operating income before statutory expenses and reorganization expenses | 60,481 | 49,288 |
| | | |
| **Statutory expenses** | | |
| Racing industry other than The New York Racing Association | 35,167 | 28,152 |
| The New York Racing Association | 43,195 | 31,823 |
| State of New York | 8,526 | 6,653 |
| New York State Racing and Wagering Board regulatory fee | 4,078 | 3,288 |
| Local governments other than City of New York | 2,274 | 1,652 |
| City of New York | | |
| Surcharge received from other OTB communities | 1,613 | 1,490 |
| Surcharge earned for and distributed to City of New York | 1,509 | 1,372 |
| Total statutory expenses | 96,362 | 74,430 |
| | | |
| Operating loss before reorganization expenses | (35,881) | (25,142) |
| | | |
| **Reorganization expenses** | | |
| Professional fees | 1,306 | - |
| Total reorganization expenses | 1,306 | - |
| | | |
| Operating loss | (37,187) | (25,142) |
| | | |
| Total net deficiency, beginning of period | (253,977) | (228,835) |
| | | |
| Total net deficiency, end of period | $ (291,164) | $ (253,977) |

*See notes to financial statements.*

# NEW YORK CITY OFF-TRACK BETTING CORPORATION

**(A Component Unit of the State of New York)**
**STATEMENTS OF CASH FLOWS**
**(In 000's)**

|  | Year Ended March 31, 2010 | | Nine-Month Period Ended March 31, 2009 | |
|---|---:|---|---:|---|
| **Cash Flow From Operating Activities** | | | | |
| Receipts from customers | $ | **201,057** | $ | 161,015 |
| Payments to The New York Racing Association | | **(39,186)** | | (37,949) |
| Payments to suppliers and racing industry other than | | | | |
| The New York Racing Association | | **(52,172)** | | (55,534) |
| Payments to employees and benefits | | **(90,272)** | | (60,069) |
| Payments to City of New York, State of New York and local governments | | **(15,020)** | | (11,663) |
| Interest received | | **62** | | 180 |
| Net cash provided by (used in) operating activities | | **4,469** | | (4,020) |
| **Capital and Related Financing Activities** | | | | |
| Net purchase of capital assets | | **(657)** | | (1,449) |
| Other | | **(79)** | | (74) |
| Net cash used in capital and related financing activities | | **(736)** | | (1,523) |
| Change in cash and cash equivalents | | **3,733** | | (5,543) |
| Cash and cash equivalents, beginning of period | | **18,414** | | 23,957 |
| Cash and cash equivalents, end of period | $ | **22,147** | $ | 18,414 |
| **Reconciliation of Operating Loss to Net Cash Provided by** | | | | |
| **(Used in) Operating Activities:** | | | | |
| Operating loss | $ | **(37,187)** | $ | (25,142) |
| Adjustments to reconcile operating loss to net cash | | | | |
| provided by (used in) operating activities: | | | | |
| Depreciation and amortization | | **2,576** | | 3,149 |
| Changes in: | | | | |
| Accounts receivable and other current assets | | **(395)** | | (140) |
| Accounts payable and accrued expenses | | **25,652** | | 879 |
| Due to City of New York | | **(1,709)** | | 2,309 |
| Due to State of New York | | **5,947** | | 1,867 |
| Due to local governments | | **311** | | (278) |
| Outstanding pari-mutuel tickets | | **(169)** | | (265) |
| Advance deposit wagering accounts | | **(205)** | | 95 |
| Compensated leave time | | **(248)** | | 300 |
| Other postemployment benefits obligation | | **9,896** | | 13,206 |
| Net cash provided by (used in) operating activities | $ | **4,469** | $ | (4,020) |

|  | Assets | | | |
|---|---|---|---|---|
|  | Unrestricted | Restricted (1) | Total | |
| **Reconciliation of Cash and Cash Equivalents:** | | | | |
| Cash and cash equivalents, beginning of period | $ 16,701 | $ 1,713 | $ 18,414 | |
| Net increase (decrease) | 3,963 | (230) | 3,733 | |
| Cash and cash equivalents, end of period | $ 20,664 | $ 1,483 | $ 22,147 | |

(1) Includes restricted cash and cash equivalents relating to advance deposit wagering accounts and capital acquisition fund.

*See notes to financial statements.*

## NOTE 1 — ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Organization

Since 1970, the Laws of the State of New York have permitted local communities to operate a system of off-track pari-mutuel betting under the supervision of the New York State Racing and Wagering Board. New York City Off-Track Betting Corporation (the "Corporation") was established in 1970 as a public benefit corporation to operate a system of off-track betting in the City of New York.

The Corporation was a component unit of the City of New York until June 17, 2008 when, under Chapter 115 of the Laws of 2008 that provided for a State takeover of the Corporation, the Corporation became a component unit of the State of New York. In connection with this takeover, provisions of the Racing, Pari-Mutuel Wagering and Breeding Law were amended to reflect the Corporation's status change from being a component unit of the City of New York to becoming a component unit of the State of New York. In conjunction with the Corporation's change in status, the Corporation's fiscal year end changed from June 30 to March 31.

### Accounting and Financial Reporting

The Corporation follows enterprise fund reporting; accordingly, the accompanying financial statements are presented using the economic resources measurement focus and the accrual basis of accounting. Revenues are recognized when earned and expenses are recognized when incurred. In accordance with Government Accounting Standards Board ("GASB") Statement No. 20, *Accounting and Financial Reporting for Proprietary Funds and Other Government Activities that Use Proprietary Fund Accounting*, the Corporation has elected not to adopt Financial Accounting Standards Board statements issued after November 30, 1989.

### Cash and Cash Equivalents

For purposes of the statements of cash flows, the Corporation considers highly rated money market funds and all investments maturing in three months or less at date of acquisition to be cash equivalents.

### Capital Assets

Capital assets are recorded at cost. Depreciation and amortization are calculated utilizing the straight-line method based upon estimated useful lives, which range from three to fifteen years. Leasehold improvements are amortized principally over the term of the lease or useful life of asset, whichever is less.

### Other Postemployment Benefits (OPEB)

The Corporation accounts for OPEB in accordance with GASB Statement No. 45, *Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions*. The Statement establishes standards for the measurement, recognition, and display of OPEB expense/expenditures and related liabilities (assets), note disclosures, and, if applicable, required supplementary information in the financial reports of state and local governmental employers. OPEB includes postemployment healthcare, as well as other forms of postemployment benefits when provided separately from a pension plan.

**NOTE 1 — ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**
(Continued)

**Operating Revenues**

Revenues earned by the Corporation and distributions of such revenues are defined by the applicable provisions of New York State law, some of which are summarized below:

*Earned on Handle*

Gross revenues earned on handle generally range from 12% to 35% of the total amount of applicable wagers depending on the type of wager (e.g., regular, multiple or exotic).

*Distributable Surcharge and Surcharge Breakage*

The portion of the 5% surcharge and surcharge breakage collected on winning tickets from New York State tracks that is distributable to the local governments in which the track is located.

*Capital Acquisition Surcharge*

Effective July 1990, the New York Racing, Pari-Mutuel Wagering and Breeding Law was amended to allow, among other things, the Corporation to collect a 1% surcharge on multiple, exotic and super exotic wagering pools and to retain the proceeds of the surcharge for financing the acquisition, construction or equipping of offices, facilities or premises of the Corporation. As of June 17, 2008, under Chapter 115 of the Laws of 2008, all funds accumulated in the capital acquisition fund, established pursuant to section 609-a of the New York Racing, Pari-Mutuel Wagering and Breeding Law, prior to July 1, 2008 or deposited into such fund thereafter are available to the Corporation for general corporate purposes.

*Surcharge Received From Other OTB Communities*

The Corporation is a collection agent for the City of New York for surcharge and surcharge breakage on winnings due from other community off-track betting corporations on wagers placed on races run at Belmont and Aqueduct racetracks.

*Breakage*

Breakage is the revenue resulting from the rounding down of winning payoffs. This amount is partially distributed to the State of New York and the New York State breeding and development funds and the balance is retained by the Corporation.

*Uncashed Pari-Mutuel Tickets*

Uncashed pari-mutuel tickets represent winning tickets outstanding.

*Revenue Derived from Surcharge*

Under Chapter 115 of the Laws of 2008, revenue derived from surcharge results from the 5% surcharge and surcharge breakage collected on winning tickets less the amount that is distributable to local governments in which a New York State track is located.

**NOTE 1 — ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**
(Continued)

**Statutory Expenses**

In accordance with the requirements of New York State law, revenues are allocated among the racing industry, the State of New York, local governments, and the City of New York, as summarized below:

*The Racing Industry*

Compensation is payable to racing entities at statutory rates on racing wagers related to races at in-state tracks and at contractual rates on racing wagers related to races at both in-state and out-of-state tracks.

Approximately 50% of the statutory payments made to tracks located in the State of New York is distributable to New York State horsemen for purse money.

Contributions to the New York State Thoroughbred Breeding and Development Fund are 0.5% of handle derived from bets on thoroughbred or steeplechase races. Contributions to the Agriculture and New York State Breeding and Development Fund are 1.0% of handle derived from bets on harness races.

*The New York Racing Association*

Actual statutory expenses to the New York Racing Association (NYRA) totaled $43,195,000 and $35,073,000 for the fiscal year ended March 31, 2010 and for the nine-month period ended March 31, 2009, respectively. However, as a result of the reversal of a prior accrual of $3,250,000 in respect to a claim in litigation by NYRA that the Corporation had breached a contract respecting simulcasting fees, the sum of $31,823,000 is shown in that category for the nine-month period ended March 31, 2009. The accrual was reversed following the conclusion of the litigation with NYRA in favor of the Corporation during the nine-month period ended March 31, 2009.

*State of New York*

Pari-mutuel taxes are imposed on the amount wagered at rates determined by the type of wager, type of race and location.

Uncashed pari-mutuel tickets held by the Corporation on April 1, applicable to the preceding calendar year, are distributable to the State of New York. For the calendar years ended December 31, 2009 and 2008, the amount of uncashed pari-mutuel tickets distributable approximated $2,534,000 and $2,911,000, respectively, none of which was remitted to the State of New York during fiscal 2010. If the payment is not made when due a one time penalty of five percent and interest at the rate of one percent per month is assessed from the due date to the date of payment to the State of New York. For the fiscal year ended March 31, 2010 and for the nine-month period ended March 31, 2009, penalties and interest related to untimely payment approximated $500,000 and $154,000, respectively, and were included in operating expenses in the statement of revenues, expenses, and changes in net deficiency, respectively.

**NOTE 1 — ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**
(Continued)

**Statutory Expenses (Continued)**

*State of New York (Continued)*

As of June 17, 2008, under Chapter 115 of the Laws of 2008, the Corporation shall use any net revenue remaining after payment of taxes and distributions to pay all liabilities of the Corporation that existed as of June 17, 2008 and, thereafter when those liabilities are paid off, any remaining net revenue will be paid to the State general fund. There were no such amounts available for distribution for the fiscal year ended March 31, 2010 and for the nine-month period ended March 31, 2009.

*New York State Racing and Wagering Board Regulatory Fee*

The New York Racing, Pari-Mutuel Wagering and Breeding Law requires the payment of regulatory fees to the Racing and Wagering Board. The regulatory fee is levied at .50% of the Corporation's net handle. If the payment is not made when due a one time penalty of five percent and interest at the rate of one percent per month is assessed from the due date to the date of payment to the New York State Racing and Wagering Board. For the fiscal year ended March 31, 2010, penalties and interest related to untimely payment approximated $259,000 (none for the nine-month period ended March 31, 2009), and were included in operating expenses in the statement of revenues, expenses, and changes in net deficiency.

*Local Governments*

Local governments in which tracks reside receive 50% of the surcharge revenue except for Ontario County which receives 5%.

*Surcharges Distributed to City of New York*

The Corporation is a collection agent for the City of New York for surcharge and surcharge breakage on winnings due from other community off-track betting corporations.

In addition, as of June 17, 2008, under Chapter 115 of the Laws of 2008, the City of New York receives surcharge revenue from revenue earned by the Corporation on wagers on races run at Aqueduct and Belmont Park. The entire remaining surcharge earned by the Corporation not otherwise payable to localities where New York State race tracks are located is retained by the Corporation for its corporate purposes.

**Reclassifications**

Certain reclassifications have been made to the financial statements for 2009 to conform to the presentation for 2010.

**NOTE 1 — ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**
(Continued)

**Use of Estimates**

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**Going Concern and Other Uncertainties**

At March 31, 2010, the Corporation's current liabilities exceeded its current assets by $82,841,000, the Corporation has suffered an operating loss of $37,187,000 for the fiscal year ended March 31, 2010 and the Corporation has a net deficit of $291,164,000. On December 3, 2009, the Corporation filed a petition for adjustment of its debts under Chapter 9 of Title 11 of the United States Bankruptcy Code, a municipal bankruptcy case, in the United States Bankruptcy Court for the Southern District of New York (See Note 2). Over the past several years, the Corporation has experienced continuing mandated increases in personnel and other costs and increases in statutory expenses as required by New York State law. These factors have resulted in the Corporation being required to make distributions in excess of its operating income before statutory expenses.  Management has instituted a number of initiatives to reduce its expenses, including a reduction in workforce and a focus on maximization of branch profitability.  These operating initiatives, however, have not been sufficient to offset the increases in expenses and distributions.  Management has also continued to seek legislative relief. There is no assurance that the New York State legislature will adopt the necessary changes to New York State law to provide relief to the Corporation.  Without such relief, the Corporation will continue to experience difficulties in making required payments on a timely basis.  Additionally, the racing industry and the Corporation have and continue to face a variety of significant challenges. The financial, legislative and regulatory environment in addition to gaming competition and declining consumer interest, continue to impact the thoroughbred and harness racing industries. Management continues to focus on and attempt to enhance overall operations, combined with new opportunities and initiatives which support and leverage the industry. The financial statements do not include any adjustments that might result from the outcome of these uncertainties.

**NOTE 2 — BANKRUPTCY**

**Chapter 9 Filing**

As of October 31, 2009, the Corporation had unrestricted operating cash of approximately $11,098,000 and current liabilities of approximately $89,372,000. Cash flow projections indicated that the Corporation would run out of operating cash in December 2009, assuming all obligations were timely satisfied. On December 3, 2009, the Corporation filed a petition for adjustment of its debts under Chapter 9 of Title 11 of the United States Bankruptcy Code, a municipal bankruptcy case, in the United States Bankruptcy Court for the Southern District of New York.

**NOTE 2 — BANKRUPTCY** (Continued)

**Chapter 9 Filing** (Continued)

The Chapter 9 filing has enabled the Corporation to continue to operate and provide wagering opportunities to its customers by freezing payments on certain prepetition debts until a plan of adjustment can be negotiated and approved. By operation of law, the filing enjoined creditor enforcement actions against the Corporation during the case, unless otherwise permitted by the court. The case has provided the Corporation and its creditor constituencies, including employees and racing industry stakeholders, with time to negotiate settlements and legislative changes with an objective of long-term fiscal stability. There is no assurance that any such negotiations will meet that objective.

**Pendency Plan and Service Delivery**

Since January 1, 2010, the Corporation has operated under a series of "Pendency Plans" that identify and implement modifications to existing agreements, including reduced staffing and frozen wages. These modifications have allowed the Corporation to continue to provide essential services to its customers and racing industry stakeholders during the pendency of the Chapter 9 case, although at certain diminished service levels.

**Court Ruling on Eligibility**

After an evidentiary hearing on February 22, 2010, the Bankruptcy Court ruled that the Corporation was eligible for Chapter 9 relief on March 22, 2010. On April 5, 2010, NYRA appealed from the ruling to the United States District Court for the Southern District of New York. The appeal is pending.

**Official Unsecured Creditors Committee**

On March 30, 2010, the United States Trustee for Region 2, under 11 U.S.C. §§ 901(a) and 1102(a) and (b), appointed the following creditors to the Official Committee of Unsecured Creditors of New York City Off-Track Betting Corporation (Official Unsecured Creditors Committee): 1) Yonkers Racing Corporation, 2) The New York Racing Association, Inc., 3) Empire Resorts, 4) District 37, Local 2021, 5) Finger Lakes Racing Association, Inc., 6) Churchill Downs, Incorporated, and 7) Paramount Leasehold, L.P.

**Restructuring Plan**

On May 10, 2010, the Corporation met with the Official Unsecured Creditors Committee and presented a Restructuring Plan for their consideration. The Restructuring Plan includes the following:

1) Streamlining the current operations through headcount reduction and process improvement.
2) Investment to grow revenues via development of Flagship Entertainment Centers (FEC) and Internet Access Terminals (IAT) throughout New York City.
3) Promotion of in-state horse racing. Racing at in-state tracks would be prominently promoted in all of the Corporation's bricks and mortar facilities and throughout all of the Corporation's other wagering channels.
4) Ongoing supplier relationships between the Corporation and the in-state race tracks would be based on market rates for services rendered or product supplied.

**NOTE 2 — BANKRUPTCY** (Continued)

**Restructuring Plan** (Continued)

5) Indirect commissions to New York State race tracks and breeding development funds are proposed to be abolished going forward and replaced with a profit sharing mechanism.

6) The obligation to make Maintenance of Effort payments and Dark Day payments, as required by Sections 1017(2) and 1014 and 1016, respectively, of the New York Racing Law, would be eliminated.

7) To effect the changes called for by the Restructuring Plan a financing event would be required. The Corporation with assistance from underwriters would issue up to $300 million of municipal bonds.

8) The Corporation would pay 100% of all prepetition liabilities and deferred payments subject to acceptance of the Restructuring Plan and a successful financing event.

9) The Corporation would provide to in-state industry stakeholders additional funds out of the bond proceeds that would help to offset the impact of lower revenues in the initial stages of restructuring and the elimination of indirect commissions.

10) The Corporation would make available to NYRA $30 million immediately after the Legislature has passed legislation consistent with terms outlined in the Restructuring Plan.

11) The Corporation would establish an advisory board to be comprised of members from the horse racing industry and other related constituencies whom the Corporation would consult as it moves forward with the Restructuring Plan.

12) A number of legislative and regulatory changes would be required to effectuate the Restructuring Plan.

The restructuring plan calls for the rejection of eight leases in bankruptcy, the early termination of nine leases and the expiration of nine leases and the leasing of five larger properties for Flagship Entertainment Centers over the next eighteen to twenty-four months.

On May 28, 2010, The Corporation was notified by the New York State Director of the Budget that in accordance with existing legal, fiscal and policy considerations, the New York State Division of the Budget can not endorse any form of State guarantee to securitize such potential financing.

On June 4, 2010, the Corporation's Chairman submitted his letter of resignation to the Governor. The secretary to the governor has been appointed by the Governor to serve as interim chairman of the Corporation.

**Plan of Adjustment**

The negotiation of terms of a plan of adjustment has commenced. If issues cannot be resolved with the Official Unsecured Creditors Committee in the near future, the Corporation may continue to negotiate with its other creditors and seek to confirm a plan of adjustment over the objection of the Official Unsecured Creditors Committee. Accordingly, no adjustment in the valuation of assets or debt obligations has been made in the accompanying financial statements, and no aggregate gain expected to occur from re-measuring liabilities can reasonably be estimated.

**NOTE 2 — BANKRUPTCY** (Continued)

**Prepetition Liabilities Subject to the Plan of Adjustment**

The following table summarizes the components of prepetition liabilities subject to a plan of adjustment included in the statements of net deficiency as of March 31, 2010:

|  | Amount |
|---|---|
| Accounts payable and accrued expenses | $ 51,940,000 |
| Due to State of New York - |  |
| Outstanding pari-mutuel tickets | 5,949,000 |
| Pari-mutuel tax and breakage | 763,000 |
| New York State Racing and Wagering Board regulatory fee | 2,143,000 |
| Due to other local governments | 293,000 |
| Compensated leave time | 9,056,000 |
| Other postemployment benefits obligation | 213,970,000 |
| Other | 216,000 |
|  | $284,330,000 |

Prepetition liabilities subject to the plan of adjustment may be impacted by the Chapter 9 process. These amounts represent current estimates of known prepetition liabilities to be resolved in connection with the Corporation's Chapter 9 proceeding.

Differences between liabilities that the Corporation has estimated and the claims filed, or to be filed, will be investigated and resolved in connection with the claims resolution process. The Corporation will continue to evaluate these liabilities throughout the Chapter 9 process and adjust amounts as necessary. Such adjustments may be material.

**Uncertain Outlook**

Based on the Corporation's analysis, a likely alternative to the Restructuring Plan would be a complete shutdown of NYCOTB. A shutdown would be expected to result in a significant cost to the State and City for unfunded Corporation liabilities, such as pension and employee welfare benefits. In addition, the multiplier effects throughout the State horse racing industry and the State would likely be much larger, as a result of the loss of annual revenue generated by the Corporation to the State and local governments and the State horse racing industry participants.

There has never been a Chapter 9 filing by a New York public benefit corporation. Consequently, there is little case law to guide the potential outcome of the Corporation's case. During the pendency of the Corporation's Chapter 9 petition, the Corporation has remained focused on negotiating settlements to meet its objective of long-term fiscal stability and currently anticipates emerging from the Chapter 9 case as an ongoing provider of pari-mutuel wagering services.

The process of developing and negotiating a plan for adjusting the Corporation's debts is underway. As a result, the accompanying financial statements do not purport to reflect or provide for the consequences of the bankruptcy proceedings. In particular, such financial statements do not purport to show (a) as to assets, their realizable value on a liquidation basis or their availability to satisfy liabilities; (b) as to prepetition liabilities, the amounts that may be allowed for claims or contingencies, or the status and priority thereof; and (c) as to operations, the effect of any changes that may be made in its business.

## NOTE 3 — CASH AND CASH EQUIVALENTS

Cash and cash equivalents are comprised of the following at March 31:

|  | 2010 | | 2009 | |
|  | Carrying Amount | Bank Balance | Carrying Amount | Bank Balance |
| --- | --- | --- | --- | --- |
| Vault cash | $ 1,543,000 |  | $ 1,899,000 |  |
| Deposits and money market funds | 20,604,000 | $ 22,971,000 | 16,515,000 | $ 20,778,000 |
| Total cash and cash equivalents | $ 22,147,000 |  | $ 18,414,000 |  |

Custodial credit risk is the risk that, in the event of a bank failure, the Corporation's deposits might not be recovered. The Corporation has implemented a deposit policy for custodial credit risk. Credit risk is generally the risk that the issuer of an investment will not fulfill its obligation to the holder of the investment. This is measured by assignment of a rating by a nationally recognized rating organization. Concentration of credit risk is the risk of loss attributed to the magnitude of a holder's investment in a single issuer.

As of March 31, 2010, of the Corporation's bank balance of $22,971,000, $15,949,000 was collateralized by US government instruments or insured by the Federal Deposit Insurance Corporation (the "FDIC"), and $7,022,000, invested in a money market fund, was uninsured and uncollateralized and exposed to credit risk.

At March 31, 2010 and 2009, NYCOTB's sole investment was in the JPMorgan U.S. Government Money Market Fund (Money Market Fund). The Money Market Fund invests exclusively in high-quality, short-term securities that are issued by or guaranteed by the U.S. government or by U.S. government agencies and instrumentalities. Some of the securities purchased by the Money Market Fund may be subject to repurchase agreements. The Money Market Fund is rated AAAm by S&P and Aaa by Moody's.

Cash and cash equivalents in the amount of $1,483,000 and $1,688,000 are restricted for customer advance deposit wagering account activities at March 31, 2010 and 2009, respectively.

## NOTE 4 — CAPITAL ASSETS, NET

The following is a summary of changes in capital assets for the year ended March 31, 2010:

|  | March 31, 2009 | Additions | Deletions | March 31, 2010 |
| --- | --- | --- | --- | --- |
| Office machinery and equipment | $ 22,551,000 | $ 394,000 | $ 20,000 | $ 22,925,000 |
| Furniture and fixtures | 735,000 | 14,000 | - | 749,000 |
| Leasehold improvements, principally for branch offices | 41,749,000 | 257,000 | 83,000 | 41,923,000 |
| Data processing equipment | 6,462,000 | 262,000 | - | 6,724,000 |
| Automobiles | 1,077,000 | - | 170,000 | 907,000 |
| Total | 72,574,000 | 927,000 | 273,000 | 73,228,000 |
| Less accumulated depreciation and amortization | 63,405,000 | 2,576,000 | 273,000 | 65,708,000 |
| Capital Assets, net | $ 9,169,000 |  |  | $ 7,520,000 |

**NEW YORK CITY OFF-TRACK BETTING CORPORATION**
**(A Component Unit of the State of New York)**
**NOTES TO FINANCIAL STATEMENTS**
**March 31, 2010 and 2009**

## NOTE 5 — COMPENSATED LEAVE TIME

The Corporation has included in compensated leave time the liability for unused vested sick leave attributable for services rendered by employees with ten years or more of continuous service. The Corporation has also included in compensated leave time the liability for unused vacation leave. Corporate policy is to pay employees for vested unused sick leave and unused vacation leave upon termination. Compensated leave time expenses are included in the operating expenses in the statements of revenues, expenses, and changes in net deficiency.

## NOTE 6 — PENSION PLAN

Substantially all full-time employees of the Corporation are members of the New York City Employees' Retirement System ("NYCERS" or the "System"), which is a cost-sharing, multiple-employer public employee retirement system ("PERS").

*Benefits Provided by the System*

The System provides retirement as well as death, accident and disability benefits. Benefits vest after five years of credited service depending on date of employment. Certain retirees also receive supplemental benefits.

Benefit and contribution provisions, which are dependent upon the point in time at which the employee last entered qualifying service and length of credited service, are established by New York State law and may be amended only by the New York State Legislature. The System has both contributory and noncontributory requirements, with retirement age varying from 55 to 70 depending upon when an employee last entered qualifying service. Employees entering qualifying service on or before July 26, 1976 are enrolled in a noncontributory plan. Employees entering qualifying service after July 26, 1976 are enrolled in a contributory plan, which requires a 3% contribution of their salary.

*NYCERS*

The Corporation funds accrued pension cost, which represents an amount actuarially computed by NYCERS for employer contributions using the frozen entry age actuarial cost method of funding. NYCERS makes the benefit payments to retired employees of the Corporation.

The following table presents the Corporation's total payroll paid for all employees and covered payroll relating to NYCERS, employer and employee contributions, contributions as a percentage of covered payroll and the percentage of required employer contributions contributed for the years ended June 30, 2009, 2008, and 2007, the latest dates for which such information is available:

| | *(In Millions)* | | |
| --- | --- | --- | --- |
| | **2009** | **2008** | **2007** |
| **Current-year payroll paid:** | | | |
| Covered | $ 43.2 | $ 43.2 | $ 43.2 |
| Total | $ 63.5 | $ 65.3 | $ 64.3 |
| **Required contributions:** | | | |
| Employer | $ 7.6 | $ 7.0 | $ 5.9 |
| Employee | $ 3.1 | $ 2.7 | $ 2.6 |
| **Percentage of covered payroll:** | | | |
| Employer | 17.6% | 16.2% | 13.7% |
| Employee | 7.2% | 6.3% | 6.0% |
| **Percentage of required employer** | | | |
| contributions contributed: | 100% | 100% | 100% |

**NEW YORK CITY OFF-TRACK BETTING CORPORATION**
**(A Component Unit of the State of New York)**
**NOTES TO FINANCIAL STATEMENTS**
**March 31, 2010 and 2009**

**NOTE 6 — PENSION PLAN** (Continued)

For the year ended June 30, 2010, the Corporation was required to contribute approximately $7.4 million, of which $2.2 million was paid as of March 31, 2010.

Historical trend information designed to provide information about the Plan's progress made in accumulating sufficient assets to pay benefits when due is presented in the component unit financial report prepared by NYCERS.

NYCERS issues a stand-alone financial report, which is included in The City of New York Comprehensive Annual Financial Report as a pension trust fund. This financial report may be obtained from the New York City Employees' Retirement System, 335 Adams Street, Suite 2300, Brooklyn, N.Y. 11201.

**NOTE 7 — OTHER POSTEMPLOYMENT BENEFITS**

In accordance with collective bargaining agreements, the Corporation provides other post-employment benefits ("OPEB") which include health insurance, Medicare Part B reimbursements, and welfare fund contributions to eligible retirees and beneficiaries. The Corporation provides basic health care benefits to eligible retirees and dependents at no cost to most of the participants. Basic healthcare premium costs, which are partially paid by the remaining participants, vary according to the terms of their elected plans. To qualify, retirees must: (i) have worked for the Corporation with at least ten years of credited service (five years of credited service if employed on or before December 27, 2001) as a member of an approved pension system (requirement does not apply if retirement is as a result of accidental disability); (ii) have been employed by the Corporation or a Corporation-related agency prior to retirement; (iii) have worked regularly for at least twenty hours a week prior to retirement; and (iv) be receiving a pension check from a retirement system maintained by the Corporation or another system approved by the Corporation. The Corporation is not required by law or contractual agreement to provide funding for its OPEB obligation other than the pay-as-you-go amount necessary to provide current benefits to retirees and eligible beneficiaries.

The Corporation's OPEB expense of $14,371,000 and $15,821,000 for the fiscal year ended March 31, 2010 and for the nine-month period ended March 31, 2009, respectively, was equal to the annual OPEB cost ("AOC"), an amount actuarially determined in accordance with the parameters of GASB Statement No. 45. The Corporation's annual required contribution ("ARC") was approximately $223,235,000 and $161,104,000 at March 31, 2010 and 2009, respectively. The ARC represents a level of funding that, if paid on an ongoing basis, is projected to cover normal cost each year and amortize any unfunded actuarial liabilities. The ARC adjustment represents the discounted present value of the balance of the net OPEB obligation at the beginning of the year. The Corporation's AOC and OPEB obligation for the fiscal year ended March 31, 2010 and for the nine-month period ended March 31, 2009 are composed of the following (as calculated by the Office of the Actuary, the City of New York):

**NOTE 7 — OTHER POSTEMPLOYMENT BENEFITS** (Continued)

|  | 2010 | | 2009 | |
|---|---:|---:|---:|---:|
| OPEB obligation, beginning of period | | $ 208,864,000 | | $ 195,658,000 |
| Annual OPEB cost (AOC) | | | | |
|   Annual required contribution (ARC) | | | | |
|     Normal cost | $ 10,549,000 | | $ 9,691,000 | |
|     Amortization of unfunded actuarial accrued liability over one year | 204,100,000 | | 146,743,000 | |
|     Interest at 4.0% | 8,586,000 | | 4,670,000 | |
|   ARC | 223,235,000 | | 161,104,000 | |
|   ARC Adjustment | (217,219,000) | | (151,124,000) | |
|   Interest on net OPEB obligation | 8,355,000 | | 5,841,000 | |
|   AOC | $ 14,371,000 | 14,371,000 | $ 15,821,000 | 15,821,000 |
| Less: Corporation payments for retired employees' health care benefits | | 4,475,000 | | 2,615,000 |
|   OPEB obligation, end of period | | 218,760,000 | | 208,864,000 |
| Less: Current portion of net OPEB obligation | | 9,116,000 | | 8,095,000 |
|   OPEB obligation, non-current | | $ 209,644,000 | | $ 200,769,000 |

The Corporation has not funded any of its net OPEB obligation. Non-cash expense of $9,896,000 and $13,206,000 was incurred for the fiscal year ended March 31, 2010 and for the nine-month period ended March 31, 2009, respectively.

For the current year and each of the preceding two periods, AOC, percentage of AOC contributed, and the net OPEB obligation at the end of the period are as follows:

| Period Ended | Annual OPEB Cost | Actual Contributions | Percentage of OPEB Contributed | Net OPEB Obligation |
|---|---|---|---|---|
| Year ended March 31, 2010 | $14,371,000 | $4,475,000 | 31% | $218,760,000 |
| Nine-month period ended March 31, 2009 | $15,821,000 | $2,615,000 | 17% | $208,864,000 |
| Year ended June 30, 2008 | $63,647,000 | $4,942,000 | 8% | $195,658,000 |

Actuarial valuations involve estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future. Examples include assumptions about future employment, mortality, and the healthcare cost trend. Amounts determined regarding the funded status and the ARC are subject to continual revision as actual results are compared with past expectations and new estimates are made about the future. The following schedule of funding progress presents information about the actuarial value of assets relative to the actuarial accrued liabilities for benefits.

## NOTE 7 — OTHER POSTEMPLOYMENT BENEFITS (Continued)

| Actuarial Valuation Date | Actuarial Value of Assets (a) | Actuarial Accrued Liability (AAL) (b) | Unfunded AAL (UAAL) (b-a) | Funded Ratio (a/b) | Covered Payroll (c) | UAAL as a Percentage of Covered Payroll ((b-a)/c) |
|---|---|---|---|---|---|---|
| 3/31/2009* | $ - | $204,100,000 | $204,100,000 | 0.0% | $46,862,000 | 435.5% |
| 6/30/2008** | - | 195,658,000 | 195,658,000 | 0.0% | 47,124,000 | 415.2% |
| 6/30/2007 | - | 180,196,000 | 180,196,000 | 0.0% | 45,751,000 | 393.9% |

* Roll-forward of June 30, 2008 actuarial valuation results to March 31, 2009
** Roll-forward of June 30, 2007 actuarial valuation results to June 30, 2008

Projections of benefits for financial reporting purposes are based on the types of benefits provided at the time of each valuation and the historical pattern of sharing of benefit costs between the employer and employees to that point. The actuarial methods and assumptions used include techniques that are designed to reduce short-term volatility in actuarial accrued liabilities, consistent with the long-term perspective of the calculations.

The frozen entry age actuarial cost method was used in the March 31, 2009 and June 30, 2008 actuarial valuation, the basis for the ARC calculation for the fiscal year ended March 31, 2010 and for the nine-month period ended March 31, 2009. The actuarial assumptions used in the March 31, 2009 and June 30, 2008 OPEB actuarial valuations are classified as those used in the New York City Retirement Systems (NYCRS) valuations and those specific to the OPEB valuations.

## NOTE 8 — DEFERRED COMPENSATION PLAN

The Corporation's employees may participate in a deferred compensation plan established by the State of New York in accordance with Internal Revenue Code Section 457. The Plan is available to all employees of the Corporation. All amounts of compensation deferred under the Plan, and all income attributable to such compensation, are held in a trust for the exclusive benefit of the participants and their beneficiaries, and not included in the financial statements of the Corporation. The contributions are invested in mutual funds.

## NOTE 9 — COMMITMENTS

*Leases*

Minimum rental commitments under the terms of all non-cancelable real property leases in effect at March 31, 2010 are summarized below:

| Year Ending March 31, | Amount |
|---|---|
| 2011 | $ 16,612,000 |
| 2012 | 14,041,000 |
| 2013 | 13,917,000 |
| 2014 | 13,879,000 |
| 2015 | 13,502,000 |
| 2016 - 2020 | 49,276,000 |
| 2021 - 2023 | 6,663,000 |
| Aggregate commitment | $127,890,000 |

**NOTE 9 — COMMITMENTS** (Continued)

*Leases (Continued)*

In addition to the minimum rentals, certain of these leases provide for payments of taxes and other costs. Rental expense for property under all lease agreements for the fiscal year ended March 31, 2010 and for the nine-month period ended March 31, 2009 was $21,727,000 and $15,097,000, respectively.

*Agreement with City of New York*

The Corporation has an agreement with the City of New York, dated June 16, 2008, regarding continued use of governmental cable channels for carriage of government programming produced by the Corporation. Under this agreement, the City of New York continues its practice of transmitting programming delivered by the Corporation on government use channels as part of the City's activity of providing government use programming to cable television subscribers, and the Corporation assists in offsetting costs incurred by the City in facilitating the provision and transmission of such government use programming by paying the City annually an amount equal to $3.25 million. To help alleviate the Corporation's cash flow, the agreement was modified on July 13, 2009 to allow the Corporation to make monthly payments. In return the Corporation amortized these payments to the City of New York over the twelve months at 4% interest. On June 3, 2010, the Corporation and the City of New York signed a second amendment to the agreement to continue making monthly payments and to amortize the final twelve months at 5% interest. This agreement expires on June 15, 2011.

**NOTE 10 — CONTINGENCIES**

*Legal Matters*

In the normal course of business, the Corporation is involved in legal proceedings, including labor and collective bargaining, safety, liability, insurance and other matters. The Corporation accrues a liability, if any, for such matters when it is possible that a liability has been incurred and the amount can be reasonably estimated. When only a range of possible loss can be established, the most probable amount in the range is accrued. If no amount within this range is a better estimate than any other amount within the range, the minimum amount in the range is accrued. The Corporation believes it has meritorious defenses to these proceedings and intends to vigorously defend them. Also, the Corporation believes that the liability, if any, that may ultimately result from the resolution of these proceedings, in excess of amounts provided for at March 31, 2010, will not have a material adverse effect on the financial condition of the Corporation.

*Labor Agreements*

At March 31, 2010, approximately 1,180 or 90% of the Corporation's employees work under collective bargaining agreements. All of those employees are represented by unions whose existing labor agreements have expired and are subject to renegotiation. In December 2009, three of the four unions entered into memorandums of agreement with the Corporation, however, new collective bargaining agreements have not yet been negotiated.

## NOTE 11 — CAPITAL ACQUISITION FUND

Beginning in July 1990, the Corporation established a Capital Acquisition Fund (the "Fund"). As of June 17, 2008, under Chapter 115 of the Laws of 2008, all funds accumulated in the capital acquisition fund, established pursuant to section 609-a of the Racing, Pari-Mutuel Wagering and Breeding Law, prior to July 1, 2008 or deposited into such fund thereafter are available to the Corporation for any corporate purpose. The Fund has been consolidated with the operating accounts of the Corporation and is included in the accompanying financial statements.

The assets, liabilities and net assets of the Capital Acquisition Fund are included in the following statements of net assets' captions at March 31:

|  | 2010 | 2009 |
|---|---|---|
| **Assets** | | |
| Restricted cash and cash equivalents | $ - | $ 25,000 |
| Capital assets, net | 5,588,000 | 7,739,000 |
| Total assets | $ 5,588,000 | $ 7,764,000 |
| **Liabilities and Net Assets** | | |
| Liabilities | | |
| Other current liabilities | $ - | $ 25,000 |
| Total liabilities | - | 25,000 |
| **Net Assets** | | |
| Invested in capital assets, net of related debt | 5,588,000 | 7,714,000 |
| Restricted for acquisition of capital assets | - | 25,000 |
| Total net assets | 5,588,000 | 7,739,000 |
| Total liabilities and net assets | $ 5,588,000 | $ 7,764,000 |

The Fund's related activity for the fiscal year ended March 31, 2010 and for the nine-month period ended March 31, 2009 follows:

|  | Year Ended March 31, 2010 | Nine-Month Period Ended March 31, 2009 |
|---|---|---|
| **Operating Revenues** | | |
| Capital acquisition surcharge | $ 3,127,000 | $ 2,491,000 |
| Total operating revenues | $ 3,127,000 | $ 2,491,000 |
| **Operating expenses** | | |
| Depreciation and amortization | $ 2,151,000 | $ 2,900,000 |
| Other - transfer to the Corporation | 3,127,000 | 9,188,000 |
| Total operating expenses | 5,278,000 | 12,088,000 |
| Change in net assets | (2,151,000) | (9,597,000) |
| Total net assets, beginning of year | 7,739,000 | 17,336,000 |
| Total net assets, end of year | $ 5,588,000 | $ 7,739,000 |

**SUPPLEMENTARY INFORMATION**

# NEW YORK CITY OFF-TRACK BETTING CORPORATION
**(A Component Unit of the State of New York)**
**STATEMENT OF SECTION 516 REVENUES AND EXPENSES (UNAUDITED)**
**(AS REQUIRED BY THE STATE OF NEW YORK RACING AND WAGERING BOARD)**

|  | Year Ended March 31, 2010 | Nine-Month Period Ended March 31, 2009 |
|---|---|---|
| **Pari-Mutuel Revenue:** |  |  |
| Statutory Take-Out | $ 168,134,602 | $ 134,787,184 |
| Breakage | 3,376,019 | 2,719,510 |
| Minus Pools | (345,168) | (181,413) |
| Missed Pools/Adjustment of NYC Surcharge | - | (35,684) |
| Derived from Section 532.3.b.(iv) & 532.7 | 19,418,312 | 15,507,779 |
| **Total Pari-Mutuel Revenue** | $ 190,583,765 | $ 152,797,376 |
| **Statutory & Simulcast Payments** |  |  |
| New York State ( Pari-Mutuel Tax & Breakage) | $ 5,904,964 | $ 4,649,488 |
| New York State Racing & Wagering Board Regulatory Fee | 4,077,783 | 3,288,139 |
| NYS Thoroughbred Development & Breeding Fund | 4,092,415 | 3,306,434 |
| Ag. & NYS Breeding & Dev. Fund Breeders' Fund - Harness | 1,822,227 | 1,478,026 |
| In State Thoroughbred Tracks | 48,072,257 | 35,579,473 |
| Out of State Thoroughbred Tracks | 11,427,076 | 9,306,001 |
| In State Harness Tracks | 10,815,118 | 9,151,708 |
| Out of State Harness Tracks | 1,351,769 | 1,153,469 |
| Special Events | 780,930 | - |
| **Total Statutory & Simulcast Payments** | $ 88,344,539 | $ 67,912,738 |
| **Net Pari-Mutuel Revenue** | $ 102,239,226 | $ 84,884,638 |
| **Other Revenue** |  |  |
| Admission Income & Tax | $ 330,887 | $ 243,155 |
| Lottery Income | - | - |
| Concession Income | 35,063 | 57,028 |
| Derived from Section 509-a(3) | 3,127,210 | 2,491,314 |
| Transfer from Section 509 Reserve Fund | - | - |
| Interest Income | 61,757 | 179,631 |
| Enterprise Fund - Net Revenue / (Loss) | - | - |
| Other Income | 626,028 | 400,866 |
| **Net Revenue from Operations** | $ 106,420,171 | $ 88,256,632 |
| **Operating Expenses** |  |  |
| Branch Expenses | $ 87,172,867 | $ 69,188,170 |
| General & Administrative Expenses | 56,434,026 | 44,210,863 |
| **Total Operating Expenses** | $ 143,606,893 | $ 113,399,033 |
| **Section 516 Net Revenues from Operations** | $ (37,186,722) | $ (25,142,401) |
| Less: Section 509-a(ii) Contributions to Capital Acquisition Fund |  |  |
| Section 509 Contributions to Reserve Fund | - | - |
| Section 527.6 Obligations | - | - |
| **Section 516 Net Revenue for Distribution** | $ (37,186,722) | $ (25,142,401) |

Unaudited - See Auditor's Report on Supplementary Information.

# NEW YORK CITY OFF-TRACK BETTING CORPORATION
**(A Component Unit of the State of New York)**
**SUMMARY OF REVENUES AND EXPENSES BY BRANCH (UNAUDITED)**
**(AS REQUIRED BY THE STATE OF NEW YORK RACING AND WAGERING BOARD)**
**For the Fiscal Year Ended March 31, 2010**

| Branch/County | Net Handle | Branch Revenues | Branch Expenses | Branch Profit (Loss) |
|---|---|---|---|---|
| **New York** | | | | |
| 143 West 72nd Street, Man-11022 | $ 9,269,062 | $ 1,273,829 | $ 1,746,161 | $ (472,332) |
| Playwright's -21027 | 3,389,965 | 474,604 | 361,284 | 113,320 |
| 105 Delancey Street, Man-21063 | 11,699,169 | 1,643,253 | 1,046,459 | 596,795 |
| 42 West 48th St., Man-11067 | 12,543,127 | 1,779,896 | 1,767,111 | 12,785 |
| 25 Park Place, Man-21099 | 7,841,187 | 1,084,793 | 934,899 | 149,894 |
| 1318 Second Avenue, Man-11110 | 6,444,374 | 883,513 | 1,098,283 | (214,769) |
| 515 Seventh Avenue, Man-21119 | 17,028,973 | 2,385,347 | 2,405,669 | (20,322) |
| 991 Second Avenue, Man-11136 | 7,429,586 | 1,032,373 | 1,624,239 | (591,867) |
| 106-110 Lafayette Street, Man-21156 | 13,443,337 | 1,881,457 | 1,937,619 | (56,161) |
| 714 Third Avenue, Man-11169 | 7,927,203 | 1,116,225 | 1,308,293 | (192,069) |
| 200 Varick Street, Man-21171 | 3,785,207 | 525,575 | 644,886 | (119,311) |
| 7-8 Chatham Square, Man-21181 | 20,721,844 | 2,894,144 | 2,589,082 | 305,061 |
| Winners Circle 515 Seventh Ave, Man-21219 | 34,996,303 | 3,497,053 | 3,066,694 | 430,359 |
| Inside Track 991 Second Ave, Man-11236 | 31,127,281 | 2,964,417 | 3,823,394 | (858,977) |
| Yankee Clipper 17 John St., Man-21265 | 14,983,066 | 1,481,474 | 1,508,679 | (27,204) |
| **Bronx** | | | | |
| 2145 White Plains Road, Bronx-14020 | 6,513,942 | 904,903 | 845,257 | 59,647 |
| Fiddler's Elbow 3718 East Tremont, Bronx-14032 | 4,684,822 | 647,710 | 638,727 | 8,983 |
| 1935 Westchester Avenue, Bronx 14048 | 7,624,944 | 1,055,392 | 966,435 | 88,956 |
| 801-815 East 241st Street, Bronx 14057 | 12,279,091 | 1,746,843 | 1,231,514 | 515,328 |
| 1434 Williamsbridge Road, Bronx-14090 | 8,384,464 | 1,165,029 | 1,080,014 | 85,015 |
| 4325 Boston Post Road, Bronx-14108 | 14,805,769 | 2,085,878 | 1,488,602 | 597,276 |
| 70 West 233RD Street, Bronx-14121 | 10,437,465 | 1,456,728 | 1,070,031 | 386,697 |
| **Queens** | | | | |
| 107-40 Queens Boulevard, Queens-33003 | 12,729,921 | 1,778,340 | 1,261,524 | 516,816 |
| 136-55 Roosevelt Avenue, Queens-33006 | 12,621,511 | 1,775,234 | 1,190,482 | 584,752 |
| The Slow Horse Saloon 38-04 Broadway, Queens-33009 | 4,409,691 | 609,802 | 662,366 | (52,564) |
| Irish Circle 101-19 Rockwy Bch Blvd, Q-33015 | 3,687,373 | 451,773 | 421,973 | 29,801 |
| Austin Ale House 82-70 Austin St. Q-33016 | 1,613,875 | 155,607 | 279,233 | (123,626) |
| 87-16 Astoria Blvd, Queens-33026 | 10,059,780 | 1,396,995 | 988,260 | 408,735 |
| 31-35 Downing Street, Queens-33040 | 23,969,854 | 3,378,164 | 2,109,534 | 1,268,630 |
| 245-19 Jamaica Avenue, Queens-33047 | 9,821,857 | 1,369,606 | 946,498 | 423,108 |
| 4405 Queens Blvd, Queens-33051 | 6,273,339 | 869,097 | 791,220 | 77,877 |
| 62-17 Roosevelt Avenue, Queens-33060 | 11,281,313 | 1,571,106 | 999,393 | 571,713 |
| 22-72 31st Street-33097 | 11,265,178 | 1,565,961 | 1,101,791 | 464,170 |
| 253-01 Northern Blvd, Queens-33101 | 11,305,134 | 1,571,521 | 1,008,051 | 563,470 |
| 69-97 Grand Avenue, Queens-33105 | 8,204,009 | 1,117,541 | 780,777 | 336,764 |
| 160-38 Northern Blvd, Queens-33106 | 6,712,559 | 916,127 | 687,182 | 228,945 |
| 25-14 Broadway, Queens-33112 | 5,780,265 | 793,008 | 705,795 | 87,213 |
| 179-30 Hillside Avenue, Queens-33114 | 10,743,280 | 1,500,416 | 1,076,151 | 424,265 |
| O'Neill's 64-21 53rd Drive, Queens-33160 | 5,637,231 | 708,312 | 669,746 | 38,566 |
| 117-09 Jamaica Avenue, Queens-33166 | 5,234,052 | 732,961 | 603,495 | 129,466 |
| 9400 Liberty Avenue, Queens-33174 | 16,597,553 | 2,324,696 | 1,365,320 | 959,376 |

# NEW YORK CITY OFF-TRACK BETTING CORPORATION

**(A Component Unit of the State of New York)**
**SUMMARY OF REVENUES AND EXPENSES BY BRANCH (UNAUDITED), CONTINUED**
**(AS REQUIRED BY THE STATE OF NEW YORK RACING AND WAGERING BOARD)**
For the Fiscal Year Ended March 31, 2010

| Branch/County | Net Handle | Branch Revenues | Branch Expenses | Branch Profit (Loss) |
|---|---:|---:|---:|---:|
| **Kings** | | | | |
| 1612 East 16th Street, Bklyn-42002 | 7,748,943 | 1,086,789 | 997,789 | 89,000 |
| IL Fornetto's 2902 Emmons Ave, Bklyn-42013 | 4,248,514 | 592,999 | 643,041 | (50,042) |
| 8621 Fifth Avenue, Bklyn-22030 | 8,955,565 | 1,244,375 | 981,091 | 263,284 |
| 495 Fifth Avenue, Bklyn-22031 | 6,017,349 | 820,390 | 881,438 | (61,047) |
| 1367 Rockaway Parkway, Bklyn-42039 | 4,813,967 | 659,684 | 662,195 | (2,511) |
| 2901 Avenue U, Bklyn-42046 | 13,437,126 | 1,871,699 | 1,293,323 | 578,375 |
| 5704 Fifth Avenue, Bklyn-22052 | 12,613,913 | 1,773,733 | 1,122,295 | 651,438 |
| 2168 86TH Street, Bklyn-42054 | 7,149,336 | 1,005,380 | 828,717 | 176,663 |
| 756 Manhattan Avenue, Bklyn-32065 | 5,557,874 | 770,227 | 619,679 | 150,548 |
| 45 Remsen Avenue, Bklyn-42083 | 9,613,937 | 1,340,020 | 1,028,765 | 311,255 |
| 1520 Flatbush Avenue, S.I.-42084 | 10,936,112 | 1,531,179 | 1,434,051 | 97,128 |
| 4013 13th Avenue, Bklyn-42100 | 6,149,410 | 862,713 | 820,238 | 42,475 |
| 276 Avenue X, Bklyn-42103 | 7,860,478 | 1,094,767 | 916,883 | 177,885 |
| Hunter's 9404 4th Avenue, Bklyn-42109 | 4,692,524 | 583,070 | 564,546 | 18,523 |
| 1204 Neptune Avenue, Bklyn-42117 | 3,362,218 | 473,692 | 452,181 | 21,510 |
| 6305 18th Avenue, Bklyn-42120 | 5,928,642 | 838,646 | 629,752 | 208,894 |
| 2112 Rockaway Parkway, Bklyn-42128 | 5,818,865 | 817,114 | 831,410 | (14,295) |
| 6719 Bay Parkway, Bklyn-42133 | 17,219,376 | 2,409,556 | 1,494,657 | 914,900 |
| 7206 13th Avenue, Bklyn-42145 | 9,198,321 | 1,272,771 | 882,597 | 390,174 |
| 86 Livingston Street, Bklyn-22164 | 5,222,016 | 728,316 | 656,293 | 72,022 |
| 11114 Flatlands Avenue, Bklyn-42183 | 12,327,640 | 1,746,222 | 1,291,299 | 454,923 |
| **Richmond** | | | | |
| 2795 Richmond Avenue, S.I.-45093 | 11,172,941 | 1,544,830 | 1,272,286 | 272,544 |
| 1410 Forest Ave., S.I.-45125 | 8,822,406 | 1,216,701 | 1,237,173 | (20,472) |
| 4324 Amboy Road, S.I.-45185 | 10,517,566 | 1,438,344 | 1,135,332 | 303,013 |
| **Account Wagering** | 160,482,310 | 15,513,527 | 12,312,492 | 3,201,035 |
| **Closed Branches** | | | | |
| 215 West 125th Street, Man-11011 | 1,293,172 | 180,665 | 228,855 | (48,190) |
| 202 West 72ND Street, Man-11023 | - | - | (27) | 27 |
| 5119 Avenue U, Bklyn-42102 | 3,304,192 | 454,974 | 547,736 | (92,762) |
| George Washington Bridge, Man-11130 | 5,783,912 | 792,118 | 568,891 | 223,227 |
| 333 Graham Avenue, Bklyn-32144 | - | - | 1,818 | (1,818) |
| 17 John Street, Man-21184 | - | - | 2,928 | (2,928) |
| 2696 Hylan Blvd, S.I-45187 | - | - | 21 | (21) |
| **Adjustments** | | | | |
| Account Adjustments | - | - | 1,272 | (1,272) |
| **Total** | $815,556,581 | $103,231,204 | $ 87,173,139 | $ 16,058,064 |

Unaudited - See Auditor's Report on Supplementary Information.

**NEW YORK CITY OFF-TRACK BETTING CORPORATION**
**(A Component Unit of the State of New York)**
**CAPITAL ACQUISITION FUND – BALANCE SHEETS (UNAUDITED)**
**(AS REQUIRED BY THE STATE OF NEW YORK RACING AND WAGERING BOARD)**

|  | March 31, | |
|---|---|---|
|  | **2010** | **2009** |
| Cash and cash equivalents | **$          -** | $      25,000 |
| Land | **-** | - |
| Building and Improvements | **41,212,000** | 41,268,000 |
| Furniture and Fixtures | **712,000** | 712,000 |
| Machinery and Equipment | **27,323,000** | 27,343,000 |
|  | **69,247,000** | 69,323,000 |
| Less accumulated depreciation | **(63,659,000)** | (61,584,000) |
| Net property and equipment | **5,588,000** | 7,739,000 |
| Total assets | **$  5,588,000** | $  7,764,000 |
| Capital lease obligation | **$          -** | $      25,000 |
| Net Assets | **5,588,000** | 7,739,000 |
| Total liabilities and net assets | **$  5,588,000** | $  7,764,000 |

Unaudited - See Auditor's Report on Supplementary Information.

# NEW YORK CITY OFF-TRACK BETTING CORPORATION

**(A Component Unit of the State of New York)**
**CAPITAL ACQUISITION FUND – STATEMENTS OF REVENUES, EXPENSES AND**
**CHANGES IN FUND NET ASSETS (UNAUDITED)**
**(AS REQUIRED BY THE STATE OF NEW YORK RACING AND WAGERING BOARD)**

|  | Year Ended March 31, 2010 | Nine-Month Period Ended March 31, 2009 |
|---|---|---|
| Contribution [Section 532] (Statutory 1%) | $ 3,127,000 | $ 2,491,000 |
| Total revenues | 3,127,000 | 2,491,000 |
| Operating expenses |  |  |
| Depreciation and amortization | 2,151,000 | 2,900,000 |
| Other - transfer to the Corporation | 3,127,000 | 9,188,000 |
| Total expenses | 5,278,000 | 12,088,000 |
| Change in net assets | (2,151,000) | (9,597,000) |
| Net assets - beginnning of period | 7,739,000 | 17,336,000 |
| Net assets - end of period | $ 5,588,000 | $ 7,739,000 |

Unaudited - See Auditor's Report on Supplementary Information.



**INDEPENDENT AUDITOR'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING AND ON COMPLIANCE AND OTHER MATTERS BASED ON AN AUDIT OF FINANCIAL STATEMENTS PERFORMED IN ACCORDANCE WITH *GOVERNMENT AUDITING STANDARDS***

Board of Directors
New York City Off-Track Betting Corporation

We have audited the financial statements of New York City Off-Track Betting Corporation (Corporation), a component unit of the State of New York, as of and for the fiscal year ended March 31, 2010, and have issued our report thereon dated June 28, 2010. We conducted our audit in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in Government Auditing Standards, issued by the Comptroller General of the United States.

<u>Internal Control Over Financial Reporting</u>

In planning and performing our audit, we considered New York City Off-Track Betting Corporation's internal control over financial reporting as a basis for designing our auditing procedures for the purpose of expressing our opinion on the financial statements, but not for the purpose of expressing an opinion on the effectiveness of New York City Off-Track Betting Corporation's internal control over financial reporting. Accordingly, we do not express an opinion on the effectiveness of New York City Off-Track Betting Corporation's internal control over financial reporting.

A deficiency in internal control exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent, or detect and correct misstatements on a timely basis. A material weakness is a deficiency, or a combination of deficiencies, in internal control such that there is a reasonable possibility that a material misstatement of the entity's financial statements will not be prevented, or detected and corrected on a timely basis.

Our consideration of internal control over financial reporting was for the limited purpose described in the first paragraph of this section and was not designed to identify all deficiencies in internal control over financial reporting that might be deficiencies, significant deficiencies or material weaknesses. We did not identify any deficiencies in internal control over financial reporting that we consider to be material weaknesses, as defined above. However, as discussed below, we identified certain deficiencies in internal control over financial reporting that we consider to be significant deficiencies in internal control over financial reporting.

A significant deficiency is a deficiency, or a combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those charged with governance. We consider the deficiencies described in the following paragraphs to be significant deficiencies in internal control over financial reporting.

Page 33



**Establishment, Implementation and Monitoring of Accounting Policies and Procedures**

Well-defined accounting policies and procedures have not been established in all areas, and certain reviews and reconciliations have not consistently been performed or monitored. We recommend that the corporation review staffing, prioritization and accounting process efforts to enhance the financial accounting reporting function.

Additionally, the Internal Audit (IA) function is intended to monitor and report on certain accounting and internal control activities. As a result of continued staffing challenges, and the broader charge of the IA group, the effectiveness of its oversight and assessment has been diluted. We recommend that consideration be given to staffing needs as well as a more studied risk based assessment conducted by the IA group so as to incorporate today's best practices in accounting, information technology, industry-wide regulatory compliance and anti-money laundering challenges.

**Segregation of Duties**

Segregation of duties was not maintained through independent preparation and review of reconciliations in several audit areas. Both accrual and asset accounts were prepared without independent review by informed personnel. We recommend that management incorporate proper controls for segregation of duties in all financial reporting areas.

**Lease Agreements**

Certain real property leases include escalation clauses in contemplation of the Corporation's continued possession and control of the properties. Rental payments, including escalated rent clauses, were not properly recognized as rental expense on a straight-line basis over the lease term, as a result an adjustment was recorded during the audit to correct this matter. We recommend continued monitoring of new and amended real property leases so as to reflect the appropriate accounting treatment consistent with generally accepted accounting principles.

**Compliance and Other Matters**

As part of obtaining reasonable assurance about whether New York City Off-Track Betting Corporation's financial statements are free of material misstatement, we performed tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements, noncompliance with which could have a direct and material effect on the determination of financial statement amounts. However, providing an opinion on compliance with those provisions was not an objective of our audit, and accordingly, we do not express such an opinion. The results of our tests disclosed instances of noncompliance or other matters that are required to be reported under *Government Auditing Standards* and which are described in the following paragraphs.

**Investment**

The Corporation, as required by guidelines set forth by the Office of the State Comptroller, must maintain compliance with its written investment guidelines as approved by its governing board. At March 31, 2010, approximately $7 million was invested in a money market fund that invests exclusively in high-quality, short-term securities that are issued by or guaranteed by the U.S. government or by the U.S. government agencies and instrumentalities. The Corporation's investment policy does not formally identify money market funds as a permissible investment type.

* * *



We noted certain matters that we reported to management of the Corporation in a separate letter dated June 28, 2010.

This report is intended solely for the information and use of management, Board of Directors, and others within the Corporation, and the Office of the New York State Comptroller, and is not intended to be and should not be used by anyone other than these specified parties.

*UHY LLP*

New York, New York
June 28, 2010



AUDITED FINANCIAL STATEMENTS

Years ended June 30, 2008 and 2007

# NEW YORK CITY OFF-TRACK BETTING CORPORATION

## TABLE OF CONTENTS

|  | Page |
|---|---|
| **Report of Independent Auditors** | 1 |
| **Management's Discussion and Analysis** | 2-7 |
| **Financial Statements** | |
| Statements of Net Assets (Deficiency) | 8 |
| Statements of Revenues, Expenses, and Changes in Net Assets (Deficiency) | 9 |
| Statements of Cash Flows | 10 |
| Notes to Financial Statements | 11-22 |
| **Supplemental Information As Required by the New York State Racing and Wagering Board** | |
| Statements of Net Revenues | 23 |
| Statements of Net Revenues by Branch | 24-25 |
| Capital Acquisition Fund – Balance Sheets | 26 |
| Capital Acquisition Fund – Statements of Revenues, Expenses and Changes in Fund Net Assets | 27 |
| Capital Acquisition Fund – Section 609-a Funding Test | 28 |



**REPORT OF INDEPENDENT AUDITORS**

Board of Directors
New York City Off-Track Betting Corporation

We have audited the accompanying statements of net assets (deficiency) of New York City Off-Track Betting Corporation (a public benefit corporation) as of June 30, 2008 and 2007, and the related statements of revenues, expenses, and changes in net assets (deficiency), and cash flows for the years then ended. These financial statements are the responsibility of the Corporation's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of New York City Off-Track Betting Corporation as of June 30, 2008 and 2007, and the changes in its financial position and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming that the Corporation will continue as a going concern. As discussed in Note 1 to the financial statements, the Corporation's current liabilities exceed its current assets, the Corporation has suffered recurring operating losses, has a net deficiency, and is experiencing significant industry challenges. Without legislative adjustment to the statutory scheme of distribution of retained commissions from handle, the Corporation will continue to be required to make statutory distributions in aggregate amount exceeding operating income before statutory distributions. This gives rise to additional uncertainties that raise substantial doubt about its ability to continue as a going concern. Management's plans regarding those matters also are described in Note 1. The financial statements do not include any adjustments that might result from the outcome of these uncertainties.

The management's discussion and analysis, on pages 2 through 7, is not a required part of the basic financial statements but is supplementary information required by accounting principles generally accepted in the United States of America. We have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the required supplementary information. However, we did not audit the information and express no opinion on it.

Our audits were made for the purpose of forming an opinion on the basic financial statements of New York City Off-Track Betting Corporation taken as a whole. The supplementary information on pages 23 through 28 is presented for the purpose of additional analysis and is not a required part of the basic financial statements. Such information has not been subjected to the audit procedures applied in the audit of the basic financial statements and, accordingly, we express no opinion on it.

*UHY LLP*

New York, New York
October 28, 2008

# MANAGEMENT'S DISCUSSION AND ANALYSIS

# NEW YORK CITY OFF-TRACK BETTING CORPORATION

## MANAGEMENT'S DISCUSSION AND ANALYSIS

New York City Off-Track Betting Corporation's (the "Corporation" or "NYCOTB") annual financial report consists of two parts: *management's discussion and analysis* (this section) and the *basic financial statements*. Management's discussion and analysis provides an introduction and overview to the financial statements for the fiscal year ended June 30, 2008. The information contained in this section should be considered in conjunction with the basic financial statements, including the notes to the financial statements for the year ended June 30, 2008.

### Our Business

The mission of the Corporation, a public benefit corporation, is threefold: first, to generate revenue for municipal and state government; second, to help fund the state's horse racing and breeding industry; and, third, to help stamp out illegal wagering on horse races. NYCOTB offers off-track pari-mutuel wagering on thoroughbred and harness horse racing to customers in the City of New York (the "City" or "NYC") through its network of fifty-seven branch offices, eight restaurants, and three teletheaters and through its account wagering (telephone and internet betting) operation. NYCOTB broadcasts on Channel 71 and 73 for in home cable television reception by its customers in the City of New York.

To understand the Corporation's business, it is necessary to look at the following financial components:

- Net handle – the total amount wagered by the Corporation's customers on races.

- Earned on handle – the revenues that result from the portion of the handle that is not paid out in winning bets to customers.

- Surcharge revenues – made up of 5% and 1% surcharges on certain winning wagers.

- Operating expenses – the expenses that are required to operate NYCOTB.

- Statutory distributions and distributions to the City of New York – the amount of revenues that the Corporation is required by the State of New York (the "State" or "NYS") laws to distribute to each of its constituencies: the racing industry, the State of New York, other local governments, and the City of New York.

- Change in net assets – the surplus or deficit that remains after expenses and distributions.

### Legislative Change

On June 17, 2008, Governor Paterson signed legislation, designated as Chapter 115 of the Laws of 2008 that provided for a State takeover of the Corporation. In connection with this takeover, provisions of the Racing, Pari-Mutuel Wagering and Breeding Law (the "Racing Law") were amended to reflect the Corporation's status change from being a component unit of the City of New York to becoming a component unit of the State of New York. With respect to the Corporation's financial operations and reporting status, the following were changes in the legislative scheme significantly affecting the Corporation:

- Racing Law § 527(6) was amended to provide that the Corporation shall use any net amount remaining after payment of taxes and distributions to pay all liabilities of the Corporation that existed as of the effective date of the legislation, and thereafter, once such liabilities are paid off, for such net amount to be paid to the State general fund.

# NEW YORK CITY OFF-TRACK BETTING CORPORATION

**MANAGEMENT'S DISCUSSION AND ANALYSIS**

**Legislative Change** (Continued)

- Racing Law § 532 was amended to provide that the Corporation will retain for its corporate purposes the portion of the surcharge not distributable to localities where New York State racetracks are located.

- Racing Law § 609 was amended to provide that the Corporation shall be subject to the procurement requirements under State Finance Law §§ 139-j and 139-k.

- Racing Law § 610 was amended to provide that the Director of the Division of the Budget will review the books and accounts of the Corporation.

- Racing Law § 624 was amended to provide that upon termination of the Corporation, all corporate assets will vest in the State rather than the City.

- Public Officers Law §17 was amended to include the Corporation's officers, directors and employees within the definition of "employee" for purposes of defense and indemnification by the State in civil actions, and thereby transfer from the Corporation to the State the obligation to indemnify the Corporation's officers, directors or employees in civil actions.

- Chapter 115 further provided that all funds in the Corporation's Capital Acquisition Fund prior to July 1, 2008, or deposited thereafter, shall be made available to the Corporation for any corporate purpose.

- Chapter 115 of the Laws of 2008 created a task force on the future of off-track betting in NYS. The task force charge is to analyze and make recommendations concerning the optimal utilization of the State's regional off-track betting system with an emphasis on the system's capability to raise revenues for the State and local governments and strengthening the racing and breeding industries in NYS. The task force, no later than March 1, 2009, will report its findings and recommendations to the governor and the legislature.

## Financial Summary of the Corporation

NYCOTB is a public benefit corporation established under the laws of the State of New York. The Corporation has no component units and was a component unit of the City of New York until June 17, 2008 when, under Chapter 115 of the Laws of 2008, the Corporation became a component unit of the State of New York. Under Chapter 115 of the Laws of 2008 the public benefit corporation known as the "New York City Off-Track Betting Corporation" shall continue in existence and "shall continue to be the public benefit corporation authorized to operate the system for off-track pari-mutuel wagering on horse races within the City of New York" as a component unit of the State of New York. NYCOTB follows enterprise fund reporting; accordingly, the financial statements are presented using the economic resources measurement focus and the accrual basis of accounting. Enterprise fund statements offer short and long-term financial information about the activities and operations of the Corporation.

The Corporation has prepared the financial statements for a full fiscal year ending June 30, 2008. The Corporation will next prepare financial statements for the nine-month period ending March 31, 2009 and thereafter annual financial statements for fiscal years ending March 31, which will be incorporated in the State of New York's Comprehensive Annual Financial Reportings.

# NEW YORK CITY OFF-TRACK BETTING CORPORATION

## MANAGEMENT'S DISCUSSION AND ANALYSIS

### Financial Summary of the Corporation (Continued)

The basic financial statements are accompanied by a report of the independent auditors. Their report includes an explanatory paragraph that concludes that substantial doubt about the Corporation's ability to continue as a going concern remains. NYCOTB management's plans in this regard are discussed in Note 1 to the financial statements.

The following table summarizes the revenues, expenses and changes in net assets (deficiency) for the years ended June 30 ($ in thousands):

|  | 2008 | 2007 | 2006 |
|---|---|---|---|
| Net handle | $ 998,216 | $1,040,579 | $1,071,447 |
| Operating revenues | $ 244,696 | $ 255,883 | $ 261,325 |
| Operating expenses |  |  |  |
| Annual OPEB cost - Medicare Part B (1) | 40,681 | - | - |
| Annual OPEB cost - other | 22,966 | 26,166 | 120,152 |
| Other operating expenses | 128,989 | 125,614 | 123,550 |
| Total operating expenses | 192,636 | 151,780 | 243,702 |
| Operating income before statutory distributions | 52,060 | 104,103 | 17,623 |
| Statutory distributions |  |  |  |
| Racing industry | 93,211 | 97,338 | 100,904 |
| State of New York (2) | 15,167 | 15,251 | 15,962 |
| Other local governments | 2,485 | 2,560 | 2,407 |
| Surcharge received from other OTB communities | 2,222 | 2,227 | 2,418 |
| Total statutory distributions other than distributions to City of New York | 113,085 | 117,376 | 121,691 |
| Distributions to City of New York | 15,460 | 16,787 | 17,580 |
| Total statutory distributions | 128,545 | 134,163 | 139,271 |
| Operating loss | (76,485) | (30,060) | (121,648) |
| Total net assets (deficiency), beginning of year | (152,350) | (122,290) | (642) |
| Total net assets (deficiency), end of year | $ (228,835) | $ (152,350) | $ (122,290) |

(1) - reflective of a plan amendment as a result of transfer of obligation for Medicare Part B liabilities from the City of New York to the Corporation under Chapter 115 of the Laws of 2008 of the State of New York

(2) - includes New York State Racing and Wagering Board regulatory fee

### Net Handle

Net handle for 2008 decreased 4.1% as compared to 2007. During 2008 four branches were closed. Management continues to review the closing of unprofitable branches along with the enhancement of existing branches. Yonkers Raceway, which was closed during most of 2006 for remodeling, reopened in November 2006. After Yonkers reopened the Bronx branches lost some of the handle that had transferred during Yonkers' closing.

### Financial Summary of the Corporation (Continued)

#### Net Handle (Continued)

The following table shows the sources of the Corporation's net handle for the years ended June 30 ($ in thousands):

|  | 2008 | 2007 | % Increase/ (Decrease) |
|---|---|---|---|
| Branch offices | $ 641,890 | $ 669,100 | (4.1%) |
| Account wagering | 206,761 | 211,100 | (2.1%) |
| Teletheaters | 108,295 | 116,379 | (7.0%) |
| Restaurants | 41,270 | 44,000 | (6.2%) |
| Total | $ 998,216 | $1,040,579 | (4.1%) |

#### Operating Revenue

Revenue as a percentage of handle was 24.5% and 24.6% for the years ended June 30, 2008 and 2007, respectively. The almost $42.4 million decrease in handle between 2008 and 2007 accounts for the lower revenue.

#### Operating Expenses

The Corporation provides other postemployment benefits ("OPEB"), which include basic health care benefits to eligible retirees and dependents at no cost to most of the participants. In 2007 an expense of $26.2 million (about $4.7 million was funded during 2007) was recorded as an operating expense. Effective with the enactment of Chapter 115 of the Laws of 2008, the Corporation assumed from the City of New York the costs of reimbursing Medicare Part B premiums to eligible retirees and beneficiaries. In 2008, an additional $63.6 million ($40.7 million attributable to Medicare Part B) was expensed (about $4.9 million was funded during 2008), raising the estimated future funding requirements to approximately $195.7 million.

Operating expenses, excluding the annual other postemployment benefits costs of $63.6 million and $26.2 million in 2008 and 2007, totaled $129.0 million and $125.6 million in 2008 and 2007, respectively. Wage settlements and increased benefit costs accounted for the 2.7% increase.

#### Operating Income

Operating income before statutory distributions excluding the annual other postemployment benefits cost went from $130.3 million in 2007 to $115.7 million in 2008, a $14.6 million decrease. The decline in handle contributed to the lower operating income.

#### Distributions

The amounts required to be distributed to each of our constituencies are determined primarily by provisions of New York State law and are usually related to handle. The $42.4 million decrease in handle resulted in lower distributions in 2008 as compared to 2007. The Corporation makes distributions to the City of New York for surcharge, it acts as the collection agent for the City of New York for surcharge due from other community off-track betting corporations, and it was also required to distribute any remaining net income, except for amounts retained for capital acquisitions, to the City of New York. Distributions to the City of New York from the Corporation and through the

# NEW YORK CITY OFF-TRACK BETTING CORPORATION

## MANAGEMENT'S DISCUSSION AND ANALYSIS

### Financial Summary of the Corporation (Continued)

#### Distributions (Continued)

Corporation from other community off-track betting corporations decreased by $1.3 million from 2007 to 2008 because of the decline in handle and the change in legislation. Going forward the City of New York will receive as revenue only the locality surcharge with respect to races run at Aqueduct and Belmont Park; other surcharge that previously was paid to the City of New York will instead be retained by the Corporation. Net revenues after payment of taxes and distribution that previously was made to the City will instead now go to pay off the pre-existing liabilities of the Corporation as of the effective date of Chapter 115 and, thereafter, when such liabilities have been fully paid any such remaining net revenue will be paid to the State general fund.

Statutory distributions also decreased from $134.2 million in 2007 to $128.5 million in 2008. The decline in handle resulted in lower payments to the racing industry.

#### Net Assets (Deficiency)

The following table summarizes the Corporation's financial position as of June 30 ($ in thousands):

|  | 2008 | 2007 | 2006 |
|---|---|---|---|
| Restricted cash and cash equivalents - telephone betting accounts | $ 1,593 | $ 1,891 | $ 1,979 |
| Other current assets | 16,971 | 21,115 | 19,270 |
| Restricted cash and cash equivalents - capital acquisition fund | 6,796 | 6,197 | 8,379 |
| Capital assets, net | 10,869 | 11,460 | 11,786 |
| Total assets | 36,229 | 40,663 | 41,414 |
| Current liabilities - telephone betting accounts | 1,593 | 1,891 | 1,979 |
| Other current liabilities | 67,036 | 52,212 | 43,763 |
| Long-term liabilities - Other OPEB obligations - Medicare Part B (1) | 40,681 | - | - |
| Other long-term liabilities | 155,754 | 138,910 | 117,962 |
| Total liabilities | 265,064 | 193,013 | 163,704 |
| Net assets (deficiency) |  |  |  |
| Invested in property and equipment, net of debt | 10,770 | 11,270 | 11,493 |
| Restricted for acquisition of capital assets | 6,796 | 6,197 | 8,379 |
| Unrestricted deficit | (246,401) | (169,817) | (142,162) |
| Total net assets (deficiency) | $ (228,835) | $ (152,350) | $ (122,290) |

(1) - reflective of a plan amendment as a result of transfer of obligation for Medicare Part B liabilities from the City of New York to the Corporation under Chapter 115 of the Laws of 2008 of the State of New York

The impact of additional expense accrued for future postemployment benefits plus the required distributions and mandated contractual expenses in excess of revenue available resulted in net assets declining $76.5 million during 2008.

# NEW YORK CITY OFF-TRACK BETTING CORPORATION

## MANAGEMENT'S DISCUSSION AND ANALYSIS

**Financial Summary of the Corporation** (Continued)

### Liquidity and Capital Resources

At June 30, 2008, the Corporation had $24.0 million of cash and cash equivalents, which is a $4.6 million decrease from $28.6 million at June 30, 2007. As of June 30, 2008 $1.6 million of the cash and cash equivalents was cash in the vaults of the Corporation's operating locations, $1.6 million was attributable to accounts of our telephone betting account customers, and $6.8 million was restricted for acquisition of capital assets. In addition, $1.5 million was attributable to unclaimed tickets from calendar year 2008.

The summer represents the seasonal high point in NYCOTB cash levels. The seasonal low point occurs in the late winter. Much of NYCOTB's cash is either formally restricted or is required for payment of specific obligations. Without New York State legislation to address the fact that NYCOTB's distributions and expenses exceed NYCOTB's revenue, management expects that the decline in net assets of the past five years will continue. Absent changes to the mandated distribution scheme in the laws under which NYCOTB operates, this decline will lead to cash shortfalls and delays in distribution payments.

Since 1990, the majority of the Corporation's capital expenditures have been made through its capital acquisition fund. As discussed in the Notes to the Financial Statements, the Corporation collects a supplemental 1% surcharge on certain wagering pools which it retains to finance the acquisition, construction and equipping of its facilities. The unused portion of the amounts collected approximated $6.8 million at June 30, 2008 as compared to $6.2 million at June 30, 2007. During 2008 the Corporation collected $3.7 million of capital acquisition surcharge and expended $3.0 million on capital assets. Under the new Legislation all funds in the capital acquisition fund prior to July 1, 2008 or deposited into such fund thereafter are made available to the Corporation for any corporate purpose.

# FINANCIAL STATEMENTS

# NEW YORK CITY OFF-TRACK BETTING CORPORATION

**STATEMENTS OF NET ASSETS (DEFICIENCY)**
**June 30, 2008 and 2007**
**(In 000's)**

| | 2008 | 2007 |
|---|---:|---:|
| **Assets** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 15,568 | $ 20,471 |
| Restricted cash and cash equivalents - telephone betting accounts | 1,593 | 1,891 |
| Accounts receivable and other current assets | 1,403 | 644 |
| Total current assets | 18,564 | 23,006 |
| **Restricted Cash and Cash Equivalents** | | |
| - capital acquisition fund | 6,796 | 6,197 |
| **Capital Assets, net** | 10,869 | 11,460 |
| Total assets | $ 36,229 | $ 40,663 |
| **Liabilities and Net Assets (Deficiency)** | | |
| **Current Liabilities** | | |
| Accounts payable and accrued expenses | $ 55,423 | $ 41,334 |
| Due to City of New York | 208 | 201 |
| Due to State of New York | 1,820 | 1,976 |
| Due to other local governments | 325 | 387 |
| Outstanding pari-mutuel tickets | 745 | 937 |
| Telephone betting accounts | 1,593 | 1,891 |
| Compensated leave time, current | 2,543 | 2,025 |
| Other postemployment benefits obligation, current (Note 6) | 5,972 | 5,352 |
| Total current liabilities | 68,629 | 54,103 |
| **Long-term Liabilities** | | |
| Compensated leave time, non-current | 6,650 | 7,119 |
| Other postemployment benefits obligation, non-current (Note 6) | 189,686 | 131,601 |
| Other | 99 | 190 |
| Total long-term liabilities | 196,435 | 138,910 |
| Total liabilities | 265,064 | 193,013 |
| **Commitments and Contingencies** | | |
| **Net Assets (Deficiency)** | | |
| Invested in capital assets, net of related debt | 10,770 | 11,270 |
| Restricted for acquisition of capital assets | 6,796 | 6,197 |
| Unrestricted deficit | (246,401) | (169,817) |
| Total net assets (deficiency) | (228,835) | (152,350) |
| Total liabilities and net assets (deficiency) | $ 36,229 | $ 40,663 |

*See notes to financial statements.*

**NEW YORK CITY OFF-TRACK BETTING CORPORATION**
**STATEMENTS OF REVENUES, EXPENSES, AND CHANGES IN**
**NET ASSETS (DEFICIENCY)**
**Years Ended June 30, 2008 and 2007**
**(In 000's)**

| | 2008 | 2007 |
|---|---|---|
| **Net handle** | $ 998,216 | $ 1,040,579 |
| **Operating revenues** | | |
| Earned on handle | $ 201,760 | $ 209,944 |
| Distributable surcharge and surcharge breakage | 17,971 | 19,350 |
| Capital acquisition surcharge | 3,713 | 3,873 |
| Surcharge received from other OTB communities | 2,222 | 2,227 |
| Breakage | 4,217 | 4,536 |
| Uncashed pari-mutuel tickets allocable to State of New York | 2,988 | 3,372 |
| Revenue derived from surcharge | 9,806 | 9,845 |
| Other | 2,019 | 2,736 |
| Total operating revenues | 244,696 | 255,883 |
| **Operating expenses** | | |
| Operations | 110,586 | 106,160 |
| Administrative and selling | 14,942 | 16,083 |
| Depreciation and amortization | 3,461 | 3,371 |
| Annual other postemployment benefits cost - Medicare Part B (Note 6) | 40,681 | - |
| Annual other postemployment benefits cost - Other | 22,966 | 26,166 |
| Total operating expenses | 192,636 | 151,780 |
| Operating income before statutory distributions | 52,060 | 104,103 |
| **Statutory distributions** | | |
| Compensation and payments to the racing industry other than | | |
| The New York Racing Association | 41,521 | 43,978 |
| The New York Racing Association | 51,690 | 53,360 |
| State of New York | 10,176 | 10,048 |
| New York State Racing and Wagering Board Regulatory Fee | 4,991 | 5,203 |
| Local governments | 2,485 | 2,560 |
| Surcharge received from other OTB communities | 2,222 | 2,227 |
| Total statutory distributions other than distributions to City of New York | 113,085 | 117,376 |
| **Distributions to City of New York** | 15,460 | 16,787 |
| Total statutory distributions | 128,545 | 134,163 |
| Operating loss (Note 1) | (76,485) | (30,060) |
| Total net assets (deficiency), beginning of year | (152,350) | (122,290) |
| Total net assets (deficiency), end of year | $ (228,835) | $ (152,350) |

*See notes to financial statements.*

# NEW YORK CITY OFF-TRACK BETTING CORPORATION

**STATEMENTS OF CASH FLOWS**
**Years Ended June 30, 2008 and 2007**
**(In 000's)**

|  | 2008 | 2007 |
|---|---:|---:|
| **Cash Flow From Operating Activities** | | |
| Receipts from customers | **$ 237,267** | $ 248,044 |
| Payments to The New York Racing Association | **(54,742)** | (53,207) |
| Payments to suppliers and the racing industry other than | | |
| The New York Racing Association | **(84,590)** | (94,389) |
| Payments to employees | **(70,935)** | (68,735) |
| Payments to City of New York, State of New York and local governments | **(33,358)** | (34,420) |
| Interest received | **1,004** | 1,588 |
| Net cash used in operating activities | **(5,354)** | (1,119) |
| **Capital and Related Financing Activities** | | |
| Capital acquisition surcharge | **3,713** | 3,873 |
| Net purchase of capital assets | **(2,870)** | (3,045) |
| Other | **(91)** | (103) |
| Net cash provided by capital and related financing activities | **752** | 725 |
| Change in cash and cash equivalents | **(4,602)** | (394) |
| Cash and cash equivalents, beginning of year | **28,559** | 28,953 |
| Cash and cash equivalents, end of year | **$ 23,957** | $ 28,559 |
| **Reconciliation of Operating Loss to Net Cash** | | |
| **Used in Operating Activities:** | | |
| Operating loss | **$ (76,485)** | $ (30,060) |
| Adjustments to reconcile operating loss to net cash | | |
| used in operating activities: | | |
| Depreciation and amortization | **3,461** | 3,371 |
| Capital acquisition surcharge | **(3,713)** | (3,873) |
| Changes in: | | |
| Accounts receivable and other current assets | **(759)** | 31 |
| Accounts payable and accrued expenses | **14,089** | 7,610 |
| Due to New York City | **7** | (8) |
| Due to New York State | **(156)** | 146 |
| Due to local governments | **(62)** | 31 |
| Outstanding pari-mutuel tickets | **(192)** | (63) |
| Telephone betting accounts | **(298)** | (88) |
| Compensated leave time | **49** | 356 |
| Postemployment benefits obligation | **58,705** | 21,428 |
| Net cash used in operating activities | **$ (5,354)** | $ (1,119) |

| | Assets | | |
|---|---:|---:|---:|
|  | Unrestricted | Restricted (1) | Total |
| **Reconciliation of Cash and Cash Equivalents:** | | | |
| Cash and cash equivalents, beginning of year | $ 20,471 | $ 8,088 | $ 28,559 |
| Net increase (decrease) | (4,903) | 301 | (4,602) |
| Cash and cash equivalents, end of year | $ 15,568 | $ 8,389 | $ 23,957 |

(1) Includes restricted cash and cash equivalents relating to telephone betting accounts and capital acquisition fund.

*See notes to financial statements.*

### NOTE 1 — ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

#### Organization

Since 1970, the Laws of the State of New York have permitted local communities to operate a system of off-track pari-mutuel betting under the supervision of the New York State Racing and Wagering Board. New York City Off-Track Betting Corporation (the "Corporation") was established in 1970 as a public benefit corporation to operate a system of off-track betting in the City of New York. The Corporation has no component units and was a component unit of the City of New York until June 17, 2008 when, under Chapter 115 of the Laws of 2008, the Corporation became a component unit of the State of New York.

#### Background

On June 17, 2008, Governor Paterson signed legislation, designated as Chapter 115 of the Laws of 2008 that provided for a State takeover of the Corporation. In connection with this takeover, provisions of the Racing, Pari-Mutuel Wagering and Breeding Law were amended to reflect the Corporation's status change from being a component unit of the City of New York to becoming a component unit of the State of New York. The Corporation has prepared the financial statements for a full fiscal year ending June 30, 2008. The Corporation will next prepare financial statements for the nine-month period ending March 31, 2009 and thereafter annual financial statements for fiscal years ending March 31, which will be incorporated in the State of New York's Comprehensive Annual Financial Reportings.

#### Accounting and Financial Reporting

The Corporation follows enterprise fund reporting; accordingly, the accompanying financial statements are presented using the economic resources measurement focus and the accrual basis of accounting. Revenues are recognized when earned and expenses are recognized when incurred. In accordance with Government Accounting Standards Board ("GASB") Statement No. 20, "Accounting and Financial Reporting for Proprietary Funds and Other Government Activities that Use Proprietary Fund Accounting", the Corporation has elected not to adopt Financial Accounting Standards Board statements issued after November 30, 1989.

#### Cash and Cash Equivalents

For purposes of the statements of cash flows, the Corporation considers all investments maturing in three months or less at date of acquisition to be cash equivalents.

#### Capital Assets

Capital assets are recorded at cost. Depreciation and amortization are calculated utilizing the straight-line method based upon estimated useful lives, which range from three to fifteen years. Leasehold improvements are amortized principally over the term of the lease or useful life of asset, whichever is less. Management intends to exercise the renewal options for substantially all leases and, if appropriate, seek additional lease options on new locations.

**NOTE 1 — ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (Continued)

**Other Postemployment Benefits**

In June 2004, GASB issued Statement No. 45, *Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions*. The Statement establishes standards for the measurement, recognition, and display of Other Postemployment Benefits (OPEB) expense/expenditures and related liabilities (assets), note disclosures, and, if applicable, required supplementary information in the financial reports of state and local governmental employers. OPEB includes postemployment healthcare, as well as other forms of postemployment benefits when provided separately from a pension plan. Statement No. 45 improves the relevance and usefulness of financial reporting by: (i) recognizing the cost of benefits in periods when the related services are received by the employer; (ii) providing information about the actuarial accrued liabilities for promised benefits associated with past services and whether and to what extent those benefits have been funded; and (iii) providing information useful in assessing potential demands on the employer's future cash flows. The Corporation implemented Statement No. 45 in its fiscal year ending June 30, 2006.

**Operating Revenues**

Revenues earned by the Corporation and distributions of such revenues are defined by the applicable provisions of New York State law, some of which are summarized below:

*Earned on Handle*

Gross revenues earned on handle generally range from 15% to 31% of the total amount of applicable wagers depending on the type of wager (e.g., regular, multiple or exotic).

*Distributable Surcharge and Surcharge Breakage*

The portion of the 5% surcharge collected on winning tickets from New York State tracks that is distributable to the local governments in which the track is located.

*Capital Acquisition Surcharge*

Effective July 1990, the New York Racing, Pari-Mutuel Wagering and Breeding Law was amended to allow, among other things, the Corporation to collect a 1% surcharge on multiple, exotic and super exotic wagering pools and to retain the proceeds of the surcharge for financing the acquisition, construction or equipping of offices, facilities or premises of the Corporation. As of June 17, 2008, under Chapter 115 of the Laws of 2008, all funds accumulated in the capital acquisition fund, established pursuant to section 609-a of the New York Racing, Pari-Mutuel Wagering and Breeding Law, prior to July 1, 2008 or deposited into such fund thereafter are available to the Corporation for any corporate purpose.

Through June 30, 2008, surcharges of $70,062,000 have been collected and $63,266,000 has been used to finance leasehold improvements and the acquisition of property and equipment.

**NOTE 1 — ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**
(Continued)

**Operating Revenues (Continued)**

*Surcharge Received From Other OTB Communities*

The Corporation is a collection agent for the City of New York for surcharge and surcharge breakage on winnings due from other community off-track betting corporations. Surcharges of $2,222,000 and $2,227,000 were received during fiscal 2008 and 2007, respectively, of which $208,000 and $201,000 were payable to the City of New York by the Corporation as of June 30, 2008 and 2007, respectively.

*Breakage*

Breakage is the revenue resulting from the rounding down of winning payoffs. This amount is partially distributed to the State of New York and the New York State breeding and development funds and the balance is retained by the Corporation.

*Uncashed Pari-Mutuel Tickets*

Uncashed pari-mutuel tickets represent winning tickets outstanding. This balance must be remitted to the State of New York on an annual basis.

*Revenue Derived from Surcharge*

Revenue derived from surcharge results from 50% of all out-of-state simulcasting surcharge revenue and 45% of all Finger Lakes simulcasting surcharge revenue. As of June 17, 2008, under Chapter 115 of the Laws of 2008, revenue derived from surcharge results from the 5% surcharge collected on winning tickets less the amount that is distributable to local governments in which a New York State track is located.

**Statutory Distributions**

In accordance with the requirements of New York State law, revenues are allocated among the racing industry, the State of New York, local governments, and the City of New York, as summarized below:

*The Racing Industry*

Compensation is payable to racing entities at statutory rates on racing wagers related to races at in-state tracks and at contractual rates on racing wagers related to races at out-of-state tracks.

A portion of the track commission payments made to tracks located in the State of New York is paid to New York State horsemen for purse money. These rates range from .25% to 5.50%.

Contributions to the New York State Thoroughbred Breeding and Development Fund are 0.5% (decreased from 0.7% commencing April 1, 2007) of handle derived from bets on thoroughbred or steeplechase races. Contributions to the Agriculture and New York State Breeding and Development Fund are 1.0% of handle derived from bets on harness races.

**NOTE 1 — ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**
(Continued)

**Statutory Distributions (Continued)**

*State of New York*

Pari-mutuel taxes are imposed on the amount wagered at rates determined by the type of wager, type of race and location.

Uncashed pari-mutuel tickets held by the Corporation on April 1, applicable to the preceding calendar year, are distributable to the State of New York. If the payment is not made when due a penalty of five percent and interest at the rate of one percent per month is assessed from the due date to the date of payment to the State of New York. For the calendar year ended December 31, 2007, the amount distributable approximated $3,118,000, which was remitted to the State of New York during fiscal 2008.

*New York State Racing and Wagering Board Regulatory Fee*

The New York Racing, Pari-Mutuel Wagering and Breeding Law requires the payment of regulatory fees to the Racing and Wagering Board. The regulatory fee is levied at .50% of the Corporation's net handle.

*Local Governments*

Local governments in which tracks reside receive 50% of the surcharge revenue except for Ontario County which receives 5% and Nassau County which receives 37.5%.

*Distributions to City of New York*

Distributions to the City of New York include all the remaining portion of surcharge revenue from the tracks after deducting the amounts payable to other local governments and the revenue derived from surcharge. As of June 17, 2008, under Chapter 115 of the Laws of 2008, the City of New York will only receive surcharge revenue from revenue earned on OTB wagers on races run at Aqueduct and Belmont Park, and all the remaining surcharge earned by the Corporation not otherwise payable to localities where New York State race tracks are located will be retained by the Corporation for its corporate purposes.

In addition, after deducting the Corporation's operating expenses and statutory distributions any remaining net income, except for amounts retained for capital acquisitions, is distributable to the City of New York. As of June 17, 2008, under Chapter 115 of the Laws of 2008, the Corporation shall use any net amount remaining after payment of taxes and distributions to pay all liabilities of the Corporation that existed as of June 17, 2008 and, thereafter when those liabilities are paid off, any remaining net income will be paid to the State general fund. There are no such amounts available for distribution for the years ended June 30, 2008 and 2007.

**Use of Estimates**

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**NOTE 1 — ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (Continued)

**Reclassifications**

Certain reclassifications have been made to the financial statements for the year ended June 30, 2007 to conform to the presentation for the year ended June 30, 2008.

**Going Concern and Other Uncertainties**

At June 30, 2008, the Corporation's current liabilities exceeded its current assets by $50,065,000, the Corporation has suffered operating losses of $76,485,000 (including non-cash expenses of $40,681,000 related to an other postemployment benefit plan amendment as a result of transfer of obligation for Medicare Part B liabilities from the City of New York to the Corporation under Chapter 115 of the Laws of 2008 of the State of New York (Note 6)) and $30,060,000 in 2008 and 2007 respectively and the Corporation has a net deficit of $228,835,000. Over the past several years, the Corporation has experienced continuing mandated increases in personnel and other costs and increases in the statutory distribution requirements of New York State law, including a regulatory fee of .50% of the Corporation's gross handle payable to the New York State Racing and Wagering Board. These factors have resulted in the Corporation being required to make distributions in excess of its operating income before statutory distributions. Management has instituted a number of initiatives to reduce its expenses, including a reduction in workforce and a focus on maximization of branch profitability. These operating initiatives, however, have not been sufficient to offset the increases in expenses and distributions. Management has continued to seek legislative relief since June 17, 2008. There is no assurance that the New York State legislature will adopt the necessary changes to New York State law to provide relief to the Corporation. Without such relief, the Corporation will continue to experience difficulties in making required distributions to the racing industry on a timely basis. Additionally, the racing industry and the Corporation have and continue to face a variety of significant challenges. The financial, legislative and regulatory environment in addition to gaming competition and consumer interest, continue to impact the thoroughbred and harness racing industries. Management continues to focus on and enhance overall operations, combined with new opportunities and initiatives which support and leverage the industry. The financial statements do not include any adjustments that might result from the outcome of the financial uncertainties created by this situation.

**NOTE 2 — CASH AND CASH EQUIVALENTS**

Cash and cash equivalents are comprised of vault cash/deposits and repurchase agreements at June 30, 2008 and 2007.

*Vault Cash and Deposits*

Vault cash and deposits at June 30, 2008 and 2007 are as follows:

|  | 2008 | | 2007 | |
|---|---|---|---|---|
|  | Carrying Amount | Bank Balance | Carrying Amount | Bank Balance |
| Vault cash | $ 1,592,000 | | $ 2,193,000 | |
| Deposits | 14,115,000 | $ 16,231,000 | 26,366,000 | $ 36,074,000 |
| Total vault cash and deposits | $ 15,707,000 | | $ 28,559,000 | |

**NOTE 2 — CASH AND CASH EQUIVALENTS** (Continued)

*Vault Cash and Deposits (Continued)*

Custodial credit risk is the risk that, in the event of a bank failure, the Corporation's deposits might not be recovered. The Corporation has implemented a deposit policy for custodial credit risk for the fiscal year ended June 30, 2008. As of June 30, 2008, of the Corporation's bank balance of $16,231,000, $3,100,000 was collateralized by US government instruments or insured by the Federal Deposit Insurance Corporation (the "FDIC"), and $13,131,000 was uninsured and uncollateralized and exposed to custodial credit risk. As of June 30, 2007, of the Corporation's bank balances of $36,074,000, $35,974,000 was uninsured and uncollateralized and exposed to custodial credit risk.

Cash and cash equivalents in the amount of $1,593,000 are restricted for customer telephone betting account activities at June 30, 2008 ($1,891,000 at June 30, 2007). Cash and cash equivalents in the amount of $6,796,000 are restricted for capital acquisitions at June 30, 2008 ($6,197,000 at June 30, 2007). As of June 17, 2008, under Chapter 115 of the Laws of 2008, all funds accumulated in the capital acquisition fund, established pursuant to section 609-a of the New York Racing, Pari-Mutuel Wagering and Breeding Law, prior to July 1, 2008 or deposited into such fund thereafter are available to the Corporation for any corporate purpose.

*Repurchase Agreements*

It is the Corporation's policy to invest only in United State Government securities, backed by the full faith and credit of the United States Government, or repurchase agreements collateralized by United States Government securities and covered by a master repurchase agreement. The investments are held in the Corporation's name in a custody account by its agent. Investments are carried at amortized cost, which approximates fair value.

The Corporation's repurchase agreements at June 30, 2008 are as follows:

|  | 2008 | | |
|---|---|---|---|
|  | Carrying Amount/ Fair Value | Maturity | Rate |
| Repurchase agreements | $ 8,250,000 | July 7, 2008 | 1.95% |

**NOTE 3 — CAPITAL ASSETS, NET**

The following is a summary of changes in capital assets for the year ended June 30, 2008:

|  | June 30, 2008 | Additions | Deletions | June 30, 2007 |
|---|---|---|---|---|
| Office machinery and equipment | $ 22,426,000 | $ 355,000 | $ - | $ 22,071,000 |
| Furniture and fixtures | 718,000 | 82,000 | - | 636,000 |
| Leasehold improvements, principally for branch offices | 41,304,000 | 1,997,000 | 400,000 | 39,707,000 |
| Data processing equipment | 5,646,000 | 599,000 | - | 5,047,000 |
| Automobiles | 1,295,000 | 217,000 | - | 1,078,000 |
| Total | 71,389,000 | 3,250,000 | 400,000 | 68,539,000 |
| Less accumulated depreciation and amortization | 60,520,000 | 3,461,000 | 20,000 | 57,079,000 |
| Capital Assets, net | $ 10,869,000 | | | $ 11,460,000 |

## NOTE 4 — COMPENSATED LEAVE TIME

The Corporation has included in compensated leave time the liability for unused vested sick leave attributable for services rendered by employees with ten years or more of continuous service. The Corporation has also included in compensated leave time the liability for unused vacation leave. Corporate policy is to pay employees for vested unused sick leave and unused vacation leave upon termination. Compensated leave time expenses are included in the operating expenses in the statements of revenues, expenses, and changes in fund net assets (deficit).

## NOTE 5 — PENSION PLAN

Substantially all full-time employees of the Corporation are members of the New York City Employees' Retirement System ("NYCERS" or the "System"), which is a cost-sharing, multiple-employer public employer retirement system ("PERS").

*Benefits Provided by the System*

The System provides retirement as well as death, accident and disability benefits. Benefits vest after five years of credited service depending on date of employment. Certain retirees also receive supplemental benefits.

Benefit and contribution provisions, which are contingent upon the point in time at which the employee last entered qualifying service and length of credited service, are established by New York State law and may be amended only by the New York State Legislature. The System has both contributory and noncontributory requirements, with retirement age varying from 55 to 70 depending upon when an employee last entered qualifying service. Employees entering qualifying service on or before July 26, 1976 are enrolled in a noncontributory plan. Employees entering qualifying service after July 26, 1976 are enrolled in a contributory plan, which requires a 3% contribution of their salary.

*NYCERS*

The Corporation funds accrued pension cost, which represents an amount actuarially computed by NYCERS for employer contributions using the frozen entry age actuarial cost method of funding. NYCERS makes the benefit payments to retired employees of the Corporation.

The following table presents the Corporation's total current-year payroll paid for all employees and covered payroll relating to NYCERS, employer and employee contributions, contributions as a percentage of covered payroll and the percentage of required employer contributions contributed for the years ended June 30, 2007, 2006, and 2005, the latest dates for which such information is available:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | **2007** | **2006** | **2005** |
| **Current-year payroll paid:** | | | |
| Covered | $ 43.2 | $ 43.3 | $ 42.6 |
| Total | $ 64.3 | $ 64.1 | $ 63.8 |
| **Required contributions:** | | | |
| Employer | $ 5.9 | $ 4.8 | $ 4.3 |
| Employee | $ 2.6 | $ 2.5 | $ 2.5 |
| **Percentage of covered payroll:** | | | |
| Employer | 13.7% | 11.1% | 10.1% |
| Employee | 6.0% | 5.8% | 5.9% |
| **Percentage of required employer** | | | |
| **contributions contributed:** | 100% | 100% | 100% |

Historical trend information designed to provide information about the Plan's progress made in accumulating sufficient assets to pay benefits when due is presented in the component unit financial report prepared by NYCERS.

## NOTE 6 — OTHER POSTEMPLOYMENT BENEFITS

In accordance with collective bargaining agreements, the Corporation provides other post-employment benefits ("OPEB") which include health insurance, Medicare Part B reimbursements, and welfare fund contributions to eligible retirees and beneficiaries. The Corporation provides basic health care benefits to eligible retirees and dependents at no cost to most of the participants. Basic healthcare premium costs, which are partially paid by the remaining participants, vary according to the terms of their elected plans. To qualify, retirees must: (i) have worked for the Corporation with at least ten years of credited service (five years of credited service if employed on or before December 27, 2001) as a member of an approved pension system (requirement does not apply if retirement is as a result of accidental disability); (ii) have been employed by the Corporation or a Corporation-related agency prior to retirement; (iii) have worked regularly for at least twenty hours a week prior to retirement; and (iv) be receiving a pension check from a retirement system maintained by the Corporation or another system approved by the Corporation. The Corporation is not required by law or contractual agreement to provide funding for its OPEB obligation other than the pay-as-you-go amount necessary to provide current benefits to retirees and eligible beneficiaries.

The Corporation's OPEB expense of $63,647,000 and $26,166,000 for the fiscal year ended June 30, 2008 and 2007, respectively, was equal to the annual OPEB cost ("AOC"), an amount actuarially determined in accordance with the parameters of GASB Statement No. 45. The Corporation's annual required contribution ("ARC") was approximately $200,600,000 and $141,691,000 at June 30, 2008 and 2007, respectively. The ARC at June 30, 2008 included a plan amendment in the amount of approximately $40,681,000 as a result of transfer of obligation for Medicare Part B liabilities from the City of New York to the Corporation under Chapter 115 of the Laws of 2008 of the State of New York. The ARC represents a level of funding that, if paid on an ongoing basis, is projected to cover normal cost each year and amortize any unfunded actuarial liabilities. The ARC adjustment represents the discounted present value of the balance of the net OPEB obligation at the beginning of the year. The Corporation's AOC and OPEB obligation for the fiscal year ended June 30, 2008 and 2007 are composed of the following (as calculated by the Office of the Actuary, the City of New York):

|  | 2008 | | 2007 | |
|---|---|---|---|---|
| OPEB obligation, beginning of year | $ 136,953,000 | | | $ 115,525,000 |
| Annual OPEB cost (AOC) | | | | |
| Annual required contribution (ARC) | | | | |
| Normal cost | $ 12,688,000 | | $ 8,587,000 | |
| Amortization of unfunded actuarial accrued liability over one year | 180,196,000 | | 127,654,000 | |
| Interest at 4.0% | 7,716,000 | | 5,450,000 | |
| ARC | 200,600,000 | | 141,691,000 | |
| ARC Adjustment | (142,431,000) | | (120,146,000) | |
| Interest on net OPEB obligation | 5,478,000 | | 4,621,000 | |
| AOC | $ 63,647,000 | 63,647,000 | $ 26,166,000 | 26,166,000 |
| Less: Corporation payments for retired employees' health care benefits | | 4,942,000 | | 4,738,000 |
| OPEB obligation, end of year | | 195,658,000 | | 136,953,000 |
| Less: Current portion of net OPEB obligation | | 5,972,000 | | 5,352,000 |
| OPEB obligation, non-current | | $ 189,686,000 | | $ 131,601,000 |

The Corporation has not funded any of its net OPEB obligation, such that the non-cash charge incurred in each fiscal year was $58,705,000 for 2008 and $21,428,000 for 2007, respectively, were non-cash in nature.

**NOTE 6 — OTHER POSTEMPLOYMENT BENEFITS** (Continued)

Actuarial valuations involve estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future. Examples include assumptions about future employment, mortality, and the healthcare cost trend. Amounts determined regarding the funded status and the ARC are subject to continual revision as actual results are compared with past expectations and new estimates are made about the future. The following schedule of funding progress presents information about the actuarial value of assets relative to the actuarial accrued liabilities for benefits.

| Actuarial Valuation Date | Actuarial Value of Assets (a) | Actuarial Accrued Liability (AAL) (b) | Unfunded AAL (UAAL) (b-a) | Funded Ratio (a/b) | Covered Payroll (c) | UAAL as a Percentage of Covered Payroll ((b-a)/c) |
|---|---|---|---|---|---|---|
| 6/30/2007 | $    - | $ 180,196,000 | $ 180,196,000 | 0.0% | $ 45,751,000 | 393.9% |
| 6/30/2006 | - | 127,654,000 | 127,654,000 | 0.0% | 42,638,000 | 299.4% |
| 6/30/2005 | - | 107,599,000 | 107,599,000 | 0.0% | 42,584,000 | 252.7% |

Projections of benefits for financial reporting purposes are based on the types of benefits provided at the time of each valuation and the historical pattern of sharing of benefit costs between the employer and employees to that point. The actuarial methods and assumptions used include techniques that are designed to reduce short-term volatility in actuarial accrued liabilities, consistent with the long-term perspective of the calculations.

The frozen entry age actuarial cost method was used in the June 30, 2007 and 2006 actuarial valuations, the basis for the ARC calculation for the fiscal year ended June 30, 2008 and 2007. The actuarial assumptions used in the June 30, 2007 and 2006 OPEB actuarial valuations are classified as those used in the New York City Retirement Systems (NYCRS) valuations and those specific to the OPEB valuations. The actuarial assumptions and methods used in the June 30, 2007 actuarial valuation are generally the same as those used in the June 30, 2006 actuarial valuation except that: (a) Per capita claims costs and Medicare Part B premiums have been updated to reflect more recent experience. In addition, actual age distribution of covered population rather than estimated average age has been used to age adjust the premiums for the Medicare GHI/EBCBS plan; (b) A factor was applied to HIP Medicare HMO costs in addition to medical trend to reflect expected changes in Medicare Advantage reimbursements; and (c) Welfare fund contributions have been updated to reflect a three-year trended average of reported annual contribution amounts for current retirees. A trended average is used instead of a single reported welfare fund amount to smooth out negotiated variations. The welfare fund rates reported for the previous two valuations were trended to current levels based on a historical increase rate of 4.3% per year, approximating overall recent growth of welfare fund contributions.

**NOTE 7 — DEFERRED COMPENSATION PLAN**

The Corporation's employees may participate in a deferred compensation plan established by the State of New York in accordance with Internal Revenue Code Section 457. The Plan is available to all employees of the Corporation. All amounts of compensation deferred under the Plan, and all income attributable to such compensation, are held in a trust for the exclusive benefit of the participants and their beneficiaries, and not included in the financial statements of the Corporation. The contributions are invested in mutual funds.

## NOTE 8 — COMMITMENTS

*Leases*

Minimum rental commitments under the terms of all non-cancelable real property leases in effect at June 30, 2008 are summarized below:

| Year Ending June 30, | Amount |
|---|---|
| 2009 | $ 15,901,000 |
| 2010 | 14,465,000 |
| 2011 | 13,038,000 |
| 2012 | 11,950,000 |
| 2013 | 11,431,000 |
| 2014 - 2018 | 47,094,000 |
| 2019 - 2022 | 18,374,000 |
| Aggregate commitment | $132,253,000 |

In addition to the fixed rentals, certain of these leases provide for payments of taxes and other costs. Rental expense for property under the lease agreements for the years ended June 30, 2008 and 2007 was $21,724,000 and $19,294,000, respectively.

*Agreement with City of New York*

The Corporation has an agreement with the City of New York, dated June 16, 2008, regarding continued use of governmental cable channels for carriage of government programming produced by the Corporation. Under this agreement, the City of New York continues its practice of transmitting programming delivered by the Corporation on government use channels as part of the City's activity of providing government use programming to cable television subscribers, and the Corporation assists in offsetting costs incurred by the City in facilitating the provision and transmission of such government use programming by paying the City annually an amount equal to $3.25 million. This agreement expires on June 15, 2011.

## NOTE 9 — CONTINGENCIES

The Corporation is involved in several litigation matters which allege claims for substantial damages with certain former employees who have filed actions against the Corporation for wrongful termination due to claimed discriminatory practices and with the New York Racing Association which alleges that the Corporation breached a contract between the parties and seeks damages of $5,000,000. The Corporation's management believes that the liability, if any, that may ultimately result from the resolution of the foregoing matters, in excess of amounts provided for at June 30, 2008, would not have a material effect on the financial condition of the Corporation.

**NOTE 9 — CONTINGENCIES** (Continued)

During the fiscal year ended June 30, 2008, the Corporation received a request from the Office of Labor Relations to make payments in the amount of approximately $835,000 as reimbursement of Medicare Part B premium payments for the Corporation's retirees during the calendar year 2007. The Corporation has concluded that there is no enforceable legal obligation which places responsibility for this cost on the Corporation or otherwise requires the Corporation to fund such reimbursement to the City of New York with respect to periods of time prior to the effective date of Chapter 115 of the Laws of 2008, which was June 17, 2008. Accordingly, no such liabilities have been recorded as of June 30, 2008.

The Corporation is also involved in various other claims or matters of litigation with vendors, customers, and others for which the Corporation's management believes that the liability, if any, that may ultimately result from the resolution of these matters, will not have a material adverse effect on the financial condition of the Corporation.

**NOTE 10 — CAPITAL ACQUISITION FUND**

As discussed in Note 1, beginning in July 1990, the Corporation established a Capital Acquisition Fund (the "Fund"). As of June 17, 2008, under Chapter 115 of the Laws of 2008, all funds accumulated in the capital acquisition fund, established pursuant to section 609-a of the Racing, Pari-Mutuel Wagering and Breeding Law, prior to July 1, 2008 or deposited into such fund thereafter are available to the Corporation for any corporate purpose. The Fund has been consolidated with the operating accounts of the Corporation and is included in the accompanying financial statements.

The assets, liabilities and net assets of the Capital Acquisition Fund are included in the following statement of net assets' captions at June 30, 2008 and 2007:

|  | 2008 | 2007 |
|---|---|---|
| **Assets** | | |
| Restricted cash and cash equivalents | $  6,796,000 | $  6,197,000 |
| Capital assets, net | 10,639,000 | 10,955,000 |
| Total assets | $ 17,435,000 | $ 17,152,000 |
| **Liabilities and Net Assets** | | |
| Liabilities | | |
| Other long-term liabilities | $       99,000 | $      190,000 |
| Total liabilities | 99,000 | 190,000 |
| **Net Assets** | | |
| Invested in capital assets, net of related debt | 10,540,000 | 10,765,000 |
| Restricted for acquisition of capital assets | 6,796,000 | 6,197,000 |
| Total net assets | 17,336,000 | 16,962,000 |
| Total liabilities and net assets | $ 17,435,000 | $ 17,152,000 |

During the fiscal year ended June 30, 2007, pursuant to the Racing, Pari-Mutuel Wagering and Breeding Law Section 532, subdivision 3-a and Section 609-a, the Corporation's management decided that the net carrying value of the warehouse leasehold improvements in the amount of approximately $3.2 million should be transferred to the Fund from the operating accounts of the Corporation.

**NEW YORK CITY OFF-TRACK BETTING CORPORATION**
NOTES TO FINANCIAL STATEMENTS
June 30, 2008 and 2007

### NOTE 10 — CAPITAL ACQUISITION FUND (Continued)

The Fund's related activity for the years ended June 30, 2008 and 2007 follows:

|  | 2008 | 2007 |
|---|---|---|
| **Operating Revenues** | | |
| Capital acquisition surcharge | $ 3,713,000 | $ 3,873,000 |
| Total operating revenues | $ 3,713,000 | $ 3,873,000 |
| **Operating expenses** | | |
| Depreciation and amortization | $ 3,331,000 | $ 3,062,000 |
| Other | 8,000 | 18,000 |
| Total operating expenses | 3,339,000 | 3,080,000 |
| Change in net assets | 374,000 | 793,000 |
| Total net assets, beginning of year | 16,962,000 | 16,169,000 |
| Total net assets, end of year | $ 17,336,000 | $ 16,962,000 |

### NOTE 11 — RECONCILIATION BETWEEN STATEMENTS OF REVENUES, EXPENSES, AND CHANGES IN NET ASSETS (DEFICIENCY) AND STATEMENTS OF NET REVENUES (AS REQUIRED BY NEW YORK STATE RACING AND WAGERING BOARD) (UNAUDITED)

|  | 2008 | 2007 |
|---|---|---|
| Operating loss (Page 9) | $(76,485,000) | $(30,060,000) |
| Less: Total capital acquisition funds (Page 23) | (3,713,000) | (3,873,000) |
| Add: Depreciation and amortization - capital acquisition funds (Page 27) | 3,331,000 | 3,062,000 |
| Others | (17,000) | 15,000 |
| Section 516 net revenue (loss) for distribution (Page 23) | $(76,884,000) | $(30,856,000) |

# SUPPLEMENTAL INFORMATION
# AS REQUIRED BY THE NEW YORK STATE
# RACING AND WAGERING BOARD

# NEW YORK CITY OFF-TRACK BETTING CORPORATION
## STATEMENTS OF NET REVENUES
## (AS REQUIRED BY NEW YORK STATE RACING AND WAGERING BOARD)
## For the fiscal years ended June 30, 2008 and 2007

| | 2008 | 2007 |
|---|---|---|
| **Net Handle** | | |
| In State Thoroughbred Net Handle | $ 311,010,311 | $ 318,383,170 |
| Out of State Thoroughbred Net Handle | 550,940,786 | 578,108,214 |
| In State Harness Net Handle | 48,170,538 | 45,356,305 |
| Out of State Harness Net Handle | 88,093,942 | 98,731,732 |
| **Total Net Handle** | **$ 998,215,577** | **$ 1,040,579,421** |
| Less:  a)  Amounts Returned to Bettors | 760,917,412 | 793,145,169 |
| b)  Surcharge | 31,490,496 | 33,068,088 |
| **Subtotal** | **$ 205,807,669** | **$ 214,366,164** |
| **OTB Takeout and Breakage** | | |
| NY State (Pari-Mutuel Tax & Breakage) | $ 7,170,024 | $ 6,658,027 |
| NY State & Racing Board Regulatory Fee | 4,991,078 | 5,202,897 |
| NY State (Uncashed Tickets) | 2,988,180 | 3,371,619 |
| Breeders' Fund - Thoroughbred | 5,049,129 | 6,044,235 |
| Breeders' Fund - Harness | 2,247,703 | 2,394,258 |
| In State Thoroughbred Tracks | 57,491,082 | 59,418,944 |
| Out of State Thoroughbred Tracks | 13,066,585 | 12,840,828 |
| In State Harness Tracks | 13,521,547 | 14,608,623 |
| Out of State Harness Tracks | 1,834,708 | 2,030,763 |
| **Total Statutory Payments** | **$ 108,360,036** | **$ 112,570,194** |
| **Net Racing Revenue** | **$ 97,447,633** | **$ 101,795,970** |
| | | |
| **Other Revenue** | | |
| Admission Income | $ 372,210 | $ 366,950 |
| Lottery Income | - | - |
| Concession Income | 48,369 | 44,271 |
| Derived from Section 532 | 9,806,486 | 9,845,018 |
| Interest Income | 1,004,083 | 1,587,867 |
| Uncashed Tickets | 2,988,180 | 3,371,619 |
| Other Income | 594,290 | 737,382 |
| **Total Other Revenue** | **$ 14,813,618** | **$ 15,953,107** |
| | | |
| **Total Operating Revenue (1)** | **112,261,251** | **117,749,077** |
| | | |
| **Operating Expenses** | | |
| Branch Expenses (2) | $ 93,377,440 | $ 90,153,768 |
| Administrative Expenses | 95,768,014 | 58,451,312 |
| **Total Operating Expenses - Incl. Depreciation** | **$ 189,145,454** | **$ 148,605,080** |
| | | |
| **Section 516 Net Revenues from Operations** | **$ (76,884,203)** | **$ (30,856,003)** |
| Less: Section 509-a Contributions to Capital Acquisition Fund | | - |
| **Section 516 Net Revenue for Distribution** | **$ (76,884,203)** | **$ (30,856,003)** |
| | | |
| Add: Section 532 Revenues To Participating Localities | | |
| Benefits to NYC from NYC OTB's | $ 15,485,854 | $ 16,790,504 |
| **Total Benefits to NYC** | **15,485,854** | **16,790,504** |
| Section 532 Revenues To Other Localities | 2,484,836 | 2,559,852 |
| **Total Benefits To All Localities** | **$ 17,970,690** | **$ 19,350,356** |
| Add: Capital Acquisition Funds: | | |
| Section 509-a Contribution from Net Revenues | $ - | $ - |
| Supplemental 1% Section 532 | 3,713,319 | 3,872,714 |
| Other Fund Revenues Net of Expenses | - | - |
| Total Capital Acquisition Funds | 3,713,319 | 3,872,714 |
| | | |
| **Total Available For Distribution To Localities & For Capital Acquisitions** | **$ (55,200,194)** | **$ (7,632,933)** |

(1) = This total must equal the total found on the Statement of Net Revenues by Branch
(2) = This total must equal the total found on the Statement of Net Revenues by Branch

Unaudited - See Auditor's Report on Supplementary Information.

# NEW YORK CITY OFF-TRACK BETTING CORPORATION
## STATEMENTS OF NET REVENUES BY BRANCH
## (AS REQUIRED BY STATE OF NEW YORK RACING AND WAGERING BOARD)
## For the fiscal year ended June 30, 2008

| Branch Address | Handle | Branch Revenue | Branch Expenses | Surcharge | Profit (Loss) Amount |
|---|---|---|---|---|---|
| 1612 East 16th Street, Bklyn-42002 | $ 9,143,244 | $ 1,144,849 | $ 998,012 | $ 201,069 | $ 347,906 |
| 107-40 Queens Boulevard, Queens-33003 | 14,479,355 | 1,769,875 | 1,243,951 | 325,307 | 851,231 |
| Times Square | 39,705 | 3,999 | 104 | 1,216 | 5,111 |
| 136-55 Roosevelt Avenue, Queens-33006 | 15,233,252 | 1,879,521 | 1,107,418 | 335,867 | 1,107,970 |
| Blackstone Restaurant 38-04 Broadway, Queens-33009 | 6,337,502 | 805,323 | 695,204 | 138,320 | 248,439 |
| 215 West 125th Street, Man-11011 | 8,116,427 | 992,216 | 863,825 | 181,337 | 309,727 |
| IL Fornetto's 2902 Emmons Ave, Bklyn-42013 | 6,395,002 | 788,628 | 704,277 | 140,818 | 225,169 |
| Irish Circle 101-19 Rockwy Bch Blvd, Q-33015 | 4,647,454 | 480,178 | 478,518 | 111,770 | 113,429 |
| Austin Ale House 82-70 Austin St. Q-33016 | 3,152,901 | 312,522 | 435,344 | 72,781 | (50,041) |
| 2145 White Plains Road, Bronx-14020 | 7,400,397 | 909,238 | 853,773 | 166,161 | 221,626 |
| 143 West 72nd Street, Man-11022 | 4,404,048 | 528,474 | 1,101,590 | 104,337 | (468,779) |
| 87-16 Astoria Blvd, Queens-33026 | 12,037,757 | 1,455,883 | 933,675 | 270,144 | 792,352 |
| Playwright's -21027 | 3,709,629 | 453,701 | 432,232 | 83,747 | 105,216 |
| 8621 Fifth Avenue, Bklyn-22030 | 10,968,722 | 1,338,385 | 914,601 | 246,647 | 670,431 |
| 495 Fifth Avenue, Bklyn-22031 | 7,394,819 | 849,255 | 811,318 | 176,391 | 214,328 |
| Fiddler's Elbow 3718 East Tremont, Bronx-14032 | 5,133,557 | 619,576 | 562,445 | 114,054 | 171,186 |
| 1367 Rockaway Parkway, Bklyn-42039 | 5,602,656 | 649,594 | 631,094 | 131,295 | 149,795 |
| 31-35 Downing Street, Queens-33040 | 24,907,159 | 3,104,303 | 2,080,651 | 548,010 | 1,571,662 |
| 2901 Avenue U, Bklyn-42046 | 11,483,957 | 1,402,956 | 1,061,051 | 256,984 | 598,888 |
| 245-19 Jamaica Avenue, Queens-33047 | 10,456,491 | 1,272,169 | 1,000,982 | 239,963 | 511,150 |
| 1935 Westchester Avenue, Bronx 14048 | 9,115,739 | 1,085,475 | 917,901 | 211,124 | 378,699 |
| 4405 Queens Blvd, Queens-33051 | 7,407,371 | 891,836 | 700,192 | 166,670 | 358,315 |
| 5704 Fifth Avenue, Bklyn-22052 | 13,479,456 | 1,632,892 | 1,104,755 | 303,271 | 831,409 |
| 2168 86TH Street, Bklyn-42054 | 8,225,582 | 998,944 | 827,764 | 184,390 | 355,570 |
| 801-815 East 241st Street, Bronx 14057 | 14,578,519 | 1,792,914 | 1,216,672 | 324,038 | 900,280 |
| 62-17 Roosevelt Avenue, Queens-33060 | 14,703,324 | 1,809,297 | 1,074,081 | 325,727 | 1,060,942 |
| 105 Delancey Street, Man-21063 | 13,025,133 | 1,556,860 | 1,060,699 | 296,288 | 792,449 |
| 756 Manhattan Avenue, Bklyn-32065 | 3,792,382 | 438,854 | 455,933 | 86,137 | 69,058 |
| 42 West 48th St., Man-11067 | 15,908,492 | 1,969,570 | 1,848,822 | 350,944 | 471,692 |
| 45 Remsen Avenue, Bklyn-42083 | 11,060,869 | 1,305,599 | 972,889 | 254,785 | 587,496 |
| 1520 Flatbush Avenue, Bklyn-42084 | 12,726,529 | 1,555,053 | 1,191,750 | 282,837 | 646,141 |
| 1434 Williamsbridge Road, Bronx-14090 | 9,953,151 | 1,203,033 | 1,174,354 | 225,648 | 254,327 |
| 2795 Richmond Avenue, S.I.-45093 | 14,825,663 | 1,778,477 | 1,238,945 | 340,171 | 879,702 |
| 22-72 31st Street-33097 | 13,449,525 | 1,627,204 | 1,146,013 | 302,991 | 784,183 |
| 25 Park Place, Man-21099 | 7,457,335 | 870,785 | 848,884 | 174,760 | 196,661 |
| 4013 13th Avenue, Bklyn-42100 | 7,614,254 | 921,854 | 1,007,403 | 170,859 | 85,311 |
| 253-01 Northern Blvd, Queens-33101 | 16,251,904 | 2,007,592 | 1,140,110 | 360,093 | 1,227,576 |
| 5119 Avenue U, Bklyn-42102 | 5,504,734 | 635,585 | 601,689 | 129,047 | 162,942 |
| 276 Avenue X, Bklyn-42103 | 10,558,031 | 1,289,438 | 987,439 | 239,384 | 541,383 |
| 69-97 Grand Avenue, Queens-33105 | 9,583,173 | 1,086,751 | 721,635 | 231,107 | 596,223 |
| 160-38 Northern Blvd, Queens-33106 | 7,620,258 | 874,155 | 694,512 | 181,884 | 361,527 |
| 4325 Boston Post Road, Bronx-14108 | 17,481,634 | 2,133,293 | 1,484,365 | 391,026 | 1,039,955 |
| Hunter's 9404 4th Avenue, Bklyn-42109 | 5,473,830 | 579,658 | 670,363 | 128,706 | 38,001 |
| 1318 Second Avenue, Man-11110 | 8,658,998 | 996,016 | 1,108,480 | 210,615 | 98,151 |
| 25-14 Broadway, Queens-33112 | 5,149,200 | 590,891 | 525,835 | 121,162 | 186,235 |
| 179-30 Hillside Avenue, Queens-33114 | 13,098,087 | 1,589,711 | 1,087,429 | 296,312 | 798,594 |
| 1204 Neptune Avenue, Bklyn-42117 | 3,910,107 | 468,516 | 496,702 | 90,308 | 62,122 |
| 515 Seventh Avenue, Man-21119 | 19,430,236 | 2,407,549 | 2,493,736 | 431,806 | 345,619 |
| 6305 18th Avenue, Bklyn-42120 | 6,025,435 | 726,168 | 561,240 | 134,430 | 299,358 |
| 70 West 233RD Street, Bronx-14121 | 9,941,644 | 1,220,080 | 1,033,892 | 222,591 | 408,779 |

# NEW YORK CITY OFF-TRACK BETTING CORPORATION
## STATEMENTS OF NET REVENUES BY BRANCH, CONTINUED
## (AS REQUIRED BY STATE OF NEW YORK RACING AND WAGERING BOARD)
### For the fiscal year ended June 30, 2008

| Branch Address | Handle | Branch Revenue | Branch Expenses | Surcharge | Profit (Loss) Amount |
|---|---|---|---|---|---|
| | | | 2008 | | |
| 1410 Forest Ave., S.I.-45125 | 11,203,653 | 1,344,711 | 1,146,068 | 260,176 | 458,819 |
| 2112 Rockaway Parkway, Bklyn-42128 | 6,356,459 | 760,749 | 692,604 | 144,049 | 212,194 |
| George Washington Bridge, Man-11130 | 8,795,495 | 999,941 | 596,216 | 211,471 | 615,196 |
| 6719 Bay Parkway, Bklyn-42133 | 19,109,183 | 2,354,423 | 1,450,149 | 419,888 | 1,324,162 |
| 991 Second Avenue, Man-11136 | 7,737,790 | 958,150 | 2,137,073 | 172,425 | (1,006,497) |
| 7206 13th Avenue, Bklyn-42145 | 9,529,170 | 1,145,047 | 900,739 | 217,286 | 461,594 |
| 106-110 Lafayette Street, Man-21156 | 16,429,313 | 1,971,202 | 1,930,920 | 373,337 | 413,619 |
| O'Neill's 64-21 53rd Drive, Queens-33160 | 6,420,079 | 694,956 | 631,029 | 150,058 | 213,985 |
| 86 Livingston Street, Bklyn-22164 | 5,869,577 | 698,529 | 636,025 | 136,074 | 198,579 |
| 117-09 Jamaica Avenue, Queens-33166 | 6,077,569 | 722,975 | 637,104 | 137,812 | 223,683 |
| 714 Third Avenue, Man-11169 | 9,607,854 | 1,166,816 | 1,254,302 | 219,944 | 132,458 |
| 200 Varick Street, Man-21171 | 4,812,983 | 568,130 | 606,280 | 112,077 | 73,927 |
| 9400 Liberty Avenue, Queens-33174 | 18,434,517 | 2,267,145 | 1,311,444 | 406,874 | 1,362,575 |
| 7-8 Chatham Square, Man-21181 | 24,285,197 | 2,959,894 | 2,388,469 | 541,425 | 1,112,850 |
| 11114 Flatlands Avenue, Bklyn-42183 | 14,417,403 | 1,811,608 | 1,330,086 | 311,536 | 793,057 |
| 4324 Amboy Road, S.I.-45185 | 8,481,925 | 944,938 | 937,167 | 208,319 | 216,090 |
| Winners Circle 515 Seventh Ave, Man-21219 | 44,352,087 | 4,575,774 | 3,352,972 | - | 1,222,802 |
| Inside Track 991 Second Ave, Man-11236 | 48,610,523 | 4,667,959 | 3,691,838 | - | 976,122 |
| Yankee Clipper 17 John St., Man-21265 | 15,332,116 | 1,497,361 | 1,549,774 | - | (52,414) |
| Telephone Betting Center-330 | 206,761,288 | 19,169,721 | 13,110,051 | - | 6,059,670 |
| Sub-total | 979,678,810 | 110,084,727 | 87,594,859 | 15,038,099 | 37,527,966 |
| **Closed Branches** | | | | | |
| 28-15 Steinway Street, Queens-33010 | 2,892,268 | 332,122 | 329,297 | 68,815 | 71,640 |
| Sidetracks 45-08 Queens Blvd -33017 | - | - | (6,200) | - | 6,200 |
| 202 West 72ND Street, Man-11023 | - | - | 388 | - | (388) |
| 828 Ninth Avenue, Man-11096 | - | - | (38,820) | - | 38,820 |
| 333 Graham Avenue, Bklyn-32144 | 4,714,563 | 535,918 | 526,268 | 117,445 | 127,095 |
| 17 John Street, Man-21184 | 4,583,385 | 551,597 | 707,804 | 108,997 | (47,210) |
| 2696 Hylan Blvd, S.I-45187 | 6,346,551 | 756,929 | 843,937 | 152,498 | 65,490 |
| Select Club 165 Water St, Man-21262 | - | - | (18,800) | - | 18,800 |
| **Adjustments** | | | | | |
| Retiree Benefits | | | 3,438,646 | | (3,438,646) |
| Account Miscode | | (41) | 61 | | (102) |
| Total | $ 998,215,577 | $ 112,261,251 | $ 93,377,440 | $ 15,485,854 | $ 34,369,665 |

(1) = The totals in the first three columns must equal the appropriate lines on the Statement of Net Revenues

Unaudited - See Auditor's Report on Supplementary Information.

# NEW YORK CITY OFF-TRACK BETTING CORPORATION

**CAPITAL ACQUISITION FUND – BALANCE SHEETS**
**(AS REQUIRED BY STATE OF NEW YORK RACING AND WAGERING BOARD)**
**As of June 30, 2008 and 2007**

|  | 2008 | 2007 |
|---|---|---|
| Restricted cash and cash equivalents | $ 6,796,000 | $ 6,197,000 |
| Property and equipment | 62,509,000 | 59,548,000 |
| Less accumulated depreciation | (51,870,000) | (48,593,000) |
| Net property and equipment | 10,639,000 | 10,955,000 |
| Total assets | $17,435,000 | $17,152,000 |
| Capital lease obligation | $ 99,000 | $ 190,000 |
| Net Assets | 17,336,000 | 16,962,000 |
| Total liabilities and net assets | $17,435,000 | $17,152,000 |

Unaudited - See Auditor's Report on Supplementary Information.

# NEW YORK CITY OFF-TRACK BETTING CORPORATION

**CAPITAL ACQUISITION FUND – STATEMENTS OF REVENUES, EXPENSES
AND CHANGES IN FUND NET ASSETS
(AS REQUIRED BY STATE OF NEW YORK RACING AND WAGERING BOARD)
For the fiscal years ended June 30, 2008 and 2007**

|                                              | 2008        | 2007        |
|----------------------------------------------|-------------|-------------|
| Contribution [Section 532] (Statutory 1%)    | $ 3,713,000 | $ 3,873,000 |
| Total revenues                               | 3,713,000   | 3,873,000   |
| Operating expenses                           |             |             |
| Depreciation and amortization                | 3,331,000   | 3,062,000   |
| Other                                        | 8,000       | 18,000      |
| Total expenses                               | 3,339,000   | 3,080,000   |
| Change in net assets                         | 374,000     | 793,000     |
| Net assets - beginnning of year              | 16,962,000  | 16,169,000  |
| Net assets - end of year                     | $17,336,000 | $16,962,000 |

Unaudited - See Auditor's Report on Supplementary Information.

**NEW YORK CITY OFF-TRACK BETTING CORPORATION**
**CAPITAL ACQUISITION FUND – SECTION 609-A FUNDING TEST**
**(AS REQUIRED BY STATE OF NEW YORK RACING AND WAGERING BOARD)**
**As of June 30, 2008 and 2007**

|  | **2008** | **2007** |
|---|---|---|
| Handle, for the fiscal year | $ 998,216,000 | $ 1,040,579,000 |
| 1% of handle | 9,982,160 | 10,405,790 |
| Net assets | 10,639,000 | 10,955,000 |
| Cap (the lesser of 1% of handle or net assets) | 9,982,160 | 10,405,790 |
| Capital acquisition fund cash balance | 6,697,000 | 6,007,000 |
| Cash in excess of cap | $ - | $ - |

Unaudited - See Auditor's Report on Supplementary Information.

# NYC OTB 5 YEAR PRO FORMA INCOME STATEMENT AND CASH FLOW

| | BASELINE | | | YEAR 1 | | YEAR 2 | | YEAR 3 | | YEAR 4 | | YEAR 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HANDLE | 737,280 | (176,985) | -24% | 560,295 | 0.0% | 560,295 | 2.5% | 574,303 | 2.5% | 588,660 | 2.5% | 603,377 |
| REVENUE | 179,970 | (38,464) | -21% | 141,506 | 0.0% | 141,506 | 2.5% | 145,043 | 2.5% | 148,670 | 2.5% | 152,386 |
| STATUTORY PMTS | 85,392 | (42,131) | -49% | 43,261 | 4.3% | 45,128 | 6.7% | 48,173 | 6.6% | 51,342 | 2.5% | 52,625 |
| SALARIES & WAGES | 55,002 | (19,319) | -35% | 35,683 | 0.0% | 35,683 | 2.0% | 36,397 | 0.0% | 36,397 | 2.0% | 37,125 |
| FRINGE | 20,851 | (3,223) | -15% | 17,628 | 3.0% | 18,157 | 3.0% | 18,702 | 3.0% | 19,263 | 3.0% | 19,841 |
| RENT | 20,861 | (4,177) | -20% | 16,684 | 0.0% | 16,684 | 0.0% | 16,684 | 3.0% | 17,185 | 3.0% | 17,700 |
| OPERATING EXPENSES | 19,280 | (4,705) | -24% | 14,575 | 2.0% | 14,866 | 2.0% | 15,164 | 2.0% | 15,467 | 2.0% | 15,776 |
| PENSION | 7,920 | | | 6,480 | 3.0% | 6,674 | 3.0% | 6,875 | 3.0% | 7,081 | 3.0% | 7,293 |
| EBITDA | (29,337) | | | 7,194 | | 4,312 | | 3,049 | | 1,936 | | 2,026 |
| CAPEX | - | | | 2,000 | | 2,000 | | 2,000 | | 2,000 | | 2,000 |
| ERI | - | | | - | | - | | - | | - | | - |
| LEAVE BALANCE | - | | | 2,000 | | - | | - | | - | | - |
| SEVERANCE & UNEMPLOYMENT | - | | | 6,500 | | - | | - | | - | | - |
| FREE CASH FLOW | (29,337) | | | (3,306) | | 2,312 | | 1,049 | | (64) | | 26 |
| | | | | | | | | | | | | |
| BEGINNING CASH | | | | 11,600 | | 8,294 | | 10,607 | | 11,656 | | 11,592 |
| ENDING CASH | | | | 8,294 | | 10,607 | | 11,656 | | 11,592 | | 11,618 |